RECORDING REQUESTED BY

**And when recorded, mail this deed and, unless otherwise shown below, mail tax statements to:**

TRUE COPY of Document Recorded on July 20, 2000 as No. 2000 215933
FIRST AMERICAN TITLE COMPANY
[signature]

James M. Flint, City Manager
City of Alameda
Alameda City Hall
2263 Santa Clara Avenue
Alameda, CA 94501-4456

**QUITCLAIM DEED AND ENVIRONMENTAL RESTRICTIONS PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1471 FOR FISC ALAMEDA**

**This Deed** is made this 17th day of July, 2000, by and between the **United States of America**, acting by and through the Department of the Navy, hereinafter called the **GRANTOR,** and the **City of Alameda**, a municipal corporation of the State of California, hereinafter called the **GRANTEE.**

**WITNESSETH:**

**WHEREAS**, the GRANTEE has requested conveyance from the GRANTOR of approximately one hundred and forty seven (147) acres of property comprising the Fleet and Industrial Supply Center, Alameda Facility/Annex, hereinafter referred to as the "Property," which was closed pursuant to and in accordance with the Defense Base Closure and Realignment Act of 1990, (Pub. L. No. 101-510), 10 U.S.C. § 2687 note, as amended, and which is no longer required for military purposes; and

**WHEREAS**, the GRANTOR is authorized to convey the Property to the GRANTEE pursuant to Section 2834(b) of the National Defense Authorization Act for Fiscal Year 1993 (Pub. L. No. 102-484), as amended; and

**WHEREAS**, the GRANTOR has not completed remedial actions on the Property that are necessary to provide the covenants required by the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) 42 U.S.C. Section 9620(h)(3)(A)(ii)(I); and

**WHEREAS**, the GRANTOR has found and determined that the Property is suitable for early transfer in advance of providing the required covenants pursuant to a Finding of Suitability for Early Transfer and Environmental Response Obligation Addendum (FOSET/EROA), dated February 18, 2000; and

**WHEREAS,** the GRANTOR has provided the assurances required by CERCLA 42 U.S.C. Section 9620(h)(3)(C), and has complied with other statutory conditions necessary for the early transfer of the Property following the due execution of a FOSET; and

**WHEREAS,** GRANTOR has determined pursuant to applicable Federal statutes and regulations and California Civil Code Section 1471(c) that it is reasonably necessary to impose certain restrictions on the use of the Property to protect present and future human health or safety or the environment as a result of the presence of hazardous materials on portions of the Property described hereinafter with particularity.

**NOW THEREFORE,** the GRANTOR, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby remise, release and forever quitclaim to the GRANTEE, all of GRANTOR'S right, title and interest in and to that certain real property, comprising the Property, as more particularly described in Exhibit "A."

**I. TOGETHER WITH** all buildings, improvements, and related personal property located thereon, and all rights, tenements, hereditaments, and appurtenances belonging, or in any wise appertaining, including fixtures, structures, mineral rights, water rights, the banks, beds and waters of any streams, rivers or lakes upon said Property, appurtenant easements, rail lines and utility lines, alleys, roads, streets ways, strips, gores or railroad rights of way upon said Property, and any means of ingress and egress appurtenant thereto.

**II. SUBJECT TO THE FOLLOWING NOTICES, COVENANTS, RESTRICTIONS, AND CONDITIONS,** which shall be binding upon and enforceable against the GRANTEE, its successors and assigns, in perpetuity:

A. The GRANTEE agrees to accept conveyance of the Property subject to all covenants, conditions, restrictions, easements, rights-of-way, reservations, rights, agreements, and encumbrances of record.

B. Except as otherwise provided herein, or as otherwise provided by law, the GRANTEE acknowledges that it has inspected, is aware of, and accepts the condition and state of repair of the Property, and that the Property is conveyed "as is" and "where is" without any representation, promise, agreement, or warranty on the part of the GRANTOR regarding such condition and state of repair, or regarding the making of any alterations, improvements, repairs or additions. Except for the environmental remediation required to be undertaken by GRANTOR, the GRANTEE further acknowledges that the GRANTOR shall not be liable for any latent or patent defects in the Property except to the extent required by applicable law.

C. To the extent that any portion of the Property lies within a floodplain as defined in Section 6(c) of Executive Order No. 11988, dated May 24, 1977, the use of that portion of the Property may be subject to the National Flood Insurance Program.

## D. LEAD BASED PAINT (LBP).

1. The GRANTEE is hereby informed and does acknowledge that the Property includes buildings and structures that, due to their age, are presumed to contain LBP. Lead from paint, paint chips, and dust can pose health hazards if not managed properly.

2. The GRANTEE covenants and agrees that in its use and occupancy of the Property, it will comply with all applicable Federal, State, and local laws relating to LBP. The GRANTEE acknowledges that the GRANTOR assumes no liability for damages for personal injury, illness, disability, or death to the GRANTEE, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition, or other activity causing or leading to contact of any kind whatsoever with LBP on the Property, arising after the conveyance of the Property from the GRANTOR to the GRANTEE, whether the GRANTEE has properly warned, or failed to properly warn, the persons injured.

3. The GRANTOR shall provide a Notice of Release (NOR), in recordable form, to the GRANTEE at such time as demolition of the buildings on the Property containing LBP has been completed and the appropriate Federal or State regulatory agency(s) have concurred in writing that LBP has been removed from the buildings and any necessary soil remediation has been conducted in accordance with all applicable Federal, State, and local laws and regulations. This NOR shall be deemed to remove all notices and restrictions relating to LBP from the Property.

## E. ASBESTOS CONTAINING MATERIALS (ACM).

1. The GRANTEE is hereby informed and does acknowledge that asbestos or ACM have been founa and are otherwise presumed to exist in buildings and structures on the Property. The GRANTEE acknowledges receipt of documentation disclosing the presence of any known ACM in the buildings and structures on the Property. The GRANTEE covenants that it will prohibit occupancy of buildings and structures, or portions thereof, containing known ACM prior to abatement of the ACM or demolition of the building or structure.

2. The GRANTEE covenants and agrees that in its use and occupancy of the Property, including but not limited to demolition of buildings containing ACM, it will comply with all applicable Federal, State and local laws relating to ACM. The GRANTEE acknowledges that the GRANTOR assumes no liability for damages for personal injury, illness, disability, or death to the GRANTEE, or to any other person, including members of the general public, arising from or incident to the purchase, transportation, removal, handling, use, disposition, or activity causing or leading to contact of any kind whatsoever with ACM in the structures on the Property, arising after the conveyance of the Property from the GRANTOR to the GRANTEE, whether the GRANTEE has properly warned, or failed to properly warn the persons injured.

3. The GRANTOR shall provide an NOR, in recordable form, to the GRANTEE at such time as demolition of the buildings on the Property containing ACM has been completed and the appropriate Federal or State regulatory agency(s) have certified in writing that ACM has been removed from the buildings and any necessary soil remediation has been conducted in accordance with all applicable Federal, State, and local laws and regulations. This NOR shall be deemed to remove all notices and restrictions relating to ACM from the Property.

F. **NOTICE OF COVENANT DEFERRAL**: Pursuant to the requirements for "covenant deferral" of CERCLA 42 U.S.C. Section 9620(h)(3)(C), as amended by Section 334 of the National Defense Authorization Act for Fiscal Year 1997 [Pub. L. No. 104-201; 42 U.S.C. 9620(h)(3)(C)], the following notices, assurances, covenants and declarations apply to the Property.

1. **Hazardous Substance Notification.** Notice is hereby provided that the information set out in Exhibit "B", attached hereto and made a part hereof, identifies hazardous substances that were stored for one year or more, known to have been released, or disposed of on this Property. The GRANTOR has made a complete search of its files and records concerning the Property and found that Exhibit "B" provides: (1) notice of the type and quantity of such hazardous substances, (2) notice of the time the storage, release, or disposal took place, and (3) a description of the remedial action taken, if any.

2. **Access [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(iii)].** GRANTOR reserves access to and the right to use of the Property in any case in which a remedial or corrective action is found to be necessary after the date of the conveyance of the Property. In exercising this right of access, except in the case of imminent and substantial endangerment to human health or the environment, the GRANTOR: (a) shall give the GRANTEE reasonable prior written notice of actions to be taken related to such remedial or corrective actions on the Property, and (b) make reasonable efforts to minimize interference with the ongoing use of the Property. Furthermore, the GRANTOR and GRANTEE agree to cooperate in good faith to minimize any conflict between necessary environmental investigation and remediation activities and the GRANTEE's use of the Property. Any inspection, survey, investigation, or other response, corrective or remedial action undertaken by the GRANTOR will, to the maximum extent practicable, be coordinated with representatives designated by the GRANTEE.

3. **Additional Remediation Obligation [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(ii)(II)].** The GRANTOR covenants and warrants that GRANTOR shall conduct any additional remedial action necessary after the date of transfer for any hazardous substance existing on the Property prior to the date of this Deed. This covenant shall not apply to the extent that the GRANTEE caused or contributed to any release or threatened release of any hazardous substance, pollutant, contaminant, petroleum or petroleum derivative.

**4. Response Action Assurances [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)]:**

**a. Necessary Restrictions to Protect Human Health and the Environment [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)(I)].** The following environmental covenants, conditions, and restrictions (hereinafter "environmental restrictions") regarding the use of the Property have been determined by the GRANTOR in this Covenant to be reasonably necessary to protect present or future human health or safety or the environment as provided by CERCLA and California Civil Code Section 1471. The environmental restrictions made and accepted herein by GRANTEE shall be for the benefit of and enforceable by the GRANTOR herein as provided under Civil Code Section 1471, shall run with the land, and shall be binding on the GRANTEE, its successors and assigns. These environmental restrictions shall be released at such time as the GRANTOR has obtained written confirmation from California Department of Toxic Substances Control (DTSC) that the appropriate regulatory agency has determined that the restricted Property is protective of present or future human health or safety or the environment for the use that was formerly prohibited. Upon receipt of such written confirmation, the GRANTOR shall deliver to the GRANTEE in recordable form, a release (the Release) relating specifically to the environmental use restrictions set forth in this deed. The execution of the Release by the GRANTOR shall remove all notices and restrictions relating to the remedy addressed by the restrictions from the title to the Property.

**i. GROUNDWATER USE RESTRICTION.** The GRANTEE covenants and agrees not to construct or allow the construction of any water wells screened for extraction of groundwater from the shallowest groundwater zone (upper-water bearing unit in the artificial fill) within the boundaries of the Property. GRANTEE covenants and agrees not to extract that groundwater for any use other than irrigation, construction site dewatering, or emergency use (e.g., firefighting). Disposal of extracted groundwater from construction site dewatering into the waters of the State is prohibited except in compliance with the requirements of the Regional Water Quality Control Board, San Francisco Bay Region. GRANTEE will record that certain Covenant to Restrict Use of Property (Environmental Restrictions) (the "State Covenant"), in substantially the same form as Exhibit "C" attached hereto, by and between the City of Alameda, as Covenantor, and the California Environmental Protection Agency - Department of Toxic Substances Control (DTSC), as Covenantee, which sets forth restrictions on the use of ground water covered by this paragraph, prior to conveying the Property. GRANTOR and GRANTEE intend that the restrictions set out in this paragraph, which are enforceable by the United States of America acting by and through the Department of the Navy, shall be interpreted in a manner that is consistent and not in conflict with the restrictions set forth in the State Covenant which is enforceable by DTSC. A failure to enforce the State Covenant by DTSC shall not preclude the Department of Navy from enforcing this restriction.

## ii. INTERIM RESTRICTIONS.

(a) The GRANTEE covenants and agrees that the following Interim Restrictions on use of the specified areas of the Property shall apply unless otherwise approved by the GRANTOR and DTSC as provided below:

Area 1: Area 1 is that portion of the Property as described and shown in Exhibit "D" and generally known as IR Site 02. Area 1 shall not be used for residential purposes and construction activities shall not begin until the GRANTOR and DTSC determine that the soils having polychlorinated biphenyls and cadmium concentrations have been properly remediated and the GRANTOR has recorded a release terminating these Interim Restrictions for Area 1 in accordance with Paragraph II.F.4.a. of this Covenant.

Area 2: Area 2 is that portion of the Property as described and shown in Exhibit "D". Area 2 shall not be used for residential purposes and construction activities shall not begin until the GRANTOR and DTSC determine that PAH concentrations in soil do not pose an unacceptable risk to human health or safety or the environment or have been properly remediated to make the Area suitable for residential use and the GRANTOR has recorded a release terminating these Interim Restrictions for Area 2 in accordance with Paragraph II.F.4.a. of this Covenant.

Area 3: Area 3, which is a sub-area of Area 2, is that portion of the Property as described and shown in Exhibit "D", and known generally as IR Sites 04/06. Construction activities in these areas shall not begin until the GRANTOR and DTSC determine that petroleum concentrations in soil do not pose an unacceptable risk to human health or safety or the environment or have been properly remediated and the GRANTOR has recorded a release terminating these Interim Restrictions for Area 3 in accordance with Paragraph II.F.4.a. of this Covenant.

(b) GRANTOR and GRANTEE acknowledge a certain Interim Covenant to Restrict Use of Property Environmental Restriction (Re: Fleet and Industrial Supply Center –Alameda Annex) dated ______, 2000 (the "Interim Covenant") by and between the GRANTOR, as Covenantor, and DTSC, as Covenantee, which also sets forth Interim Restrictions on residential use and construction activities covered by this Subparagraph II.F.4.a.ii. GRANTOR and GRANTEE intend that the Interim Restrictions set out in this Subparagraph II.F.4.a.ii, which are enforceable by the GRANTOR, shall be interpreted in a manner that is consistent and not in conflict with the interim restrictions set forth in Article IV of the Interim Covenant which is enforceable by DTSC. A failure to enforce the Interim Covenant by DTSC shall not preclude the GRANTOR from enforcing these restrictions.

(c) As used in this Subparagraph II.F.4.a.ii. "construction activities" shall mean any below ground demolition work and any above ground or below ground construction of any permanent structure, including utility lines, that would conflict with the final soil remedy approved by DTSC for the affected Area. Construction activities do

not include above ground demolition work. Any person desiring to conduct any restricted construction activities, including subsurface utility demolition or construction, in the Areas described above prior to the release of any applicable Interim Restrictions by the GRANTOR in accordance with this Subparagraph II.F.4.a.ii. shall apply to DTSC for approval to do so as provided in the Interim Covenant. Approval by GRANTOR of such activities shall not be required. Except as expressly provided in this Paragraph II.4.a., this Covenant does not restrict any use of the Property.

(d) Following completion of remediation of that portion of Area 1 (IR Site 02) planned for residential use by the GRANTEE as shown and described in Exhibit "E" hereto, the GRANTOR shall use best efforts to obtain DTSC's expeditious written concurrence that all necessary response action has been taken. Upon DTSC concurrence, GRANTOR shall expeditiously prepare a Release of the interim residential use restrictions set forth in Subparagraph II.F.4.a.ii. (a) of this Deed in recordable form as provided in said paragraph and deliver it to the GRANTEE.

**iii. MARSH CRUST/SUBTIDAL ZONE SOIL MANAGEMENT REQUIREMENTS.** "Marsh Crust" is defined as the underground layer that is the remnant of the tidal marsh that existed along the shoreline of Alameda Island before filling to create additional dry land. "Subtidal Zone" is defined as the underground layer that is the pre-filling San Francisco Bay floor extension of the historic marsh. These layers form a single continuous underground layer that extends Bayward of the original mean high tide line of Alameda Island before filling and contains hazardous materials and hazardous substances, pollutants, and contaminants that were retained in the historic marsh and Subtidal Zone before filling. The GRANTEE covenants and agrees that it shall comply with City of Alameda Ordinance No. 2824 regarding Excavation Into the Marsh Crust/Subtidal Zone at the Former Naval Air Station Alameda and Fleet and Industrial Supply Center, Alameda Annex and Facility. In the event that DTSC has notified the City that the Ordinance does not protect human health or safety or the environment, then GRANTEE covenants and agrees that it shall not excavate below the "threshold depth" as defined in the Excavation Ordinance, without prior written approval of DTSC. GRANTEE will record that certain Covenant to Restrict Use of Property (Environmental Restrictions) (the "State Covenant"), in substantially the same form as Exhibit "C" attached hereto, by and between the City of Alameda, as Covenantor, and the California Environmental Protection Agency - Department of Toxic Substances Control (DTSC), as Covenantee, which sets forth restrictions applicable to the Marsh Crust/Subtidal Zone covered by this paragraph, prior to conveying the Property. GRANTOR and GRANTEE intend that the restrictions set out in this paragraph, which are enforceable by the United States of America acting by and through the Department of the Navy, shall be interpreted in a manner that is consistent and not in conflict with the restrictions set forth in the State Covenant which is enforceable by DTSC. A failure to enforce the State Covenant by DTSC shall not preclude the Department of Navy from enforcing this restriction.

b. **Disruption of Remedies [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)(II)].** The GRANTEE covenants not to engage in activities that will disrupt required remedial investigation, remedial actions, or oversight activities, should any be required of the GRANTOR on the Property. The GRANTOR and GRANTEE agree to cooperate in good faith to minimize any conflict between necessary environmental investigation and remediation activities at the Property, and the operations and construction activities of the GRANTEE, and successors, lessees, and contractors of the GRANTEE.

c. **Response Action Assurance and Schedules for Investigation and Completion of all Necessary Response Action [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)(III)].** The Grantor hereby provides assurance that it will take all necessary response action at the Property as provided by CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)(III). Schedules for investigation and completion of all necessary response action are identified and included as an Exhibit "G" to the Memorandum of Agreement for Conveyance of the Property (FISCA MOA).

d. **Budget Requests [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(ii)(IV)].** The GRANTOR hereby provides assurances that it will submit a budget request to the Director of the Office of Management and Budget that adequately addresses schedules for investigation and completion of all necessary response actions subject to Congressional authorization and appropriations.

5. **Grant of Warranty [CERCLA 42 U.S.C. Section 9620(h)(3)(C)(iii)].** When all response action necessary to protect human health and the environment with respect to any substance remaining on the property on the date of transfer has been taken, the GRANTOR shall execute and deliver to the GRANTEE an appropriate document containing a warranty that all such response action has been taken and that the requirements of CERCLA 42 U.S.C. Section 9620(h)(3)(C)(iii) have been satisfied.

## G. INDEMNIFICATION REGARDING TRANSFEREES

The GRANTOR hereby recognizes its obligations under Section 330 of the National Defense Authorization Act of 1993 (Pub. L. 102-484), as amended, regarding indemnification of transferees of closing Department of Defense property

## H. NON-DISCRIMINATION.

GRANTEE covenants not to discriminate upon the basis of race, color, religion, disability, sex, age or national origin in the use, occupancy, sale, or lease of the Property, or in its employment practices conducted thereon. This covenant shall not apply however, to the lease or rental of a room or rooms within a family dwelling unit, nor shall it apply with respect to religion if the Property is on premises used primarily for religious purposes. The GRANTOR shall be deemed a beneficiary of this covenant without regard to whether it remains the owner of any land or interest

therein in the locality of the Property hereby conveyed and shall have the sole right to enforce this covenant in any court of competent jurisdiction.

III. THE CONDITIONS, RESTRICTIONS, RESERVATIONS, AND COVENANTS set forth in this deed, unless subsequently released, are a binding servitude on the Property; shall inure to the benefit of the GRANTOR and GRANTEE, their successors and assigns, and will be deemed to run with the land in perpetuity.

IV. **LIST OF EXHIBITS**: The following exhibits are attached hereto and made a part of this Quitclaim Deed:

A. Exhibit "A" Legal Descriptions and Plats of the Property.

B. Exhibit "B" CERCLA Hazardous Substance Notice pertaining to the Property

C. Exhibit "C" Draft State Covenant

D. Exhibit "D" Legal Descriptions and plats of Area 1 (IR Site 02), Area 2, and Area 3 (IR Site 04/06).

E. Exhibit "E" Legal Description and plat of portion of Area 1 (IR Site 02) to be used for residential purposes by Grantee.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the GRANTOR has caused its name to be signed to these presents by an authorized Real Estate Contracting Officer on the day first above written.

**UNITED STATES OF AMERICA,**
acting by and through the Department of the Navy,

BY: ______________________
**WILLIAM R. CARSILLO**
**Real Estate Contracting Officer**

**ACCEPTANCE:**

The GRANTEE hereby accepts this Deed and agrees to be bound by all the agreements, covenants, conditions, restrictions and reservations contained therein.

**CITY OF ALAMEDA**
A Municipal Corporation.

By: ______________________
JEFFREY T. BOND
Development Manager

Date: 7/17/2000

# NOTARY ACKNOWLEDGMENT

STATE OF CALIFORNIA )ss
COUNTY OF Alameda )

On July 17, 2000, before me, P. D. Campbell, a Notary Public in and for said State, personally appeared William R. Carsillo and Jeffrey T. Bond, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature P. D. Campbell

P. D. CAMPBELL
Comm. # 1217922
NOTARY PUBLIC - CALIFORNIA
Alameda County
My Comm. Expires May 1, 2003

(This area for official notarial seal)

**OPTIONAL:**

DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document

Date of Document

**FISC North**

A parcel of land lying in the City and County of Alameda, State of California, and being a portion of Parcel 1 and Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records and a portion of Parcel No. 1 and Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4663 of Official Records at page 35, Alameda County Records and a portion of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records and a portion of Parcel No. 1 and Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 168, Alameda County Records more particularly described as follows:

BEGINNING at the most northwesterly corner of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records:

1. Thence along said northerly line of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, North 86°38'46" East, 16.02 feet to a point of intersection with the easterly line of Parcel #10 described in that certain deed recorded on April 8, 1984 as Document Number 84-064504, Official Records Alameda County, being the TRUE POINT OF BEGINNING;

2. Thence continuing along the northerly line of said parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, North 86°38'46" East, 402.97 feet;

3. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, South 84°06'14" East, 567.60 feet;

4. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, North 87°53'46" East, 726.00 feet;

5. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, South 87°21'14" East, 858.00 feet;

6. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 172, Alameda County Records, South 58°36'14" East, 153.54 feet to the most

northwesterly corner of the parcel described in that certain deed recorded on September 24, 1941 in Book 4142 of Official Records at page 18, Alameda County Records;

7. Thence leaving said northerly line and along the westerly line of the parcel described in that certain deed recorded on September 24, 1941 in Book 4142 of Official Records at page 18, Alameda County Records, South 15°28'16" West, 579.96 feet to the most northwesterly corner of Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4663 of Official Records at page 35;

8. Thence leaving said westerly line and along the northerly line of Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4663 of Official Records at page 35, Alameda County Records, South 31°40'14" East, 82.16 feet;

9. Thence continuing along said northerly line of Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4663 of Official Records at page 35, Alameda County Records, South 81°24'14" East, 285.99 feet;

10. Thence continuing along said northerly line of Parcel No. 2 described in that certain deed recorded on December 18, 1944 in Book 4663 of Official Records at page 35, Alameda County Records, South 88°00'44" East, 87.24 feet to the most northwesterly corner of Parcel B described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 701, Alameda County Records, being a point on a non-tangent curve to the left from which point a radial line bears South 65°48'44" East;

11. Thence leaving said northerly line and along the westerly line of Parcel B described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 701, Alameda County Records, along said curve having a radius of 30050.01 feet, through a central angle of 0°12'27", for an arc length of 108.83 feet to a point on the southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, being a point on a non-tangent curve to the left from which point a radial line bears South 13°02'54" West;

12. Thence leaving said westerly line along said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 741.84 feet, through a central angle of 1°33'38", for an arc length of 20.21 feet to a point of compound curvature;

13. Thence continuing along said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 980.54 feet, through a central angle of 1°47'59", for an arc length of 30.80 feet to a point of compound curvature;

14. Thence continuing along said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 1457.97 feet, through a central angle of 1°12'01", for an arc length of 30.54 feet to the beginning of a non-tangent curve to the left from which point a radial line bears South 08°27'44" West;

15. Thence continuing along said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 2890.33 feet, through a central angle of 0°36'00", for an arc length of 30.27 feet;

16. Thence continuing along said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County, North 82°06'43" West, 848.13 feet to a point on the southerly line of Parcel No. 1 described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 168, Alameda County Records;

17. Thence leaving said southerly line of Parcel 2 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County, and along said southerly line of Parcel No. 1 described in that certain deed recorded on December 18, 1944 in Book 4652 of Official Records at page 168, Alameda County Records, North 88°07'13" West, 422.49 feet to the most southeasterly corner of Parcel 1 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records;

18. Thence along said southerly of Parcel 1 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, North 89°46'04" West, 1515.46 feet to a point of intersection with the easterly line of Parcel 10 described in that certain deed recorded on April 8, 1984 as Document Number 84-064504 Official Records Alameda County;

19. Thence along said easterly line of Parcel 10 described in that certain deed recorded on April 8, 1984 as Document Number 84-064504 Official Records Alameda County, North 0°30'14" West, 746.23 feet to the TRUE POINT OF BEGINNING;

Containing an area of 45.45148 acres, more or less.

Basis of Bearings:
Bearings are based on the California Coordinate System of 1927 Zone III using the bearing of South 87°45'20" East between USC & GS Station "MAIN ATL" and USC & GS Station "ALT FIFTH". All distances in this description are ground distances. Multiply by 0.9999295 to obtain grid distances.

A plat showing the above description is attached herein and made a part hereof as Exhibit "B".

This description was prepared by me or under my direction in conformance with the requirements of the Land Surveyor's Act.

Prepared By:

Billy Martin, P.L.S. 5797
Expires: 6/30/2004

LICENSED LAND SURVEYOR
BILLY MARTIN
EXP. 6/30/2004
No. 5797
STATE OF CALIFORNIA

Dated: July 17, 2000

K:\MAIN\1998\980223\LEGALS\FISCNORTH071700.DOC




| LINE TABLE | | |
|---|---|---|
| LINE | BEARING | LENGTH |
| L1 | N 00°30'14" W | 746.23' |
| L2 | S 58°36'14" E | 153.54' |
| L3 | S 15°28'16" W | 100.37' |
| L4 | S 31°40'14" E | 82.16' |
| L5 | S 81°24'14" E | 285.99' |
| L6 | S 88°00'44" E | 87.24' |
| L7 | N 86°38'46" E | 16.02' |

| CURVE TABLE | | | |
|---|---|---|---|
| CURVE | DELTA | RADIUS | LENGTH |
| C1 | 00°12'27" | 30050.01' | 108.83' |
| C2 | 01°33'38" | 741.84' | 20.21' |
| C3 | 01°47'59" | 980.54' | 30.80' |
| C4 | 01°12'01" | 1457.97' | 30.54' |
| C5 | 00°36'00" | 2890.33' | 30.27' |

## DETAIL "A"




**Brian Kangas Foulk**
Engineers • Surveyors • Planners

540 Price Avenue
Redwood City, CA 94063
650/482-6300
650/482-6399 (FAX)

Subject EXHIBIT "B"
FISC NORTH
Job No. 980221-10
By RCS Date 05/15/00 Chkd. MP
SHEET 1 OF 1

J:\Sur98\980221\DWG\Plots\
NAME: NFISC

DATE: 5/15/2000
TIME: 11:30 a.m

# FISC South

A parcel of land lying in the City and County of Alameda, State of California, and being a portion of the parcel described in that certain Judgment on Declaration of Taking entered in Civil Action No. 30735 recorded on December 21, 1951 in Book 6618 of Official Records at page 339, Alameda County Records, and being all of Parcel 2 described in that certain deed recorded on September 2, 1948 in Book 5597 of Official Records at page 433 and being a portion of Parcel 1 described in that certain deed recorded on July 22, 1948 in Book 5582 of Official Records at page 597, Alameda County Records, and being a portion of the parcel described in that certain deed recorded on July 21, 1944 in Book 4499 of Official Records at page 401, Alameda County Records, and being a portion of the parcel described in that certain deed recorded on June 29, 1944 in Book 4499 of Official Records at page 384, Alameda County Records, and being a portion of the parcel described in that certain deed recorded on June 29, 1944 in Book 4499 of Official Records at page 316, Alameda County Records, and being a portion of Parcel 1 described in that certain deed recorded on February 14, 1955 in Book 7567 of Official Records at page 117, Alameda County Records, and being a portion of Parcel 3 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, and all of Parcel 2 described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 712, Alameda County Records, and all of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, and all of the parcel described in that certain deed recorded on September 16, 1959 in Book 9152 of Official Records at page 57, Alameda County Records, more particularly described as follows:

BEGINNING at the intersection of the northerly line of Atlantic Avenue, being 51 feet wide, and the easterly line of Main Street as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Records of Survey at page 16 through 22, inclusive, in the Office of the Recorder of Alameda County:

1. Thence along said easterly line of Main Street and the westerly boundary line of the parcel described in that certain deed recorded on March 28, 1941 in Book 4023 of Official Records at page 499, Alameda County Records, North 00°34'11" East, 1240.19 feet to the southerly line of the parcel described in that certain deed recorded on December 21, 1951 in Book 6618 of Official Records at page 339, Alameda County Records, and the TRUE POINT OF BEGINNING;

2. Thence continuing along said easterly line of Main Street, North 00°34'11" East, 596.74 feet;

3. Thence leaving said easterly line of Main Street; South 87°57'28" East, 1923.89 feet;

4. Thence North 02°47'17" East, 364.75 feet to a point on the southerly line of Parcel 1 described in that certain deed recorded on February 14, 1955 in Book 7567 of Official Records at page 117, Alameda County Records;

5. Thence along said southerly line of Parcel 1 as described in that certain deed recorded on February 14, 1955 in Book 7567 of Official Records at page 117, Alameda County Records, South 87°12'43" East, 351.25 feet;

6. Thence leaving said southerly line of Parcel 1 as described in that certain deed recorded on February 14, 1955 in Book 7567 of Official Records at page 117, Alameda County Records, North 2°47'17" East, 1161.09 feet;

7. Thence North 87°21'26" West, 426.49 feet to a point on the easterly line of the parcel described in that certain deed recorded on August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records;

8. Thence along said easterly line of the parcel described in that certain deed recorded on August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records, North 2°47'17" East, 293.60 feet to the northeasterly corner of said parcel;

9. Thence along the northerly line of said parcel described in that certain deed recorded on August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records, North 89°46'04" West, 1180.27 feet;

10. Thence continuing along the northerly line of said parcel described in that certain deed recorded August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records, South 76°59'47" West, 30.74 feet;

11. Thence continuing along the northerly line of said parcel described in that certain deed recorded on August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records, North 00°30'07" West, 15.37 feet;

12. Thence continuing along the northerly line of said parcel described in that certain deed recorded August 10, 1966 in Reel 1821 of Official Records at Image 494, Alameda County Records, South 76°59'47" West, 51.25 feet to a point on the easterly line of Parcel 9 described in that certain document recorded on April 8, 1984 as Document Number 84-064504 of Official Records, Alameda County;

13. Thence along said easterly line of Parcel 9 described in that certain document recorded on April 8, 1984 as Document Number 84-064504 of Official Records, Alameda County, North 00°30'13" West, 28.00 to the most northwesterly corner of Parcel 2 described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 712, Alameda County Records, being a point on a non-tangent curve to the right from which point a radial line bears South 17°36'08" East;

14. Thence leaving said easterly line of Parcel 9 described in that certain document recorded on April 8, 1984 as Document Number 84-064504 of Official Records, Alameda County, and along the northerly line of Parcel 2 described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 712, Alameda County Records, along said curve having a radius of 955.37 feet, through a central angle of 1°14'55", for an arc length of 20.82 feet to a point of compound curvature;

15. Thence continuing along said northerly line of Parcel 2 described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 712, Alameda County Records, along said curve having a radius of 557.56 feet, through a central angle of 15°51'00", for an arc length of 154.24 feet;

16. Thence continuing along said northerly line of Parcel 2 described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 712, Alameda County Records, North 89°29'47" East, 183.18 feet to a point on the westerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records;

17. Thence along said westerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, North 00°42'53" West, 10.00 feet to the northwesterly corner of said parcel;

18. Thence along the northerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, North 87°10'47" East, 238.51 feet to the beginning of a tangent curve to the right;

19. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, along said curve having a radius of 1136.01 feet, through a central angle of 3°03'09", for an arc length of 60.52 feet;

20. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, South 89°46'04" East, 1216.24 feet;

21. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, South 88°07'13" East, 367.67 feet to the beginning of a tangent of curve to the right;

22. Thence continuing along said northerly line of the parcel described in that certain deed recorded December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, along said curve having a radius of 563.14 feet, through a central angle of 6°00'30", for an arc length of 59.05 feet;

23. Thence continuing along said northerly line of the parcel described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 707, Alameda County Records, South 82°06'43" East, 335.29 feet to a point on the northerly line of Parcel 3 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records;

24. Thence along said northerly line of Parcel 3 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, South 82°06'43" East, 505.98 feet to the beginning of a tangent curve to the right;

25. Thence continuing along said northerly line of Parcel 3 described in that certain deed recorded on August 9, 1945 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 2867.82 feet, through a central angle of 00°36'00", for an arc length of 30.03 feet to a point of compound curvature;

26. Thence continuing along said northerly line of Parcel 3 described in that certain deed recorded on June 20, 1956 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 1435.47 feet, through a central angle of 1°12'01", for an arc length of 30.07 feet to a point of compound curvature;

27. Thence continuing along said northerly line of Parcel 3 described in that certain deed recorded on June 20, 1956 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 958.04 feet, through a central angle of 01°47'59", for an arc length of 30.09 feet to a point of compound curvature;

28. Thence continuing along said northerly line of Parcel 3 described in that certain deed recorded on June 20, 1956 in Book 4757 of Official Records at page 138, Alameda County Records, along said curve having a radius of 719.34 feet, through a central angle of 1°12'56", for an arc length of 15.26 feet to the most northerly corner of Parcel A described in that certain deed recorded on December 1, 1967 in Book 2084 of Official Records at page 701, Alameda County Records, being a point on a non-tangent curve to the left from which point a radial line bears South 66°03'48" East;

29. Thence along the westerly line of Parcel A described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 701, Alameda County Records, along said curve having a radius of 30,050.01 feet, through a central angle of 00°56'00", for an arc length of 489.48 feet to the beginning of a non-tangent curve to the left, from which point a radial line bears South 2°09'25" East;

30. Thence continuing along said westerly line of Parcel A described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image

701, Alameda County Records, along said curve having a radius of 60.00 feet, through a central angle of 63°17'05", for an arc length of 66.28 feet to a point of compound curvature;

31. Thence continuing along said westerly line of Parcel A described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 701, Alameda County Records, along said curve having a radius of 1222.09 feet, through a central angle of 31°53'47", for an arc length of 680.33 feet to a point of compound curvature;

32. Thence continuing along said westerly line of Parcel A described in that certain deed recorded on December 1, 1967 in Reel 2084 of Official Records at Image 701, Alameda County Records, along said curve having a radius of 1434.10 feet, through a central angle of 07°09'19", for an arc length of 179.09 feet to a point on the southerly line of that certain deed recorded on July 22, 1948 in Book 5582 of Official Records at page 597, Alameda County Records;

33. Thence along said southerly line of the parcel described in that certain deed recorded on July 22, 1948 in Book 5582 of Official Records at page 597, Alameda County Records, North 87°12'43" West, 332.59 feet to the northwesterly corner of that certain Parcel Map recorded on October 2, 1981 in Book 131 of Maps at page 1 through 2, inclusively, Alameda County Records;

34. Thence along the westerly line of that certain Parcel Map recorded on October 2, 1981 in Book 131 of Maps at page 1 through 2, inclusively, Alameda County Records, South 02°04'31" West, 464.06 feet to a point on the northerly line of the parcel described in that certain deed recorded on February 11, 1960 in Reel 25 of Official Records at Image 976, Alameda County Records;

35. Thence along said northerly line of the parcel described in that certain deed recorded February 11, 1960 in Reel 25 of Official Records at Image 976, Alameda County Records, North 87°55'29" West, 499.91 feet to the northwesterly corner of said parcel;

36. Thence leaving said northerly line and along the westerly line of the parcel described in that certain deed recorded on February 11, 1960 in Reel 25 of Official Records at Image 976, Alameda County Records, South 2°08'09" West, 624.82 feet to a point on the southerly line of the parcel described in that certain Judgment on Declaration of Taking entered in Civil Action No. 30735 recorded on December 21, 1951 in Book 6618 of Official Records at page 339;

37. Thence along said southerly line of the parcel described in that certain Judgment on Declaration of Taking entered in Civil Action No. 30735 recorded on December 21, 1951 in Book 6618 of Official Records at page 339, Alameda County Records, North 87°51'51" West, 2730.99 feet to the TRUE POINT OF BEGINNING.

Containing an area of 100.14102 acres, more or less.

Basis of Bearings:
Bearings are based on the California Coordinate System of 1927 Zone III using the bearing of South 87°45'20" East between USC & GS Station "MAIN ATL" and USC & GS station "ALT FIFTH". All distances in this description are ground distances. Multiply by 0.9999295 to obtain grid distances.

A plat showing the above description is attached herein and made a part hereof as Exhibit "B".

This description was prepared by me or under my direction in conformance with the requirements of the Land Surveyor's Act.

Prepared By:




Billy Martin, P.L.S. 5797
Expires: 6/30/2004

Dated: July 17, 2000

K:\MAIN\1998\980221\LEGALS\FISCSOUTH071700.DOC




**Curve Table**

| No. | Radius | Delta | Length |
|---|---|---|---|
| C1 | 955.37' | 01°14'55" | 20.82' |
| C2 | 557.56' | 15°51'00" | 154.24' |
| C3 | 2867.82' | 00°36'00" | 30.03' |
| C4 | 1435.47' | 01°12'01" | 30.07' |
| C5 | 958.04' | 01°47'59" | 30.09' |
| C6 | 719.34' | 01°12'56" | 15.26' |
| C7 | 30050.01' | 00°56'00" | 489.48' |
| C8 | 60.00' | 63°17'05" | 66.28' |
| C9 | 1222.09' | 31°53'47" | 680.33' |
| C10 | 1434.10' | 07°09'19" | 179.09' |

**Bearing Table**

| No. | Bearing | Distance |
|---|---|---|
| L1 | S 76°59'47" W | 30.74' |
| L2 | N 00°30'07" W | 15.37' |
| L3 | S 76°59'47" W | 51.25' |
| L4 | N 00°30'13" W | 28.00' |
| L5 | N 89°29'47" E | 183.18' |
| L6 | N 00°42'53" W | 10.00' |
| L7 | N 87°10'47" E | 238.51' |

**Brian Kangas Foulk**
Engineers • Surveyors • Planners

540 Price Avenue
Redwood City, CA 94063
650/482-6300
650/482-6399 (FAX)

Subject EXHIBIT "B"
FISC SOUTH
Job No. 980221-10
By RCS Date 5/12/00 Chkd. MP
SHEET 1 OF 1

PATH: J:\SUR98\980221\DWG\Plots\

DATE: 5/12/2000
TIME: 2:42 p.m.

TABLE 
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 1 of 8

*Notice is hereby given that the information provided below contains a notice of hazardous substances that are known to have been stored for one year, or known to have been released, or disposed on certain portions of the FOST area of the facility, and the dates that such storage, release, or disposal took place. 40 C.F.R. Section 373.3(b) requires that the aforementioned statement be prominently displayed in this notice. The information contained in this notice is required under the authority of regulations promulgated under section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or "Superfund") 42 U.S.C. section 9620(h).*

*Chemicals specifically excluded from consideration were incidental quantities of household-type cleaning chemicals and consumer office products. It should also be noted that minimal information regarding hazardous materials was available, therefore the periods that these materials was stored is uncertain, unless specifically stated.*

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Open lot | No record | NA | NA | NA | NA | NA | NA | No storage, release, or disposal identified |
| 2 | Open lot | No record | NA | NA | NA | NA | NA | NA | No storage, release, or disposal identified |
| 3 | Open lot | Unknown - cargo containers | NA | NA | NA | Unknown | S | Unknown | |
| 3 | Open lot | Propane | 74-98-6 | NA | NA | Unknown | S | Unknown | |
| 4 | Warehouse 1 | Waste ORM-E | Unknown | NA | NA | Unknown | S | 1988 | |
| 4 | Warehouse 1 | Cold storage | NA | NA | NA | NA | S | Unknown | No storage, release, or disposal identified |

CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

TABLE 8
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 2 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Building 27 | Unknown | NA | NA | NA | Unknown | NA | NA | |
| 5 | Railroad tracks | SVOCs | Unknown | NA | NA | Unknown | R | 1950 Aerial Photograph | |
| 6 | Warehouse 2 | Used spray cans | Unknown | NA | NA | Unknown | S | March 1996 | |
| 6 | Warehouse 2 | ORM-E | Unknown | NA | NA | Unknown | S | March 1996 | |
| 7 | Open lot | Cargo containers | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 8 | Open lot | Cargo containers | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 9 | Open lot | Storage boxes | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 10 | Former Building 13 | Unknown | NA | NA | NA | Unknown | S | NA | |
| 10 | Former Building 25 | Unknown | NA | NA | NA | Unknown | S | NA | |

64

CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED,
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 3 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 11 | Building 10 | No record | NA | NA | NA | NA | NA | NA | No storage, release, or disposal identified |
| 12 | Building 26 | Various hazardous and flammable (paint-related) materials | Unknown | NA | NA | Unknown | S | Unknown | |
| 13 | Open lot | Cargo containers | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 14 | Open lot | Cargo containers | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 15 | Open lot | No record | NA | NA | NA | NA | NA | NA | No storage, release or disposal identified |
| 16 | Building 6 | Photographic developing and processing chemicals for dental laboratory | Unknown | NA | NA | Unknown | S | Unknown | |
| 16 | Building 6 | Paint | Unknown | NA | NA | Unknown | S | Unknown | |
| 17 | Building 7 | Unknown | NA | NA | NA | Unknown | NA | NA | |
| 18 | Building 8 | Descaling agents | Unknown | NA | NA | Unknown | S | Unknown | |



CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

TABLE 8
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 4 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 19 | Open lot | No record | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 20 | Open lot | Cargo containers | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 21 | Building 16 | No record | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 22 | Railroad Tracks, Open lot | Spent antifreeze | Unknown | NA | NA | Unknown | S | Unknown | |
| 23 | Building 3 | Antifreeze | 107-21-1 | NA | NA | Unknown | S | VSI | |
| 23 | Building 3 | Oxygen tanks | Unknown | NA | NA | Unknown | S | VSI | |
| 23 | Building 3 | Copier toner | Unknown | NA | NA | Unknown | S | VSI | |
| 23 | Building 3 | Batteries | Unknown | NA | NA | Unknown | S | VSI | |
| 23 | Building 3 | Acetylene | 74-86-2 | NA | NA | Unknown | S | VSI | |
| 24 | Building 4 | Battery acid | Unknown | NA | NA | Unknown | S | Unknown | |
| 24 | Building 4 | Hydrochloric acid | 7647-01-0 | NA | NA | Unknown | S | Unknown | |

CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 5 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of-Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 24 | Building 4 | Nitric acid | 7697-37-2 | NA | NA | Unknown | S | Unknown | |
| 25 | Building 5 | Solvents | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Pesticides | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Flammables | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Oxidizers | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Corrosive acids | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Toxins | Unknown | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | PCBs | 1336-36-3 | NA | NA | Unknown | S | VSI | |
| 25 | Building 5 | Asbestos | Unknown | NA | NA | Unknown | S | VSI | |
| 26 | Open lot | Cargo containers | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 27 | Open lot | Monitoring well purge water in drums and tanks | Unknown | NA | NA | Unknown | S | Unknown | |
| 27 | Open lot | Cargo containers and drums | NA | NA | NA | NA | S | NA | No storage, release, or disposal identified |
| 28 | Open lot | Containerized medical supplies and drums | Unknown | NA | NA | Unknown | S | Unknown | |



CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

TABLE 8
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 6 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 29 | Open lot/Bldgs 365,366,& 367 | Scrapyard Sorting & Storage Area, spills of liquids associated with scrap items, PCB's, paints, oils & greases. Door weights made of depleted uranium | Unknown | NA | NA | Unknown | (S) & (R) | NA | PCB and Cadmium cleanup planned |
| 30 | Open lot | No record | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 31 | Open lot | Cargo containers | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 32 | Building 370 | Janitorial supplies | Unknown | NA | NA | Unknown | S | VSI | |
| 32 | Building 370 | Hospital supplies | Unknown | NA | NA | Unknown | S | VSI | |
| 32 | Building 370 | Malathion | 121-75-5 | NA | NA | Unknown | S | VSI | |
| 33 | Building 368 | Flammable solids and oxidizers | Unknown | NA | NA | Unknown | S | 3/13/96 | |
| 34 | Building 364 | Cargo containers | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |



CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "A"

TABLE 8
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page7 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 35 | Open lot | Cargo containers | NA | NA | NA | Unknown | NA | NA | No storage, release, or disposal identified |
| 36 | Building 361 | Oxidizers | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Corrosive acids | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Isopropyl alcohol | 67-63-0 | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Calcium hypochlorite | 7778-54-3 | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Flammables | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Nonflammables | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Poisons | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Pesticides | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Insecticides | Unknown | NA | NA | Unknown | S | Unknown | |



CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

TABLE 8
NOTICE OF HAZARDOUS SUBSTANCES STORED, RELEASED, OR DISPOSED AT THE TRANSFER AREA
ALAMEDA FACILITY/ALAMEDA ANNEX
Page 8 of 8

| Parcel | Facility Number/ Name | Hazardous Substance(s) Stored | CAS Number | Regulatory Synonym | RCRA Waste Number | Quantity | Stored (S), Released (R), or Disposed (D) | Storage Term/ Date of Release | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 36 | Building 361 | Aerosol cans | Unknown | NA | NA | Unknown | S | Unknown | |
| 36 | Building 361 | Chloroform | 67-66-3 | NA | U044 | Unknown | S | Unknown | |
| 36 | Building 361 | Detergents | Unknown | NA | NA | Unknown | S. | Unknown | |
| 36 | Open lot | Malathion | 121-75-5 | NA | NA | Unknown | S | VSI | |
| 37 | Building 371 | Used spray paint cans | Unknown | NA | NA | Unknown | S | VSI | |
| Base-wide | Basewide Marsh Crust | SVOCs | Unknown | NA | NA | Unknown | R | Unknown | |
| Base-wide | Basewide Storm Drain System | SVOCs | Unknown | NA | NA | Unknown | R | Unknown | |
| Base-wide | Basewide Storm Drain System | PCBs/Pesticides | 1336-36-3 /Unknown | NA | NA | Unknown | R | Unknown | |
| Base-wide | Basewide Storm Drain System | Metals | Unknown | NA | NA | Unknown | R | Unknown | |

Notes:

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act |
| DRMO | Defense Reuse and Marketing Office |
| NA | Not available or applicable |
| ORM-E | Other reactive material, class E |
| PCB | Polychlorinated biphenyl |
| SVOC | Semivolatile organic compound |
| VSI | Visual site inspection |

CERCLA HAZARDOUS SUBSTANCE NOTICE
Exhibit "B"

DRAFT STATE COVENANT
EXHIBIT "C"

Recording Requested by:

City of Alameda
Economic Development Division
950 West Mall Square, #215
Alameda, CA 94501
Attn: Jeffrey T. Bond

When Recorded, Mail to:

Department of Toxic Substances Control
10151 Croydon Way, Suite 3
Sacramento, CA 95827-2106
Attention: A. J. Landis, P.E., Chief
Office of Military Facilities

COVENANT

TO RESTRICT USE OF PROPERTY

(ENVIRONMENTAL RESTRICTIONS)

Fleet and Industrial Supply Center, Oakland
Alameda Facility and Alameda Annex
and
Alameda Naval Air Station East Housing
Alameda, California

This Covenant To Restrict Use of Property ("Covenant") is made on the ____ day of ____________, 2000 by the City of Alameda ("City" or "Covenantor"), which is the current owner of the property restricted by this Covenant, and the California Environmental Protection Agency - Department of Toxic Substances Control (the "Department" or "Covenantee").

RECITALS/STATEMENT OF FACTS

A. Covenantor is the owner of record of that certain real property consisting of approximately _____ acres (the "Property") situated in the City of Alameda, County of Alameda, State of California. The Property formerly was part of the United States Navy installation commonly known as the Fleet and Industrial Supply Center, Oakland, Alameda Facility and

Alameda Annex and the adjacent part of the former Alameda Naval Air Station commonly known as East Housing. A legal description of the Property is set forth in Exhibit A and is incorporated herein by this reference. A figure depicting the location of the Property is set forth in Exhibit B and is incorporated herein by this reference.

B. The Property was formerly owned by the United States Navy.

C. The Navy has caused to be completed environmental response actions on and in connection with the Property. Such actions include, but are not limited to, preparation of a **[insert date and name of final remedial action document]** ("RAP/ROD") that has been approved by the Department, and the implementation of response actions pursuant to the RAP/ROD that allow the Property to be used without significant risk to human health and without significant potential for future environmental damage.

D. Pursuant to California Civil Code section 1471(c), the Department has determined that this Covenant is reasonably necessary to protect present or future human health and safety or the environment as a result of the potential presence of hazardous materials, as defined in California Health and Safety Code section 25260, in the marsh crust and the shallowest groundwater zone, as defined below, under the surface of land at the Property. The Department has also determined that such protection is part of the remedy contemplated in the RAP/ROD. The Covenantor and the Department therefore intend that the use of the Property be restricted as set forth in this Covenant to protect human health, safety and the environment.

E. The Property is planned for mixed uses including residential use. Before 1920, the Property and surrounding areas were undeveloped tidal marsh along Alameda Island's San Francisco Bay shoreline. Between approximately 1900 and 1940, the Property and surrounding areas were filled with sand and clay material from unknown sources.

F. "Marsh crust" means the underground layer that is the remnant of the tidal marsh that existed along the shoreline of Alameda Island before filling to create additional dry land. In many places, this layer contains hazardous materials from former industrial discharges that were

retained in the historic marsh before filling. These hazardous materials include petroleum hydrocarbons (TPH) and polynuclear aromatic hydrocarbons (PAHs). The marsh crust is a continuous underground layer, at depths of ___ to ___ feet from the surface, that extends bayward of the original mean higher high tide line of Alameda Island, before filling, throughout the area that was filled.

G. The "shallowest groundwater zone" is in the fill at the Property, is first encountered at depths from 4 to 8 feet below ground surface (bgs) and extends to a maximum depth of approximately 20 feet bgs. The shallowest groundwater zone does not include any deeper groundwater zone that is hydraulically separated from the fill. In particular, the shallowest groundwater zone does not include the "Merritt Sand" zone, which is first encountered at approximately 10 to 105 feet bgs and is hydraulically separated from the fill by Bay Mud, the thickness of which ranges from 5 to 95 feet at the Property. The shallowest groundwater zone is currently not usable for drinking water because of the presence of naturally occurring inorganic constituents (total dissolved solids and some metals). Because of this intrinsic use limitation of the groundwater, the contamination of organic constituents (volatile organic compounds, TPH, and PAHs) related to former activities at or in the vicinity the Property, may, at this time, remain in place provided there are sufficient controls and restrictions to protect the public health, safety, and the environment.

## ARTICLE I.
## ADDITIONAL DEFINITIONS

1.1 Occupant(s). "Occupant(s)" means any person or entity entitled by ownership, leasehold, or other legal relationship to occupy any portion of the Property.

1.2 Owner(s). "Owner(s)" means the Covenantor, its successors in interest and their successors in interest, including heirs and assigns, who at any time hold fee title to all or any portion of the Property.

1.3 Excavation ordinance. "Excavation ordinance" means City of Alameda Ordinance No. ______, a copy of the current version of which is attached as Exhibit C and incorporated

herein by this reference.

1.4 Threshold depth. "Threshold depth"is the elevation above which there is little likelihood that hazardous materials from the marsh crust would have mixed during filling. The threshold depth for any location at the Property is shown on Exhibit __ to the RAP/ROD.

1.5 Permitted excavation. "Permitted excavation" means (i) excavation performed in accordance with a City permit approved and issued pursuant to the excavation ordinance when such permit is required under the terms of the excavation ordinance; or (ii) if the excavation ordinance has been repealed or the Department has made a written determination pursuant to subsection 3.2 that the excavation ordinance does not comport with the intent of this Covenant, excavation performed in accordance with a written approval issued by the Department.

1.6 Department. "Department" means the California Environmental Protection Agency, Department of Toxic Substances Control and its successor agencies, if any.

ARTICLE II.
GENERAL PROVISIONS

2.1 Restrictions to Run with the Land. This Covenant sets forth protective provisions, covenants, restrictions, and conditions (collectively referred to as "Restrictions"), subject to which the Property and every portion of the Property shall be improved, held, used, occupied, leased, sold, hypothecated, encumbered and/or conveyed. Each and every Restriction: (a) runs with the land pursuant to California Health & Safety Code section 25355.5(a)(1)(C) and California Civil Code section 1471; (b) inures to the benefit of and passes with each and every portion of the Property; (c) is for the benefit of, and is enforceable by the Department; and (d) is imposed upon the entire Property unless expressly stated as applicable only to a specific portion of the Property.

2.2 Binding Upon Owners/Occupants. Pursuant to California Health & Safety Code section 25355.5(a)(1)(C), this Covenant binds all Owners and Occupants of the Property, and their heirs, successors and assignees, and their agents, employees, and lessees. Pursuant to California Civil Code section 1471(b), all Owners of the Property are expressly bound by this

Covenant for the benefit of Covenantee.

2.3 Incorporation into Deeds and Leases. The Restrictions set forth in this Covenant shall be incorporated by reference in each and all deeds, leases and subleases of any portion of the Property.

2.4 Conveyance of Property. The Owner(s) shall provide a notice to the Department not later than thirty (30) days after any sale, lease or other conveyance of the Property or a real property estate in the Property (excluding mortgages, liens, and other non-possessory encumbrances). The Department shall not, by these provisions, have authority to approve, disapprove, or otherwise affect any such sale, lease or other conveyance of the Property or estate except as otherwise provided by law, by administrative order, or by a specific provision of this Covenant.

2.5 Written Notification. Upon a determination that a hazardous substance is present upon or beneath nonresidential real property, a notification must be made pursuant to California Health & Safety Code section 25359.7. Specifically, prior to the sale or lease of nonresidential real property, the owner or lessor shall give the buyer or lessee notice that a hazardous substance is located on or beneath the Property.

ARTICLE III.
RESTRICTIONS/ENFORCEMENT

3.1 Applicability. The provisions of this Article shall apply to the Property described in Exhibit A and shown on Exhibit B.

3.2 Prohibited Activities. The following activities are prohibited on the Property:

a. Construction of any water well screened for the extraction of water from the shallowest groundwater zone (as defined above) except as provided in this Covenant;

b. Extraction (except for necessary construction site dewatering), utilization or consumption of water from the shallowest groundwater zone for use other than irrigation or emergency use , e.g. firefighting;

c. Disposal of extracted groundwater from construction site dewatering into the waters of the state except in compliance with the requirements of the Regional Water Quality Control Board, San Francisco Bay Region; and

d. Engaging in any excavation below the threshold depth without a City excavation permit. If the excavation ordinance has been repealed, or if the Department has made a written determination with thirty (30) days prior written notice to the City that the excavation ordinance does not comport with the intent of this Covenant, then a permitted excavation may be conducted only in accordance with a written approval issued by the Department. Covenantor's application for such an approval shall be submitted to the Department and shall otherwise comply with the permit application requirements of the last version of the excavation ordinance or such other requirements as the Department may specify.

3.3 Access For Department. The Department shall have a reasonable right of entry and access to the outdoor areas of the property for inspection, monitoring, and other activities consistent with the purposes of this Covenant as deemed necessary by the Department to protect the public health or safety, or the environment.

3.4 Enforcement. Failure of the Covenantor, or Owner(s)/Occupant(s) to comply with any of the Restrictions specifically applicable to it shall be grounds for the Department to require that the Covenantor or Owner(s)/Occupant(s) remove any wells constructed or to close or otherwise remedy any excavation conducted in violation of the prohibited activities stated in subsection 3.2 of this Covenant. Violations of this Covenant shall be grounds for the Department to file civil or criminal actions as provided by law.

## ARTICLE IV.
## VARIANCE AND TERMINATION

4.1 Variance. Covenantor or any other aggrieved person may apply to the Department for a written variance from the provisions of this Covenant. Such application shall be made in accordance with California Health & Safety Code section 25233.

4.2 Termination. Covenantor or any other aggrieved person may apply to the Department for a termination of some or all of the Restrictions as they apply to all or any portion of the Property. Such application shall be made in accordance with California Health & Safety Code section 25234.

4.3 Term. Unless terminated in accordance with subsection 4.2 above, by law or by the Department in the exercise of its discretion, this Covenant shall continue in effect in perpetuity.

ARTICLE V.
MISCELLANEOUS

5.1 No Dedication Intended. Nothing set forth in this Covenant shall be construed to be a gift or dedication, or offer of a gift or dedication, of the Property or any portion of the Property to the general public or anyone else for any purpose whatsoever.

5.2 Department References. All references to the Department include successor agencies/departments or other successor entity.

5.2 Notices. Whenever any person gives or serves any notice, demand, or other communication with respect to this Covenant, each such notice, demand, or other communication shall be in writing and shall be deemed effective (i) when delivered, if personally delivered to the person being served or to an officer of a corporate party being served or official of a government agency being served, or, (ii) three (3) business days after deposit in the mail if mailed by United States mail, postage paid and certified, return receipt requested:

To: "Covenantor":
City of Alameda
Economic Development Division
950 West Mall Square, #215
Alameda, CA 94501
Attention: Jeffrey T. Bond

To: "Department":
Department of Toxic Substances Control
10151 Croydon Way, Suite 3
Sacramento, CA 95827-2106
Attention: A. J. Landis, P.E., Chief
Office of Military Facilities

Any party may change its address or the individual to whose attention a notice is to be sent by giving notice in compliance with this paragraph.

5.3 Partial Invalidity. If any portion of the Restrictions or terms set forth in this Covenant is determined by a court of competent jurisdiction to be invalid for any reason, the remaining portion shall remain in full force and effect as if such portion found invalid had not been included in this Covenant.

5.4 Article Headings. Headings at the beginning of each numbered article of this Covenant are solely for the convenience of the parties and are not a part of the Covenant.

5.5 Recordation. This instrument shall be executed by the Covenantor and by the Northern California Coastal Cleanup Operations Branch Chief, California Department of Toxic Substances Control. This instrument, with all referenced Exhibits, shall be recorded by the Covenantor in the County of Alameda within fifteen (15) days of the date of execution by both parties.

5.6 Statutory References. All statutory references include successor provisions.

5.7 Representative Authority. The undersigned representative of each party to this Covenant certifies that he or she is fully authorized to enter into this Covenant and to execute and legally bind that party to this Covenant.

IN WITNESS WHEREOF, the parties execute this Covenant as of the date set forth above.

OWNER: City of Alameda

By ______________________________

Title:

Date: ____________________

DEPARTMENT OF TOXIC SUBSTANCES CONTROL

By: ______________________________
Anthony J. Landis, P.E.

Title: Chief, Office of Military Facilities

Date: ______________________________

STATE OF CALIFORNIA )
)
COUNTY OF )

On ________, 1999 before me, a Notary Public in and for State of California, personally appeared ________________, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she/he executed the same in his authorized capacity, and that by her/his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

________________________________

Notary's Signature



6/6/00 1:11 PM 252057 1