Winzler & Kelly (W&K) documented a series of soil sampling events in the East Housing Area (EHA). The results of that study indicated that a number of organochlorine pesticides (OCPs), namely chlordane, exceeded potentially applicable regulatory standards (primarily the Regional Board's Risk-Based Screening Levels, or RBSLs). The findings of W&K's study, in conjunction with results of ERM's *Updated Risk Analysis of Shallow Soil and Ground Water Conditions* (March 2002), which included soil sampling for OCPs in open spaces within EHA, indicated that chlordane concentrations were highest adjacent to and beneath residential structures within EHA, and were not detectable in open spaces between and surrounding structures.

Recognizing that abatement and/or reduction of OCP levels to below RBSLs (or other, more restrictive regulatory criteria) would be necessary in order to render EHA suitable for future unrestricted residential use, (Alameda Reuse and Redevelopment Authority), which is the approved use of the EHA property, ARRA, City of Alameda and Catellus began to evaluate the regulatory implications of the OCP remaining in soil. During an 11 November 2001 meeting at Alameda Point, representatives of the City and the City's developer addressed these implications and potential actions.

The primary issue was whether regulation by the California Department of Toxic Substances Control (DTSC) (the lead regulatory agency), in the form of a Cleanup and Abatement Order, would be necessary to allow OCP remediation to proceed to a successful conclusion. It was agreed that DTSC issuance of a formal order would significantly delay implementation of OCP abatement actions, and thereby create significant delays in site redevelopment activities and increasing the costs associated with remediation. Conversely, voluntary implementation of OCP abatement actions by the City and the developer, with the full concurrence of DTSC but without the need to issue a formal regulatory order, would make the OCP remediation process both faster and cheaper. Counsel to ARRA agreed to contact DTSC to determine the agency's position on this matter.

From counsel's discussions with DTSC, it was determined that the DTSC does not consider OCPs in soil at EHA actionable under Chapter 6.8 of the California Health and Safety Code (i.e., a "release") as long as the structures for which the OCPs were applied are intact. However, upon removal of those structures, residual OCPs in soil could be actionable and subject to DTSC order, depending on the levels of the OCPs left in the soil. As stated above, OCPs exceeded the Regional Water Quality Control Board's risk based screening levels. Based on these and subsequent internal City/developer team discussions, it was determined that ERM and Ferma Corporation, with assistance from W&K, would prepare the Demolition and Organochlorine Pesticide Removal Workplan (DOCPRW) to address all site demolition activities as well as OCP removal. Given that OCP removal actions would be performed prior to and concurrent with structure demolition, it was agreed between DTSC and the City/developer team that removal of the OCPs would not require issuance of a cleanup and abatement order in order to be acceptable to DTSC. Instead, DTSC agreed to provide a concurrence letter for the DOCPRW once

appropriate DTSC input was provided and incorporated. This DTSC letter would be in lieu of an order.

From December 2001 through January 2002, ERM and Ferma crafted a draft version of the DOCPRW for internal review. Ferma concentrated on building demolition (including asbestos and lead-based paint removal) and related activities; ERM's focus was OCP removal and associated confirmation sampling. While preparing the DOCPRW, ERM remained in close communication with Mr. Henry Wong and Mr. Daniel Murphy of DTSC's Northern California Office of Military Facilities to make sure their input was included. A draft DOCPRW was submitted for DTSC review on 8 February 2002.

The City/developer team received DTSC comments on the draft DOCPRW on 4 March 2002. DTSC's comments focused primarily on confirmation sampling issues and clarification of DTSC's jurisdiction under Section 6.8 of the Health and Safety Code. ERM addressed DTSC's comments and provided a revised draft DOCPRW on 8 March 2002.

In response to the revised draft DOCPRW, DTSC provided one additional comment in a letter dated 19 April 2002. DTSC's only comment was to request collection of confirmation samples from immediately adjacent to the foundation exteriors instead of within three feet. This recommendation was incorporated, and a Final DOCPRW was produced on 23 April 2002. DTSC provided its concurrence on the document in a letter dated 3 May 2002. (attached)

Pursuant to DTSC's concurrence, the City and its developer implemented OCP removal actions in May 2002. As documented in a letter from ERM to DTSC dated 17 May 2002 (attachment), W&K's preliminary confirmation sampling found that soil contaminated with OCPs remained beneath the grade beams and foundation footings following primary excavation. ERM indicated that to effectively remove the OCPs, it would be necessary to remove the grade beams and foundation footings, and that such actions constitute a part of the ongoing demolition effort consistent with the DOCPRW. In an 18 May 2002 telephone conversation between Henry Wong of DTSC and Mike Quillin of ERM, Mr. Wong concurred with that approach.

OCP removal actions continued into early August 2002, when the last of 113 buildings were demolished and cleared (and all OCPs had been removed to concentrations below applicable cleanup criteria established in the DOCPRW). A completion report documenting OCP removal actions and other activities associated with site demolition is pending preparation by ERM.