to take further remedial action, because there is no residual risk requiring further response action. All remedial action necessary to protect human health and the environment with respect to hazardous substances in the Marsh Crust has been taken.

## 5.1 MARSH CRUST ISSUE

Organic chemicals (polynuclear aromatic hydrocarbons [PAH] and total petroleum hydrocarbons [TPH]) are present in subsurface soil, between the historical marshlands and former subtidal surface and the overlying fill material used to construct Alameda Point. This layer is covered with an average of 8 feet (range of 4 to 10 feet below ground surface) of fill soil and is commonly known as the Marsh Crust or former subtidal area. PAH- and TPH-contaminated soils were present prior to 1936, when the Navy took ownership of the property.

Two manufactured gas plants and an oil refinery, formerly located on the western tip of Alameda Island from the late 1800s to 1920s, discharged petroleum waste to adjacent marshlands during their operation. The discharge contained semivolatile organic compounds, PAHs, and TPH. The waste migrated over much of the marsh and subtidal surface through tidal actions, leaving a layer of contaminated sediment under what would later become Alameda Point. Fill material dredged from the Oakland Inner Harbor and San Francisco Bay was placed onto these areas from the late 1800s to as late as 1975, essentially encapsulating the Marsh Crust or former subtidal area under the fill.

The area affected by the Marsh Crust or former subtidal area is about 727 acres in size and includes the East Housing area. Currently, contaminated sediments in this area do not pose a risk to human health or the environment, because no complete exposure pathways exist. However, future construction activities (that may occur after property transfer) could bring contaminated sediments to the surface and thereby create a complete exposure pathway to future residents or construction workers. To address this concern, the City of Alameda has prepared an excavation ordinance that specifically applies to areas potentially affected by the Marsh Crust, including the East Housing Area. The excavation ordinance was presented to the city council at a public hearing on January 18, 2000, was approved after a second reading on February 4, 2000, and took effect 30 days thereafter.

The ordinance requires a permit for any excavation work that could expose construction workers to the Marsh Crust or could result in Marsh Crust materials being brought to the ground surface. A threshold depth has been established above the Marsh Crust; any work below the threshold depth requires a permit.

The threshold depth is designed to maintain an adequate margin of safety. Permittees are required to either manage any excavation in the Marsh Crust area as though the affected soil is hazardous or to demonstrate through testing that the material in the excavation area is not hazardous. In addition, the permittee is required to prepare a health and safety plan (ensuring protection of workers and the public) for any excavation requiring a permit. Noncompliance with the ordinance is a misdemeanor.

## 5.2 BENEFICIAL USE OF GROUNDWATER

As described in the most recent Groundwater Beneficial Use Determination Reports for NAS Alameda and the FISCO Alameda Annex/Alameda Facility (TtEMI 1999b, 1999c), the groundwater at the East Housing Area likely exceeds the federal Class II total dissolved solids threshold of 10,000 milligrams per Liter (mg/L). The East Housing Area's water needs are currently being served by the public water supply provided by the East Bay Municipal Utilities District, and it is not anticipated that this groundwater will be used for drinking water. No chemicals of concern have been detected in groundwater at the East Housing Area. However, the East Housing Area is located east and south of groundwater plumes containing petroleum hydrocarbons. These plumes are associated with the former service station at the Navy Exchange on Alameda Point (Installation Restoration [IR] Site 7) and the former scrap yard (IR Site 2) at the FISCO Alameda Annex/Alameda Facility. These nearby plumes could be mobilized if groundwater is extracted from the shallow zone at the East Housing Area. The groundwater is addressed in the Covenant to Restrict Use of Property, which prohibits construction of any water well screened for the extraction of water from the shallowest groundwater zone and extraction, utilization, or consumption of water from this zone. As long as the transferee complies with the existing requirements regarding well installation in Alameda, the presence of the nearby plumes should not pose a concern to human health or the environment at the East Housing Area.

# 6.0 SUMMARY OF ENVIRONMENTAL FINDINGS

Section 6.1 presents the hazardous substances notification required under CERCLA. Sections 6.2 through 6.7 summarize available information regarding environmental concerns at the East Housing Area parcels. Table 2 provides a list of environmental factors and resources considered. Those factors or parcels identified with a "yes" in Table 2 indicate that the factor affects the transfer.

The Navy believes that certain information contained in this section warrants permanent notification by deed to the future owner(s) of the property. Specific deed restrictions and notifications are provided at the end of each section.

## 6.1 HAZARDOUS SUBSTANCE NOTIFICATION

Hazardous substances were stored on various parcels throughout former NAS Alameda as part of routine activities. Hazardous substances stored at Parcels 170 and 171 were limited to small quantities of pesticides and herbicides used in routine maintenance activities. All of these hazardous substances were known to have been stored from October 1992 to October 1993.

## 6.2 MARSH CRUST NOTIFICATION

Hazardous substances have been identified in the Marsh Crust. These hazardous substances are not associated with Navy activities at the property, but do require institutional controls memorialized in the deed, as described above. In addition, shallow soil sampling has revealed the presence of PAHs in soil. As discussed in the soils investigation summary prepared by ERM-West (1999), detected concentrations do not pose an unacceptable risk to human health under a residential reuse scenario.

**Notifications:** A notice of known storage and release or disposal of hazardous substances is required by CERCLA Section 120(h)(1). The notice of hazardous substances stored/disposed/released is contained in Table 3.

**Restrictions: MARSH CRUST/SUBTIDAL ZONE SOIL MANAGEMENT**

**REQUIREMENTS.** The "Marsh Crust" is defined as the underground layer that is the remnant of the tidal marsh that existed along the shoreline of Alameda Island before filling to create additional dry land. This layer contains hazardous materials and hazardous substances, pollutants, and contaminants that were retained in the historic marsh before filling. The owner shall comply with City of Alameda Ordinance No. 2824 regarding Excavation Into the Marsh Crust/Subtidal Zone at the Former Naval Air Station Alameda and Fleet and Industrial Supply Center, Alameda Annex and Facility. In the event that DTSC has notified the City that the Ordinance does not protect human health or safety or the environment, then GRANTEE shall not excavate below the "threshold depth" as defined in the Excavation Ordinance, without prior written approval of DTSC. GRANTOR and GRANTEE acknowledge that certain Covenant to Restrict Use of Property (Environmental Restrictions) dated February 15, 2000 (the "State Covenant") by and between the City of Alameda, as Covenantor, and the California Environmental Protection Agency – Department of Toxic Substances Control, as Covenantee, which sets forth restrictions applicable to the Marsh Crust. The restrictions set out in this paragraph, which are enforceable by the United States of America acting by and through the Department of the Navy, shall be interpreted in a manner that is

consistent and not in conflict with the restrictions set forth in the State Covenant which is enforceable by DTSC. A failure to enforce the State Covenant by DTSC shall not preclude the Navy from enforcing this restriction.

## 6.3 INSTALLATION RESTORATION SITES

No IR sites are located in the East Housing Area; the closest IR sites are IR Site 7 (on Alameda Point) and IR Site 2 (on the FISCO Alameda Annex/Alameda Facility). Based on available information, low levels of petroleum hydrocarbons have migrated underneath Main Street from IR Site 7 and under the warehouses north of Parcel 170 from IR Site 2. Constituents in the two groundwater plumes have not impacted the East Housing Area. However, as discussed in Section 5.2, should shallow groundwater be extracted at the East Housing Area in the future, it is possible that future residents could be exposed to petroleum compounds, including benzene.

**Notifications:** IR Site 7 is located west of the East Housing area, and IR Site 2 is located northeast of the East Housing Area. Extraction of shallow groundwater at the East Housing Area may result in migration of the IR Site 7 or IR Site 2 contaminant plumes to the East Housing Area.

**Required Deed Restrictions:** The grantee and its successors are prohibited from: (1) installing wells into the shallow groundwater (first aquifer) at the East Housing Area, (2) extracting shallow groundwater at the East Housing Area, and (3) allowing or causing the use of shallow groundwater at the East Housing Area.

## 6.4 ASBESTOS-CONTAINING MATERIAL

Asbestos-containing material (ACM) is prevalent in the World War II-era buildings at Alameda Point. The mere presence of asbestos in a building does not preclude the parcel from transfer; however, asbestos that poses a threat to human health must be abated in accordance with applicable local, state, and federal laws and regulations. In accordance with DoD policy (DoD 1994b), the Navy is required to abate asbestos that is damaged, friable, and accessible prior to transfer of buildings intended for reuse. Asbestos surveys for Parcels 170 and 171 were performed by the Navy Public Works Center (PWC) Norfolk, in 1995 (PWC 1996a). Because suspect ACM was present throughout the East Housing Area, buildings were randomly surveyed. The surveys showed that asbestos was present in floor tiles, mastic, and drywall throughout the East Housing Area. Roofing materials were assumed to contain asbestos, but were not sampled to avoid harming the integrity of the roofs. All ACM identified was nonfriable and in

good condition, with low potential for damage to occur. Replacement of drywall, built-up roofs, and floor tiles was the recommended response action during renovation of buildings throughout the East Housing Area.

Since the ACM survey was completed, it has been determined that the buildings located in the East Housing area will be demolished (Brady/LSA 1999), not renovated. Therefore, the only concern posed by the presence of ACM in the East Housing Area is the potential for release during demolition.

**Notifications:** ACM is present in the buildings located on Parcels 170 and 171. The ACM currently poses no human health or environmental problems. However, if the ACM is not managed in compliance with applicable local, state, and federal laws and regulations, it may become a hazard during demolition of the buildings. The transferee will be responsible for managing ACM in compliance with all federal, state, and local laws relating to asbestos.

**Required Deed Restrictions:** None

## 6.5 LEAD-BASED PAINT

Lead-based paint (LBP)hazards are defined in the Federal Residential Lead-based Paint Hazard Reduction Act of 1992, as codified in 42 USC Section 4852d (Title X) as "any condition that causes exposure to lead ... that would result in adverse health effects." Lead exposure is especially harmful to young children and pregnant women. The LBP Act provides for regulation of the abatement of lead hazards from LBP, lead-contaminated dust, and lead-contaminated soil for target housing only. The LBP Act defines target housing as any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing for the elderly or persons with disabilities) or any 0-bedroom dwelling. In addition, the deed requires the seller and lessor to disclose the possibility of LBP and LBP hazards on residential housing built before 1978, in accordance with Title 40 CFR Part 745.

The Navy is required by the LBP Act and subsequent DoD BRAC guidelines (DoD 1994b) to survey and abate LBP hazards on target housing constructed before 1960. DoD guidelines also stipulate that LBP surveys be conducted at target housing constructed between 1960 and 1978. No survey or abatement is required to be conducted at housing constructed after 1978. One of the exceptions to the DoD policy is

that inspection or abatement of target housing is not required if the buildings are scheduled for demolition.

EPA and DTSC disagree with DoD guidelines on LBP hazards in soil. It is EPA's and DTSC's position that contamination of soil resulting from LBP constitutes a CERCLA release.

PWC Norfolk conducted an LBP survey on Parcels 170 and 171 in March 1996 (PWC 1996b). LBP was identified in areas throughout the interior and exterior of units within the FOST area. Several of the surfaces were found to have LBP in a damaged condition. These areas were considered to be short-response items, and PWC Norfolk recommended that they be restored or removed. PWC Norfolk also recommended that an operations and maintenance program be developed for all LBP components. Paint restoration, component replacement, and enclosure were recommended at various locations throughout the FOST area. However, as indicated earlier, the buildings at the East Housing Area are slated for demolition. Therefore, remediation of LBP in the structures is not required prior to transfer. The only potential concerns associated with LBP in the structures are the potential for releases during demolition and the potential for improper disposal of contaminated building materials.

PWC Norfolk also conducted sampling of lead in soil adjacent to the buildings. Fifty-five samples were collected from the East Housing area (PWC 1996b). Only two of the samples contained lead at concentrations exceeding the 400 milligrams per kilogram (mg/kg) screening level set by the EPA Region IX Preliminary Remediation Goals. One of these samples contained 409 mg/kg lead, the other contained 531 mg/kg lead. Therefore, PWC Norfolk concluded that no current hazards are associated with lead in dust or lead in soil within the FOST area. Nonetheless, as required by the most recent LBP Field Guide issued by DoD and EPA (DoD and EPA 1999), the transferee will be required to assess the property for soil-lead hazards following demolition. Abatement of any identified hazards must be conducted prior to the occupancy of any newly constructed dwellings.

**Notifications:** LBP exists in residential buildings at the East Housing Area constructed before 1978. Lead exposure is especially harmful to young children and pregnant women. No part of the premises, or any buildings, facilities, or other improvements on them, shall be used (or allowed to be used) for residential habitation or by children under 6 years of age, unless and until all LBP hazards are abated prior to such occupancy. For purposes of this transfer, the transferee shall comply with all applicable federal, state, and local laws and regulations relating to LBP.

Although the buildings will be demolished following transfer, in accordance with 24 CFR Part 35 and 40 CFR Part 745, at the time of transfer, the disclosure information on LBP or LBP hazards shall include the elements in, Sample Form for Transfer of Residential Dwellings, as shown in Appendix D. In accordance with 24 CFR Part 35 and 40 CFR Part 745, at the time of transfer, the disclosure information on LBP and/or LBP hazards must be listed in the transfer form paragraph (a) (i):

"Section (a) (i) serves as a disclosure that lead-based paint (LBP) exists in residential buildings built prior to 1978 at Alameda Point which are part of this FOST. The basis for the determination that LBP and/or LBP hazards exists in the housing, the location of the LBP or LBP hazards, and the conditions of the painted surfaces are contained in the report(s) listed below."

The notice, in accordance with 24 CFR 35.88, shall include all reports available pertaining to LBP or LBP hazards in the housing area. The documents will be listed in Section (b) (i) of the transfer form and include:

- Lead Management Plan Townhouses NAS Alameda (PWC 1996b)
- Any other reports containing information on LBP at the East Housing Area developed prior to the transfer of the property
- A lead hazard information pamphlet in accordance with the Residential Lead-based Paint Hazard Reduction Act and 24 CFR Part 35 titled, Protect Your Family from Lead in Your Home (EPA No.747-K-94-001), as noted in Paragraph (d) of the transfer form

In addition, the transferee is required to assess the property for soil-lead hazards following demolition of any target units. Abatement of any identified hazards must be conducted prior to the occupancy of any newly constructed dwellings.

**Required Deed Restrictions:** None

## 6.6 POLYCHLORINATED BIPHENYLS

Polychlorinated biphenyls (PCB) are regulated under the Toxic Substances Control Act (TSCA) and are also a hazardous substance under CERCLA. For a detailed description of PCB-contaminated units, refer to the Annual PCB Survey Report dated March 1999 (Navy 1999). No equipment at the East Housing Area contains PCBs at concentrations exceeding the TSCA threshold (50 parts per million [ppm]). California state law dictates that equipment containing over 5 ppm of PCBs must be disposed of as

hazardous waste after it has become decommissioned. Three pieces of equipment located at the East Housing Area contain more than 5 ppm of PCBs (10.2, 11.7, and 41.2 ppm, respectively).

**Notification:** Equipment containing PCBs in the concentration range of 5 to 41.2 ppm exists at the East Housing Area. The transferee will be responsible for managing this equipment in compliance with all applicable federal, state, and local laws and regulations.

**Required Deed Restrictions:** None

## 6.7 RADON

Radon is of concern in buildings where it may potentially accumulate and pose a health risk. Regional geologic conditions at Alameda Point indicate that areas of naturally occurring granitic material (the source of radon) are generally absent; therefore, radon is not considered to be a concern at Alameda Point.

**Notification:** None

**Required Deed Restriction:** None

## 6.8 PESTICIDES

No evidence exists to suggest that pesticides and herbicides, other than those ordinarily and routinely applied in a manner consistent with the standards for licensed application, were ever used at Alameda Point and the former NAS Alameda.

A review of pest management plans from PWC indicates that the following were typical of herbicides and pesticides that were used at former NAS Alameda. The following herbicides, insecticides, termiticides, and rodenticides may have been used at the former NAS Alameda:

- PT-515 (Wasp Freeze)
- Dursban 2E
- Drione
- Ficam W
- Talon G

Pesticides, herbicides, insecticides, termiticides, and rodenticides were applied intermittently on an as-needed basis at former NAS Alameda, either by personnel from the PWC Pest Control Department or by contractor personnel. All personnel who routinely applied pest control substances were trained and licensed in the proper and legal application of pesticides, including the insecticides, termiticides, and rodenticides listed previously. Pesticides were applied in accordance with the manufacturer's directions, state and federal EPA registered pesticide label directions, and the installation's annually approved pest management plan. Because the pesticides and herbicides were routinely applied in a manner consistent with the standards for licensed application, they likely do not pose a threat to human health or the environment. In addition, records do not indicate that parcels covered by this FOST have been used to store pesticides in any great quantity.

**Notification:** None

**Required Deed Restriction:** None

## 7.0 RECOMMENDED DEED NOTIFICATIONS AND RESTRICTIONS

Deed restrictions and notifications are provided below. In addition, the Marsh Crust excavation ordinance applies to the East Housing Area.

**Notifications:**

- IR Sites 7 and 2 are located west and north of the East Housing Area. Extraction of shallow groundwater at the East Housing Area may result in migration of IR Sites 7 and 2 groundwater plume contaminants into the groundwater underlying the East Housing Area.

- ACM is present in the buildings located on Parcels 170 and 171. The ACM currently poses no human health or environmental problems. However, if the ACM is not managed in compliance with applicable local, state, and federal laws and regulations, it may become a hazard during demolition of the buildings. The transferee will be responsible for managing ACM in compliance with all federal, state, and local laws relating to asbestos.

- LBP exists in residential buildings at the East Housing Area constructed before 1978. Lead exposure is especially harmful to young children and pregnant women. No part of the premises, or any buildings, facilities, or other improvements on them, shall be used (or allowed to be used) for residential habitation or by children under 6 years of age, unless and until all LBP hazards are abated prior to such occupancy. For purposes of this

transfer, the transferee shall comply with all applicable federal, state, and local laws and regulations relating to LBP.

Although all buildings at the East Housing Area are slated for demolition following transfer, in accordance with 24 CFR Part 35 and 40 CFR Part 745, at the time of transfer, the disclosure information on LBP or LBP hazards shall include the elements in Sample Form for Transfer of Residential Dwellings, as shown in Appendix D. In accordance with 24 CFR Part 35 and 40 CFR Part 745, at the time of transfer, the disclosure information on LBP or LBP hazards must be listed in the transfer form in Paragraph (a) (i).

"Section (a) (i) serves as a disclosure that lead-based paint (LBP) exists in residential buildings built prior to 1978 at Alameda Point which are part of this FOST. The basis for the determination that LBP or LBP hazards exists in the housing, the location of the LBP and/or LBP hazards, and the conditions of the painted surfaces are contained in the report(s) listed below."

The notice, in accordance with 24 CFR 35.88, shall include all reports available pertaining to LBP or LBP hazards in the housing area and will include the following documents to be listed in Paragraph (b) (i):

- Lead Management Plan Townhouses NAS Alameda for Capehart (PWC 1996b)
- Any other reports containing information on LBP at the East Housing Area, developed prior to the transfer of the property
- A lead hazard information pamphlet in accordance with the Residential Lead-based Paint Hazard Reduction Act and 24 CFR Part 35 titled, Protect Your Family from Lead in Your Home (EPA No. 747-K-94-001), as noted in Paragraph (d).

In addition, the transferee is required to assess the property for soil-lead hazards following demolition of any target units. Abatement of any identified hazards must be conducted prior to the occupancy of any newly constructed dwellings.

- Equipment containing PCBs in the concentration range of 5 to 41.2 ppm is located at the East Housing Area. The transferee will be responsible for managing this equipment in compliance with all applicable federal, state, and local laws and regulations.

**Restrictions:**

The Quitclaim Deed and Environmental Restrictions Pursuant to California Civil Code Section 1471 for East Housing Portion of NAS Alameda, Environmental Restriction section states the following:

- **MARSH CRUST/SUBTIDAL ZONE SOIL MANAGEMENT REQUIREMENTS.** "Marsh Crust" is defined as the underground layer that is the remnant of the tidal marsh that existed along the shoreline of Alameda Island before filling to create additional dry

land. This layer contains hazardous materials and hazardous substances, pollutants, and contaminants that were retained before filling operations. The owner shall comply with City of Alameda Ordinance No. 2824 regarding Excavation Into the Marsh Crust/Subtidal Zone at the Former Naval Air Station Alameda and Fleet and Industrial Supply Center, Alameda Annex and Facility. In the event that DTSC has notified the City that the ordinance does not protect human health or safety or the environment, then Grantee covenants and agrees that it shall not excavate below the "threshold depth" as defined in the Excavation Ordinance, without prior written approval of DTSC. GRANTOR and GRANTEE acknowledge that certain Covenant to Restrict Use of Property (Environmental Restrictions) dated February 15, 2000 (the "State Covenant") by and between the City of Alameda, as Covenantor, and the California Environmental Protection Agency – Department of Toxic Substances Control, as Covenantee, which sets forth restrictions applicable to the Marsh Crust covered by this paragraph, which are enforceable by the United States of America acting by and through the Department of the Navy, shall be interpreted in a manner that is consistent and not in conflict with the restrictions set forth in the State Covenant which is enforceable by DTSC. A failure to enforce the State Covenant by DTSC shall not preclude the Navy from enforcing this restriction.

## 8.0 REQUIRED ENVIRONMENTAL COVENANTS

The two parcels at Alameda Point deemed suitable to transfer in this document will be transferred in accordance with federal real property disposal laws. The deed will contain the notice of hazardous substances, as required by CERCLA Section 120(h)(3)(A)(i), and will also contain the deed covenant required by Section 120(h)(3)(A)(ii) of CERCLA. The deed for conveyance of this property will contain the following:

For both parcels (Parcels 170 and 171) with ECP Area Type 4, the following applies:

Under 42 USC §9602(h)(3), with respect to any portion of the Real Estate on which any hazardous substance was stored for 1 year or more, known to have been released, or disposed of:

A. Grantor covenants that all remedial action necessary to protect human health and the environment with respect to any such substance remaining on the Property was taken before the date of transfer to Grantee.

B. Any additional remedial action found to be necessary after the date of such transfer shall be conducted by the Grantor.

C. Grantee covenants that Grantor shall have access to the Property in any case in which remedial action or corrective action is found to be necessary after the date of such transfer.

D. Grantor is hereby giving notice to Grantee of Section 6.1 of the FOST entitled "Hazardous Substances Notification".

## 9.0 FINDING OF SUITABILITY TO TRANSFER

The transfer proposal has been adequately assessed and evaluated for: (1) environmental hazards and (2) environmental impacts anticipated from future use of the property. The intended reuse, as outlined in the Reuse Plan of the designated parcels at Alameda Point, does not present a current or future risk to human health or the environment, provided the above-discussed restrictions are followed. Based on the foregoing information and analysis, the property covered by this FOST is suitable for transfer.

G.J. Buchanan 4/19/00

G.J. Buchanan, CAPT, CEC, USN
Commanding Officer
Engineering Field Activity, West
Naval Facilities Engineering Command

## REFERENCES

Alameda Reuse and Redevelopment Authority (ARRA). 1996. "Alameda Point Community Reuse Plan." January.

Brady/LSA. 1999. "Catellus Mixed Use Development EIR." Public Review Draft. December.

Department of Defense (DoD). 1994a. "Preparation of a Finding of Suitability to Transfer for Base Realignment and Closure (BRAC) Property." June.

Department of the Navy (Navy). 1999. "Annual PCB Survey Report, Alameda Point Alameda, California." March.

DoD. 1994b. "Asbestos, Lead-based Paint, and Radon Policies at BRAC Properties." October.

DoD and U. S. Environmental Protection Agency (EPA) 1999. *Lead-based Paint Field Guide*. 1999.

ERM-West, Inc. (ERM) 1994. "Final Environmental Baseline Survey/Community Environmental Response Facilitation Act Report for NAS/NADEP Alameda." October.

ERM. 1999. "Soils Investigation at the Alameda Point East Housing Area, Alameda, California." December.

International Technology Corporation (IT). 1998a. "Zone Analysis Data/Sampling Phase 2A." December.

IT. 1998b. "Environmental Baseline Survey for NAS Alameda." December.

IT. 1998c. "Zone Summary Reports for NAS Alameda." December.

IT. 2000. "Parcel Evaluation Data Summary Phase 2A Sampling Zone 16: The Housing Zone Parcel 170: Family Housing Alameda Point Alameda, California." April.

IT. 2000. "Parcel Evaluation Data Summary Phase 2A Sampling Zone 16: The Housing Zone Parcel 171: Family Housing Alameda Point Alameda, California." April.

Navy. 2000a. "Final Environmental Impact Statement for the Disposal and Reuse of Naval Air Station Alameda and the Fleet and Industrial Supply Center, Alameda Annex and Facility, Alameda, California." February 29th.

Navy. 2000b. "Record of Decision Disposal and Transfer of Former Naval Air Station Alameda and FISC Alameda Facility/Alameda Annex, California." February 29th.

Navy. 2000c. "Marsh Crust Time Critical Removal Action at Parcels 170 and 171 Alameda Point (The Former Naval Air Station Alameda), California." April 7th.

Navy Public Works Center, Norfolk (PWC). 1996a. "Asbestos Management Plan, Townhouses NAS Alameda." March.

PWC. 1996b. "Lead Management Plan, Townhouses NAS Alameda." March.

## REFERENCES (Continued)

TtEMI. 1997b. "Final Sector II Finding of Suitability to Lease Zones 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, 15, 16 (Partial), 20, 21, and 23 Naval Air Station Alameda." April.

TtEMI. 1998a. "Parcel Reclassification Memorandum Revision 01 Alameda Point Alameda, California." December.

TtEMI. 1998b. "BRAC Cleanup Plan Revision 05: Alameda Point, Alameda, California." December.

TtEMI. 1999a. "Environmental Baseline Survey Qualitative Data Base." September.

TtEMI. 1999b. "Final Basewide Groundwater Beneficial Use Report: FISCO Alameda Annex/Alameda Facility." October.

TtEMI. 1999c. "Determination of the Beneficial Uses of Groundwater at Alameda Point, Alameda, California." Revised Draft. November.

TtEMI. 2000. "UST Summary Report, Alameda Point Alameda, California." April.

# Exhibit 1

# Attachment C

*Appendix A*

# APPENDIX A

## LEGAL DESCRIPTION OF THE PROPERTY

**(Five Pages)**

**Brian Kangas Foulk**

Engineers • Surveyors • Planners

**EXHIBIT A**
**Legal Description**
**Naval Air Station Alameda**
**EAST HOUSING**

A Parcel of land being a portion of the Alameda Naval Air Station, Alameda, California, lying in the city and county of Alameda, State of California, and being all of the Parcel described in that certain deed recorded June 18, 1963 in Book 924 of Official Records at page 879, Alameda County Records, and being all of the Parcel described in that certain deed recorded April 29, 1963 in Book 871 of Official Records at page 597, Alameda County Records, and being a portion of the Parcel described in that certain deed recorded March 28, 1941 in Book 4023 of Official Records at page 499, Alameda County Records, more particularly described as follows:

BEGINNING at the intersection of the northerly line of Atlantic Avenue, being 51 feet wide, and the easterly line of Main Street as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Maps at page 16 through 22, inclusive, in the Office of the Recorder of Alameda County:

1. Thence along said easterly line of Main Street and the westerly boundary line of the Parcel described in that certain deed recorded March 28, 1941 in Book 4023 of Official Records at page 499, Alameda County Records, North 00°34'39" East, 1240.61 feet to the northerly line of those lands acquired by the United States of America, filed June 18, 1963 in Book 924 of Official Records at page 879, Alameda County Records;

2. Thence leaving said easterly line of Main Street and continuing easterly along the Northerly line of said lands acquired by United States of America, filed June 18, 1963 in Book 924 of Official Records at page 879, Alameda County Records. South 87°51'51" East, 2575.48 feet to the easterly line of those lands acquired by United States of America, filed April 29, 1963 in Book 871 of Official Records at Page 597, Alameda County Records;



540 Price Avenue • Redwood City, CA 94063 • (650) 482-6300 • FAX (650) 482-6399

3. Thence along the easterly line of said lands acquired by United States of America, filed April 29, 1963 in Book 871 of Official Records at page 597, Alameda County Records, South 02°08'09" West, 1242.27 feet to the northerly line of Atlantic Avenue, being 51 feet wide, as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Maps at page 16 through 22, inclusive, Alameda County Records;

4. Thence westerly along said northerly line of Atlantic Avenue, being 51 feet wide, as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Maps at page 16 through 22, inclusive, North 85°25'50" West, 729.46 feet;

5. Thence continuing westerly along said northerly line of Atlantic Avenue, being 51 feet wide, as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Maps at page 16 through 22, inclusive, South 89°49'12" West, 884.17 feet;

6. Thence continuing westerly along said northerly line of Atlantic Avenue, being 51 feet wide, as shown on that certain map entitled "OFFICIAL RESURVEY OF PORTION OF SEGREGATION LINE AND VICINITY", filed for record on August 13, 1951 in Book 3 of Maps at page 16 through 22, inclusive, North 87°26'26" West, 929.52 feet to the POINT OF BEGINNING.

Containing an area of 72.47048 acres, more or less.

Basis of Bearing Note:
Bearings are based on the California Coordinate System of 1927 Zone III using the bearing of South 88°34'15" East between USC & GS Station "MAIN ATL" 1973 Adjustment Value and USC & GS station "ALT FIFTH" 1973 adjustment value.

All distances in this description are grid distances. Multiply by 1.0000705 to obtain ground distances.

A plat showing the above description is attached herein and made a part hereof as Exhibit "B".

This description was prepared by me or under my direction in conformance with the requirements of the Land Surveyor's Act.

Approved By:

Mike Mahoney

Mike Mahoney, P.L.S. 5577
Department of the Navy
EFA-West San Bruno, CA

Dated: Mar. 23, 2000

K:\MAIN\1999\98022\1\LEGALS\EHOUSE.DOC

Exhibit "A"
Page 3 of 3




**Brian Kangas Foulk**
Engineers • Surveyors • Planners

540 Price Avenue
Redwood City, CA 94063
650/482-6300
650/482-6399 (FAX)

Subject EXHIBIT "B"
EAST HOUSING
Job No. 980221-10
By SPM Date 3-23-00 Chkd. MP
SHEET 1 OF 1

------------------------------------------------------------------------------------------

Lot name: EHOUSE_ 1

```
   North: 471031.6598              East: 1482777.2652
Line   Course: N 00-34-39 E  Length: 740.340
         North: 471771.9622              East: 1482784.7272
Line   Course: N 00-34-39 E  Length: 500.273
         North: 472272.2098              East: 1482789.7695
Line   Course: S 87-51-51 E  Length: 1797.951
         North: 472205.2025              East: 1484586.4714
Line   Course: S 87-51-51 E  Length: 777.530
         North: 472176.2250              East: 1485363.4612
Line   Course: S 02-08-09 W  Length: 500.030
         North: 471676.5424              East: 1485344.8258
Line   Course: S 02-08-09 W  Length: 742.244
         North: 470934.8140              East: 1485317.1633
Line   Course: N 85-25-50 W  Length: 729.458
         North: 470992.9280              East: 1484590.0239
Line   Course: S 89-49-12 W  Length: 884.170
         North: 470990.1503              East: 1483705.8582
Line   Course: N 87-26-26 W  Length: 929.520
         North: 471031.6588              East: 1482777.2655

   Perimeter: 7601.515   Area: 3,156,814 sq.ft. 72.47048 acres

Mapcheck Closure - (Uses listed courses, radii, and deltas)
Error Closure: 0.0010                  Course: S 17-34-37 E
  Error North: -0.00098                  East: 0.00031
Precision  1: 7,373,139.626
```

# Exhibit 1

# Attachment C

*Appendix B*

# APPENDIX B

## PUBLIC NOTICES

(Five Pages)

**PROOF OF PUBLICATION**
**(2015.5 C.C.P.)**

TATE OF CALIFORNIA
County of Alameda

I am a citizen of the United States and a resident of the County aforesaid; I am over the age of eighteen years, and not a party to or interested in the above-entitled matter.

I am the Principal Legal Clerk of the Alameda Journal, a newspaper of general circulation, printed in Contra Costa County and Published in County of Alameda.

And which newspaper has been adjudged a newspaper of general circulation by the Superior Court of the County of Alameda, State of California, under the date of, August 25,1992. Case Number 702515-6.

The notice, of which the annexed is a printed copy (set in type not smaller than nonpareil), has been published in each regular and entire issue of said newspaper and not in any supplement thereof on the following dates, to-wit:

December 31

all in the year of 1999

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Executed at Walnut Creek, California.
On this 31 day of December, 1999

Shelly Taylor
Signature

Alameda Journal
1416 Park Ave.
Alameda, CA 94501-4520
(510) 748-1666

Proof of Publication of:
(attached is a copy of the legal advertisement that published)

**PUBLIC NOTICE**

**NAVY INTENDS TO SIGN A FINDING OF SUITABILITY FOR TRANSFER FOR ALAMEDA POINT**
**ALAMEDA, CALIFORNIA**

The Department of the Navy (Navy) intends to transfer to the City of Alameda, the Alameda Point East Area. The property consists of Parcels 170 and 171 (72.5 acres of onshore property) located in the easter of Alameda Point, California. The Finding of Suitability to Transfer (FOST) property is currently owned by Navy and will be transferred to the City of Alameda for residential land use. One hundred-thirteen b consisting of multi-family residences, are currently located in the FOST area. In accordance with Depar Defense guidance on the process to reach a FOST, notice is hereby given that the Navy intends to sign a FO about March 13, 2000, in connection with the transfer of the Alameda Point East Housing Area.

This transfer is in accordance with Section 120(h) of the Comprehensive Environmental Response, Compen and Liability Act and the Community Environmental Response Facilitation Act that requires the identificatic documentation of all uncontaminated real property at former Department of Defense facilities.

The decision to transfer the property was made after a comprehensive review of the environmental condition property and in consultation with the California Department of Toxic Substances Control and the U.S. Environmental Protection Agency, Region IX. The property will be transferred after the determination that: property is suitable for future residential use; (2) the intended use is consistent with the protection of human and the environment; and (3) the public has had at least 30 days to comment on the suitability of the property transfer.

Alameda Point, formerly Naval Air Station Alameda, was primarily used as a defense facility since the U.S. acquired the western tip of Alameda Island from the City of Alameda in 1930. The Navy acquired title to the from the Army in 1936. The Navy Public Works Center and Naval Aviation Depot Alameda were the two la tenants at the facility. Industrial activities at the facility included the use of solvents, acids, paint strippers, degreasers, caustic cleaners, and metal plating chemicals. However, industrial activities have never occurred East Housing Area. The East Housing Area has only been used as residential housing and is located outside industrial zone. The sites are discussed in more detail in the Draft FOST.

The public is invited to review and comment on this proposed transaction beginning on December 31, 1999. Navy will consider written comments received by January 31, 2000. For more information or to send written comments, please contact Warren Yip or John Hill at the address and phone numbers below:

**For additional information contact:**

Mr. Warren Yip
Remedial Project Manager
Engineering Field Activity West
900 Commodore Dr. Bldg. B-206 (U)
San Bruno, CA 94066-5006
Phone 650-244-2627
FAX 650-244-2774
email address: wyip@efawest.navfac.navy.mil

Mr. John Hill
Remedial Project Manager
Naval Facilities Engineering Command
Southwest Division
BRAC Operations, Code 05BN.JH
1420 Kettner Blvd., Suite 501
San Diego, California 92101-2404
Phone 619-532-4746
FAX 619-532-4743
email address: hilljm@efdsw.navfac.navy.mil

**Copies of the Draft FOST and supporting documents may be read at the following locations:**

Alameda Public Library
2264 Santa Clara Avenue
Alameda, California

Alameda Point Information Repository
950 West Mall Square
Main Office Building (Building 1)
Alameda Point, Alameda, California

Legal Alameda Journal #0112 Publish December 31, 1999

The Oakland Tribune
Making a difference from the Bay to the Valley
ANG NEWSPAPERS
[illegible]ck London Sq. Oakland, CA. 94607
[illegible]10) 208-6340

**LEGAL NO.** 1692943

190N0201

# PROOF OF PUBLICATION

PUBLIC NOTICE PUBLIC NOTICE

**NAVY INTENDS TO SIGN A FINDING OF SUITABILITY FOR TRANSFER FOR ALAMEDA POINT ALAMEDA, CALIFORNIA**

The Department of the Navy (Navy) intends to transfer to the City of Alameda, the Alameda Point East Housing Area. The property consists of Parcels 170 and 171 (72.5 acres of onshore property) located in the eastern portion of Alameda Point, California. The Finding of Suitability to Transfer (FOST) property is currently owned by the U.S. Navy and will be transferred to the City of Alameda for residential land use. One hundred-thirteen buildings, consisting of multi-family residences, are currently located in the FOST area. In accordance with the Department of Defense guidance on the process to reach a FOST, notice is hereby given that the Navy intends to sign a FOST on or about March 13, 2000, in connection with the transfer of the Alameda Point East Housing Area.

This early transfer is in accordance with Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act and the Community Environmental Response Facilitation Act that requires the identification and documentation of all uncontaminated real property at former Department of Defence facilities.

The decision to transfer the property will be made after a comprehensive review of the environmental conditions of the property and consultation with the California Department of Toxic Substance Control, and the U.S. Environmental Protection Agency, Region IX. The property will be transferred after the determination that: (1) the property is suitable for future residential use; (2) the intended use is consistent with the protection of human health and the environment; and (3) the public has had at least 30 days to comment on the suitability of the property for transfer.

Alameda Point, formerly Naval Air Station Alameda, was primarily used as as defense facility since the U.S. Army acquired the western tip of Alameda Island from the City of Alameda in 1930. The Navy acquired title to the land from the Army in 1936. The Navy Public Works Center and Naval Aviation Depot Alameda were the two largest tenants at the facility. Industrial activities at the facility included the use of solvents, acids, paint strippers, degreasers, caustic cleaners, and metal plating chemicals. However, the industrial activities have never occurred at the East Housing Area. The East Housing Area has only been used as residential housing and is located outside the industrial zone. The sites are discussed in more detail in the Draft FOST.

The public is invited to review and comment on this proposed transaction beginning on December 31, 1999. The Navy will consider written comments received by January 31, 2000. For more information or to send written comments, please contact Warren Yip or John Hill at the address and phone number below:

**For additional information contact:**

Mr. Warren Yip
Remedial Project Manager
Engineering Field Activity West
900 Commodore Dr. Bldg. B-206 (U)
San Bruno, CA 94066-5006
Phone 650-244-2627
FAX 650-244-2772
Email address: wyip@efawest.navfac.navy.mil

Mr. John Hill
Remedial Project Manager
Naval Facilities Engineering Command
Southwest Division
BRAC Operations, Code 05BN.JH
1420 Kettner Blvd., Suite 501
San Diego, California 92101-2402
Phone 619-532-4746
FAX 619-532-4743
Email address: hilljm@efdsw@navfac.navy.mil

**Copies of the Draft FOST And supporting Documents may be read at either of the following locations:**

Alameda Public Library
2264 Santa Clara Avenue
Alameda, California

Alameda Point Information Repository
950 West Mall Square
Main Office Building (Building 1)
Alameda Point, Alameda, California

**The Oakland Tribune, #1692943**
**December 30, 1999**

Case No. ____________

In the matter of

Department of the Navy

Alameda Point, Alameda, CA

Samantha Allen-Wise deposes and says that he/she was the Public Notice Advertising Clerk of THE OAKLAND TRIBUNE a newspaper of general circulation as defined by Government Code Section 6000 adjudicated as such by the Superior Court of the State of California, County of Alameda (Order No. 237798, December 4, 1951) which is published and circulated in Oakland Township in said county and state seven days a week.

That the

Public Notice

of which the annexed is a printed copy, was published in every issue of THE OAKLAND TRIBUNE on the following dates.

December 30, 1999

I certify (or declare) under the penalty of perjury that the foregoing is true and correct

Date January 6, 2000

at Oakland, California

Samantha Allen-Wise

Public Notice Advertising Clerk

Alameda Times-Star
56 Jack London Square, Oakland, CA 94607
(510) 208-6300

**LEGAL NO.** 1692863

190N0201

# PROOF OF PUBLICA

PUBLIC NOTICE PUBLIC NOTICE

**NAVY INTENDS TO SIGN A FINDING OF SUITABILITY FOR TRANSFER FOR ALAMEDA POINT ALAMEDA, CALIFORNIA**

The Department of the Navy (Navy) intends to transfer to the City of Alameda, the Alameda Point East Housing Area. The property consists of Parcels 170 and 171 (72.5 acres of onshore property) located in the eastern portion of Alameda Point, California. The Finding of Suitability to Transfer (FOST) property is currently owned by the U.S. Navy and will be transferred to the City of Alameda for residential land use. One hundred-thirteen buildings, consisting of multi family residences, are currently located in the FOST area. In accordance with the Department of Defense guidance on the process to reach a FOST, notice is hereby given that the Navy intends to sign a FOST on or about March 13, 2000, in connection with the transfer of the Alameda Point East Housing Area.

This early transfer is in accordance with Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act and the Community Environmental Response Facilitation Act that requires the identification and documentation of all uncontaminated real property at former Department of Defence facilities.

The decision to transfer the property will be made after a comprehensive review of the environmental conditions of the property and consultation with the California Department of Toxic Substance Control, and the U.S. Environmental Protection Agency, Region IX. The property will be transferred after the determination that: (1) the property is suitable for future residential use; (2) the intended use is consistent with the protection of human health and the environment; and (3) the public has had at least 30 days to comment on the suitability of the property for transfer.

Alameda Point, formerly Naval Air Station Alameda, was primarily used as as defense facility since the U.S. Army acquired the western tip of Alameda Island from the City of Alameda in 1930. The Navy acquired title to the land from the Army in 1936. The Navy Public Works Center and Naval Aviation Depot Alameda were the two largest tenants at the facility. Industrial activities at the facility included the use of solvents, acids, paint strippers, degreasers, caustic cleaners, and metal plating chemicals. However, the industrial activities have never occurred at the East Housing Area. The East Housing Area has only been used as residential housing and is located outside the industrial zone. The sites are discussed in more detail in the Draft FOST.

The public is invited to review and comment on this proposed transaction beginning on December 31, 1999. The Navy will consider written comments received by January 31, 2000. For more information or to send written comments, please contact Warren Yip or John Hill at the address and phone number below:

**For additional information contact:**

Mr. Warren Yip
Remedial Project Manager
Engineering Field Activity West
900 Commodore Dr. Bldg. B-206 (U)
San Bruno, CA 94066-5006
Phone 650-244-2627
FAX 650-244-2772
email address: wyip@efawest.navfac.navy.mil

Mr. John Hill
Remedial Project Manager
Naval Facilities Engineering Command
Southwest Division
BRAC Operations, Code 05BN.JH
1420 Kettner Blvd., Suite 501
San Diego, California 92101-2402
Phone 619-532-4746
FAX 619-532-4743
email address: hilljm@efdsw@navfac.navy.mil

**Copies of the Draft FOST And supporting Documents may be read at either of the following locations:**

Alameda Public Library
2264 Santa Clara Avenue
Alameda, California

Alameda Point Information Repository
950 West Mall Square
Main Office Building (Building 1)
Alameda Point, Alameda, California

**Alameda Times-Star, #1692863**
**December 30, 1999**

Case No. ______

In the matter of

Department of the Navy
Alameda Point, Alameda, CA

Samantha Allen-Wise de

says that he/she was the Public Notice Advertisin ALAMEDA TIMES STAR a newspaper of general cir defined by Government Code Section 6000 adju such by the Superior Court of the State of California Alameda under the date of September 17, 1951. 236092) which is published and circulated in said c state daily and Saturday.

That the Public Notice

of which the annexed is a printed copy, was publishec every issue of ALAMEDA TIMES-STAR on the followin

December 30, 1999

I certify (or declare) under the penalty of perjury foregoing is true and correct

Date January 6, 2000

at Alameda, California.

[signature]

Public Notice Advertising Clerk