also reserve 94 acres as open space. It would build 960 townhouses on 80 acres in this part of the base and use 78,000 square feet of space for commercial activities to support the new residents. The commercial activities would include restaurants, cafes, convenience stores, retail stores, and department stores. About one third of the buildings in this planning area would be demolished to accommodate the proposed redevelopment.

On 236 acres in the Main Streets Neighborhoods planning area, the Residential Alternative would develop a mix of housing units, with 1,314 single family homes and 174 attached homes composed of existing residential units and new construction. On 21 acres, this Alternative would continue to use the George P. Miller Elementary School and adjacent child care center and build a new elementary school to support the proposed residential complex. This Alternative would use the Navy Lodge as a shelter; build small retail and commercial stores on four acres; and reserve an additional four acres for parks and recreational activities.

On 63 acres in the northern part of the Inner Harbor planning area, the Residential Alternative would develop a residential complex with 378 single family homes. On 13 additional acres, this Alternative would build 156 units of attached housing and reserve eight acres for a school to be built in the future. On 36 acres in the southern part of the Inner

Harbor area, the Residential Alternative would develop a regional park to be included in the Bay Trail System. Where feasible, the existing roadways in this part of the base would be extended to connect with the residential neighborhood outside the Air Station property.

In the northern part of the North Waterfront planning area, the Residential Alternative would demolish all of the existing structures and develop 313,000 square feet of space for mixed use facilities including offices. This Alternative would also develop restaurants, a passenger ferry service, and a waterfront promenade here. On 34 acres, this Alternative would build 408 units of attached waterfront housing along the Oakland Inner Harbor. On 20 acres here, the Residential Alternative would develop a 200-slip marina. On eight acres at the western edge of this planning area, east of the George P. Miller Elementary School, this Alternative would develop an alternative education high school, a regional kitchen facility, a parking area, a storage area, and maintenance facilities for the Alameda Unified School District.

The Residential Alternative would develop the Marina planning area as a commercial marina. This Alternative would build a 900-slip marina in the seaplane lagoon to accommodate private and public vessels and facilities for a passenger ferry service and deep draft yachts. The three piers in the

southeastern part of this planning area would be used to accommodate large cruise ships and historic vessels such as the former USS Hornet. This Alternative would also develop about 264,000 square feet of space for light industrial and commercial marine activities.

In the northern part of the Marina planning area, the Residential Alternative would develop a promenade and a civic plaza. Near the plaza, this Alternative would develop facilities for civic uses such as offices, a cultural arts center or theater, and recreational activities. This Alternative would build a hotel and conference center on four acres in this part of the base.

On 32 acres along the eastern shore of the seaplane lagoon, the Residential Alternative would build 384 residential units composed of artists' lofts, low to moderate income apartments, and townhouses. It would allocate 100 of the 900 marina slips for those who wish to live aboard their vessels. All of the large industrial buildings in this planning area would be demolished to accommodate the proposed redevelopment.

On 226 acres in the Northwest Territories planning area, the Residential Alternative would build 1,200 single family homes and 312 units of attached housing and reserve eight acres for a school to be built in the future. It would also reserve 38 acres for parks and recreational activities.

Navy analyzed a fourth "action" alternative, described in the FEIS as the Reduced Density Alternative. The Reduced Density Alternative proposed land uses similar to those advanced in the Preferred Alternative, but the extent of development would be reduced to provide more open space.

In the Civic Core planning area, the Reduced Density Alternative would develop a mixed use office and industrial park providing about 1,822,000 square feet of space. On 37 acres in the northern part of the Civic Core, this Alternative would build athletic fields and recreational facilities. It would expand the existing parade ground into a larger open space mall covering 57 acres.

On 16 acres in the Civic Core planning area, the Reduced Density Alternative would build 96 townhouses. It would dedicate 26,000 square feet of space to commercial activities that would support the new residents. The commercial activities would include restaurants, cafes, convenience stores, retail stores, and department stores. On 13 acres, it would develop a recreational vehicle park with a capacity of 135 recreational vehicles. About one third of the buildings in this planning area would be demolished to accommodate the proposed redevelopment.

On 236 acres in the Main Streets Neighborhoods planning area, the Reduced Density Alternative would develop a mix of housing units, with 793 single family homes and 144 attached

homes composed of existing residential units and new construction. On 21 acres, this Alternative would continue to use the George P. Miller Elementary School and adjacent child care center and build a new elementary school to support the proposed residential complex. It would use the Navy Lodge as a shelter; build small retail and commercial stores on four acres; and reserve an additional four acres for parks and recreational activities.

On 76 acres in the northern part of the Inner Harbor planning area, the Reduced Density Alternative would develop a residential complex with 228 single family homes. This Alternative would reserve eight acres for a school to be built in the future. On 36 acres in the southern part of the Inner Harbor area, the Reduced Density Alternative would develop a regional park to be included in the Bay Trail System. Where feasible, the existing roadways in this part of the base would be extended to connect with the residential neighborhood outside the Air Station property.

In the northern part of the North Waterfront planning area, the Reduced Density Alternative would demolish all of the existing structures and develop 418,000 square feet of space for mixed use facilities including offices. This Alternative would also develop restaurants, a passenger ferry service, and a waterfront promenade here. On 12 acres, this Alternative would

build 144 units of attached waterfront housing along the Oakland Inner Harbor.

In the southern part of the North Waterfront planning area, the Reduced Density Alternative would develop 381,000 square feet of space for light industrial and research and development activities. On eight acres at the western edge of this planning area, east of the George P. Miller Elementary School, this Alternative would develop an alternative education high school, a regional kitchen facility, a parking area, a storage area, and maintenance facilities for the Alameda Unified School District.

The Reduced Density Alternative would develop the Marina planning area as a commercial marina. It would build a 250-slip marina in the seaplane lagoon to accommodate private and public vessels and facilities for a passenger ferry service and deep draft yachts. The three piers in the southeastern part of this planning area would be used to accommodate large cruise ships and historic vessels such as the former USS Hornet. This Alternative would also develop about 115,000 square feet of space for light industrial and commercial marine activities.

In the northern part of the Marina planning area, the Reduced Density Alternative would develop a promenade and a civic plaza. Near the plaza, this Alternative would develop facilities for civic uses such as offices, a cultural arts center or theater, and recreational activities. It would build a hotel and

conference center on four acres in this part of the base.

On 32 acres along the eastern shore of the seaplane lagoon, this Alternative would build about 192 residential units composed of artists' lofts, low to moderate income apartments, and townhouses. All of the large industrial buildings in this planning area would be demolished to accommodate the proposed redevelopment.

In the western part of the Northwest Territories planning area, the Reduced Density Alternative would build a 162-acre links golf course, a clubhouse on six acres, and a conference center. This Alternative would also develop a 29-acre park along the shore of the Oakland Inner Harbor. On 17 acres in the eastern part of the Northwest Territories, it would develop athletic fields that would be associated with the sports complex proposed for the Civic Core planning area. It would also reserve 58 acres as open space.

**ENVIRONMENTAL IMPACTS:** Navy analyzed the direct, indirect, and cumulative impacts of the disposal and reuse of this Federal property. The EIS addressed impacts of the Preferred Alternative, the Seaport Alternative, the Residential Alternative, the Reduced Density Alternative, and the "No Action" Alternative for each alternative's effects on land use, visual resources, socioeconomics, public services, utilities, cultural resources, biological resources, geology and soils, water

resources, traffic and circulation, air quality, noise, and hazardous materials and waste. This Record Of Decision focuses on the impacts that would likely result from implementation of the Reuse Plan, identified in the FEIS as the Preferred Alternative.

The Preferred Alternative would not have a significant impact on land use. The land uses proposed in the Preferred Alternative would be generally compatible with each other and with adjacent off-site land uses. The development of a recreational vehicle park adjacent to existing residential and recreational uses would be governed by the City of Alameda's zoning and land use ordinances.

The proposed development in four planning areas (Civic Core, Main Street Neighborhoods, Marina, and Northwest Territories) of residential, educational and commercial facilities that are not related to maritime activities could have a significant impact on land use if these facilities were built on tidelands encumbered by a public trust established by California law. The Tidelands Trust mandates that public tidelands and submerged lands must be used for the benefit of the people of California for commerce, navigation, fisheries and recreation. The proposed residential, educational and general commercial development of property in these planning areas would not be consistent with the Trust's restrictions.

The City of Alameda, however, could avoid this impact by entering into an agreement with the California State Lands Commission to impose public trust restrictions on non-trust lands or by making monetary contributions to the Kapiloff Land Bank Fund in exchange for the removal of Tidelands Trust restrictions on property in these planning areas. The Kapiloff Land Bank Fund is a mitigation fund administered by the State Lands Commission.

The Preferred Alternative would have several impacts on visual resources. The development of light industrial facilities in the Northwest Territories planning area could decrease the visual quality of this part of the Air Station from vantage points in Alameda and Oakland. However, the demolition of warehouses and the elimination of open storage areas in the North Waterfront planning area would improve views of the base from the City of Oakland's Jack London Square and from the Oakland Ferry Terminal located across the Oakland Inner Harbor. The proposed golf course and park in the Northwest Territories planning area would also enhance views of the former Air Station from the Oakland side of the Inner Harbor. Additionally, the Preferred Alternative provides public access to the Northwest Territories and Marina planning areas that will introduce new opportunities to view San Francisco Bay and the Oakland Inner Harbor.

The Preferred Alternative would not have an adverse impact on the socioeconomics of the surrounding area. In the full

buildout year of 2020, there would be 2,378 residential units on the NAS Alameda and Alameda Annex properties. This would constitute about two percent of the projected housing increase in Alameda County. By the same year, implementation of the Preferred Alternative would increase the number of Alameda County residents by 19,400 persons. This would constitute only seven percent of the County's total projected population growth.

By the year 2020, this Alternative would create 18,978 jobs, which constitutes about seven percent of the projected job growth for Alameda County. The Preferred Alternative would have a greater impact on the City of Alameda, because the number of new jobs constitutes about 84 percent of the City's projected job growth.

The Preferred Alternative would not a have significant impact on schools. By the year 2020, the Preferred Alternative would generate an increase of 1,103 school age children living in the area. The new elementary school to be built under the Reuse Plan would have a 500-student capacity and would be funded by impact fees, property taxes, and other taxes generated by the reuse of NAS Alameda and the Alameda Annex.

The proposed redevelopment of NAS Alameda and the Alameda Annex would increase the demand for police, fire, and ambulance services with the resultant requirements for increased staffing, equipment, and an additional fire station. These additional City

services would be funded by a variety of sources such as impact fees, special taxes and other public revenues.

The Preferred Alternative would not have a significant impact on utilities. The Reuse Plan's projected demands for potable water and wastewater treatment would be less than the demands generated by Navy's historical usage.

Implementation of the Preferred Alternative would reduce the amount of impervious surface on the property. Consequently, the amount of stormwater runoff would also decrease.

The amount of solid waste generated by the Preferred Alternative would increase during demolition and construction activities but would remain within the maximum daily capacity of the landfill that the City of Alameda uses. It would decrease over time as demolition and construction were completed. The City can remain in compliance with California and Alameda County waste diversion requirements by developing a solid waste management program that maximizes reuse and recycling of solid waste.

The Preferred Alternative would not have a significant impact on cultural resources. Pursuant to Section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. § 470f (1994), Navy performed cultural resource surveys of NAS Alameda and the Alameda Annex. In 1992, Navy determined that while there were no individual buildings or structures at NAS Alameda that

qualified for listing on the National Register of Historic Places, an area in the center of the base containing 38 buildings and structures qualified for listing as an historic district. In a letter dated September 23, 1992, the California State Historic Preservation Officer (SHPO) concurred with Navy's determination.

In 1997, Navy and the United States Army Corps of Engineers determined that the Air Station's south jetty on the Oakland Inner Harbor was also eligible for listing on the National Register. In a letter dated October 15, 1997, the SHPO concurred that the south jetty is eligible for listing on the National Register as part of the Oakland Inner Harbor Jetties and Federal Channel Historic District.

Later in 1997, Navy determined that 49 houses in the center of the base were also eligible for listing on the National Register as part of the NAS Alameda Historic District. In a letter dated November 5, 1997, the SHPO concurred that the 49 houses were eligible for listing on the National Register as part of the Historic District.

In 1996, Navy determined that there were no buildings or structures at the Alameda Annex that were eligible for listing on the National Register. In a letter dated July 31, 1996, the SHPO concurred with Navy's determination that no buildings or structures at the Annex were eligible for listing on the National Register.

The Reuse Plan proposes to demolish six of the 87 buildings that constitute the Historic District. It is also likely that other buildings in the District will be demolished or modified or will deteriorate and that new structures will be built there. However, the Historic District as a whole will not be modified to such an extent that it is no longer eligible for listing on the National Register.

Navy has completed consultation pursuant to Section 106 of the National Historic Preservation Act with the Advisory Council on Historic Preservation and the California State Historic Preservation Officer. These consultations identified actions that Navy must take before it conveys the NAS Alameda property and actions that acquiring entities must take to avoid or mitigate adverse impacts on the eligible structures. These obligations were set forth in a Memorandum Of Agreement among Navy, the Advisory Council on Historic Preservation, and the California State Historic Preservation Officer dated October 5, 1999.

Navy will nominate the NAS Alameda Historic District for listing on the National Register of Historic Places in accordance with 36 C.F.R. § 60.9. The City of Alameda will adopt an amendment to the Alameda Municipal Code governing Building and Housing, i.e., Article VII, Historical Preservation, Section 13-21, Preservation of Historical Monuments, to require the review

of proposed modifications to the exterior of historic structures. This review will ensure that the modifications are consistent with the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings. Additionally, the City will designate the NAS Alameda Historic District as an historic monument protected by the City's historic preservation ordinance. Navy will also request that the City of Alameda place the south jetty on the City's Historical Buildings Study List to provide it with the protection afforded such properties.

The Preferred Alternative would not have a significant impact on biological resources. In a letter dated October 3, 1997, Navy requested formal consultation with the United States Fish And Wildlife Service pursuant to Section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536 (1994). In a letter dated March 22, 1999, the Fish And Wildlife Service set forth its biological opinion that the disposal and reuse of NAS Alameda and the Alameda Annex are not likely to jeopardize the continued existence of the Federally-listed endangered California least tern or the endangered California brown pelican. The Service also concluded that since no critical habitat has been designated for either species on those parts of NAS Alameda and the Alameda Annex that lie outside the proposed Alameda National Wildlife Refuge, none will be adversely modified or destroyed.

The Service, however, conditioned its opinion on the implementation of reasonable and prudent measures to minimize incidental take of these species. These measures would protect the species and their critical habitat within the proposed Refuge from intrusion or other dangers originating outside the Refuge. Navy, the City of Alameda, and entities that may acquire property at NAS Alameda and the Alameda Annex will be bound by this requirement. To fulfill its obligation, Navy will ensure that notifications, covenants, restrictions, and agreements to protect Federally-listed endangered or threatened species are in place when the property is conveyed.

The Preferred Alternative would not have a significant impact on geology and soils. The NAS Alameda and Alameda Annex properties are located in a highly active seismic region and consist of fill placed over submerged land or tidal flats. Thus, the property has a high potential for liquefaction, differential settlement, and dike failure. As a result, it will be necessary for developers to prepare a soils and geology report before the City of Alameda can issue grading and building permits. The City will require developers to take account of the conclusions of the soils and geology report and apply the standards of the California Building Code, the Alameda Building Code, and the Uniform Building Code to the design and construction of buildings on the former Air Station and Annex.

The Preferred Alternative would not have a significant impact on the quality of surface water. The waters of San Francisco Bay, the Oakland Inner Harbor, and the Seaplane Lagoon would not be significantly affected by the proposed grading and construction if standard soil erosion and sedimentation control measures required by existing laws and regulations were implemented.

Stormwater discharge from the proposed light industrial activities, marina, parking areas, golf course, and routine operations and maintenance in developed areas (such as the application of herbicides and pesticides) could enter and contaminate local water. Stormwater must be managed in accordance with Federal, State, and local laws and regulations, and the acquiring entities will be responsible for building adequate drainage facilities.

Certain areas at NAS Alameda and the Alameda Annex could be subject to flooding from high tides, backed up stormwater runoff, a tidal wave, and rising sea level. The City of Alameda's General Plan, dated February 5, 1991, contains a guiding policy regarding flooding, designated 8.3.b, which states that structures to be located in floodplains subject to 100-year floods should have adequate protection from floods. Additionally, in accordance with Executive Order 11988, Floodplain Management, 3 C.F.R. 117 (1978), Navy will place a

notice in the conveyance document that describes those uses that are restricted under Federal, State, and local floodplain regulations.

The Preferred Alternative would have significant impacts on traffic and circulation. By the year 2020, this Alternative would generate about 90,530 average daily trips compared with about 29,000 average daily trips that were associated with Navy's use of the property. The traffic generated by the Reuse Plan would cause substantial delays during peak commuting hours at four intersections in the City of Alameda and at three intersections in the City of Oakland. Traffic congestion would increase significantly along two freeway segments and on one local roadway. During peak commuting hours, traffic congestion would also increase significantly on State Route 260 at the Webster and Posey Tubes.

The Preferred Alternative would also generate an increase in traffic on the former Air Station and Annex properties. The Reuse Plan would improve existing roadways on the base and build additional roadways to accommodate the increased traffic there.

The Preferred Alternative would have a significant impact on air quality. Carbon monoxide emissions from traffic generated by the Reuse Plan would exceed Federal and State air quality standards at two intersections, Tinker Avenue and Webster Street in the City of Alameda and Harrison Street and Seventh Street in

the City of Oakland.

Section 176(c) of the Clean Air Act, 42 U.S.C. § 7506 (1994), requires Federal agencies to review their proposed activities to ensure that these activities do not hamper local efforts to control air pollution. Section 176(c) prohibits Federal agencies from conducting activities in air quality areas such as the San Francisco Bay Area that do not meet one or more of the national standards for ambient air quality, unless the proposed activities conform to an approved implementation plan. The United States Environmental Protection Agency regulations implementing Section 176(c) recognize certain categorically exempt activities. Conveyance of title to real property and certain leases are categorically exempt activities. 40 C.F.R. § 93.153(c)(2)(xiv) and (xix). Therefore, the disposal of NAS Alameda and the Alameda Annex will not require Navy to conduct a conformity determination.

Navy holds Bay Area Air Quality Management District (BAAQMD) air emission reduction credits (ERCs) for stationary air emission sources such as boilers and furnaces, paint spray booths, fuel storage facilities, and jet engine test cells that historically generated air emissions at NAS Alameda. These annual ERCs include 52.4 tons of precursor organic compounds, 29.9 tons of nitrogen oxides, 61 tons of non-precursor organic compounds, 6.5 tons of particulate matter (PM10), 25.3 tons of carbon monoxide,

and 3.1 tons of sulfur oxides.

The BAAQMD Emissions Bank credits can be withdrawn to offset air emissions from new stationary sources. Navy has allocated to ARRA credits for 30 tons of precursor organic compounds to support interim leasing requirements and redevelopment of the base. Navy will retain credits for 15.9 tons of precursor organic compounds and 29.9 tons of nitrogen oxides to meet any future permit requirements for Department of Defense facilities and activities. If there are no future Department of Defense needs, the credits will be reallocated. The remaining credits for precursor organic compounds were previously applied to permitted Navy stationary sources that were either demolished or moved to another base and are no longer available for future allocation.

There were mobile source emissions at NAS Alameda and the Alameda Annex associated with sources such as motor vehicles and aircraft and ship operations. These mobile emission sources annually produced about 169 tons of reactive organic compounds, 182 tons of nitrogen oxides, 859 tons of carbon monoxide, ten tons of sulfur oxides, and 30 tons of particulate matter (PM10).

The mobile source emission reductions resulting from the closure of NAS Alameda and the Alameda Annex can be applied to offset emissions from other Federal mobile sources in the area to satisfy Clean Air Act conformity requirements. Navy will retain

these mobile source emission offsets to meet future Clean Air Act conformity requirements.

The Preferred Alternative would not have a significant impact on noise. Exposure to noise from aircraft operations would be eliminated, because there would no longer be any aircraft operations on the property. Ambient noise levels would not change substantially as a result of the increased vehicular traffic. Noise levels in the vicinity of NAS Alameda and the Alameda Annex are typical of an urban neighborhood and are already high. Noise arising out of demolition and construction activities would be governed by the City of Alameda's noise ordinance.

Hazardous materials and hazardous waste that may be used and generated by the Preferred Alternative would not cause any significant adverse impacts. The quantity of hazardous materials used, stored, and disposed of and the quantity of hazardous waste generated on the properties would be less under the Preferred Alternative than during Navy's use of NAS Alameda and the Alameda Annex. Hazardous materials used and hazardous waste generated by the Reuse Plan will be managed in accordance with Federal and State laws and regulations.

Implementation of the Preferred Alternative would not have an impact on public health and safety. Navy will inform future property owners about the environmental condition of the property

and may, when appropriate, include restrictions, notifications, or covenants in deeds to ensure the protection of human health and the environment in light of the intended use of the property.

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 3 C.F.R. 859 (1995), requires that Navy determine whether any low income and minority populations will experience disproportionately high and adverse human health or environmental effects from the proposed action. Navy analyzed the impacts on low income and minority populations pursuant to Executive Order 12898. The FEIS addressed the potential environmental, social, and economic impacts associated with the disposal of NAS Alameda and the Alameda Annex and reuse of the properties under the various proposed alternatives. Minority and low income populations residing within the region would not be disproportionately affected. Indeed, the employment opportunities, housing, and recreational resources generated by the Reuse Plan would have beneficial effects.

Navy also analyzed the impacts on children pursuant to Executive Order 13045, Protection of Children from Environmental Health and Safety Risks, 3 C.F.R. 198 (1998). Under the Preferred Alternative, the largest concentration of children would be present in the residential, educational, and recreational areas. The Preferred Alternative would not pose any

disproportionate environmental health or safety risks to children.

**MITIGATION:** Implementation of Navy's decision to dispose of NAS Alameda and the Alameda Annex does not require Navy to implement any mitigation measures. Navy will take certain actions to implement existing agreements and regulations. These actions were treated in the FEIS as agreements or regulatory requirements rather than as mitigation. Before conveying any property at NAS Alameda, Navy will nominate the NAS Alameda Historic District for listing on the National Register of Historic Places.

The FEIS identified and discussed those actions that will be necessary to mitigate the impacts associated with the reuse and redevelopment of NAS Alameda and the Alameda Annex. The acquiring entities, under the direction of Federal, State, and local agencies with regulatory authority over protected resources, will be responsible for implementing necessary mitigation measures.

**COMMENTS RECEIVED ON THE FEIS:** Navy received comments on the FEIS from two State agencies, three local government agencies, three private organizations, and one person. The State agencies were the Governor's Office of Planning and Research and the Department of Parks and Recreation's Office of Historic Preservation. The local agencies were the City of Oakland, the Port of Oakland, and the East Bay Municipal Utility District.

The private organizations were the Golden Gate Audubon Society, the San Francisco Bay Chapter of the Sierra Club, and Arc Ecology. These comments concerned issues already discussed in the FEIS and do not require further clarification.

**REGULATIONS GOVERNING THE DISPOSAL DECISION:** Since the proposed action contemplates the disposal of NAS Alameda under the Defense Base Closure and Realignment Act of 1990 (DBCRA), Public Law 101-510, 10 U.S.C. § 2687 note (1994), Navy's decision was based upon the environmental analysis in the FEIS and application of the standards set forth in the DBCRA, the Federal Property Management Regulations (FPMR), 41 C.F.R. Part 101-47, and the Department of Defense Rule on Revitalizing Base Closure Communities and Community Assistance (DoD Rule), 32 C.F.R. Parts 174 and 175. Navy's decision to dispose of the Alameda Annex was based upon the environmental analysis in the FEIS and Section 2834(b) of Public Law 102-484, as amended by Section 2833 of Public Law 103-160, Section 2821 of Public Law 103-337, and Section 2867 of Public Law 104-106.

Section 101-47.303-1 of the FPMR requires that disposals of Federal property benefit the Federal Government and constitute the "highest and best use" of the property. Section 101-47.4909 of the FPMR defines the "highest and best use" as that use to which a property can be put that produces the highest monetary return from the property, promotes its maximum value, or serves a

public or institutional purpose. The "highest and best use" determination must be based upon the property's economic potential, qualitative values inherent in the property, and utilization factors affecting land use such as zoning, physical characteristics, other private and public uses in the vicinity, neighboring improvements, utility services, access, roads, location, and environmental and historical considerations.

After Federal property has been conveyed to non-Federal entities, the property is subject to local land use regulations, including zoning and subdivision regulations, and building codes. Unless expressly authorized by statute, the disposing Federal agency cannot restrict the future use of surplus Government property. As a result, the local community exercises substantial control over future use of the property. For this reason, local land use plans and zoning affect determination of the "highest and best use" of surplus Government property.

The DBCRA directed the Administrator of the General Services Administration (GSA) to delegate to the Secretary of Defense authority to transfer and dispose of base closure property. Section 2905(b) of the DBCRA directs the Secretary of Defense to exercise this authority in accordance with GSA's property disposal regulations, set forth in Part 101-47 of the FPMR. By letter dated December 20, 1991, the Secretary of Defense delegated the authority to transfer and dispose of base closure

property closed under the DBCRA to the Secretaries of the Military Departments. Under this delegation of authority, the Secretary of the Navy must follow FPMR procedures for screening and disposing of real property when implementing base closures. Only where Congress has expressly provided additional authority for disposing of base closure property, e.g., the economic development conveyance authority established in 1993 by Section 2905(b)(4) of the DBCRA or the authority provided in Section 2867 of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106, may Navy apply disposal procedures other than those in the FPMR.

In Section 2901 of the National Defense Authorization Act for Fiscal Year 1994, Public Law 103-160, Congress recognized the economic hardship occasioned by base closures, the Federal interest in facilitating economic recovery of base closure communities, and the need to identify and implement reuse and redevelopment of property at closing installations. In Section 2903(c) of Public Law 103-160, Congress directed the Military Departments to consider each base closure community's economic needs and priorities in the property disposal process. Under Section 2905(b)(2)(E) of the DBCRA, Navy must consult with local communities before it disposes of base closure property and must consider local plans developed for reuse and redevelopment of the surplus Federal property.