No. 05-1020C
Judge Sweeney

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202)305-7562
Facsimile: (202)305-7644

Attorneys for Defendant

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Navy Litigation Office
Washington, D.C.

July 12, 2006

TABLE OF CONTENTS

STATEMENT OF THE ISSUES ..... 1

ANSWERS TO THE COURT'S QUESTIONS ..... 2

FACTUAL BACKGROUND ..... 3

SUMMARY OF THE ARGUMENT ..... 7

ARGUMENT ..... 9

I. Legal Standards ..... 9

II. Jurisdiction ..... 11

III. The Government Did Not Breach The East Housing Deed (Counts One Through Four) ..... 12

A. The Government Did Not Breach The CERCLA Covenants ..... 12

B. The Government Did Not Misrepresent The Presence Of Chlordane ..... 16

IV. The Government Did Not Breach The Memorandum Of Agreement (Counts Seven And Eight) ..... 19

V. AISLIC Cannot Recover Under Section 330, Which Does Not Provide For Indemnification Of A Transferee's Cleanup Costs ..... 21

A. The City Did Not Acquire A Section 330 "Facility" ..... 23

B. There Was No "Claim" Against The City ..... 24

C. There Was No Claimed "Property Damage" ..... 26

D. There Was No Claimed "Release Or Threatened Release" Of The Termiticide ..... 29

E. Assuming There Was A Threatened Release, The Government Was Not Responsible ..... 30

CONCLUSION ..... 31

# TABLE OF AUTHORITIES

## CASES

AMI, Inc. v. International Forging Equip. Co.,
982 F.2d 989 (6th Cir. 1993) .......... 13

A&W Smelter and Refs., Inc. v. Clinton,
146 F.3d 1107 (9th Cir. 1998) .......... 13

Aetna Ins. Co. v. United States,
143 Ct. Cl. 159 F. Supp. 831 (1958) .......... 3

Ambassador Div. of Florsheim Shoe Co. v. United States,
748 F.2d 1560 (Fed. Cir. 1984) .......... 10, 27

American Intl. Spec. Lines Ins. Co. v. United States,,
No. C 04-01591 CRB 2005 WL 680159 (N.D. Cal. March 24, 2005) .......... 6, 7

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 10

Barnes v. Independent Auto. Dealers Assoc. of Cal. Health & Welfare Ben. Plan,
64 F.3d 1389 (9th Cir. 1995), quoted in 2005 WL 680159a .......... 6

Briscoe v. LaHue,
663 F.2d 713 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983) .......... 15

C.B.C. Enterps., Inc. v. United States,
24 Cl. Ct. 1, 5 (1991) .......... 16

Compare Maryland Cas. Co. v. Armco, Inc.,
643 F. Supp. 430 (D. Md.), aff'd, 822 F.2d 1348 (4th Cir. 1987) .......... 28

Conley v. Gibson,
355 U.S. 41 (1957) .......... 9

Continental Ins. Co. v. Northeastern Pharm. & Chem. Co.,
842 F.2d 977 (8th Cir. 1988) .......... 28

Cortec Indus., Inc. v. Sum Holding, L.P.,
949 F.2d 42 (2d Cir. 1991) .......... 9

D.V. Gonzalez Elec. & Gen. Contrs. v. United States,
55 Fed. Cl. 447 (2003) .......... 16

Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.,
906 F.2d 1059 (5th Cir.1990) .......... 14

Dulien v. United States,
143 Ct. Cl. 484 (1958) .......... 18

First United methodist Church of Hyattsville v. U.S. Gypsum Co.,
882 F.2d 862 (4th Cir. 1989) .......... 23

Ford Motor Co. v. United States,
378 F.3d 1314 (Fed. Cir. 2004) .......... 28

Gerrish Corp. v. Universal Underwriters Ins. Co.,
947 F.2d 1023 (2d Cir. 1991) .......... 29

Gussack Realty Co. v. Xerox Corp.,
224 F.3d 85 (2d Cir. 2000) .......... 28

Hanson v. United States,
13 Cl. Ct. 519, 530 (1987) .......... 15

Haskell v. Time, Inc.,
857 F. Supp. 1392 (E.D. Cal. 1994) .......... 10

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 351 F.2d 972 (1965) .......... 10

Hugo Boss Fashions, Inc. v. Federal Ins. Co.,
252 F.3d 608 (2d Cir. 2001) .......... 29

Independent Petrochem. Corp. v. Aetna Cas. & Surety Co.,
944 F.2d 940 (D.C. Cir. 1991) .......... 29

Insurance Co. of the West v. United States,
243 F.3d 1367 (Fed. Cir. 2001) .......... 3, 11

Lamie v. United States Trustee,
540 U.S. 520 (2004) .......... 10

Lindsay v. United States,
295 F.3d 1252 (Fed. Cir. 2002) .......... 9

Maryland Cas. Co. V. Armco, Inc.,
643 F. Supp. 430 (D.Md.) .......... 28

Mattes v. ABC Plastics, Inc.,
323 F.3d 695 (8th Cir. 2003) .......... 9

Mraz v. Canadian Univ. Ins. Co.,
804 F.2d 1325, 1328-29 (4th Cir. 1986) .......... 28

Munsey Trust Co. v. United States,
330 U.S. 234 (1947) .......... 12

New Castle County v. Hartford Accid. & Ins. Co.,
933 F.2d 1162 (3d Cir. 1991) .......... 29

Owen Equip. & Erection Co. v. Kroger,
437 U.S. 365 (1978) .......... 2

Pacrim Pizza Co. v. Prine,
304 F.3d 1291 (Fed. Cir. 2002) .......... 12

Redwing Carriers, Inc. v. Saraland Apts.,
94 F.3d 1489 (11th Cir. 1996) .......... 14

Southern Cal. Edison Inc. v. United States,
58 Fed. Cl. 313 (2003) .......... 9

Splane v. West,
216 F.3d 1058 (Fed. Cir. 2000) .......... 10

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 10

Teagardener v. Republic-Franklin Inc. Pension Plan,
909 F.2d 947 (6th Cir. 1990) .......... 9, 18

United States v. Aetna Cas. & Sur. Co.,
338 U.S. 366 (1949) .......... 3

United States Fidelity & Guar. Co. v. United States,
201 Ct. Cl. 475 F.2d 1377 (1973) .......... 6, 12

Wilkerson v. United States,
67 F.3d 112 (5th Cir. 1995) .......... 12

STATUTES

7 U.S.C. §§ 136-136y .......... 14

10 U.S.C. § 2687 .......... 2, 4, 22

28 U.S.C. § 1491(a) .......... 11

28 U.S.C. § 1631 .......... 7

42 U.S.C. §§ 107, 113 .......... 28

42 U.S.C. § 4332(2) .......... 18

42 U.S.C. § 9601 .......... 27

42 U.S.C. § 9601(6) .......... 27

42 U.S.C. § 9601(9) .......... 14, 23

42 U.S.C. § 9601(14) .......... 13, 14, 23, 30

42 U.S.C. § 9604 .......... 27

42 U.S.C. § 9606 .......... 27

42 U.S.C. § 9607(a)(1)-(3) .......... 27

42 U.S.C. § 9607(a)(4) .......... 27

42 U.S.C. § 9611(b) .......... 27

42 U.S.C. § 9607(i) .......... 14

42 U.S.C. § 9613(f) .......... 27

42 U.S.C. § 9620 (h)(3)(A)(ii)(I) .......... 12

42 U.S.C. § 9620 (h)(3)(A)(ii)(II) .......................................................................................... 12, 13

Department of Defense Appropriations Act for 1991,
Pub. L. No. 101-511, 104 Stat. 1856, 1887 (1990) ......................................................... 24

INDEX TO APPENDIX

December 1, 1998 letter and excerpted attachments from Department of the Navy to California Environmental Protection Agency ........ 1

July 20, 1999 letter and excerpted attachments from Environmental Resources Management to BRAC Environmental Coordinator ........ 5

Vol. I, Final Environmental Impact Statement, October 1999 (excerpts) ........ 11

Parcel Evaluation Data Summary (environmental baseline survey), April 2000 ........ 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | No. 05-1020C (Judge Sweeney) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Rules 12(a)(2), 12(b)(6), and 56 of the Court's Rules ("RCFC"), defendant, the United States, in lieu of an answer, respectfully requests the Court to dismiss each of the eight counts of the first amended complaint for failure to state a claim upon which the Court could grant relief or, alternatively, to grant the Government summary judgment upon any count that is not dismissed. We rely upon the allegations of, and the attachments to, the first amended complaint; as necessary, the accompanying proposed findings of uncontroverted fact and evidentiary appendix; and the following brief.

STATEMENT OF THE ISSUES

1. Whether the Court should dismiss counts one through four, seven, and eight of the first amended complaint for failure to state claims upon which the Court could grant relief, or, alternatively, grant defendant summary judgment upon those counts, upon the grounds that the Department of the Navy's lawful application of a chlordane-based termiticide at the East Housing Area of the former Naval Air Station Alameda (i) was not a release or threatened release of a hazardous substance, pollutant, contaminant, or petroleum product and (ii) was fully

disclosed to plaintiff's alleged insureds, before the memorandum of agreement and deed of transfer attached to the complaint were executed.

2. Whether the Court should dismiss counts five and six, or, alternatively, grant defendant summary judgment upon those counts, upon the grounds that plaintiff cannot recover damages pursuant to section 330 of National Defense Authorization Act of 1993, as amended, 10 U.S.C. § 2687 note ("section 330"), or under a deed provision referencing the statute, because (i) the property acquired by the City was not a "facility" with the scope of section 330; (ii) the costs allegedly incurred by the City to remediate pesticide-treated soil when demolishing buildings at the property did not arise from a "claim for personal injury or property damage"; (iii) assuming there was such a claim, it was not predicated upon a "release or threatened release of any hazardous substance"; and (iv) assuming there was a claim premised upon a "release or threatened release," the latter was caused by the insureds, not by the United States.

ANSWERS TO THE COURT'S QUESTIONS

For clarity and convenience, below are the Government's short answers to the questions posed in the order dated May 5, 2006. Our jurisdictional analysis has changed since our prior briefing. (The Court should, nonetheless, satisfy itself that it possesses subject matter jurisdiction. See, e.g., Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978).)

1. Does plaintiff, a liability insurer of the Alameda Reuse and Redevelopment Authority and the City of Alameda, have standing to sue in the Court of Federal Claims as a subrogee? At this time, we see no basis upon which to challenge plaintiff's standing to sue.

a. The Memorandum of Agreement, East Housing Deed, and section 330 of the National Defense Authorization Act for Fiscal Year 1993 all allow "successors and assigns" to assert the rights contained therein. Are subrogees encompassed within "successors and assigns?"

Yes. See Insurance Co. of the West v. United States, 243 F.3d 1367, 1374-75 (Fed. Cir. 2001) (referring to equitable subrogees as "assignees by operation of law"); Aetna Ins. Co. v. United States, 143 Ct. Cl. 771, 159 F. Supp. 831, 837 n.8 (1958) ("[Subrogation under bill of lading] was an assignment by operation of law which is valid.") (citing United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 373 (1949)).

. b. Does the law regarding the subrogation rights of sureties apply equally to liability insurers? In general, yes; but see below.

2. With regard to the ripeness issue, does the "make-whole" rule of suretyship law apply equally to liability insurers? Apparently not. See Aetna Cas., 338 U.S. at 381 (in Federal Tort Claims Act case, rejecting "common-law practice" and holding that, "in cases of partial subrogation, . . . both insured and insurer 'own' portions of the substantive right and should appear in the litigation in their own names").

## FACTUAL BACKGROUND

We respectfully presume familiarity with the allegations of the first amended complaint. Plaintiff, American International Specialty Lines Insurance Company ("AISLIC"), seeks to recover litigation, cleanup, and other costs allegedly incurred by the City of Alameda, California, and the Alameda Reuse and Redevelopment Authority ("ARRA") (collectively, "the City"), which are alleged to hold AISLIC insurance policies, in connection with the removal of termiticide-treated soil from property located at the former Naval Air Station Alameda. AISLIC alleges that the United States would be liable to the City under contractual and statutory theories.

There appear to be no disputes of historical fact relating to this motion. The parties' disagreements center, instead, upon the interpretation, and the legal significance, of documents. Thus, as discussed below, the Court can resolve this motion under RCFC 12(b)(6), by consulting

documents relied upon in the first amended complaint. See RCFC 10(c). Alternatively, should the Court invoke RCFC 56, we have submitted proposed findings of uncontroverted fact, pursuant to RCFC 56(h)(1), which track the events and documents alleged by AISLIC in the first amended complaint.

The Federal Government conveyed the East Housing property to the City of Alameda, pursuant to the Defense Base Realignment Act of 1990, 10 U.S.C. § 2687 note, by quitclaim deed dated July 17, 2000. 1st Am. Compl. Exh. 2. The attachments to the first amended complaint establish that the City was advised several times before the transfer date that chlordane compounds were present at the property. For example, the memorandum of agreement ("MOA") anticipating the transfer of the property, signed on June 6, 2000, states that an environmental baseline study ("EBS") for the property, dated April 2000, "ha[s] been provided to [the City]." Id. Exh. 1, at 6. A precursor of the April 2000 EBS was referenced in the finding of suitability for transfer ("FOST") executed by the Navy on April 7, 2000. 1st Am. Compl. Exh. 3, at 8.[1] The 2000 EBS is referenced in both the MOA and the quitclaim deed. Id. Exh. 1, at 6; Exh. 2, at 6. The EBS states that soil samples taken from within the East Housing area tested positive for alpha-chlordane and gamma-chlordane, as well as the chlordane compounds heptachlor, heptachlor epoxide, and methoxychlor. Def. App. 26, 28, 38. The EBS contains a map showing the locations from which these samples were taken. Def. App. 36A.

Other documents that the City possessed, or knew of, on or before the transfer date, and which provided notice that chlordane compounds had been used at the property included (i) the

---

[1] The FOST, which is Exhibit C to the MOA, cites "IT 2000" when referring to the EBS, as the EBS was prepared by IT Corporation. The EBS is also identified in the FOST as "Parcel Evaluation Data Summary Phase 2A Sampling Zone 16." See Def. App. 15.

final environmental impact statement ("EIS") dated October 1999, stating, "Pesticides used on-site in the past included chlordane, lindane and . . . DDT, which are now banned," Def. App. 12; (ii) a letter to the Navy (with a copy to the City) from the Government's environmental consultant, dated July 20, 1999, reporting the detection of chlordane and heptachlor epoxide in soil samples taken from the property, Def. App. 8; and (iii) a report submitted by the Navy to the California Department of Toxic Substance Control ("DTSC") in December 1998, also copied to the City, indicating that alpha-chlordane and gamma-chlordane were present at one of the East Housing parcels. Def. App. 4.

At the time of the conveyance, military housing structures, around which chlordane-based termiticide had been applied, remained on the property. On May 3, 2002, the California DTSC approved a "workplan" submitted by the City for the demolition of the buildings. See 1st Am. Compl. ¶ 45. The State regulators advised the City:

> The building foundations at EHA [East Housing area] appear to have been properly treated with organochloride pesticides (OCP) for termite control, and as such, are currently being used in the manner intended. Upon removal [by the City] of the buildings and foundations that are treated with OCP, any OCP remaining in soils and exceeding the [State-prescribed] concentrations . . . would be a hazardous substance released to the environment, and would require remedial action . . . .
>
> . . . [E]nsuring that soils and structures impacted with OCP [are] removed concurrent with structure demolition . . . would lead to DTSC concurrence that no release of OCP to the environment remains that requires action.

9/30/05 Transf. Compl. Exh. 2, Tab 7 (emphasis added). The City allegedly remediated the treated soil in accordance with the State-approved workplan. 1st Am. Compl. ¶ 46.

On October 31, 2002, the City filed a claim with the Navy for indemnification of the soil remediation costs under "section 330," cited above. Id. Exh. 4. The City supplemented its

section 330 claim in December 2003. Id. Exh. 5. The Department of Defense had not acted upon the claim when, in April 2004, AISLIC filed an equitable subrogation lawsuit against the United States in the District Court for the Northern District of California, seeking cost recovery and declarative relief pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), (ii) section 330, and (iii) the July 2002 quitclaim deed. AISLIC alleged in that complaint that it had incurred some cleanup costs upon behalf of the insureds. AISLIC acknowledges, however, that it did not "complete[] payment in full of all claims and demands relating to the remedial action that is the subject of this suit [until] November 20, 2005," after its claims had been transferred to this Court. 1st Am. Compl. ¶ 52.

In March 2005, the district court dismissed AISLIC's CERCLA claims for lack of jurisdiction, as unripe. American Intl. Spec. Lines Ins. Co. v. United States, No. C 04-01591 CRB, 2005 WL 680159 (N.D. Cal. March 24, 2005). The court relied upon "the general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for her injuries, that is, has been made whole." Barnes v. Independent Auto. Dealers Assoc. of Cal. Health & Welfare Ben. Plan, 64 F.3d 1389, 1394 (9th Cir. 1995), quoted in 2005 WL 680159, at *4; cf. United States Fidelity & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1385 (1973) ("[W]e would be powerless . . . to require that the Government make a payment . . . to the surety when it is clear that the surety has not paid these subcontractors in full.").

The district court transferred AISLIC's other equitable subrogation claims to this Court, pursuant to 28 U.S.C. § 1631. 2005 WL 680159, at *5. This Court's May 5, 2006 order summarized the procedural history since the matter was transferred here.

The first amended complaint filed in January 2006 contains eight counts. Counts one through four allege that the Government breached the quitclaim deed for the East Housing area, dated July 17, 2000, by falsely representing that chlordane compounds were not present in the soil, or failing to disclose that fact, and by failing to remove pesticide from the soil, before or after the transfer. 1st Am. Compl. ¶¶ 53-105. In the fifth count, AISLIC alleges that it (as a subrogee of the City) is entitled to indemnification for the soil remediation, pursuant to section 330. Id. ¶¶ 106-19. Count six alleges that the Government expressly agreed in the East Housing deed to indemnify the City under section 330. Id. ¶ 120-35. The seventh and eighth counts allege that the Government breached a memorandum of agreement dated June 6, 2000 by failing to disclose the presence of chlordane in the soil at the property and failing to conduct remedial action at the City's request. Id. ¶¶ 136-62.

## SUMMARY OF THE ARGUMENT

The first amended complaint – actually the fourth complaint AISLIC has filed in this case, including the district court litigation – is deficient upon multiple grounds. AISLIC's pleadings establish that the City of Alameda was placed on notice multiple times, in several documents, before assuming ownership of the East Housing site in 2000, that the Navy had applied a chlordane-based termiticide near buildings on the property and that chlordane compounds remained in the soil. In 2002, California regulators determined that the Navy had properly applied the termiticide for its intended purpose and that the termiticide would be deemed a released hazardous substance requiring remediation only if actionable amounts remained in the soil after the structures were removed. This plainly meant that no remediation would have been required, had the City not proceeded with the demolition. The City allegedly safely removed the treated soil.

These facts and allegations – all of which can be derived from the pleadings and documents cited in the pleadings – provide no basis for AISLIC to recover. The Government did not breach the June 2000 MOA or the July 2000 quitclaim deed by inaction or affirmative misrepresentation, as alleged in counts one through four, seven, and eight. The City was repeatedly advised of the Navy's use of chlordane and the continued presence at the site of the chemical, which continued to serve its intended purpose as a termiticide until being removed by the City and was, consequently, never released or threatened to be released as a hazardous substance into the environment or required to be remediated by the United States.

With respect to counts five and six, the first amended complaint and its attachments establish that AISLIC's insureds are not entitled to indemnification pursuant to section 330. The legislation requires the Secretary of Defense to indemnify transferees of certain military property, under limited circumstances, against particular types of costs arising from damages claims brought by third parties. The following required elements of a section 330 claim are absent: (i) a claim (ii) against a transferee of a covered facility, as defined by CERCLA, (iii) for property damage (iv) in connection with a release or threatened release of CERCLA-regulated material (v) which resulted from military activities, rather than those of the transferee. Instead, here, approximately two years after accepting title to the property, at which there had been no release of a hazardous substance, the City received advice from State regulators as to how to avoid environmental liability in connection with pesticide-treated soil, when (and if) the City demolished structures at the site. Congress plainly did not provide for indemnification under these circumstances.

In the event the Court determines that any count cannot be dismissed upon the basis of the pleadings, pursuant to RCFC 12(b)(6), the relevant facts are uncontroverted and support entry of judgment in favor of the Government under RCFC 56.

## ARGUMENT

### I. Legal Standards

Dismissal for failure to state a claim is warranted "when the facts asserted by the claimant do not entitle [it] to a legal remedy . . . accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in the claimant's favor." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002); accord Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Because, pursuant to RCFC 10(c), documents that form the basis of a claim for relief are considered part of the pleadings, the Court is free to consider documents referenced in the first amended complaint without treating this motion as a summary judgment motion. E.g., Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 & n.4 (8th Cir. 2003); Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42 (2d Cir. 1991); see also Southern Cal. Edison Inc. v. United States, 58 Fed. Cl. 313, 321 (2003) (noting that contract interpretation is a proper basis for motion to dismiss).

AISLIC cannot avoid dismissal by resting upon bare allegations regarding the contents of relevant documents. "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." Cortec, 949 F.2d at 48 (emphasis added); accord Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947, 949-50 (6th Cir. 1990) ("[T]he language of the Plan, and the arguable meanings of its terms, were central to the plaintiffs' complaint, and were part of the pleadings before the district court."); Haskell v. Time, Inc., 857 F. Supp. 1392, 1397-98 (E.D. Cal. 1994).

Alternatively, summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c). A factual issue is "material" only if it could affect the outcome, under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine" factual dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. Defendant ordinarily may satisfy its initial burden under RCFC 56 simply by "pointing out" that evidence in the record fails to support plaintiff's claim. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987); see RCFC 56(b) (party without burden of proof may "move with or without . . . affidavits").

Statutory construction begins with the text, which should be read as a whole and given its plain and ordinary meaning, to the extent the result is not absurd, in light of the evident legislative purposes. Lamie v. United States Trustee, 540 U.S. 520, 530 (2004); Splane v. West, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000). The Court should presume that Congress intends for closely related statutes – which we demonstrate below Section 330 and CERCLA are – to "work harmoniously together, and for neither to frustrate the other, or partially repeal it . . . ." Ambassador Div. of Florsheim Shoe Co. v. United States, 748 F.2d 1560, 1565 (Fed. Cir. 1984).

Similarly, contract terms are interpreted as far as possible in accordance with their ordinary, plain meaning, without rendering any part superfluous or producing an absurd result. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F.2d 972, 975 (1965).

## II. Jurisdiction

The court of appeals has interpreted the Tucker Act, 28 U.S.C. § 1491(a), "to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti-Assignment Act." Insurance Co. of the West, 243 F.3d at

1375. AISLIC alleges it is both an express assignee of the City's cost claims and an equitable subrogee. See 1st Am. Compl. ¶¶ 50-52. The Anti-Assignment Act does not serve as a bar to "assignments by operation of law," pursuant to equitable subrogation. See Insurance Co. of the West, 243 F.3d at 1372-73. Any limitation upon the sovereign immunity waiver under the Tucker Act which could affect the Court's power to hear any of AISLIC's claims, would, therefore, need to be found in some other statute.

It could be argued that the reference in section 330(a)(2)(D) to a "transferee [or] assignee," and similar references, noted by the Court in its May 5, 2006 order, in contracts between the United States and the City relating to the East Housing site, are limited to assignees or transferees of the military property itself – and, therefore, reflect an intent upon the part of the drafters to retain the United States' sovereign immunity with respect to claims by parties, such as AISLIC, that have received assignments only of claims, by means of equitable subrogation. To the extent either section 330 or the contract terms were construed as limiting the scope of the waiver under the Tucker Act in that fashion, the Court might lack jurisdiction to entertain AISLIC's claims based upon section 330, the contracts, or both.

However, we are not aware of case law or legislative history that would compel a conclusion that Congress intended for section 330 to prohibit equitable subrogation claims under the Tucker Act, by limiting the statutory remedy exclusively to owners of properties described in section 330 and prohibiting independent assignments of section 330 claims. Nor do we believe that agreements entered into between the United States and transferees of military property, such as the City, can affect the scope of the waiver of sovereign immunity contained in the Tucker Act. Cf. Pacrim Pizza Co. v. Prine, 304 F.3d 1291, 1294 (Fed. Cir. 2002) (holding sovereign immunity not waiveable by contract); Wilkerson v. United States, 67 F.3d 112, 118 (5th Cir.

1995) ("[C]ourts may not exercise subject matter jurisdiction over a claim against the federal government except as Congress allows.").

III. The Government Did Not Breach The East Housing Deed (Counts One Through Four)

Despite this, AISLIC cannot recover, inasmuch as the United States would not be liable in a lawsuit by the City. Cf. Munsey Trust Co. v. United States, 330 U.S. 234, 242 (1947) (noting "[o]ne who rests on subrogation stands in the place of one whose claim he has paid" and "cannot acquire by subrogation" any rights that the alleged subrogor "did not have"); U.S. Fidelity, 475 F.2d at 1382.

A. The Government Did Not Breach The CERCLA Covenants

The first four counts of the first amended complaint allege breaches of the July 2000 East Housing quitclaim deed. Counts one and two rely upon two covenants which were included in the deed pursuant to requirements of CERCLA. See 42 U.S.C. § 9620(h)(3)(A)(ii)(I), (II). Those covenants appear in section F of the deed and provide:

> 2. Grant of Covenant [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(ii)(I)]. The GRANTOR [United States] covenants that all remedial action necessary to protect human health and the environment with respect to any hazardous substance remaining on the Property has been taken before the date of transfer.
>
> 3. Additional Remediation Obligation [CERCLA 42 U.S.C. Section 9620 (h)(3)(A)(ii)(II)]. The GRANTOR covenants and warrants that the GRANTOR shall conduct any additional remedial action necessary after the date of transfer of any hazardous substance existing on the Property prior to the date of this Deed. This covenant shall not apply to the extent that the GRANTEE caused or contributed to any release or threatened release of any hazardous substance, pollutant, contaminant, petroleum, or petroleum derivative.

1st Am. Compl. Exh 2, at 6 (bracketed statutory citations in original).[2]

AISLIC alleges that the Government breached the first covenant above "by failing to take all remedial action necessary to protect human health and the environment with respect to the hazardous substances chlordane and/or OCPs remaining on the Property before the [transfer] date," id. ¶ 60 (emphasis added), and breached the second covenant "by failing to conduct remedial action necessary after the [transfer] date . . . ." Id. ¶ 71 (emphasis added). Both arguments run aground, however, upon the documentary evidence that (i) the responsible regulators found the pesticide applied to the building foundations was being used in the manner intended; (ii) there was no "release or threatened release" of a hazardous substance by the Navy before or after the transfer; and (iii) even assuming there was a "threatened release" of a "hazardous substance" associated with demolishing the buildings, the threat of a release was attributable solely to the actions of the City and, therefore, creates no liability for the United States under the second CERCLA covenant above.

The CERCLA liability scheme regarding "hazardous substances," 42 U.S.C. § 9601(14), does not apply to useful products, including lawfully applied pesticide that serves a legitimate purpose in its existing state. See A&W Smelter and Refs., Inc. v. Clinton, 146 F.3d 1107, 1112 (9th Cir. 1998); AMI, Inc. v. International Forging Equip. Co., 982 F.2d 989, 998 (6th Cir. 1993). That is, of course, exactly how the California DTSC characterized the termiticide in the soil at the East Housing area in 2002: The DTSC declared, in a letter attached to the first amended complaint, that the pesticide had been "properly applied" and was functioning "in the

---

[2] The deed covenants do not precisely track 42 U.S.C. § 9620(h)(3). For example, pursuant to the statute, the final sentence of the second covenant should refer only to "any hazardous substance," and not to "any . . . . pollutant, contaminant, petroleum, or petroleum derivative." The inconsistencies appear to be immaterial to this case.

manner intended," even after the East Housing property was transferred to the City. 9/30/05 Transf. Compl. Exh. 2, Tab 7.

Additionally, the statutory definition of a CERCLA "facility" includes "any site or area where a hazardous substance has . . . come to be located; but does not include any consumer product in consumer use . . . " 42 U.S.C. § 9601(9) (emphasis added). The "consumer use" exception is broad enough to encompass the East Housing property in general. See, e.g., Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059, 1065-66 (5th Cir.1990) (holding Congress did not intend to provide for recovery for releases from useful consumer products contained in building structures); see also Kane v. United States, 15 F.3d 87, 89 (8th Cir. 1994) (holding sale of a building containing asbestos insulation exempt from CERCLA under consumer use exception, under facts of the case). Because the chlordane-based termiticide constituted a "useful product" under CERCLA, the Government bore no responsibility to remediate it, either before or after the conveyance, under either of the CERCLA covenants quoted above.

Similarly, proper application of a pesticide that is registered in accordance with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y – which includes the chlordane-based termiticide at issue here, at the time it was used at the East Housing area – does not cause a release giving rise to CERCLA liability. See Redwing Carriers, Inc. v. Saraland Apts., 94 F.3d 1489, 1511 n.31 (11th Cir. 1996) (holding the 42 U.S.C. § 9607(i) exclusion covers chlordane and dieldrin compounds, although both chemicals later lost FIFRA registration). Consistent with this, the California DTSC never identified a "release or threatened release of any hazardous substance, pollutant, contaminant, petroleum, or petroleum derivative" caused by the Navy at the East Housing area, within the meaning of the second covenant above.

To the contrary, the State agency advised the City, almost two years after the City assumed ownership of the property, that hazardous substances would be released to the environment and require remedial action only if the buildings were demolished and treated soils exceeding an action level were left in place. 9/30/05 Transf. Compl. Exh. 2, Tab 7. Even assuming, for purposes of argument, that the City's demolition plan presented a "threat" of a "release" of termiticide into the soil, the threatened release would have resulted from the City's decisions concerning redevelopment of the property. Since, assuming there was a threatened release, the City alone "caused or contributed to" it, the second covenant above does "not apply" and did not obligate the United States to remediate the termiticide-treated soil in connection with the City's demolition activities. 1st Am. Compl. Exh 2, at 6.

Accordingly, the Court should dismiss counts one and two pursuant to RCFC 12(b)(6). The allegation in the first amended complaint that the termiticide constituted a "hazardous substance" requiring remediation by the United States is a legal conclusion, to which no deference is warranted, and which documents relied upon in the first amended complaint demonstrate is incorrect. See, e.g., Hanson v. United States, 13 Cl. Ct. 519, 530 (1987) ("The established rule regarding legal conclusions proffered as factual allegations is that they are not given the presumption of truth and that conclusory allegations without any supporting facts are insufficient to withstand a motion to dismiss.") (citing Briscoe v. LaHue, 663 F.2d 713 (7th Cir. 1981), aff'd,460 U.S. 325 (1983)). Alternatively, we are entitled to summary judgment, unless AISLIC adduces admissible evidence casting genuine doubt upon the findings by the responsible California regulatory agency indicating that application of the termiticide (i) was properly carried out; (ii) was not a release or threatened release of a hazardous substance prior to the

City's removal of the buildings; and (iii) could have led to a release of a hazardous substance only if actionable levels had remained in the soil after the demolition. See RCFC 56(c).

B. The Government Did Not Misrepresent The Presence Of Chlordane

AISLIC's third and fourth counts allege that the United States breached the East Housing quitclaim deed by failing to disclose the Navy's use, storage, release, or threatened release of chlordane compounds at the site. 1st Am. Compl. ¶¶ 74-105. Plaintiff "must allege a connection between the government's [supposed] misrepresentation and an express contract term." D.V. Gonzalez Elec. & Gen. Contrs. v. United States, 55 Fed. Cl. 447, 459 (2003) (emphasis added); accord C.B.C. Enterps., Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). Count three alleges that "the Government represented [in the deed] that the FOST [finding of suitability for transfer] listed the pesticides that may have been used on the Property," id. ¶ 75 (citing deed section II.F.I.A.), and that the alleged failure to identify chlordane compounds in the FOST "was a negligently untrue representation of fact," resulting in a breach. Id. ¶ 81.

Simple inspection of the cited documents is enough to establish that count three fails to state a claim: Section II.F.1.a of the deed makes no such representation concerning the FOST. It states generally that a FOST was prepared and that the FOST describes environmental conditions at the property. The deed provision says nothing about pesticides. Equally fatal to the claim, deed section II.F.I.a provides that the City "is hereby made aware of the notifications contained in the FOST and EBS [environmental baseline survey]." 1st Am. Compl. Exh. 2, at 6 (emphasis added). As noted above, the East Housing EBS dated April 2000 discloses multiple detections of chlordane and chlordane compounds in soil samples from the property. Def. App. 26, 28, 38. Because the deed references the EBS for the property, and because the EBS plainly indicates the

presence of chlordane compounds, there could not have been any misrepresentation by the United States in these documents, with respect to chlordane.

There was no misrepresentation, either, in section 6.8 of the FOST itself. That section, by its terms, does not purport to provide a complete list of pesticides used in the East Housing area. Rather, it lists substances that "typically" or "may" have been used, throughout the former Naval Air Station. 1st Am. Compl. Exh. 3, at 12. Nor does the FOST suggest anywhere else that section 6.8 lists all pesticides that were ever used at the East Housing area. Most important, however, as noted above, deed section II.F.1.a – the contractual provision allegedly breached – contains no specific references to, or representations concerning, FOST section 6.8, at all. There is, in short, simply no textual basis for count three.

Count four, by contrast, alleges that the Federal Government breached the deed by omitting chlordane from the "Hazardous Substance Notification" in exhibit B of the deed, thereby "misle[ading] the Alameda Reuse and Redevelopment Authority to believe that Chlordane and/or OCPs were not stored for one year or more, known to have been released, or disposed of on the Property." 1st Am. Compl. ¶ 101. This count fails for reasons already noted. As a threshold matter, the chlordane termiticide was not stored for a year or more, released, or disposed of at the East Housing area, under the operative meaning of those terms here: The documentary record establishes, to the contrary, that chlordane was applied in a lawful manner, for its intended purpose. Chlordane did not need to be listed as a hazardous substance in the deed notification, because it was not a hazardous substance. It was a registered termiticide, lawfully applied. AISLIC offers nothing but ungrounded speculation to the contrary.

Just as important, as a matter of law, AISLIC cannot establish "reasonable reliance" by the City upon any alleged misrepresentation regarding chlordane. See, e.g., Dulien v. United

States, 143 Ct. Cl. 484, 493-94 & n.9 (1958). This is because, before accepting the deed in 2000 – indeed, beginning as early as December 1998 – the City was notified of, had the opportunity to examine, and, in several instances, possessed independent documentation indicating that chlordane has been used at the East Housing area. We described several of the documents above. Arguably, the most prominent are the EIS prepared in accordance with the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), which unambiguously notes the Navy's "use[]" of "chlordane . . ., which [is] now banned," Def. App. 12, and the EBS, which is cited in both the FOST and the deed, and which reported the presence of chlordane compounds in soil samples taken from the property. Def. App. 26, 28, 38.

Therefore, like counts one and two, counts three and four should be dismissed for failure to state a claim, because the very documents upon which AISLIC relies (and documents cited therein) demonstrate the invalidity of its misrepresentation claims. See, e.g., Teagardener, 909 F.2d at 949 ("We agree with the defendants that the plaintiffs incorporated the Plan into their amended complaint [for purposes of Rule 12(b)(6)] by quoting extensively from it."). Alternatively, we are entitled to summary judgment, because the documentary record establishes that the use and presence of chlordane compounds at the East Housing property was disclosed to the City well before the transfer date, and the City could not have been (and was not) reasonably misled by the failure of any individual document or documents to mention chlordane.

## IV. The Government Did Not Breach The Memorandum Of Agreement (Counts Seven And Eight)

AISLIC alleges in its seventh and eighth counts that the Government breached the memorandum of agreement, which was signed approximately six weeks before the quitclaim deed. 1st Am. Compl. ¶¶ 136-62. Count seven alleges that the Government materially

misrepresented and failed to identify, in the MOA or its exhibits, chlordane compounds among the hazardous substances that were stored for one year or more, known to have been released or disposed of on the property. Id. ¶¶ 136-53. This claim fails for reasons similar to those discussed above; chlordane was not stored, released or disposed, but rather was used for its intended purpose. Therefore, there is no evidence to support these allegations.

Even assuming AISLIC presented probative evidence to support the allegations of storage, release, or disposal,, the MOA and its exhibits did, in fact, identify the use of chlordane and the presence of chlordane in soil samples. The EIS, cited in the MOA, refers to the use of chlordane pesticide. Def. App. 12. The EBS, which is also cited in the MOA, and which the City acknowledged in the MOA having received, notes the presence of chlordane compounds. Id. at 26, 28, 38. Finally, MOA Exhibit I, "List of Environmental Reports," lists, inter alia, a technical memorandum by Tetra Tech EM, Inc., dated December 1, 1998 – which is the same report mentioning chlordane which we previously noted was provided to the City in December 1998. Def. App. 2-3. The MOA states, "The Authority [ARRA] acknowledges that it has received copies of all documents listed in Exhibit I." 1st Am. Compl. Exh. 1, at 6.

Moreover, even if AISLIC presented probative evidence that (i) the use of chlordane at the property constituted the storage, release or disposal of the pesticide and (ii) the MOA failed to identify such storage, release or disposal, there is no basis upon which to conclude that a failure to disclose storage, release, or disposal of chlordane could have induced reasonable reliance by the City, given the express and repeated disclosure of the facts that chlordane was used and was still present at the site. We are entitled to dismissal of count seven, based upon the pleadings, or, alternatively, summary judgment, in light of the absence of evidence to support the claim. See RCFC 56(c).

In count eight, AISLIC alleges that the Government breached article 21 of the MOA, which provides that the City had "no obligation under this Agreement to undertake the defense of any claim or action, whether in existence now or brought in the future, or to conduct any cleanup or remediation action solely arising out of the use or release of any toxic or hazardous wastes, substances or materials . . . on or from any part of the Property due to activity on the Property by the Government." 1st Am. Compl. ¶ 157 (emphasis added); see id. Exh. 1, at 16. Count eight also fails as a matter of law. First, article 21 is plainly not an indemnification provision: It simply clarifies that the City did not assume any cleanup responsibilities or obligations as a consequence of signing the MOA. By its terms, article 21 does not contain any affirmative promises by the Government and, therefore, cannot form the basis of a claim for breach damages.

Alternatively, assuming article 21 can be read as imposing affirmative duties, AISLIC fails to allege, as explained above, any costs which were incurred by the City and were due "solely" to the use or release of a "hazardous substance" by the Navy. The pleadings and the cited documents establish that the Navy used a lawfully registered termiticide, which served its purpose. Application of the pesticide thus did not constitute the release of a hazardous substance by the Navy. By the same token, the pleadings establish that the costs incurred by the City in connection with the remediation of the soil certainly are not, as a matter of law, attributable "solely" to the Navy's activities at the site before the City assumed ownership. Accordingly, count eight fails to state a claim for damages under the MOA or, in the alternative, defendant is entitled to summary judgment upon that count, given the absence of evidence upon which a trier of fact could find a breach. See RCFC 56(c).

V. AISLIC Cannot Recover Under Section 330, Which Does Not Provide For Indemnification Of A Transferee's Cleanup Costs

Finally, count five of the first amended complaint alleges that the City and its subrogee, AISLIC, are entitled to recover the remediation-related costs under section 330, 1st Am. Compl. ¶¶ 106-19; and count six alleges the Government "expressly recognized" section 330 obligations in the East Housing deed. Id. ¶ 122. Because the contract claim depends entirely upon, and adds nothing to, AISLIC's claim of entitlement under the statute, we focus upon the statute. Section 330 directs the Secretary of Defense to indemnify a transferee of closed military property solely against "claims" by third parties for "personal injury or property damage" suffered by those third parties. The statute does not apply here, since AISLIC does not allege that the DTSC, or another third party, pursued a claim against the City for damage suffered by the third party.

Section 330 provides in relevant part:

> a) IN GENERAL.– (1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.
>
> (2) The persons and entities described in this paragraph are the following:
>
> (A) Any State (including any officer, agent, or employee of the State) that acquires ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1).

> (B) Any political subdivision of a State (including any officer, agent, or employee of the State) that acquires such ownership or control.
>
> (C) Any other person or entity that acquires such ownership or control.
>
> (D) Any successor, assignee, transferee, lender, or lessee of a person or entity described in subparagraphs (A) through (C).
>
> (3) To the extent the persons and entities described in paragraph (2) contributed to any such release or threatened release, paragraph (1) shall not apply. . . .

10 U.S.C. § 2687 note.

The legislation thus establishes several prerequisites to indemnification. Although these requirements arguably could be analyzed in various orders and combinations, a section 330 claimant must allege and establish, at a minimum, that:

(i) It is a "person or entity" described in subsection (a)(2);

(ii) It has acquired "ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1)";

(iii) It has encountered a "suit, claim, demand or action, liability, judgment, cost or other fee";

(iv) The latter circumstance or expense "aris[es] out of [a] claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss)";

(v) The latter claim "results from, or is in any manner predicated upon, the release or threatened release of any the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative" at a covered property;

(vi) The release or threatened release occurred "as a result of Department of Defense activities"; and

(vii) The party that is allegedly entitled to indemnification (here, the City) did not "contribut[e] to any such release or threatened release" (subsection (a)(3)).

A. The City Did Not Acquire A Section 330 "Facility"

The pleadings establish that requirements (ii) through (vii) above are absent here. To begin, pursuant to section 330(a)(2), a person or entity eligible for indemnification must have acquired ownership or control of "any facility at a military installation (or any portion thereof)." As noted above, section 330(f) incorporates the specific CERCLA definition of "facility," which "does not include" a location where "any consumer product in consumer use" has come to be located. 42 U.S.C. § 9601(9). As previously stated, the pleadings demonstrate that, until the City demolished the buildings, the pesticides present at the East Housing facility were a consumer product in consumer use, protecting the buildings. Accordingly, the East Housing property was not a CERCLA "facility," and the City could not, if it were the plaintiff, meet a threshold requirement for recovery under section 330. Cf. First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 867 (4th Cir. 1989) (holding CERCLA as a whole "cannot reasonably be interpreted to encompass the asbestos-removal problem").

B. There Was No "Claim" Against The City

Assuming the City took title to a statutory "facility," the City is not alleged to have faced any "claim for personal injury or property damage," as required by section 330(a)(1). That section encompasses only liabilities "arising out of any claim for personal injury or property damage" relating to military activities at a covered base (emphasis added). The significance of the quoted language is confirmed by comparing section 330 to a prior law, indemnifying the

State of New Hampshire for costs arising at Pease Air Force Base. Section 8056 of the Department of Defense Appropriations Act for 1991, Pub. L. No. 101-511, 104 Stat. 1856, 1887 (1990), was substantially similar to section 330, except that the earlier legislation held New Hampshire harmless "from and against all suits, claims, demands or actions, liabilities, judgments, costs and attorney's fees arising out of, or in any manner predicated upon releases or threatened releases of hazardous substances, or pollutants or contaminants resulting from Department of Defense activities at Pease[.]" Id. (emphasis added).

Section 330 – rather than providing for indemnification of suits, claims, etc., arising out of, or predicated upon, "releases or threatened releases" – refers to suits, claims, etc., "arising out of any claim for personal injury or property damage . . . that results from, or is in any manner predicated upon, [a] release or threatened release," etc. The "arising out of any claim" language inserted by Congress into section 330 limits the general categories of recoverable costs set forth in the statute. This limitation obligates AISLIC to point to a "claim for personal injury or property damage" from which the damages it seeks "aris[e]." Suits, claims, demands, liabilities, costs, etc. that do not "aris[e]" from a "claim for personal injury or property damage" are excluded from the scope of the indemnity. Indeed, even these categories of "suit, claim, demand or action, liability, judgment, cost or other fee" all denote, in context, circumstances and expenditures related to litigation or similar disputes – and not to an entity's general environmental expenses.

It is clear from the plain language of section 330(a) alone, therefore, that a legal "claim" for personal injury or property damage would need to have been brought against the City, in order for section 330 to apply here. Other language in the statute supports the same reading. Section 330(c)(1) provides that, if the Secretary of Defense determines that indemnification may

be available, the Secretary may "settle or defend, on behalf of [the indemnitee], the claim for personal injury or property damage." This provision makes no sense if the term "claim" is not understood to mean a legal or administrative proceeding against the alleged indemnitee. The reference to a "claim" cannot mean merely the incurrence of cleanup costs by a transferee, since such costs are not ordinarily said to be "settle[d]" or "defend[ed]" against.

Similarly, section 330(d) provides that a claim for indemnification accrues when the "plaintiff knew (or reasonably should have known) that the personal injury or property damage referred to in Section (a) was caused or contributed to by" a covered release or threatened release (emphasis added). The term "plaintiff" must refer to someone other than the transferee – as the transferee is identified elsewhere in the act as "the person or entity making a claim for indemnification" (in Section 330(b)) and "that person" (in Section (c)(1)). Reference to a "plaintiff" in subsection (d) confirms that Congress intended that an indemnified party would be facing a damages claim brought by a third party.

That did not happen here. AISLIC alleges that "the DTSC asserted a claim, demand, and/or action against the [City and AISLIC], requiring [them] to conduct remedial action." 1st Am. Compl. ¶¶ 111, 127. As a threshold matter, the terms "demand" and "action" are irrelevant. As noted, the plain language of section 330(a) includes demands or actions only to the extent they "aris[e] from any claim . . . ." The threshold question is, therefore, only whether the costs AISLIC seeks to recover arose from a "claim." A "demand" or "action" against a transferee which is not a "claim" does not trigger section 330. Moreover, the allegation that the DTSC asserted a "claim" is a legal conclusion which is not presumed true under RCFC 12(b)(6) and which can, and should, be rejected by the Court. See, e.g., Hanson, 13 Cl. Ct. at 530.

The only supposed "claim" upon which AISLIC relies is the letter from the DTSC to the City and its environmental consultant dated May 3, 2002, regarding the City's soil remediation workplan. See 1st Am. Compl. ¶ 45. That letter stated that the chlordane compounds found in the soil at the East Housing area "are currently being used in the manner intended," and that they "would be a hazardous substance released to the environment, and would require remedial action," only if the City removed the buildings from the site and did not remediate the pesticide-treated soil. 9/30/05 Transf. Compl. Exh. 2, Tab 7 (emphasis added). The State regulators did not allege that the City had caused any damage; demand money from the City; or even impose any firm requirement that the City remediate the soil, should the City opt not to proceed with the demolition. Because the May 2002 advisory letter from the DTSC was only that, an advisory, and not a legal "claim" within the plain, intended meaning of section 330(a), the City possesses no right to indemnification under the statute and the Court should dismiss counts five and six or, in the alternative, grant us summary judgment upon those counts.

C. There Was No Claimed "Property Damage"

Assuming the May 2002 advisory from the DTSC could somehow be deemed a "claim" brought by the DTSC, it was not a claim "for personal injury or property damage," as required by section 330(a)(1). The DTSC obviously did not bring a personal injury claim. Assuming there was a "claim," therefore, the only question is whether it could be called a claim for "property damage," within the meaning of section 330(a)(1). A fair reading of section 330 establishes that the answer is no.

In section 330(f), Congress expressly incorporated the definitions set forth in CERCLA, 42 U.S.C. § 9601, of "[t]he terms 'facility,' 'hazardous substance,' 'release,' and 'pollutant or contaminant' . . . ." Although neither statute contains a definition of "property damage," section

330 and CERCLA should be construed consistently, as they are in pari materia. Cf. Ambassador Div. of Florsheim, 748 F.2d at 1565. CERCLA contains only one provision authorizing an action based upon damage: Pursuant to CERCLA section 107, parties associated with a site (or "facility") at which a CERCLA-regulated substance has been released may be held "liable [to the Government] for . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release[.]" 42 U.S.C. § 9607(a)(4) (emphasis added). Consistent with this, CERCLA defines the related term "damages" to mean only "damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title." Id. § 9601(6).

Other CERCLA provisions, by contrast, rather than creating monetary liability for damage, authorize suits in equity against potentially responsible parties for incurred cleanup costs, id. §§ 9607(a)(1)-(3), 9613(f) (contribution claims by potentially responsible parties), and empower courts and the Executive Branch to order the removal or remediation of environmental contamination. Id. §§ 9604, 9606. "Under CERCLA," therefore, "cleanup costs are not substantially equivalent to compensatory damages for injury to or destruction of the environment." Continental Ins. Co. v. Northeastern Pharm. & Chem. Co., 842 F.2d 977, 986 (8th Cir. 1988) (en banc) (emphasis added); accord Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 91 (2d Cir. 2000).[3]

---

[3] In Ford Motor Co. v. United States, 378 F.3d 1314 (Fed. Cir. 2004), which involved a World War II contract, it was agreed that Ford had faced a "property damage" claim; the Government argued unsuccessfully that the contractual indemnity did not extend to a CERCLA damage claim. See id. at 1319. Whether a cleanup order, standing alone, would be a damage claim was not at issue. Here, in any event, there was no cleanup order.

It should be presumed, given these features of CERCLA, that, had Congress intended, when drafting section 330 "in the shadow" of CERCLA, to indemnify transferees for environmental cleanup costs, such as the costs allegedly incurred by the City of Alameda, Congress would have said so, in so many words. Had Congress included cleanup costs in the section 330 indemnity, it would have essentially duplicated the cost-recovery provisions that already existed under CERCLA, 42 U.S.C. §§ 107, 113, while, at the same time, rendering superfluous the post-transfer obligations imposed upon the Government by the "CERCLA covenants" which must appear in deeds transferring Federal lands. Id. § 9620(h)(3)(A)(ii). Congress instead chose to omit cleanup costs from section 330 and to limit the statutory indemnity to transferees facing "claim[s] for personal injury or property damage."

To be sure, courts interpreting private insurance policies have divided as to whether policy coverage for "property damage" should be construed as including environmental cleanup costs that are not incurred as legal damages. Compare Maryland Cas. Co. v. Armco, Inc., 643 F. Supp. 430, 432-33 (D. Md.) (holding toxic waste release caused "property damage" within meaning of policy, even though "claims for equitable [cleanup] relief are not claims for 'damages'"), aff'd, 822 F.2d 1348 (4th Cir. 1987) with Mraz v. Canadian Univ. Ins. Co., 804 F.2d 1325, 1328-29 (4th Cir. 1986) (holding court-ordered cleanup costs do not pertain to "property damage"); see also New Castle County v. Hartford Accid. & Ins. Co., 933 F.2d 1162, 1190 n.57 (3d Cir. 1991) (disagreeing with Mraz). This is not an insurance case, however. Most important, there is no presumption of payment under applicable principles of statutory construction, as there would be under an insurance policy. See Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 615 (2d Cir. 2001). The split of authority in insurance law is essentially immaterial here.

Even so, some insurance decisions support our position, despite the legal presumption in favor of policy holders. The United States Courts of Appeals for the Second Circuit and District of Columbia Circuit have interpreted insurance policies covering amounts paid as "damages" as obligating the insurers "to pay all sums [an insured was] ordered by a court to pay" to a third party. Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F.2d 1023, 1030 (2d Cir. 1991); accord Independent Petrochem. Corp. v. Aetna Cas. & Surety Co., 944 F.2d 940, 947 (D.C. Cir. 1991) ("costs the insured is legally obligated to pay to the United States and Missouri as reimbursement for . . . remedying environmental harm") (emphasis added). Because no court or other tribunal "ordered" the City to pay the DTSC any money, AISLIC would fail to state a claim under the Gerrish and Independent Petrochemical interpretations of "damages," assuming those authorities were applicable.

When section 330 is properly read against the backdrop of CERCLA, Congress' use of the limiting term "property damage" in Section 330(a) – as well as its complete omission of any reference to "cleanup costs" – plainly reflects a legislative intent not to include a transferee's own cleanup costs within the types of "claims" from which costs reimbursable by the Government under Section 330 may "arise." Even assuming the May 2002 advisory from the California DTSC regarding the East Housing area constituted a "claim" (which it did not), it was not premised upon "property damage," and there can be no relief under section 330.

D. There Was No Claimed "Release Or Threatened Release" Of Termiticide

Even assuming the Court discerns a "claim" for "property damage" against the City, there are further fatal deficiencies in AISLIC's statutory claim. Section 330(a)(1) provides that, in order to qualify for indemnification, a claim against a transferee of covered military property must be "predicated upon[] the release or threatened release of any hazardous substance or

pollutant or contaminant . . . . " Section 330(f)(1), as noted, incorporates the CERCLA definitions of "release," "hazardous substance," and "pollutant or contaminant," 42 U.S.C. § 9601(14), (22), and (33). "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." Id. § 9601(22).

As demonstrated in section III.A above, there was no release or threatened release of the chlordane termiticide, which was properly applied by the Navy, served its intended purpose as a consumer product while present in the soil, and was allegedly safely removed from the soil by the City. See 1st Am. Compl. ¶ 46. Thus, an additional reason the City does not meet the criteria for relief under section 330 is that it faced no claim for relief based on any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposal of termiticide into the soil at the East Housing area.

E. Assuming There Was A Threatened Release, The Government Was Not Responsible

Finally, recovery by AISLIC is barred by the further requirement in section 330(a)(1) that the release or threatened release arise from activities of the Department of Defense; and by Section 330(a)(3), which withdraws indemnity when an eligible transferee of military property "contributed to any such release or threatened release." We demonstrated in section III.A above that, assuming there was a release or threatened release, it occurred after the transfer of ownership and only because the City chose to demolish the structures at the site. To be clear, we do not doubt the general desirability of demolishing the buildings in order to develop the site after transfer. That is not the issue.

We have demonstrated, instead, that AISLIC fails to state a claim for relief under the plain language of section 330, because, among other things, documents incorporated into the pleadings establish that the City incurred the remediation-related costs as the proximate result of its own actions in redeveloping the site. Indeed, the pleadings show that the City was warned in advance by the State regulators that it should not proceed with the demolition, absent a plan to remediate the properly treated soil. In the alternative, the Court should grant the Government summary judgment upon counts five and six, based upon the absence of probative evidence in the record that the City has incurred damages

> arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of Department of Defense activities

See RCFC 56(c).

CONCLUSION

For the reasons given above, we respectfully request the Court to dismiss the first amended complaint for failure to state a claim or, in the alternative, to grant summary judgment upon any count that is not dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Navy Litigation Office
Washington, D.C.

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

July 12, 2006

CERTIFICATE OF FILING

I certify that on July 12, 2006, the attached motion was filed electronically. I understand that service is complete upon filing and parties and others may access this filing through the Court's system.

s/Kyle Chadwick