No. 05-1020C
Judge Margaret M. Sweeney

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S CORRECTED MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison (pending admission *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Plaintiff American International Specialty Lines Insurance Company*

August 14, 2006

# TABLE OF CONTENTS


I. Introduction ..... 1

II. Answers to the Court's Questions ..... 3

III. Argument ..... 6

A. The Government Fails to Meet the Standards for Both a Motion to Dismiss and Summary Judgment ..... 6

B. Plaintiff Has Sufficiently Alleged Breach of Contract Claims ..... 8

1. The Government's Allegations that Chlordane was Lawfully Applied is a Question of Material Fact that Cannot Be Resolved at this Stage of Litigation (Counts One and Two) ..... 9

2. Factual Issues Regarding the Misrepresentation of Chlordane Preclude the Government's Motion to Dismiss, or in the Alternative, for Summary Judgment (Counts Three and Four) ..... 12

3. Material Fact Issues Remain Regarding the Government's Breach of the Memorandum of Agreement (Counts Seven and Eight) ..... 15

C. Plaintiff Has Alleged a Claim for Indemnification (Counts Five and Six) ..... 15

1. AISLIC's Allegations Support a Finding that the East Housing Area is a "Facility" under Section 330 ..... 17

2. AISLIC Has Alleged a "Claim" for Purposes of Section 330 ..... 18

3. AISLIC Has Alleged "Property Damage" for Purposes of Section 3301 ..... 21

4. AISLIC Has Alleged that its Claim is Predicated on a Release and/or Threatened Release of a Hazardous Substance as a Result of Department of Defense Activities ..... 23

5. The City's Alleged Contribution to the Release is Not Proper for Resolution at this Stage in the Litigation ..... 24

IV. Conclusion ..... 25

# TABLE OF AUTHORITIES

## Cases

*A & W Smelter & Refs., Inc. v. Clinton*, 146 F.3d 1107 (9th Cir. 1998) .......... 9

*Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir. 1991) .......... 22

*AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 799 P.2d 1253 (1990) .......... 22

*Am. Airlines v. United States*, 68 Fed. Cl. 723 (2005) .......... 6, 7

*Am. Int'l Specialty Lines Ins. Co. v. United States*, No. C 04-01591 (CRB), slip. op., (N.D. Cal. Mar. 24, 2005) .......... 6

*AMI, Inc. v. Int'l Forging Equip. Co.*, 982 F.2d 989 (6th Cir. 1993) .......... 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 7

*Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F. Supp. 1314 (S.D.N.Y. 1988) .......... 20

*Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200 (2d Cir. 1989) .......... 22

*Balboa Ins. Co. v. United States*, 3 Ct. Cl. 543 (1983) .......... 6

*Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389 (9th Cir. 1995) .......... 6

*Bernard v. United States*, 59 Fed. Cl. 497 (2004) .......... 7, 14

*Boston Mut. Ins. Co. v. Murphree*, 21 F. Supp. 2d 1076 (D. Ariz. 1998) .......... 4

*Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F. Supp. 2d 1178 (D. Kan. 1999) .......... 8, 10, 12, 15

*Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059 (5th Cir. 1990) .......... 18

*Demarco Durzo Dev. Co. v. United States*, 60 Fed. Cl. 632 (2004) .......... 8

*First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862 (4th Cir. 1989) .......... 18

*Foster-Gardner, Inc. v. Nat'l Union Fire Ins.*, 959 P.2d 265 (Cal. 1998) .......... 20

*Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir. 1991) .......... 22

*Hanover Ins. Co. v. Corrpro Cos., Inc.*, 312 F. Supp. 2d 816 (E.D. Va. 2004) .......... 4

*Hazen Paper Co. v. United States Fid. & Guar. Co.*, 555 N.E.2d 576 (Mass. 1990) .......... 20

*Indep. Petrochemical Corp. v Aetna Cas. & Sur. Co.*, 944 F.2d 940 (D.C. Cir. 1991) ........ 22

*Intel Corp. v Hartford Accident & Indem. Co.*, 952 F.2d 1551 (9th Cir. 1991) ........ 22

*John Massman Contracting Co. v United States*, 28 Fed. Cl. 235 (Fed. Cl. 1993) ........ 8

*Jordan v Southern Wood Piedmont Co.*, 805 F. Supp. 1575 (S.D. Ga. 1992) ........ 10

*Kane v United States*, 15 F.3d 87 (8th Cir. 1994) ........ 18

*Mills v United States*, 69 Fed. Cl. 358 (Fed. Cl. 2006) ........ 7

*Morrisville Water & Light Dep't v United States Fid. & Guar. Co.*, 775 F. Supp. 718 (D. Vt. 1991) ........ 20

*New London Dev. Corp.*, 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005) ........ 17, 19, 21, 22

*Pacific Gas & Elec. Co. v United States*, 70 Fed. Cl. 766 (Fed. Cl. 2006) ........ 7

*Peterson v United States*, 68 Fed. Cl. 773 (2005) ........ 6, 7, 14

*Redwing Carriers, Inc. v Saraland Apts.*, 94 F.3d 1489 (11th Cir. 1996) ........ 12

*Telenor Satellite Servs., Inc. v United States*, 71 Fed. Cl. 114 (Fed. Cl. 2006) ........ 7

*United States v Aetna Cas. & Sur. Co.*, 338 U.S. 366 (1949) ........ 3, 5

*United States v Tropical Fruit, S.E.*, 96 F. Supp.2d 71 (D. P.R. 2000) ........ 9, 10, 11, 15, 18

**Statutes, Rules and Regulations**

10 U.S.C. § 2687 note ........ *passim*

42 U.S.C. § 9601(9) ........ 17

42 U.S.C. § 9601(14) ........ 9

42 U.S.C. § 9601(22) ........ 23, 24

42 U.S.C. § 9607(a)(3) ........ 9

42 U.S.C. § 9607(i) ........ 23

42 U.S.C. § 9620 ........ 1, 2, 24

40 C.F.R. § 302.4 ........ 9, 23

RCFC 17 ........ 3

RCFC 56(c) .......... 7

**Legislative History**

138 Cong. Rec. S11826-01 (1992) .......... 16

138 Cong. Rec. S13982 (1992) .......... 16, 20

*Department of Defense Authorization for Appropriations for Fiscal Year 1993 and for the Future Years Defense Program, Environmental Programs of the Department of Defense and Military Construction, Hearing Before the Subcomm. on Readiness, Sustainability and Support of the S. Comm. on Armed Forces*, 102d Cong. 336 (1992) .......... 16

**Other Authorities**

1 *Couch on Ins.* § 1:18 .......... 4

16 *Couch on Ins.* § 222:101 .......... 4

17 *Couch on Ins.* § 241:34 .......... 5

17 *Couch on Ins.* § 241:35 .......... 5

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 05-1020C<br>Judge Margaret M. Sweeney |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S CORRECTED MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Plaintiff American International Specialty Lines Insurance Company ("Plaintiff" or "AISLIC"), by and through its undersigned attorneys, respectfully submits Plaintiff's Opposition to Defendant's Corrected Motion to Dismiss, or in the Alternative, for Summary Judgment (the "Motion").

## I. Introduction

The Government closed the Naval Air Station Alameda and transferred the East Housing Area and other property at the former military base to the City of Alameda and the Alameda Reuse and Redevelopment Authority (collectively, the "City") on July 17, 2000, to develop a mixed-use, residential community. Before this conveyance, Congress acted to ensure that whenever the Government transferred a former military base, including the Naval Air Station Alameda, it would undertake all remedial action necessary to protect human health and the environment with respect to hazardous substances on the base. Congress enacted the National Defense Authorization Act, Pub. L. No. 102-484, 106 Stat. 2371, 10 U.S.C. § 2687 note, and Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9620, to facilitate the transfer of closed military bases to persons and entities, such as the City, while at the

same time ensuring that the Government is, and continues to be, responsible for all environmental contamination that occurred prior to the date of transfer. Accordingly, the indemnification provisions of the National Defense Authorization Act of 1993, and the requirements of Section 120(h) of CERCLA, governing property transferred by federal agencies, provide assurances that the Government is responsible for remediating environmental contamination at former military bases and will not thrust the cost of such remediation upon municipalities that agree to develop the sites for other beneficial purposes.

Notwithstanding Congress' mandate, in this case, the Government has breached both its statutory *and* contractual responsibilities to remediate environmental contamination caused by its own activities and to indemnify the City for accomplishing the remediation. In 2000, the Department of the Navy formally announced its decision to close the Naval Air Station Alameda, which included the East Housing Area – the contaminated property at issue in this case. Later that year, the Government, through the Navy, transferred the East Housing Area, as well as other land, to the City for development in accordance with a Community Reuse Plan approved and recommended by the Navy. Shortly after the transfer, the City discovered that hazardous organochlorine pesticides ("OCPs"), namely chlordane -- in dangerously high concentrations -- were present on the property as a result of the Government's activities prior to the transfer. The Department of Toxic Substance Control ("DTSC"), the State of California's cognizant agency, ordered the City to remediate that contamination prior to implementation of the Community Reuse Plan. Despite the fact that the Government was required to remediate these hazardous substances before transferring the property to the City, the Government failed to do so, and continues to deny responsibility for any cleanup whatsoever.

By contract, the Government covenanted and warranted that it (1) had remediated all hazardous substances at the East Housing Area; and (2) would remediate any such substances found

to be present after the date of transfer. Also by contract, the Government represented what hazardous substances had been released or remained on the East Housing Area, but failed to disclose the release or presence of chlordane on the property. In contravention of its contractual and statutory obligations, the Government failed to remediate the chlordane or to indemnify the City for incurred remediation costs. Consequently, AISLIC, as subrogee for the City, is now seeking to recover costs incurred to remediate the organochlorine pesticides, and to rightly hold the Government accountable for its contractual and statutory obligations. In setting forth its case, AISLIC has sufficiently alleged facts supporting numerous causes of action for breach of contract and violation of express statutory indemnification obligations.

## II. Answers to the Court's Questions

The Government does not contest that the Court has jurisdiction to hear AISLIC's claims, conceding that its "jurisdictional analysis has changed since our prior briefing." Motion at 2. Nevertheless, AISLIC responds to the Court's questions posed in its Order dated May 5, 2006, as follows:

1. Does plaintiff, a liability insurer of the Alameda Reuse and Redevelopment Authority and the City of Alameda, have standing to sue in the Court of Federal Claims as a subrogee?

Yes, AISLIC has standing to sue, as set forth in the Government's Motion and below. Motion at 2. Pursuant to RCFC 17, every action before this Court must be prosecuted in the name of the real party in interest. "[A]n insurer-subrogee, who has substantive equitable rights, qualifies as [the real party in interest]." *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 380 (1949). If, as here, "the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name." *Id.* at 380-81; *see* First Amended Complaint, ¶¶ 2, 51-52.

a. The Memorandum of Agreement, East Housing Deed, and section 330 of the National Defense Authorization Act for Fiscal Year 1993 all allow "successors and assigns" to assert the rights contained therein. Are subrogees encompassed within "successors and assigns"?

AISLIC agrees with the Government that subrogees *are* encompassed within "successors and assigns." Motion at 3. In addition to the precedent cited by the Government, AISLIC refers the Court to *Boston Mut. Ins. Co. v. Murphree*, 21 F. Supp. 2d 1076, 1081 (D. Ariz. 1998) ("Subrogation requires an insured to assign to its insurer the insured's interest in any action against the tortfeasor.").

b. Does the law regarding the subrogation rights of sureties apply equally to liability insurers?

AISLIC agrees with the Government that the answer to this question generally is yes, particularly in the context of AISLIC's standing to sue. The concepts of suretyship and liability insurance differ in that generally an insurer is the primary party liable upon the occurrence of the contingency and must bear the ultimate loss, while generally a surety is "essentially secondarily liable," as the surety is entitled to indemnity from the principal in those cases where the surety is compelled to perform. 1 *Couch on Ins.* § 1:18; *see also* 16 *Couch on Ins.* § 222:101 ("While the right of an insurer to be subrogated has been compared to that of surety who, upon payment of debt, may resort to the principal debtor, in the case of property and casualty insurance, the insurer indemnifies its insured from a loss, and upon payment gains the right to pursue the responsible third party, while under a bond, the surety indemnifies third parties from losses at the hands of its principal, and upon payment gains the right to recover from its own principal.").

Even though the concepts of suretyship and liability insurance differ slightly, some of the same general theories that support subrogation of a surety can support subrogration in other insurance contexts. *Id.* As explained in *Hanover Ins. Co. v. Corrpro Cos., Inc.*, 312 F. Supp. 2d 816, 823 (E.D. Va. 2004), "an express subrogation agreement defines the boundaries of the insurer's

ability to pursue the insured's causes of action against others; whereas in the suretyship context, principles of equitable subrogation define the surety's rights to seek reimbursement for the discharge of its duties." Because of the close analogy between suretyship and liability insurance, the law regarding the subrogation rights of sureties should apply equally to AISLIC and its rights to pursue its claims against the Government in this Court.

2. <u>With regard to the ripeness issue, does the "make-whole" rule of suretyship law apply equally to liability insurers?</u>

Yes, but regardless of the answer to this question, AISLIC has full subrogation rights against the Government. In *United States v Aetna Cas.*, 338 U.S. at 381, the Supreme Court holds that if the subrogee "has paid only part of the loss, both the insured and the insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest." As both the insured and the insurer have substantive rights, either party may bring suit alone to enforce its own rights. *Id.* at 381-82.

The Supreme Court appears to use the term "partial subrogation" in *Aetna* to describe "the situation in which an insurer had paid the full amount to the insured which it is obligated to pay but that amount does not indemnify him or her in full for the loss sustained." *See* 17 *Couch on Ins.* § 241:34. "To be distinguished from partial subrogation or indemnification is the situation in which the insurer has made only a part payment of its liability and thereby acquires no rights by way of subrogation." *Id.* Therefore, the "make-whole" rule of suretyship requires a liability insurer to fully compensate the insured only to the extent of the insurer's obligation to the insured in order to acquire subrogation rights against the third party. *Id.; see also* 17 *Couch on Ins.* § 241:35.

AISLIC has subrogation rights against the Government because it *has* fully compensated its insureds, the City of Alameda and the Alameda Reuse and Redevelopment Authority, and has so alleged in its First Amended Complaint. *See* First Amended Complaint, ¶¶ 2, 51-52. Additionally, given the specific facts in this case, the common law of suretyship provides that AISLIC acquired

subrogation rights against the Government even if it did *not* fully compensate the City for its loss. Federal common law holds that, unless there is an agreement to the contrary, an insurance company cannot enforce the rights of the insured until the insured is fully compensated. *See Am Int'l Specialty Lines Ins. Co. v United States*, No. C 04-01591 (CRB), slip. op., at 6 (N.D. Cal. Mar. 24, 2005) (emphasis added); *Barnes v Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) ("in the absence of a clear contract provision to the contrary, an insured must be made whole before an insurer can enforce its right to subrogation") (emphasis added). Here, AISLIC and its insureds contractually agreed that AISLIC did *not* have to fully compensate the City to enforce its subrogation rights. Pursuant to the AISLIC Pollution Legal Liability Select Policy, No. PLS 195 0046, which applies to the East Housing Area, AISLIC has subrogation rights in the event of any payment under the Policy. *See* First Amended Complaint ¶ 50. By the plain meaning of the contract, AISLIC did not have to fully compensate the City before initiating a suit to enforce its subrogation rights. Regardless, even absent this agreement to the contrary, AISLIC's subrogration rights are now ripe under the "make-whole" rule as AISLIC has fully compensated its insureds.

## III. Argument

### A. The Government Fails to Meet the Standards for Both a Motion to Dismiss and Summary Judgment

"As a general rule, a motion to dismiss for failure to state a claim is viewed with disfavor and should rarely be granted." *Balboa Ins. Co. v United States*, 3 Ct. Cl. 543, 545 (1983). For arguments based on failure to state a claim under RCFC 12(b)(6), the Court "must accept as true all of Plaintiffs' well-pleaded facts alleged in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Peterson v United States*, 68 Fed. Cl. 773, 775 (2005) (citing *Godwin v United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003)); *Am Airlines v United States*, 68 Fed. Cl. 723, 728 (2005) (citing *Henke v United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)) ("In ruling on a motion to dismiss, the court

'is obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor.'").[1]

A complaint merely must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *See Bernard v. United States*, 59 Fed. Cl. 497, 500 (2004). Moreover, "[d]ismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff can 'prove no set of facts in support of his claim which would entitle him to relief.'" *Am. Airlines*, 68 Fed. Cl. at 728 (quoting *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004); *Peterson v. United States*, 68 Fed. Cl. 773, 775 (2005) ("The Court should not dismiss a complaint for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974)).

Summary judgment is "only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mills v. United States*, 69 Fed. Cl. 358, 365 (Fed. Cl. 2006) (citing *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005)); *see also* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Further, "[t]he evidence is examined in the light most favorable to the non-movant ... and all justifiable inferences must be drawn in favor of the non-movant." *Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766, 769 (Fed. Cl. 2006) (internal citations omitted); *Telenor Satellite Servs., Inc. v. United States*, 71 Fed. Cl. 114, 118-19 (Fed. Cl. 2006) (In determining whether a party is entitled to summary judgment, "the Court must resolve all reasonable inferences in favor of the non-moving party.").

Throughout Defendant's Motion, the Government seeks to exceed these well-settled standards for deciding a motion to dismiss or, in the alternative, a motion for summary judgment.

[1] Defendant asserts that the Court may consider "documents that form the basis of a claim for relief." Motion at 9. Defendant's Motion, however, improperly relies on its *own* exhibits that do not form the basis for Plaintiff's claims.

As demonstrated below, the Government repeatedly introduces material factual matters which are genuinely in dispute and are not the proper subject of a motion to dismiss or a motion for summary judgment. In accordance with the standards for a motion to dismiss, the well-pleaded facts in the First Amended Complaint are more than sufficient to support AISLIC's claims, and such a motion should be denied. Further, summary judgment also should be denied as genuine issues of material fact are in dispute and AISLIC has had no opportunity to develop the record through discovery. *See John Massman Contracting Co. v. United States*, 28 Fed. Cl. 235, 242 (Fed. Cl. 1993) ("summary judgment is disfavored in situations where the non-moving party has not been afforded an opportunity to conduct discovery"); *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F. Supp. 2d 1178, 1183 (D. Kan. 1999) (denying dismissal of CERCLA claims where "the parties have not been given an opportunity for full discovery").

**B. Plaintiff Has Sufficiently Alleged Breach of Contract Claims**

The First Amended Complaint properly alleges numerous breaches of contract by the Government, including multiple breaches of both the East Housing Deed and a separate Memorandum of Agreement to convey portions of the Naval Air Station Alameda to the City. Accepting the well-pleaded allegations as true and drawing all reasonable inferences in Plaintiff's favor, AISLIC properly asserted that: (1) a valid contract existed between the Government and the City, (2) the Government was obligated to take remedial action and indemnify the City under the provisions of the contract; (3) the Government breached its contractual duties by failing to remediate and indemnify the City; and (4) the City (and Plaintiff, as subrogee) suffered damages resulting from the Government's breach. *See Demarco Durzo Dev. Co. v. United States*, 60 Fed. Cl. 632, 636 (2004) (providing the elements required to allege and establish a breach of contract claim and finding that plaintiff set forth sufficient allegations for breach of contract claim to withstand a motion to dismiss). The Government's Motion disputes Plaintiff's factual allegations and injects

factual claims still in dispute that are not the proper subject of a motion to dismiss. Additionally, as material factual issues are in dispute, summary judgment is not appropriate at this stage when AISLIC has not even had the opportunity to conduct any discovery.

**1. The Government's Allegations that Chlordane was Lawfully Applied is a Question of Material Fact that Cannot Be Resolved at this Stage of Litigation (Counts One and Two)**

The Government argues that AISLIC's claims involving CERCLA covenants are precluded because the "CERCLA liability scheme regarding 'hazardous substances,' 42 U.S.C. § 9601(14), does not apply to useful products used for their intended purpose, including lawfully applied pesticide that serves a legitimate purpose in its existing state." Motion at 13. Contrary to the Government's assertion, chlordane does constitute a "hazardous substance." *See* 40 C.F.R. § 302.4 (EPA list of "hazardous substances," which includes chlordane); *see also United States v. Tropical Fruit, S.E.*, 96 F. Supp.2d 71, 85 (D. P.R. 2000) (finding that pesticides listed as "hazardous substances" under EPA regulations at 40 C.F.R. § 302.4 are "hazardous substances" under CERCLA and that no minimum level is required to trigger CERCLA coverage). Therefore, the Government cannot prevail on its motion as to counts one and two.

Section 9601(14) sets forth no exception to the definition of 'hazardous substances' for "useful products used for their intended purpose." *See* Motion at 13. The Government cites as support cases that discuss a separate provision of CERCLA, 42 U.S.C. § 9607(a)(3), which lists as a covered person under the CERCLA liability provision a person who arranges for *disposal or treatment* of hazardous substances. One case, *A & W Smelter & Refs., Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998), looks to the definitions of disposal and treatment under the Solid Waste Disposal Act and states "A&W disposed of or treated the ore only if it was waste . . . If the ore was a useful product, then it was not waste and not subject to CERCLA. This has been called the useful product defense." Similarly, the court in *AMI, Inc. v. Int'l Forging Equip. Co.*, 982 F.2d 989, 999 (6th Cir. 1993),

considers the interpretation of 42 U.S.C. § 9607(a)(3) and states "it has been held that no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a 'useful, albeit dangerous product, to serve a particular intended purpose.'" Given that the Government relies on inapplicable precedent for its proposition, the Government's Motion fails to establish that it is somehow a defense if the Government used the chlordane at the East Housing Area for a useful, intended purpose.

Even if chlordane was not necessarily always a hazardous substance for all purposes relevant to AISLIC's claims, merely because the Government claims that a chlordane-based termiticide was used for its intended purpose and that it was properly applied does not make it so. *See Jordan v. Southern Wood Piedmont Co.*, 805 F. Supp. 1575, 1581 (S.D. Ga. 1992) (stating that an interpretation that pesticides are excluded from CERCLA coverage under all circumstances such that it is a complete defense to a CERCLA claim exaggerates the scope of § 9607(i)). Importantly, not every application of pesticide is exempted from CERCLA liability. *Tropical Fruit*, 96 F. Supp. 2d at 90; *see also Cameron*, 76 F. Supp. 2d at 1182. Rather, the pesticide exemption of CERCLA is a narrow one that does not include a "release" of a pesticide, such as pesticide disposal, storage, spills, or transport. *Tropical Fruit*, 96 F. Supp. 2d at 90; *Cameron*, 76 F. Supp. 2d at 1182. Moreover, as a party seeking to take advantage of a statutory exemption from liability under 42 U.S.C. § 9607(i), the Government bears the burden of proving that the pesticides it used were registered under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and that it applied the pesticides in the customary manner. *Tropical Fruit*, 96 F. Supp. 2d at 90; *Cameron*, 76 F. Supp. 2d at 1182-83.

The Government has offered no proof as to the *manner* in which pesticides were applied or released at the East Housing Area, including whether the pesticides were *lawfully* applied or released.

The record contains no evidence regarding *when* chlordane was applied[2] or released at the East Housing Area or in *what concentrations*, or whether the chlordane was *useful* and used for its *intended purpose*. The Government merely cites to a single letter from the California DTSC dated May 3, 2002, presumably issued long after the chlordane was released at the site, as evidence that the pesticides were properly applied and were functioning in the manner intended. Motion at 13-14 (citing an exhibit attached to a prior complaint, not the First Amended Complaint). This letter, however, does not explain the *factual basis* for the conclusions of the state agency, and the conclusions are based upon a proposed workplan that is not before the Court and unspecified provisions of the California Health and Safety Code (not CERCLA). Further, the letter reflects that the manner and extent of the Defendant's release of the chlordane was unknown because DTSC addresses only the presence of pesticide at building foundations and acknowledges that it did not know whether there would be "any OCP remaining in soils and exceeding [unspecified] concentrations." Therefore, the Government offers no *factual* evidence to support its claims that the pesticides were lawfully applied – only a conclusory allegation based on a single document that is subject to multiple interpretations.[3]

In a desperate attempt to avoid liability on count two, the Government also cites the same DTSC letter for the proposition that the state agency never identified a "release or threatened release" of any hazardous substances by the Navy, arguing that the City alone must have caused the release of OCPs by demolishing the buildings. Motion at 14-15. First, the Government's argument

---

2 The Government claims that the pesticide was registered in accordance with FIFRA at the time it was used at the East Housing Area, but sets forth no evidence to support this claim which contradicts AISLIC's factual allegations. Motion at 14.

3 It is revealing that the Government could only set forth a single letter by a state agency that does not contain any real information about how the OCPs came to exist at the site or even their concentrations. If in fact the OCPs were lawfully applied, the Government should have been able to set forth more direct and conclusive evidence than this DTSC letter. In any event, this letter is insufficient to meet the Government's burden of proof. *See Tropical Fruit*, 96 F. Supp. 2d at 90.

amounts to no more than speculation that the City must have released OCPs. The letter is irrelevant because the state agency did not make any determination, much less set forth any facts establishing, whether the Navy or the City had or would release any hazardous substance pursuant to the terms of the East Housing Deed. *See* East Housing Deed, II.F.3. Second, the Navy did not have to release the OCPs to be liable; all that is necessary is that the hazardous substance existed on the property prior to the date of the Deed, a fact the Government apparently does not deny. *Id.* Finally, even if the City caused or contributed to a release, that would only reduce the Government's liability, not extinguish it. The Government makes no attempt to establish the relative degrees to which the Government and the City are responsible for any release. In fact, the City would *not* be responsible for any release because it was merely executing the Community Reuse Plan approved and recommended by the Navy.

The Government's arguments are rife with conclusory statements based on unsupported and speculative factual claims that AISLIC disputes. Where such material issues of fact are in dispute and discovery has not even begun, Defendant's motions to dismiss and for summary judgment are inappropriate. *See Cameron*, 76 F. Supp. 2d at 1183 (denying government's motion to dismiss where the government's liability depended on whether a proper application occurred and the parties had not yet been given an opportunity for full discovery).[4] Accordingly, the Government's Motion as to the first and second counts for breach of the East Housing Deed should be denied.

**2. Factual Issues Regarding the Misrepresentation of Chlordane Preclude the Government's Motion to Dismiss, or in the Alternative, for Summary Judgment (Counts Three and Four)**

The Government makes the imaginative claim that it did not breach the East Housing Deed because its representations in Section II.F.1.a of the deed only state that "the FOST describes

[4] Unlike the Government in this case, in *Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1511 n.31 (11th Cir. 1996), the defendant provided proof that the pesticides were properly applied to treat the property for termites and the plaintiff failed to produce evidence refuting that proof.

environmental conditions at the property" and "the deed provision says nothing about pesticides." Motion at 16. The plain language of the deed establishes that the Government represented that the East Housing Area was suitable for transfer based on the environmental conditions on the property, as set forth in the FOST. East Housing Deed, II.F.1.a. The FOST, which is incorporated into the Government's representation, identifies pesticides that may have been present on the property, but does *not* identify the presence of chlordane. FOST, Section 6.8.[5] Therefore, the Government both misrepresented in the deed that the East Housing Area was suitable for transfer and misled the City to believe that chlordane was not among the hazardous substances that were present at the site.

In another attempt to reinterpret its representations to the City, the Government also claims that the FOST does not suggest that it "lists all pesticides that were ever used at the East Housing area." Motion at 17. The language is clear: the FOST represents that the pest management plans reflect the pesticides that "may have been used" at the East Housing Area. FOST, Section 6.8. Accordingly, the Government misled the City to believe that chlordane was not a pesticide that "may have been used" at the site.[6] The Government's misrepresentation led the City to reasonably believe it would not have to remediate the presence of chlordane on the property to accomplish the Navy's recommended residential development. *See* First Amended Complaint ¶¶ 10-11.[7] Therefore, the Government's motion as to count three should be denied.

---

[5] The Government makes a similar attempt to re-write the language of its representations by claiming Section II.F.1.a of the East Housing Deed does not specifically refer to Section 6.8 of the FOST. Motion at 17. Section II.F.1.a states that the "FOST sets for the basis for" the suitability of transfer. By not limiting the sections of the FOST that constitute the basis for suitability, the Government represented that the entire FOST, including Section 6.8, sets forth the basis for suitability.

[6] Moreover, the fact that chlordane was not identified in the Government's pest management plans as a pesticide used at the site demonstrates that the chlordane was not used for its intended purpose or properly applied. *See* Motion at 13.

[7] The Government claims that an environmental baseline survey ("EBS") notified the City of the presence of chlordane. Motion at 16. However, the East Housing Deed specifies that its

Regarding count four, the Government attempts to skip the trial and get a directed verdict, complaining that AISLIC offers nothing but ungrounded speculation that chlordane and/or OCPs were stored for one year or more, known to have been released, or disposed of on the property. Motion at 17. At this stage of the pleadings, a plaintiff is only required to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," and these allegations must be accepted as true. *Bernard*, 59 Fed. Cl. at 500; *Peterson*, 68 Fed. Cl. at 775. Furthermore, the Government's unspecified "documentary record" that the chlordane was allegedly lawfully applied is irrelevant to whether chlordane was also stored for one year or more, known to have been released, or disposed of on the property. Motion at 17. Indeed, because AISLIC has had *no* opportunity to explore through discovery the manner in which chlordane was applied, stored, released, and/or disposed of on the property, the Government's motion is premature.[8] Accordingly, the Government's Motion as to the fourth count should be denied.

---

representation that property is suitable for transfer is based on the FOST, and the FOST misled the City to believe the property was suitable for transfer, in part, because there were no OCPs on the property. Moreover, the Government has not established that the document it submits as evidence is the EBS referenced in the East Housing Deed, whether the pesticides identified in the Government's document are the same OCPs the City was forced to remediate, and whether the pesticides were in the same concentrations identified in the Government's document. AISLIC has not yet had any opportunity to engage in discovery on these issues. Regardless, some ambiguous data in the document submitted by the Government without explanation cannot supplant the plain misrepresentation in the FOST that chlordane was not among the pesticides that "may have been used" at the site. FOST, Section 6.8.

[8] AISLIC also has had no opportunity to explore in discovery which documents were known to the City that are relevant to Defendant's brief and unsupported assertion that the City could not reasonably rely on its misrepresentation. Motion at 12. At the outset, it appears that documents upon which the Government relies, such as *redacted* portions of an EIS, do not apply to the East Housing Area. *Id.* Even so, the Government has not established that its vague reference to "independent documentation" conclusively establishes that there is no set of facts under which the City could reasonably rely on its misrepresentation in the FOST, which was explicitly incorporated into the deed, that chlordane was not among the pesticides that may have been used at the site. *Id.*

### 3. Material Fact Issues Remain Regarding the Government's Breach of the Memorandum of Agreement (Counts Seven and Eight)

As established above, material issues of fact remain in dispute regarding the application, storage, release, and/or disposal of chlordane at the East Housing Area. Importantly, the burden rests with the Government to demonstrate that it applied chlordane in a lawful manner. *Tropical Fruit*, 96 F. Supp. 2d at 90; *Cameron*, 76 F. Supp. 2d at 1182-83. Moreover, the City reasonably relied on the assertions in the Memorandum of Agreement based on the intended residential use of the East Housing Area. For the reasons set forth above, count seven should not be dismissed.

The Government also argues that any costs incurred by the City in connection with remediation of the chlordane-contaminated soil cannot be attributed "solely" to the Navy. Motion at 20. The City certainly did not deposit the chlordane at the site before proceeding to remediate it.[9] Regardless, whether the City contributed to any release is an issue of fact not appropriately decided at this stage of the litigation. As alleged in the First Amended Complaint, the Government is solely responsible for the release of OCPs, namely chlordane, because *it* applied the hazardous substances at the East Housing Area prior to the date of transfer. First Amended Complaint, ¶ 44. The Government's Motion as to count eight also should be denied, and AISLIC should be allowed to pursue discovery as to its breach of contract claims.

## C. Plaintiff Has Alleged a Claim for Indemnification (Counts Five and Six)

AISLIC has sufficiently alleged claims for both express indemnification and contractual indemnification in accordance with Section 330 of the National Defense Authorization Act. First

---

9 The Government makes another peculiar claim by asserting that although the City did not assume liability to cleanup the chlordane by entering into the Memorandum of Agreement ("MOA") with the Government, the Government still had no obligation to cleanup the site. Motion at 20. As set forth herein, the Government had the obligation to cleanup the site *before* it transferred the property, and it failed to do so. By shifting the cleanup responsibility to the City in contravention of its contractual affirmation that the City would not be liable or responsible for the cleanup, the Government breached Article 21 of the MOA.

Amended Complaint, ¶¶ 106-135 (Fifth and Sixth Counts). In making every conceivable argument against AISLIC's claims in the hope that at least one will prevail, the Government has lost sight of its statutory obligations under Section 330 and the purpose for its existence. As amplified by the legislative history of Section 330 of the National Defense Authorization Act and demonstrated by the language of the statute itself, Congress intended to protect innocent receivers of Department of Defense closed base property from the responsibility for contamination caused by the Department of Defense, including protection against environmental cleanup orders and civil damage claims. For example, Senator McCain explained:

> Congress must encourage the timely and efficient transition of closed base property to new and productive uses. We should take the next step by removing one of the most onerous obstacles faced by local communities, the burden of liability assumed by non-Federal parties for *cleaning up environmental problems* at closed bases.

*Department of Defense Authorization for Appropriations for Fiscal Year 1993 and for the Future Years Defense Program, Environmental Programs of the Department of Defense and Military Construction, Hearing Before the Subcomm. on Readiness, Sustainability and Support of the S. Comm. on Armed Forces*, 102d Cong. 336 (1992) (emphasis added); *see also* 138 Cong. Rec. S13982, at *S14009 (1992) (statement of Senator McCain: "We simply cannot ask States or businesses to assume potentially devastating liability for conditions they did not create. Moreover, the Federal Government has a duty to accept full and unconditional responsibility for its actions."); *see also* 138 Cong. Rec. S11826-01, at *S11840 (1992) (statement of Senator Cohen). Therefore, concerned with the possibility that state and local entities would be left with the responsibility of paying for the cleanup of the hazardous waste created by the Department of Defense, Congress sought to prevent such an unjust result.

In view of the purpose of Section 330, to establish a claim for indemnification under Section 330 (or a contract incorporating Section 330),

> three conditions must be met. First, the indemnification claim must be for costs 'arising out of any claim for personal injury or property damage (including death, illness, loss or damage to property or economic loss).' Second, the claim for

> personal injury or property damage must result from or be predicated upon the release or threatened release of a hazardous substance, [pollutant or contaminant] from or on the [property]. Third, the release or threatened release must be 'as a result of Department of Defense activities on the [property].'

*New London Dev Corp.*, 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005); National Defense Authorization Act of 1993, 10 U.S.C. § 2687 note. Plaintiff's claim alleges these elements.

### 1. AISLIC's Allegations Support a Finding that the East Housing Area is a "Facility" under Section 330

Section 330 provides for indemnification of a State (including any officer, agent, or employee of the State), political subdivision of a State, or any other person that acquires ownership or control of any facility at a military installation (or any portion thereof). *See* Section 330(a)(2). Section 330(f) incorporates the definition of "facility" provided in Section 101(9) of CERCLA:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

The Government's argument is inappropriate on a motion to dismiss, where AISLIC's allegations must be accepted as true. Even on its premature motion for summary judgment, the Government fails to quote the full definition of "facility," which establishes that a facility includes any site or area where there is any deposit, storage, disposal, or placement of a hazardous substance such as chlordane. Motion at 23. The Government also has failed to set forth <u>any</u> evidence that (i) the chlordane present at the East Housing Area does not fall within subsection (A) of the definition; (ii) the chlordane present at the East Housing Area does not fall within the complete definition of subsection (B), <u>and</u> (iii) demonstrating that the chlordane, as it alleges, was a "consumer product"

and that it came to be present at the site as a result of "consumer use." Motion at 23. Discovery is needed to ascertain these facts.

As a general rule, the Government's attempt to define its conduct out of the scope of Section 330 should be viewed with skepticism. The term "facility" is interpreted broadly and includes "every conceivable place where hazardous substances come to be located." *Tropical Fruit*, 96 F. Supp. 2d at 84 (citing *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151 (1st Cir. 1989)). In *Tropical Fruit*, the court rejected an argument that a farm was not a "facility" because pesticides were sprayed there, noting that courts also have imposed liability for the transport, storage, spilling and disposal of pesticides. *Id.*[10] Therefore, the Government's technical claim that the East Housing Area does not constitute a "facility" has no substance.

**2. AISLIC Has Alleged a "Claim" for Purposes of Section 330**

AISLIC has sufficiently alleged that its indemnification claim is for costs arising out of a claim for property damage. As alleged in the First Amended Complaint, the City of Alameda, the Alameda Reuse and Redevelopment Authority, and AISLIC jointly submitted a claim for reimbursement pursuant to Section 330 for costs incurred in monitoring, removal and disposal of the previously undisclosed chlordane. First Amended Complaint, ¶ 47. The Government misreads the statute by asserting that a "claim" is one that must be asserted against the City, rather than by the City, and that the "claim" must be in the form of a lawsuit or administrative proceeding. Motion at 25. The statute contains no such restrictions.

Citing no precedent for its position, the Government's primary argument is that Section 330(d)'s reference to a "plaintiff" must refer to someone other than the transferee/indemnitee, and

10 Unlike *Tropical Fruit*, involving the use of pesticides in violation of CERCLA and FIFRA, and this case involving contamination due to the pesticide chlordane, *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1065-66 (5th Cir. 1990), *Kane v. United States*, 15 F.3d 87, 89 (8th Cir. 1994), and *First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 867 (4th Cir. 1989) involve asbestos claims.

that such language means the indemnitee must be facing a lawsuit brought by a third party. Motion at 25-26. To the contrary, the plain language of the statute reflects that Section 330(d) defines the date on which an indemnitee's claim for indemnification accrues "for purposes of subsection (b)(1)." Subsection (b)(1) sets forth conditions under which an indemnitee may sue the Government for indemnification. Section 330(d) does not define the term "claim," and it does not pertain to the general provisions establishing a right to indemnification under subsection (a).

Contrary to the Government's unsupported misreading of Section 330, no suit need be brought against the City to establish a right to indemnification. In fact, Section 330(a) explicitly provides for indemnification from and against "any suit, claim, demand or action, liability, judgment, cost or other fee." In *New London Development Corporation*, which the Government wholly ignores, the ASBCA denied a motion to dismiss for failure to state a Section 330 claim for indemnification. *New London Dev Corp.*, 2005 WL 1634772 (ASBCA). In that case, the appellant had submitted a claim for reimbursement pursuant to Section 330 for its costs incurred in monitoring, removal and disposal of previously undisclosed asbestos contaminated material ("ACM") and Polychlorinated Biphenyl ("PCBs"). *Id.* No claim, by lawsuit or otherwise, had been asserted against the appellant, but rather the appellant filed *its own claim* (as Plaintiff does here) to recover incurred costs. *Id.*

Even if Section 330 did require that a claim be made against the indemnitee, Plaintiff has sufficiently alleged such facts. As stated in the First Amended Complaint, the DTSC required the City to monitor, remove and dispose of the chlordane contamination at the East Housing Area in order to carry out the development plan that the Government had selected as the preferred alternative. First Amended Complaint, ¶ 45. While the Government argues that the DTSC's requirement to remediate the chlordane on the East Housing Area did not constitute a "claim," Section 330 does not define the term "claim," and the Government cites no precedent for its interpretation of what should constitute a "claim" under the statute. However, the legislative history

indicates that Congress intended for Section 330 to cover both regulatory and civil actions, such as environmental cleanup orders and civil damage claims. 138 Cong. Rec. S13982, at *S14009 (1992) (statement of Senator McCain).

Further, by analogy, many cases dealing with recovery under insurance policies hold that a requirement by a state or federal agency to engage in cleanup can constitute a "claim" or "suit." *See, e.g., Foster-Gardner, Inc. v. Nat'l Union Fire Ins.*, 959 P.2d 265, 279-282 (Cal. 1998) (state EPA order to remediate pollution constitutes a claim); *Morrisville Water & Light Dep't v. United States Fid. & Guar. Co.*, 775 F. Supp. 718, 731-33 (D. Vt. 1991) (EPA letter to insured constituted a suit within the meaning of the liability policy); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F. Supp. 1314, 1320-23 (S.D.N.Y. 1988) (Louisiana Department of Environmental Quality demand to clean up a site constituted a suit that required insurer to defend); *Hazen Paper Co. v. United States Fid. & Guar. Co.*, 555 N.E.2d 576, 579-82 (Mass. 1990) (letter from EPA providing notice of liability for cleanup costs was analogous to commencement of a suit). Similarly, DTSC's requirement to cleanup the East Housing Area constitutes a claim triggering the Government's obligation to indemnify the City of Alameda and Alameda Reuse and Redevelopment Authority under Section 330.

The Government attempts to contradict the factual allegations of the Complaint by reinterpreting the DTSC's requirements and creating a factual dispute over whether the DTSC ever found that a hazardous substance was present at the East Housing Area. *See* Motion at 25-26. The Government mischaracterizes DTSC's findings and fails to accept the fact that the DTSC required the City to remediate the chlordane to use the property in the manner the Government approved of and recommended in the Community Reuse Plan. The Government's failure to accept AISLIC's allegations as true requires that the motion be dismissed, and the unresolved material facts at issue preclude summary judgment for the Government, particularly at this stage of the litigation.

### 3. AISLIC Has Alleged "Property Damage" for Purposes of Section 330

Rather than looking to the language of Section 330, the Government attempts to define the term "property damage" by relying on the legislative history of a *separate* statute, CERCLA, which does *not* define the term, and by arguing that "cleanup costs" do not constitute a "claim for damage." Motion at 26-27. Instead of attempting to draw analogies based on the legislative history of another statute that does not define the term "property damage," the Court should look to the language of the applicable statute, Section 330.

The term "property damage" is parenthetically defined in subsection (a) of Section 330 as including "loss of or damage to property or economic loss." National Defense Authorization Act of 1993, 10 U.S.C. § 2687 note; *see also New London Dev. Corp.*, 2005 WL 1634772 (ASBCA). In *New London Development Corp.*, the ASBCA held that the term "'economic loss' is defined in tort law as including among other things 'costs of repair and replacement' of the defective product or defective property." *Id.* (citing *Trans States Airlines v. Pratt & Whitney Canada*, 130 F.3d 290, 291 (7th Cir. 1997); *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 829 n.11 (8th Cir. 1983)). The ASBCA denied the Government's motion to dismiss because the appellant's costs incurred in monitoring, removal and disposal of previously undisclosed ACM and PCBs could constitute property damage claims that were indemnifiable under the deed provision citing to Section 330. As in *New London Development Corp.*, the City incurred costs to monitor, remove and dispose of previously undisclosed levels of chlordane, which made the property unsuitable for the residential use recommended by the Government. Thus, the City's indemnification claim is for property damage, as the City suffered an economic loss.

The Government cites to cases where courts interpret insurance policies and whether the term "property damage" covers cleanup costs.[11] The Government's citation to cases that do not directly interpret Section 330 cannot override the explicit language of the statute, as numerous courts examining such issues hold that cleanup costs are property damage, including the Second, Ninth and District of Columbia Circuits and many state courts, including the highest courts of California, Washington, Massachusetts, Minnesota, North Carolina, and Iowa. *See, e.g., AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 819, 842, 799 P.2d 1253, 1262, 1279 (1990) ("reimbursement of response costs ... under CERCLA and related statutes are incurred 'because of' property damage"); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200 (2d Cir. 1989); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir. 1991); *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir. 1991); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551 (9th Cir. 1991); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940 (D.C. Cir. 1991). Based on the plain language of Section 330, the holding of *New London Development Corp.*, and these cases indirectly addressing analogous issues, AISLIC has suffered property damage, and on a motion to dismiss, all reasonable inferences are to be drawn in its favor. Additionally, on a motion for summary judgment, the evidence must be examined in the light most favorable to the non-movant. Accordingly, the Government cannot prevail on this issue, particularly at the earliest stage of the litigation.

---

[11] In the insurance industry, "cleanup costs" and "property damage" are frequently defined terms. Therefore, the Government's undue reliance on cases interpreting insurance policies – as opposed to the plain language of Section 330 and directly applicable cases – reveals the weaknesses in its position.

**4. AISLIC Has Alleged that its Claim is Predicated on a Release and/or Threatened Release of a Hazardous Substance as a Result of Department of Defense Activities**

AISLIC has sufficiently alleged that its indemnification claim for property damage results from and is predicated upon the release or threatened release of a hazardous substance, pollutant or contaminant (chlordane) as a result of Department of Defense activities on the property. First Amended Complaint, ¶ 44. Section 330(f)(1) defines the term "release" as having the meaning given to it under CERCLA, 42 U.S.C. § 9601(22). Under that section, the term "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)... ." 42 U.S.C. § 9601(22). Chlordane constitutes a "hazardous substance" under CERCLA. *See* 40 C.F.R. § 302.4. The Government acknowledges that it applied the chlordane on the property, but argues that the chlordane termiticide "was properly applied by the Navy" and "served its intended purpose as a consumer product while present in the soil." Motion at 30. In making this argument, the Government again improperly injects factual disputes in its motion to dismiss when the Court is required to accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiff's favor. Further, the Government's arguments raise disputed issues of fact, making summary judgment inappropriate, particularly at this early stage of the litigation.

Even if the Government were not improperly contesting Plaintiff's factual allegations on a 12(b)(6) motion, the definitions of "release" in both Section 330 and CERCLA Section 9601(22) make *no distinction* between the proper and improper application of a pesticide. Whether or not the application was proper, it constituted a release. The Court should reject the Government's attempt to incorporate a separate statutory provision under CERCLA, 42 U.S.C. § 9607(i), to claim that the "proper" application of chlordane excuses it from indemnification liability under the applicable

contracts and the National Defense Authorization Act. Section 330's definition of "release" is restricted to having the meaning given to it under 42 U.S.C. § 9601(22), which makes no distinction between the proper and improper application of chlordane. Moreover, Section 120(h) of CERCLA (42 U.S.C. § 9620(h)) requires that before the Government enters into any contract for the transfer of real property, it must take remedial action necessary to protect human health and the environment with respect to any hazardous substances known to have been released on any property. Section 120(h) also makes no distinction whether or not such substances were properly applied or used for their intended purpose. Even if the manner of application were relevant, the Government's claims that the chlordane was properly applied and used for its intended purpose are questions of fact requiring further discovery. Such issues should not be resolved on a motion to dismiss and are not appropriate for summary judgment when material facts are in dispute and the parties have not engaged in any discovery.

### 5. The City's Alleged Contribution to the Release is Not Proper for Resolution at this Stage in the Litigation

The Government argues that it is not responsible for any release or threatened release because the City "contributed to any such release or threatened release" as a result of its demolition activities at the East Housing Area after the date of transfer. Motion at 31, citing Section 330(a). The City did not "release" the chlordane as such term is defined under Section 330, as addressed above. Further, whether the City contributed to any release is an issue of fact not appropriately decided at this stage of the litigation. As alleged in the First Amended Complaint, the Government is solely responsible for the release of OCPs, namely chlordane, because it applied the hazardous substances on the East Housing Area prior to the date of transfer. First Amended Complaint, ¶ 44. As Plaintiff's allegations must be accepted as true and all reasonable inferences drawn in Plaintiff's favor, the Government's motion to dismiss must be denied. And, where factual issues are in dispute and no discovery has taken place, summary judgment would be particularly inappropriate.

Even if the Court were to make a factual finding that the City contributed to the release of chlordane, the Government is relieved of indemnification liability only to the extent the City contributed to the release. Section 330(a)(3). Therefore, the Complaint still would state a claim to the extent that the City did not contribute to any such release. Likewise, summary judgment still is inappropriate because the Government has not set forth evidence establishing which portion of the liability results from the City's alleged contribution to the release.

## IV. Conclusion

Based on the foregoing, Defendant's Corrected Motion to Dismiss or, in the Alternative, for Summary Judgment should be denied.

Respectfully submitted,

s/T. Michael Guiffré
T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Attorneys for Plaintiff American International Specialty Lines Insurance Company

August 14, 2006

**CERTIFICATE OF FILING**

I certify that on August 14, 2006, the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/T. Michael Guiffré
T. Michael Guiffré