No. 05-1020C
Judge Margaret M. Sweeney

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**PLAINTIFF'S (I) MEMORANDUM IN RESPONSE TO THE COURT'S ORDER OF NOVEMBER 30, 2006, (II) MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT, AND (III) MOTION FOR LEAVE TO FILE PROPOSED FINDINGS OF UNCONTROVERTED FACT**

---

T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison (pending admission *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Plaintiff American International Specialty Lines Insurance Company*

January 5, 2007

# TABLE OF CONTENTS


I. Introduction .................................................................................................... 1

II. Argument ........................................................................................................ 2

A. Plaintiff Needs Discovery Before Defendant's Alternative Motion for Summary Judgment Can Be Fairly Decided .......................................... 2

B. The Court Should Consider Additional Evidence Creating a Material Dispute of Fact ...................................................................................... 11

III. Conclusion ....................................................................................................... 12

# TABLE OF AUTHORITIES

## CASES

*Brubaker Amusement Co., Inc. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002) .......... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 2

*Chevron U.S.A., Inc. v. United States*, 72 Fed. Cl. 817 (2006) .......... 2-4

*Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.,* 840 F.2d 917 (Fed. Cir. 1988) .......... 2

*Mill v. United States*, 69 Fed. Cl. 258 (Fed. Cl. 2006) .......... 4, 12

*Melrose Assocs., L.P. v. United States*, 43 Fed. Cl. 124 (1999) .......... 3

*Moden v. United States*, 404 F.3d 1335 (Fed. Cir. 2005) .......... 4

*Paalan v. United States*, 57 Fed. Cl. 15 (2003) .......... 3

*Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766 (2006) .......... 4, 12

*Phonometrics, Inc. v. ITT Sheraton Corp.*, 2000 WL 286624 (Fed. Cir. 2000) .......... 3

*Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624 (Fed. Cir. 1984)) .......... 12

*State of Florida v. United States*, 32 Fed. Cl. 668 (1995) .......... 3

*Theisen Vending Co. v. United States*, 58 Fed. Cl. 194 (2003) .......... 3-4

## RULES

RCFC 26 .......... 11

RCFC 56 .......... 1, 4, 12

Fed. R. Civ. P. 26 .......... 10

## OTHER

Black's Law Dictionary (6th ed. 1990) .......... 3

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | No. 05-1020C<br>Judge Margaret M. Sweeney |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S (I) MEMORANDUM IN RESPONSE TO THE COURT'S ORDER OF NOVEMBER 30, 2006, (II) MOTION PURSUANT TO RCFC 56(f) TO REFUSE DEFENDANT'S APPLICATION FOR SUMMARY JUDGMENT, AND (III) MOTION FOR LEAVE TO FILE PROPOSED FINDINGS OF UNCONTROVERTED FACT**

In response to the Court's November 30, 2006 Order, Plaintiff American International Specialty Lines Insurance Company ("Plaintiff" or "AISLIC"), by and through its undersigned attorneys, respectfully responds to the Court's November 30, 2006 Order and moves pursuant to Rule 56(f) to refuse Defendant's alternative motion for summary judgment or, in the alternative, for a continuance to permit discovery. Plaintiff also moves for leave to file proposed findings of uncontroverted fact pursuant to RCFC 56(h)(2).[1]

## I. Introduction

Plaintiff's First Amended Complaint alleges that the Government has breached its contractual and statutory obligations to remediate environmental contamination at the Naval Air Station Alameda, East Housing Area ("EHA"), following transfer of this property at the former military base to the City of Alameda and the Alameda Reuse and Redevelopment Authority (collectively, the "City"). In response to the Complaint, Defendant submitted a Motion to Dismiss,

[1] Plaintiff consolidates these motions into the same pleading because they address the same factual issues.

or in the Alternative, for Summary Judgment, on July 12, 2006.[2] In its August 14, 2006 opposition to Defendant's motion, Plaintiff represented that it needed discovery before it could fully respond to Defendant's factual allegations in its alternative motion for summary judgment. *See, e.g.,* Plaintiff's Opposition to Defendant's Corrected Motion to Dismiss or, in the Alternative, for Summary Judgment, at 8-9, 12, and 14. Plaintiff also stated that discovery was necessary to fully respond to Defendant's factual allegations in its Proposed Findings of Uncontroverted Fact.

The Court's November 30, 2006 Order recognizes that Plaintiff expressed the need for discovery to resolve facts in dispute; however, it asks Plaintiff to respond to Defendant's argument that Plaintiff waived its right to pursue discovery at this stage of the proceeding. To be clear, Plaintiff did not waive its right to pursue discovery and hereby moves pursuant to RCFC 56(f) for the Court's denial or continuance of Plaintiff's alternative summary judgment motion to permit discovery.

Plaintiff also seeks leave to file the enclosed proposed findings of uncontroverted fact pursuant to RCFC 56(h)(2) to ensure there is additional relevant information before the Court if it proceeds to decide Defendant's alternative motion for summary judgment on its merits. *See* Exhibit ("Ex.") A.

## II. Argument

### A. Plaintiff Needs Discovery Before Defendant's Alternative Motion for Summary Judgment Can Be Fairly Decided

As a general proposition, summary judgment is not appropriate unless the parties have had adequate time for discovery. *Chevron U.S.A., Inc. v. United States*, 72 Fed. Cl. 817, 818 (2006); *see also Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.,* 840 F.2d 917, 919 (Fed. Cir. 1988) (providing that the Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), made clear that

[2] Defendant subsequently filed a corrected brief on July 21, 2006, to correct various errors.

summary judgment is not appropriate unless the tribunal permits parties adequate time for discovery). Pursuant to RCFC 56(f), this Court may refuse a motion for summary judgment or order a continuance to permit discovery to be taken when the party opposing such motion cannot present by affidavit facts essential to justify its opposition.

Motions for additional discovery under RCFC 56(f) are generally favored and are liberally granted.[3] *Chevron*, 72 Fed. Cl. at 819 (*citing Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 197 (2003)). This Court has routinely permitted the non-movant on a summary judgment motion to submit an RCFC 56(f) affidavit to preserve the party's right to discovery. *See, e.g., Chevron*, 72 Fed. Cl. 817 (ordering plaintiffs to file a revised motion pursuant to RCFC 56(f)); *Paalan v. United States*, 57 Fed. Cl. 15, 18 (2003) (advising plaintiff by order what would be required to substantiate the Rule 56(f) discovery requests); *State of Florida v. United States*, 32 Fed. Cl. 668, 670 (1995) (recognizing that plaintiff must be allowed discovery requests that are relevant to its opposition to motion for summary judgment); *see also Phonometrics, Inc. v. ITT Sheraton Corp.*, 2000 WL 286624, *1 (Fed. Cir. 2000) (reversing district court's *sua sponte* dismissal because it "failed to provide Phonometrics with the opportunity to employ the procedural rights of Rule 56 to oppose summary judgment").

As set forth above, Plaintiff previously identified in its opposition to Defendant's alternative motion for summary judgment specific reasons why it needs discovery concerning Plaintiff's proposed undisputed facts. To reconfirm its position, Plaintiff hereby submits the attached affidavits of Dr. Petra Pless and T. Michael Guiffré with this Court. Ex. A, Tab 1, and B, respectively. Plaintiff's affidavits satisfy the five-part test this Court set forth in *Chevron*, as follows:

---

[3] Defendant fails to cite any authority for the proposition that a party waives its right to discovery unless it files an RCFC 56(f) affidavit simultaneously with its opposition. Moreover, "[i]t is a well-established principle of law that waivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Melrose Assocs., L.P. v. United States*, 43 Fed. Cl. 124, 149 (1999); *see also* Black's Law Dictionary (6th ed. 1990) ("A waiver is an intentional relinquishment of a known right."). Plaintiff did not intend to relinquish its right to "obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party," as guaranteed by RCFC 26(b)(1).

> [T]he non-movant must by affidavit and supporting papers: (1) specify the particular factual discovery being sought, (2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact, (3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue, (4) recite the efforts previously made to obtain those facts, and (5) show good grounds for the failure to have discovered the essential facts sooner.

*Chevron*, 72 Fed. Cl. at 819 (*citing Theisen Vending*, 58 Fed. Cl. at 198).

As set forth below, Plaintiff has a reasonable belief that there are discoverable facts to support its claims and establish Defendant's alternative motion for summary judgment lacks merit. *See Mill v. United States*, 69 Fed. Cl. 258, 365 (Fed. Cl. 2006) (*citing Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005)) (holding that summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law); *Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766, 769 (2006) ("[t]he evidence is examined in the light most favorable to the non-movant … and all justifiable inferences must be drawn in favor of the non-movant"); RCFC 56(c).

Defendant misleads the Court by stating that none of its proposed findings of fact are uncontroverted. *See* Def's Reply to Mot. to Dismiss, or in the Alternative, for Summ. J., at 2. Most of Defendant's alleged uncontroverted facts simply seek to authenticate various documents that the Government and/or City representatives executed as part of transferring the East Housing Area to the City. Of course, a document's authenticity does not *de facto* mean that all of the information contained therein is true. Defendant has not set forth any undisputed *substantive* facts upon which its motion relies. For example, Defendant's alternative summary judgment motion hinges upon a finding that the pesticides on the base were <u>properly</u> applied for their intended purpose. *See, e.g.*, *id.*, at 7, 13, 26. The Government's only "evidence" for its position is a clause in a single letter from the California Department of Toxic Substance Control's ("DTSC") stating, without explanation, that the building foundations "*appear* to have been properly treated with" OCPs. *Id.* at 26 (*citing* Complaint,

Ex. 2, Tab 7) (emphasis added). DTSC's letter does not establish an indisputable fact that the building foundations were properly treated with OCPs. On its face, the letter reflects that DTSC did not engage in any particular fact finding mission to determine this issue. Defendant has done nothing to explain how a California agency is competent to make any such conclusive finding or set forth the information upon which DTSC would have relied. It would be astounding if the Federal Government were to concede that the OCPs were not properly applied if DTSC's letter contained the statement that the building foundations "appear to have **not** been properly treated with" OCPs. Accordingly, the Government's position here is misleading and equally astounding.

In contrast to the Government's paltry evidence of alleged proper termiticide application based on a single vague reference in DTSC's letter, there is a wealth of information reflecting that Plaintiff will prove the Navy's allegation wrong after it has a reasonable opportunity to conduct discovery. For example:

- As Dr. Petra Pless has set forth by affidavit, the organochlorine pesticides ("OCP") at the base were "likely improperly used, spilled, stored, released or disposed of at the EHA property." Ex.. A, Tab 1**,** Pless Affidavit at ¶ 8. Dr. Pless, who is an environmental scientist/engineer, reviewed available materials about Defendant's activities at the base, as well as scientific literature discussing the use of chlordane for subterranean termite control. *Id.* She concluded that "measured chlordane concentrations were more than twice as high as would be expected from pre-construction treatment of the sand/soil consistent with manufacturer-recommended application for subterranean termite control." *Id.* at ¶ 4. Moreover, Dr. Pless found "considerable evidence of excessive application of pesticides, applications inconsistent with manufacturer recommendations, and improper handling of hazardous materials elsewhere on Alameda Naval Air Station." *Id.* at ¶ 7.

- A sampling report obtained less than a year after the transfer of the East Housing Area revealed that the property was contaminated with massive levels of chlordane. Ex. A, Tab 2, Sampling Report: Organochlorine Pesticides. Concentrations were as high as 210,000 parts per billion, or 210 parts per million, a level nearly 500 times the concentration deemed safe by DTSC. *Id.*

- The Navy's own publicly available documents obtained from the Armed Forces Pest Management Board ("AFPMB"), establish that Defendant misapplied chlordane over many years and knew there was a high probability of contamination in military family housing. *See, e.g.,* Ex. A, Tab 3**,** AFPMB, *Recommended Statements on Use and*

*Disposition of Pesticides* (November 11, 1971) (noting a "use it or lose it" policy for pesticides undergoing Environmental Protection Agency ("EPA") cancellation proceedings in order to avoid the massive costs associated with disposal); Ex. A, Tab 4**,** AFPMB, Technical Information Bulletin, January – February 1988, Chlordane Policy Memorandum (directing that "installations should continue to use existing stocks of chlordane until the deadline, with preference given to any locally purchased products in order to minimize turn-in and disposal problems…[d]isposal, if required, will be coordinated with the servicing Defense Reutilization and Marketing Offices"); Ex. A, Tab 5**,** United States Navy Disease Vector Control Center, U.S. Naval Air Station Alameda, California, *A Guide for the Organization of a Pest Control Program at a Military Installation* (May 1, 1967) (acknowledging that many complaints from families living in military housing related to cockroach infestations and recommending that base pest control personnel re-treat vacant houses prior to re-occupancy "to keep complaints to a minimum and to accomplish a more thorough cleaning").

- AFPMB documents reveal that the problem of chlordane contamination in military family housing was so pervasive that the Government Accountability Office, the National Academy of Sciences, and the Environmental Protection Agency pursued investigations in the late 1970s and early 1980s, culminating in the Department of Defense ("DoD" or "Department") banning any further chlordane applications in slab-type housing, known as "Capehart Housing," and in the EPA canceling chlordane for all uses in 1988. *See, e.g.,* Ex. A, Tab 6**,**August 5, 1980, Letter from Comptroller General to EPA Administrator Douglas M. Costle, "Need for a Formal Risk/Benefit Review of the Pesticide Chlordane (CED-80-116); Ex. A, Tab 7, "An Assessment of the Health Risks of Seven Pesticides Used for Termite Control," Committee on Toxicology, Board on Toxicology and Environmental Health Hazards – National Academy of Sciences (1982)**.**

- In 1981, Velsicol Chemical Corporation, chlordane's manufacturer, reviewed the circumstances underlying DoD's problem with excessive chlordane contamination in military family housing and concluded that the excessive levels were caused by the Department's misapplication of the pesticide. Ex. A, Tab 8**,** A.M. Khasawinah, *Chlordane: Air Concentrations in Treated Homes, Assessment and Significance* (March 23, 1981). As a result, DoD directed chlordane air sampling in all Capehart-type military family housing units, probably including those located in the East Housing Area. Ex. A, Tab 9**,** Robert V. Bielarski, Ph.D., *Applied Biology Program: Naval Facilities Engineering Command, Workshop on Termiticides in Building Protection*, September 22-23, 1982.

These and presumably other expert reports and publicly available documents establish the Navy's extensive use of chlordane for subterranean termite control. Such use, combined with the Department's standing instructions to reapply chlordane in military family housing units whenever occupancy turned over, and its policy of using chlordane as much as possible to avoid potential

disposal costs at the end of EPA's regulatory efforts to cancel the pesticide, resulted in the accumulation of dangerous residues of chlordane at the East Housing Area. This evidence certainly offers more than an adequate factual predicate for the belief that there is discoverable evidence sufficient to raise disputed issues of material fact. Therefore, the Court should not rule on Defendant's alternative motion for summary judgment until Plaintiff has had a reasonable opportunity for discovery.

Defendant's motion is rife with other similar presumptions that are not established by its Proposed Findings of Uncontroverted Fact. For example, Defendant's motion states that the environmental baseline study contains a map showing the locations of soil samples, but does not explain the significance of this alleged fact or whether the soil samples reflect the location or amount of the pesticides that the City was forced to remediate. *Id.* at 4. In essence, Defendant asks this Court to presume that *any* reference to a pesticide must be sufficient to apprise the City of the type, location, volume, and concentration of the hazardous substances the City was forced to remediate. None of the documents upon which Defendant relies answer basic factual questions:

- Did the Government accurately identify the locations, volume, type and concentrations of OCPs?
- Did DTSC ever conclude that OCPs would have to be removed whether or not the housing structures were destroyed?
- Did DTSC ever require the City to remediate the OCPs?
- Was any claim ever made against the City for harm resulting from OCPs?
- Did the Government properly apply termiticide to the property?
- Did the Government properly apply OCPs in accordance with the manufacturer's directions and recommended use for subterranean termite control?
- Did DTSC actually investigate and determine whether the OCPs were "properly applied"?
- Did the termiticide serve its intended purpose?
- Was the termiticide "functioning in the manner intended" after the property was transferred to the City?

- Were OCPs stored at the East Housing Area?
- Were OCPs released at the East Housing Area?
- Were OCPs disposed of at the East Housing Area?

Without exploring through discovery these complex, technical issues, Plaintiff is unable to fully contest Defendant's allegations that it properly applied OCPs for their intended use as a consumer pesticide. Accordingly, Defendant's alternative motion for summary judgment is premature.

To procure all necessary evidence to prevail on its claims, Plaintiff anticipates serving upon Defendant and third parties, including the City and DTSC, requests for production of documents and entry upon land for inspection, interrogatories, depositions, and requests for admissions pursuant to RCFC 30, 33, 34, 36, and 45. For example, to contest Defendant's alleged facts Plaintiff has a right to obtain any and all documents and other information relating to, *inter alia*:

- The extent of OCP contamination at the site, including types, locations, concentrations, and amounts of pesticides;
- OCP clean up and demolition of the housing structures;
- Application of chlordane and heptachlor as pesticides relating to the East Housing Area;
- Environmental investigation, testing, and remedial activities at the East Housing Area;
- Brand names of pesticide products that were used, stored, or disposed of at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- The actions of the Fleet and Industrial Supply Center Oakland, Alameda Facility/Alameda Annex Restoration Advisory Board ("RAB"), including the minutes of all RAB meetings;
- Purchase documents (invoices, orders, *etc.*) for pesticides obtained for and used, stored, or disposed of at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Whether pesticide, particularly termiticide, applications were conducted by Navy personnel or contractors at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Whether pesticides, particularly termiticides, were applied before construction, upon infestation, or for other reasons;

- Any timed schedules for application of pesticides at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Any instructions to discontinue the use of chlordane termiticides at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- The Spill Prevention Control and Countermeasures Plan prepared by the U.S. Navy for Alameda Point Naval Air Station at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Any pesticide spills or occupational exposure to pesticides, *e.g.*, injuries to employees, information on spills at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Measurements of chlordane at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Locations of chlordane at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Volumes and concentrations of chlordane at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Instructions for pesticide storage at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- The storage of pesticides at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Storage of pesticides in, and size of, a pesticide storage shed in the eastern portion of Alameda Point Naval Air Station;
- Instructions for pesticide disposal at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Disposal of pesticides at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Hazardous waste disposal at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;
- Standard operating procedures for the use of pesticides, and changes thereto, at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases;

- Health and safety guidance for application of pesticides at Alameda Naval Air Station, East Housing Area, West Housing Area, and any other portions of the Navy bases; and
- Labels and other information presented at any RAB meeting disclosing actual pesticides used at Alameda Naval Air Station or whether they were only "representative" chlordane labels.

Practically all of the information Plaintiff seeks is exclusively within the control of the Government and third parties such as DTSC, and Plaintiff can only obtain it through the discovery process, including, *inter alia*, document requests and inspection of land, interrogatories, depositions, subpoenas and admissions. For example, although Plaintiff has not yet been able to obtain the testimony of City representatives, conversations with the City's counsel confirmed that the City never anticipated remediating any OCPs present on the site, as the Government promised otherwise. Ex. B at ¶ 5. Plaintiff also has attempted several times to obtain information from DTSC to rebut Defendant's unfounded allegation that DTSC determined that pesticides on the base were properly applied, but DTSC has not responded to these inquiries. *Id.* at ¶ 6.

In fact, Defendant itself represented that it has a huge amount of relevant evidence that it has not provided to Plaintiff. Defendant identified a substantial amount of discoverable information when it made its initial disclosures prior to the transfer of this action to this Court.[4] Ex. A, Tab 10**,** Def. United States of America's Fed. R. Civ. P. 26(a)(1) Initial Disclosure at 2. Defendant's identification of the categories of discoverable information included: (A) the application of chlordane and heptachlor as pesticides relating to the East Housing Area parcel of the former Naval Air Station Alameda; (B) information related to the transfer of real property formerly within the Naval Air Station Alameda; and (C) environmental investigations or response actions relating to

[4] Plaintiff initially filed suit in the District Court for the Northern District of California, Case No. 3:04-cv-01591, and the case was eventually transferred to the Court of Federal Claims. In the litigation before the District Court for the Northern District of California, Defendants, the United States of America and the United States Department of the Navy, filed initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) and Court Order, which provided categories, location, and approximate quantity of documents, materials and tangible things in the United States' possession, custody or control that it may use to support its claims or defenses.

pesticide application at the East Housing Area. Defendant represented that the Navy located "approximately 412 cubic feet of documents (one cubic foot of documents is approximately equivalent to one records box of documents) and 336 size "E" construction drawings" potentially related to the identified categories. *Id.* at 6-7. Defendant admits that it may use any of this information to support its defenses; it is therefore discoverable pursuant to RCFC 26(b).[5] Accordingly, Defendant itself has conceded that it has relevant information that may answer the factual questions at issue in its alternative motion for summary judgment and to which Plaintiff is entitled.

Plaintiff has not been able to obtain this information sooner because the case has not yet moved beyond the preliminary stages. Defendant opted to file its motion to dismiss in lieu of an answer to the complaint, thereby deferring indefinitely Plaintiff's ability to seek discovery.[6] The Court should not preclude Plaintiff from obtaining the information that Defendant itself has admitted is relevant to the claims and defenses in this action. In addition, other third parties, including the City and DTSC, have relevant information that must be acquired through formal discovery. Therefore, the Court should deny or postpone Defendant's alternative motion for summary judgment until Plaintiff has had a reasonable opportunity to obtain discovery.

B. The Court Should Consider Additional Evidence Creating a Material Dispute of Fact

If, despite the volume of information set forth above, the Court determines that Defendant's alternative motion for summary judgment is ripe for decision, the Court should ensure there is a

[5] RCFC 26(b)(1) provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter."

[6] RCFC 26(d) states that a "party may not seek discovery before the parties have conferred as required by Appendix A, paragraph 3." The Court's case management procedures envision that the parties will confer no later than 49 days after defendant's answer is filed to prepare a Joint Preliminary Status Report, which addresses specific questions and sets forth a proposed discovery plan; however, this status report is "deferred indefinitely if on or before the date [it] is due a dispositive motion addressing all issues is filed." App. A, para. 6. Defendant never filed an answer and therefore the filing of a Joint Preliminary Status Report, and the ability to conduct discovery, has been deferred indefinitely.

sufficient record before it to justly decide Defendant's alternative motion. Accordingly, Plaintiff seeks leave to file the enclosed proposed findings of uncontroverted fact pursuant to RCFC 56(h)(2). Ex. A. The evidence set forth by Plaintiff in its proposed findings of uncontroverted fact establishes that there is a genuine issue of material fact upon which Defendant's motion is based. Viewed in the light most favorable to Plaintiff, Defendant's alternative motion for summary judgment must be denied. *See Mill*, 69 Fed. Cl. at 365; *Pacific Gas & Elec. Co*, 70 Fed. Cl. at 769; RCFC 56(c).

**III. Conclusion**

Plaintiff has fully complied with the requirements of RCFC 56(f) by identifying specific reasons why discovery is needed in order to oppose Defendant's alternative motion for summary judgment. Plaintiff has done more than rely on unspecified facts or conclusory allegations, and therefore is entitled to reasonable discovery that will allow the Court to assess the merits of Defendant's motion. *Brubaker Amusement Co., Inc. v. United States*, 304 F.3d 1349, 1361 (Fed. Cir. 2002) (*citing Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984)). Accordingly, the Court should deny or continue Defendant's alternative motion for summary judgment pending the completion of discovery.

The Court also should grant Plaintiff's motion for leave to file the enclosed proposed findings of uncontroverted fact. Granting leave will appropriately supplement the record before the Court if it rules on the merits of Defendant's alternative motion for summary judgment.

Respectfully submitted,

s/T. Michael Guiffré

T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Attorneys for Plaintiff American International
Specialty Lines Insurance Company

January 5, 2007

**CERTIFICATE OF FILING**

I certify that on January 5, 2007, the foregoing *Plaintiff's (i) Memorandum in Response to the Court's Order of November 30, 2006, (ii) Motion Pursuant to RCFC 56(f) to Refuse Defendant's Application for Summary Judgment, and (iii) Motion for Leave to File Proposed Findings of Uncontroverted Fact* was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/T. Michael Guiffré
T. Michael Guiffré