# TAB 8

145539

Reprint

145539

VELSICOL CHEMICAL CORPORATION

CHICAGO, ILLINOIS 60611

# CHLORDANE:

# AIR CONCENTRATIONS IN TREATED HOMES

# ASSESSMENT AND SIGNIFICANCE

A.M. KHASAWINAH

MARCH 23, 1981

# CHLORDANE:

# AIR CONCENTRATIONS IN TREATED HOMES

# ASSESSMENT AND SIGNIFICANCE

A.M. Khasawinah
April 1, 1981

## INTRODUCTION

Currently, chlordane is the chemical of choice for termite control in human dwellings. It is generally applied to the soil outside and inside the house foundation and where termite infestations are suspected. When it is applied properly and carefully according to label directions, the potential exposure of inhabitants to chlordane should not be significant. When high concentrations of chlordane appear in treated homes, it is a good indication that accepted practices of application have not been followed or an accident had occured. In any case, such unwarranted exposures can be avoided.

The U.S. General Accounting Office (GAO) has recently petitioned the U.S. Environmental Protection Agency (EPA) to reevaluate the termiticide use of chlordane on the basis of data reported by the U.S. Air Force (USAF) indicating a high potential exposure resulting from use of chlordane (GAO letter to EPA, August 5, 1980, Exhibit 1). The GAO letter also referred to the health implications of such exposure. To understand the GAO concerns, and to determine if they are warranted, this review will discuss:

- the Air Force reports cited in the GAO letter
- the plenum housing treatment
- EPA response to the GAO letter
- potential chlordane exposure under normal situations
- the significance of human exposure - epidemiological
- findings

## U.S. AIR FORCE REPORTS

There are three reports that were cited in the GAO letter. An account of each report is given below:

1. <u>Webb AFB - Texas, 1970 Chlordane Contamination</u>

   This incident was reported in detail in Melvin's 1974 review (Melvin, 1974, USAF Kelly AFB, Texas, Exhibit 2). In the course of treating concrete slab houses at Webb AFB by sub-slab injection, it became apparent some hours later that the chlordane emulsion had been injected into one or more heating ducts in two houses. These ducts were embedded in the concrete slab. A few hours later when the thermostat-controlled furnaces "came on", the odor of the vehicle became very intense, and the

quarters were evacuated. Analysis of surface and air samples in these homes demonstrated the presence of chlordane in high concentrations. Air concentrations as high as 1,140 $\mu g/M^3$ (micrograms per cubic meter) and surface residues as high as 25,900 $\mu$g/sq. ft. were reported.

2. Wright-Patterson Air Force Base, Dayton, Ohio 1972-1974 Contamination. A detailed account is given in USAF May 13, 1975 Report. (Exhibit 3)

During the construction of some 800 military family housing units at Wright-Patterson AF Base in the Fall of 1971, water emulsion chlordane solutions were applied on top of the granular fill of the foundation prior to pouring the concrete slab. The application rate was approximately 0.035 lb active ingredient (A.I.) chlordane/sq. ft. of slab area. The granular fill contained the heating and air conditioning distribution ducts to the ground level rooms. These sub-slab ducts were constructed of six and eight inch diameter vitreous clay pipe wrapped in visqueen, were not water proofed and were often below exterior grade elevation. After chlordane application, the granular fill was covered by a polyvinyl moisture barrier before the slab was poured.

The chlordane contamination was first noticed immediately after initial occupancy in September-October, 1972 in one of the houses. The USAF states:

> "A review of the housing construction and chlordane application of almost a year ealier indicated the possibility that chlordane had entered the heating ducts, was being volatalized by 130-140 degee F. furnace, and was being distributed into the house to cause the odors."

Additional complaints of odor by occupants particularly at the start of the heating season prompted the USAF to conduct comprehensive analysis of samples from these housing units in September 1974. Contamination was very common in these housing units reaching 34.0 $\mu g/M^3$ in the air and 39 $\mu$g/sq. ft. on the surface. These findings, according to the USAF report, confirmed that:

> "The source of the chlordane within the houses was from the sub-slab pretreatment for termite control and that the mode of entry into the houses was via the sub-slab heating/air conditioning ducts".

This conclusion was further substantiated by comparison of the airborne levels in the Wright-Patterson AFB to chlordane levels in other comparably constructed and termiticide treated Air Force housing units. In those units where the air ducts were completely encased in concrete beneath the slab, chlordane air concentrations were non-detectable at a detection limit of 0.2 $\mu g/M^3$.

Furthermore, in two story houses at the Wright-Patterson AFB, chlordane contamination was limited to the lower story since it was served by the sub-slab air ducts.

According to the GAO letter, the Air Force reducted these houses above ground in 1979 after sealing the original sub-slab ducts. This apparently alleviated the problem.

3. <u>Scott AFB, Belleville, Illinois, Fall 1978</u>

This incident involved housing units that had been recently treated (1978) for termites by high pressure sub-slab injection of chlordane (Exhibit 4). The problem was detected during the first heating season following the treatment. Sampling of these houses revealed the presence of chlordane from less that 1 $\mu g/M^3$ to 630 $\mu g/M^3$. In contrast, in 43 randomly selected houses that were similarly treated prior to 1978, (between 1964-1977) air concentrations of chlordane were less than 5 $\mu g/M^3$, when sampled and analyzed in the same way. Consequently, the AF concluded that:

> "From these data, it appears that something occured in 1978 that was different from previous years. A possible explanation is that practices used to avoid insertion of chlordane into heating ducts were not adhered to".

In summary it is evident from the three accounts given above that the chlordane contamination in the described houses was the result of misapplications such as:

- accidental injection of chlordane solutions directly into the house air ducts,
- sub-slab pretreatment with chlordane solutions in the zone where unencased air ducts were laid, or
- high pressure sub-slab injections of chlordane solutions where air-ducts are also laid.

Furthermore, these applications were performed by inexperienced Air Force personnel and not by professional applicators.

PLENUM HOUSING TREATMENT

In plenum constructed houses, the area under the subfloor (crawl space) is used as a heat-cooling duct. This type of housing is not common and according to the GAO letter, the National Pest Control Association estimates that only 12,000 plenum houses were built in 1978. (Exhibit 1)

The GAO expressed concern about potential house contamination upon treatment of subsoil of plenum houses with chlordane. In response to this, it must be emphasized that both the manufacturer of chlordane and the National Pest Control Association recommend against the treatment of plenum housing. In fact, current Velsicol chlordane labels strictly forbid treatment of plenum housing. Thus, theoretically, the concern from plenum housing treatments is justified, however, in reality such concern is not warranted.

EPA RESPONSE TO GAO LETTER

The GAO, in its August 5, 1980 letter to the EPA, (Exhibit 3), concluded on the basis of the above accounts that a Rebuttable Presumption Against Registration (RPAR) of chlordane should be initiated by EPA to determine whether the pesticides registered for subsurface termite uses should be limited or canceled.

In its October 6, 1980 response to the GAO letter, EPA pointed out that (Exhibit 5):

> "The exposure problem that the report describes seems to pertain to specific types of structures and treatment practices."

This confirms the conslusions stated earlier about the exposure problem in the Military Air Force housing units in that it does not represent a general situation.

Furthermore, EPA indicated that potential exposure problems are not just limited to chlordane, but that other registered termiticides may pose similar problems. Consequently, EPA did not agree that the RPAR is the right approach to handle chlordane, but it proposes:

> "to undertake a comparative risk/benefit analysis of the registered termiticide chemicals as a group."

This "cluster" approach, according to the EPA, "is a more efficient use of Agency resources than chemical RPAR processing, and it will lead to a regulatory position which addresses the problem in its full scope rather than piecemeal". EPA proposed to initiate this project and gather all the needed data during 1981.

It is expected that EPA, in its proposed approach, will make a comprehensive review of the subject and differentiate between exaggerated exposure resulting from improper practices and actual potential exposure that may result from approved practices.

POTENTIAL CHLORDANE EXPOSURE UNDER NORMAL SITUATIONS

When proper practices are employed, detectable chlordane residues in air of treated homes were not found six months after chlordane treatment (Malina et.al, 1959, Exhibit 6). In this case five homes commercially treated with chlordane were studied. These homes were located in Georgia, South Carolina and Arkansas and were of two basic types of construction:

- slab-on-ground type of construction. Water emulsion of 1% chlordane was applied on soil surface prior to pouring the slab. Although not specified in the article, it was implied that no air ducts were either in the concrete slab or sub-slab. None of the air samples in these houses contained detectable chlordane residues.

- Crawl space homes, where chlordane emulsions were applied along the foundation walls and around piers. It is not certain if air ducts were located in the crawl space. Two air samples, out of seven samples taken at intervals of 48-126 days in these houses, showed 6 and 40 $\mu$g chlordane/$M^3$.

Recently, a study was conducted jointly by Velsicol Chemical Corp. and California Department of Food and Agriculture to determine potential inhabitants' exposure to chlordane in two types of houses (Cahill, 1979; Maddy et.al. 1979, Exhibits 7 & 8). The treatments were conducted by commercial pest control operators.

1. Crawl space houses were sprayed on the inside perimeter, and injected to a 10-inch depth on the outside perimeter.

2. Slab construction houses were injected along the outside perimeter and the inside perimeter of the garage to a depth of 10-inches.

According to the California monitoring results (Maddy et.al.), no detectable chlordane air residues were found in either type of homes after 30 days of application, in spite of some residues in some samples at earlier intervals (the highest was 13 $\mu$g/$M^3$ for slab house treatment). The Velsicol results (Cahill, 1979) showed less than 2.3 $\mu$g of chlordane/$M^3$ in the slab treated houses one day after treatment. In the crawl space houses the chlordane airborne residues were slightly higher. The maximum concentration reported was 4.9 $\mu$g/$M^3$.

THE SIGNIFICANCE OF HUMAN EXPOSURE

As a result of its review of the Air Force studies, the National Academy of Sciences recommended to the Air Force (Exhibit 9) that:

> "epidemiological data be collected on the inhabitants of the Air Force housing units from the 1970, 1974, and 1978 episodes of chlordane exposure, focusing on both acute and chronic health effects".

We believe this is an excellent recommendation. In the meantime, however, there are epidemiological studies of potentially chlordane exposed populations which indicate no long term health effects in the exposed groups. These are:

1. Harvard School of Public Health Study on Mortality of Pesticide Applicators (Wang and MacMahon 1979a, Exhibit 10). A nationwide cohort group consisting of 16,126 males employed for 3 months or more between 1967 and 1976, was the subject of this study. These applicators had been using a broad spectrum of pesticides including fumigants, botanicals, carbamates, chlorinated hydrocarbons and organophosphates.

   Particular interest was focused on applicators potentially exposed to chlordane and heptachlor. The investigators reported that analysis of mortalities due to various causes, and due to intensity of exposure, revealed no significant differences between observed and expected mortalities in the termite control operators. This cohort group is being followed prospectively.

2. Harvard School of Public Health Epidemeological Study of Workers Employed in the Manufacture of Chlordane and Heptachlor (Wang and MacMahon, 1979b, Exhibit 11). This was a retrospective mortality study on 1,403 workers (white males) employed in the manufacture of chlordane and heptachlor between 1946 and 1976, at the two Velsicol plants (Marshall, Illinois and Memphis, Tennessee) for periods ranging from 3 months to more than 30 years. The impetus for the study was a search for evidence of carcinogenicity of these compounds to man. According to the investigators, "none has been found". There was no overall excess of deaths from

cancer, even among workers followed twenty or more years after entry into the occupation. An excess of deaths from lung cancer (12 observed, 9.0 expected) was not statistically significant and was not distributed by duration of exposure or of latency in any pattern suggesting an etiologic role for chlordane - heptachlor experience. It was also found that although diseases of the circulatory system as a whole showed fewer deaths than expected, there was a statistically significant excess of deaths from cerebrovascular disease. The investigators emphasize that this excess was not related to duration of exposure or latency and occured exclusively after termination of employment.

3. <u>Shindell and Associates Epidemiologic Study of the Employees of Velsicol Chemical Corporation Plant, Marshall, Illinois</u> (Shindell, 1980, Exhibit 12). This study evaluated the overall mortality of all employees with three months or more employment at the Marshall plant between 1946 when manufacturing of chlordane began and the study cut-off date of 30 June, 1976 (a total of 716 emloyees). Mortality data on the plant employees were compared to the overall mortality experience of like segments (by age and sex) of the U.S. population at large. The study found that there were no significant differences between the Marshall plant employees and the overall U.S. population in regard to mortality. It was concluded that:

> "employment at the Marshall plant has no effect upon the employees with respect to either the causes of death or the overall longevity of such employees."

The Shindell Study was updated recently to extend coverage to include persons completing the minimum three months employment at any time between 1946 and January 1, 1980. The primary focus of this updated study which included a cohort of 783 current and former employees was to discern the long-term effects of exposure to potentially hazardous materials.

The investigators stated that:

> "Since Velsicol's Marshall Plant studies cover the entire time span of commercial production of synthetic chlorinated hydrocarbon insecticides in the United States, we have maximum possible confidence that any latent effects, if present, will have manifested themselves."

The findings of the study are:

- "The overall mortality was significantly lower in the male employees than that expected in the comparable segment of the population as a whole, 'probably' as a result of the life style of the community in which the plant is located."

- "Deaths from heart disease are not significantly different from the U.S. population and are consistent with overall mortality patterns."

- "Morbidity data were comparable to expectations in a work force of the age composition present in the Marshall Plant and amongthose no longer employed and surviving at the time of the termination of the study."

The causes of death that were considered in this study were:

- all causes

- malignant neoplasms (brains, colon, kidney, liver, lung, mediastinum, mesothelioma, pancreas, stomach, and unspecified)

- diseases of the heart and circulatory system

- cerebrovascular diseases

- all trauma (accident, suicide, homicide)

- other and unknown

Dr. Shindell concluded:

> "There is, thus, no evidence of any long-term latent effect on health related in any way to employment at the Velsicol Plant in Marshall, Illinois, for the thirty-four year period in which it has been engaged in the production of chlorinated hydrocarbon insecticides."

In addition to the above studies, there are three earlier relevant studies on small numbers of workers involved in the manufacture of chlorinated pesticides which found no harmful effects from the occupational exposure to these pesticides:

1. Princi and Spurbeck (1951, Exhibit 13) made a clinical laboratory investigation (physical examination, complete urinalysis, complete blood analysis, and complete neurological examination) on 22 workers involved in the manufacture and formulation of chlordane, aldrin and dieldrin. These persons were occupationally exposed to at least 5,000 µg air concentrations of these pesticides per cubic meter for 1 to 3 years. There were no health problems among these workers that were related to their occupational exposure.

2. Alveres and Hyman (1953, Exhibit 14) reached a similar conclusion regarding the absence of toxic manifestations in workers occupationally exposed to chlordane. Twenty four male workers involved in the manufacture of chlordane for periods ranging from 2 months to 5 years were the subject of this laboratory and clinical study. The investigators found no evidence of any abnormality in the liver, kidney, skin and nervous and blood forming organs. It was also the opinion of these investigators that "the good health of 24 men who were daily exposed to chlordane during its manufacture indicates that when it is breathed or placed in contact with the skin it is innocuous".

3. Fishbein et.al. (1964, Exhibit 15) examined the health of 15 workers involved in the manufacture of chlordane for periods ranging from 1 to 15 years. A complete physical examination was carried out on each individual. The clinical tests included urine examinations, complete blood counts, bromsulphalein and ceuphalin flocculation liver function tests, x-ray of the chest and electrocardiogram. Chlordane air concentrations in the occupational environment of these workers at the time of this study were reported to be 1.2-1.7 $\mu g/M^3$. No evidence of injury to any of the organic systems examined was found in any of the workers. It was the conclusion of the authors that "since the exposure of these workers is greater than may be expected in the use of chlordane in the quantity and manner recommended, and since they showed no signs or symptoms of toxicity, it may be stated that there is little, if any, hazard from the use of chlordane when properly employed".

## SUMMARY

The preceding review has revealed that:

1. The relatively high air concentrations of chlordane in the U.S. Air Force Military housing units described in the GAO Letter were the result of improper application practices and the direct application of chlordane solutions into heating and air conditioning ducts.

2. Current labeling prohibits the use of chlordane in plenum housing structures. (See Appendix I and II)

3. Under recommended application methods as described in the current chlordane labels (Appendix I and II), chlordane air concentrations in treated homes are not expected to exceed 5 $\mu g/M^3$.

4. In human groups with an increased potential for exposure to chlordane, such as plant workers involved in the manufacturing and formulation of chlordane for up to 30 years or more and termiticide control groups, several epidemiological studies had shown no adverse health effects attributable to working with chlordane.

It must be emphasized that the control of air contamination of chlordane treated homes depends on care in application and strict adherence to the label directions.

REFERENCES CITED

1) General Accounting Office (GAO), "Letter to Mr. Douglas M. Costle, the Administrator of the Environmental Protection Agency: Need for a formal risk/benefit review of the pesticide chlordane", Comptroller General of the United States, August 5, 1980.

2) Melvin, W.W., Jr., "Chlordane: Review of the literature", USAF Environmental Health Lab., Kelley AFB, Texas, October 1974, Page 40-80.

3) Anonymous, "Summary and Comparison of Two-Hour Baseline Chlordane Air Sampling Results From Air Force Military Family Housing", Prepared for Headquarters United States Air Force/SGPA, Prepared by Office of the Surgeon, Headquarters Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio 45433, May 13, 1975.

4) Mabson, William E., "Chlordane Contamination in Wherry Housing, Scott AFB, Illinois", Department of the Air Force, USAF Occupational and Environmental Health Laboratory (AFSC) Brook Air Force Base, Texas 78235, April 2, 1979.

5) U.S. Environmental Protection Agency, "Letter to Honorable Abraham Ribicoff, Chairman, Committee on Governmental Affairs", EPA Office of Planning and Management (William Drayton, Jr.) October 6, 1980.

6) Malina, M.A., Kearny, J.M., and Polen, P.B., "Determination of Chlordane in Air of Habitations Treated for Insect Control", J. Agr. Food Chem. 7: 30-33, 1959.

7) Cahill, W.P., "Applicator and Inhabitant Exposure to Chlordane during and after Termiticide Applications in California", Velsicol Chemical Corporation Report, Project No. 480018, October 8, 1979.

8) Maddy, Keith, T; Johnston, Lori; Cusick, B.; Schneider, F.; Jackson, T.; Cooper, Catherine; and Frederickson, A.S.; "A Study in Southern California in July 1979 of the potential dermal and inhalation exposure of applicators and other persons who might later enter or occupy areas treated with chlordane used against subterranean termites under houses", California Dept. of Food and Agriculture, Sacramento, California 95814. Report No. HS-683, November 4, 1979.

9) National Academy of Sciences, "Chlordane in Military Housing", Prepared by the Subcommittee on Chlordane in Military Housing of the committee on Toxicology, August 1979.

10) Wang, H.H., and MacMahon, B., "Mortality of Pesticide Applicators", J. Occup. Medicine 21(11): 741-744, 1979a.

11) Wang, H.H., and MacMahon, B., "Mortality of Workers employed in the manufacture of chlordane and heptachlor", J. Occup. Medicine 21(11): 745-748, 1979b.

12) Shindell and Associates, "Report of epidemiologic study of the employees of Velsicol Chemical Corporation Plant, Marshall, Illinois January 1946-December 1979", Report submitted to Velsicol, July 1980.

13) Princi, F. and Spurbeck, G., "A study of workers exposed to the insecticides chlordane, aldrin, dieldrin", Arch. Ind. Hyg. and Occup. Med. 3: 64-72, 1951.

14) Alvarez, W. and Hymen, S., "Absence of toxic manifestations in workers exposed to chlordane", Arch. Ind. Hyg. and Occup. Med. 8: 480-483, 1953.

15) Fishbein, W.I., White, J.V. and Isaacs, H.J., "Survey of workers exposed to chlordane", Ind. Med. Surg. 33(10): 726-727, 1964.

APPENDIX I

GOLD CREST PROTECTION
PEST CONTROL CHEMICALS

# GOLD CREST®

# C-100

## EMULSIFIABLE CONCENTRATE

**ACTIVE INGREDIENTS:**

| | |
|---|---|
| *Technical Chlordane | 72.0% |
| Petroleum Distillate | 21.0% |
| INERT INGREDIENTS | 7.0% |
| Total | 100.0% |

*Equivalent to 43.2% Octachloro-4, 7-methanotetrahydroindane and 28.8% related compounds. Contains 8.0 lbs. actual Chlordane per gallon.

*Registered Trademark of Velsicol Chemical Corporation

## INSECTICIDE FOR USE ONLY BY PROFESSIONAL APPLICATORS

### KEEP OUT OF REACH OF CHILDREN

## WARNING

**STATEMENT OF PRACTICAL TREATMENT**

**If swallowed**—Call a physician immediately. Gastric lavage is indicated if material was taken internally. DO NOT INDUCE VOMITING unless other treatment is not available. Vomiting may cause aspiration pneumonia. If it is necessary to induce vomiting, give victim one or two glasses of water and insert finger in back of throat. Repeat until vomit fluid is clear. Do not induce vomiting or give anything by mouth to an unconscious person. **If on skin**—Wash with soap and water. **If in eyes**—Flush with water for 15 minutes. Contact a physician. **If Inhaled**—Remove victim to fresh air and apply respiration if indicated.

SEE SIDE PANEL FOR ADDITIONAL PRECAUTIONARY STATEMENTS.

E.P.A. Reg. No. 876-63-AA
E.P.A. Est No 876—TN—1

**NET CONTENTS: 30 Gallons**

**VELSICOL CHEMICAL CORPORATION**
341 East Ohio Street, Chicago, Illinois 60611

APPENDIX II

## PRECAUTIONARY STATEMENTS

**Hazards to Humans and Domestic Animals**

### WARNING

May be fatal if swallowed. Contact with skin can cause toxic symptoms. Avoid breathing vapors or spray mist. In case of contact with skin, wash with soap and water. Avoid contamination of feed and foodstuffs. Keep out of the reach of children.

A committee of the National Academy of Sciences has stated that:

"There are no adequate data to show that these compounds are carcinogenic in humans, but because of their carcinogenicity in certain mouse strains and the extensive similarity of the carcinogenic action of chemicals in animals and in humans, the committee concluded that chlordane, heptachlor, and/or their metabolites may be carcinogenic in humans."

**Environmental Hazards**

This product is toxic to fish, birds and other wildlife. Birds and other wildlife feeding on treated areas may be killed. Keep out of lakes, streams or ponds. Do not contaminate water by cleaning of equipment or disposal of wastes. Apply this product only as specified on this label.

**Physical or Chemical Hazards**

DO NOT USE, POUR, SPILL OR STORE NEAR HEAT OR OPEN FLAME.

### GENERAL INFORMATION ON THE USE OF THIS PRODUCT

Chemicals for soil treatment are used to establish a barrier against termite attack. The chemical emulsion must be adequately dispersed in the soil to provide a barrier between the wood in the structure and the termite colonies in the soil.

For the effective use of this product, it is necessary that the service technician be familiar with current control practices including trenching, rodding, sub-slab injection and low pressure spray applications. These techniques must be correctly employed to prevent or control infestations by subterranean termite species of *Reticulitermes, Zootermopsis, Heterotermes* and *Coptotermes*. Choice of appropriate procedures should include consideration of such variable factors as the design of the structure, water table, soil type, soil compaction, grade conditions, and location and type of domestic water supplies. The biology and behavior of the termite species involved are important factors to be known as well as suspected location of the colony and severity of the infestation within the structure to be protected.

Effective termite control also includes elimination of termite access to moisture by recommending repair of faulty construction, grade and/or plumbing. Remove all wood and cellulose containing debris in contact with soil from crawl spaces, porches, and around foundations.

For advice concerning current control practices with relation to the specific local conditions, consult resources in structural pest control.

### DIRECTIONS FOR USE

It is a violation of federal law to use this product in a manner inconsistent with its labeling. This product may not be used against any pests not named on the label.

Avoid contamination of public and private water supplies by following these precautions.

Use anti-backflow equipment or procedures.

Do not treat soil beneath structures that contain below-grade wells or cisterns.

Extreme care must be taken to avoid runoff. Apply only to soil that will accept the emulsion at the specified rate. For example, water saturated or frozen soil will accept little or no emulsion.

Refer to Federal Housing Administration Specifications for guidance.

Consult state and local specifications for recommended distance of treatment areas from wells.

After treatment, plug securely all holes drilled in construction elements.

### PRECONSTRUCTION SUBTERRANEAN TERMITE TREATMENT

Effective preconstruction subterranean termite control requires the establishment of an unbroken vertical and/or horizontal chemical barrier between wood in the structure and the termite colonies in the soil.

To meet F.H.A. termite proofing requirements, follow the latest edition of the Housing and Urban Development (H.U.D.) Minimum Property Standards.

Do not apply to any area intended as a plenum air space.

Mix one gallon of **C-100** in **95** gallons of water to produce a 1% water emulsion. Use a 1% water emulsion for subterranean termites.

Where necessary, use a 2% water emulsion for *Coptotermes spp*. For a 2% emulsion, mix two gallons of **C-100** in **95** gallons of water.

After grading is completed and prior to pouring of the slab, slab supported or constructed porches, and other critical areas, make the following treatments:

**Horizontal Barriers:** Horizontal barriers shall be established over areas intended for covering such as floors, porches and other critical areas; application shall be made by a low pressure spray.

Apply the emulsion at the rate of 1 gallon per 10 square feet to dirt fill. If fill is washed gravel or other coarse material, apply the emulsion at the rate of 1½ gallons per 10 square feet.

Covering the treated area with a water resistant cover such as polyethylene sheeting will aid in protecting against soil wash out during heavy rainfall.

DO NOT USE A LOW PRESSURE SPRAY FOR AREAS INTENDED TO BE CRAWL SPACES; APPLICATIONS MUST BE MADE BY RODDING AND/OR TRENCHING.

**Vertical Barriers:** Vertical barriers shall be established around the base of foundations, plumbing, back filled soil against foundation walls, and other critical areas; applications shall be made by rodding and/or trenching.

Apply the emulsion at the rate of 4 gallons per 10 linear feet per foot of depth. For example, a footing 3 feet deep would require 12 gallons of emulsion per 10 linear feet.

Outside and inside perimeter applications must be made by rodding and/or trenching. When rodding from grade or from the bottom of a shallow trench, rod holes should be spaced in a manner that will allow for application of a continuous chemical barrier. Rod holes should not extend beneath the top of the footings.

A trench need not be wider than 6 inches. Rod from the base of a shallow trench to the top of the footings. Low pressure spray may be used to treat soil which will be replaced in the trench. Mix the emulsion with the soil as it is being replaced in the trench. Cover the treated soil with a layer of untreated soil.

Soil should be treated around sewer lines, plumbing or around any other utility extending from the soil through a slab.

For areas intended as crawl spaces, application must be made by rodding and/or trenching. Treat both sides of foundation and around all piers and pipes.

**Hollow Masonry Units of the Foundation**

Treat so as to make a continuous chemical barrier in the voids. Apply the emulsion at the rate of 2 gallons per 10 linear feet. Apply the emulsion so it will reach the footing.



© VELSICOL CHEMICAL CORPORATION, 1980

APPENDIX II (CONTINUED)

## POST CONSTRUCTION TREATMENTS

Mix one gallon of **C-100** in **95** gallons of water to produce a 1% water emulsion. Use a 1% water emulsion for subterranean termites.

Where necessary, use a 2% water emulsion for *Coptotermes spp.* For a 2% emulsion, mix two gallons of **C-100** in **95** gallons of water.

Post construction applications shall be made by sub-slab injection, rodding, trenching and low pressure spray.

Do not apply emulsion until location of heat or air conditioning ducts, vents, and water and sewer (or plumbing) lines are known and identified. Extreme caution must be taken to avoid contamination of these structural elements and airways.

Do not make a broadcast application of this product in a crawl space. Do not apply this product to the soil beneath a plenum air space.

Do not make injections of the emulsion into wood elements of construction.

### Slab-On-Ground

Apply the emulsion at the rate of 4 gallons per 10 linear feet. Application shall be made by sub-slab injection, trenching or horizontal rodding.

Treat the soil from grade to the top of the footing along the outside and, where necessary, along the inside of the foundation perimeter. Treatment may also be required along one side of a partition wall (especially where the wall is connected to the floor by fixtures inserted in the slab) and along cracks, expansion joints and other critical areas.

Drill holes should be spaced in a manner that will allow for application of a continuous chemical barrier.

Where necessary, drill through the foundation walls from the outside and force the chemical just beneath the slab or along the inside of the foundation.

Along the outside of the foundation walls where shallow foundations exist (1 foot or less), dig a narrow trench approximately 6 inches wide and not below the top of the footing. Apply the emulsion at the rate of 2 gallons per 10 linear feet. As the soil is being replaced into the trench, apply another 2 gallons per 10 linear feet to the backfill. Cover the treated soil with a layer of untreated soil. When making soil applications to the foundations extending deeper than 1 foot, follow instructions under: BASEMENTS—OUTSIDE PERIMETER. (See exception for monolithic slabs immediately following.)

Note: For monolithic slab construction a vertical barrier shall be established along the outside of foundation walls from grade to the bottom of the monolithic poured concrete foundation. Where the foundation extends deeper than one foot, rod holes should not extend beneath the bottom of the monolithic poured concrete foundation.

### Hollow Masonry Units of the Foundation

Treat so as to make a continuous chemical barrier in the voids. Apply the emulsion at the rate of 2 gallons per 10 linear feet. Apply the emulsion so it will reach the footing.

### Basements

Apply the emulsion at the rate of 4 gallons per 10 linear feet per foot of depth from the grade to the top of the footing. For example, a footing 3 feet deep would require 12 gallons of emulsion per 10 linear feet. Application shall be made by sub-slab injection, trenching and/or rodding.

### Inside

Treatment may be required along inside of foundation walls and along one side of interior partition walls (or bearing walls) especially where the wall is connected by fixtures inserted in the floor. Application may also be necessary around sewer pipes, floor drains, conduits or any cracks in the basement floor.

Drill holes should be spaced in a manner that will allow for application of a continuous chemical barrier.

### Outside Perimeter

Applications must be made by rodding and/or trenching. When rodding from grade or from the bottom of a shallow trench, rod holes should be spaced in a manner that will allow for application of a continuous chemical barrier. Rod holes should not extend beneath the top of the footings.

A trench need not be wider than 6 inches. Rod from the base of a shallow trench to the top of the footings. Low pressure spray may be used to treat soil which will be replaced in the trench. Mix the emulsion with the soil as it is being replaced in the trench. Cover the treated soil with a layer of untreated soil.

### Hollow Masonry Units of the Foundation and/or Basement Wall (below grade)

Treat so as to make a continuous chemical barrier in the voids. Apply the emulsion at the rate of 2 gallons per 10 linear feet. Apply the emulsion so it will reach the footing.

### Crawl Spaces

Apply the emulsion at the rate of 4 gallons per 10 linear feet per foot of depth from the grade to the top of the footing. For example, a footing 3 feet deep would require 12 gallons of emulsion per 10 linear feet. Application must be made by rodding and/or trenching.

Treat both sides of foundation and around all piers and pipes.

When rodding from grade or from the bottom of a shallow trench, rod holes should be spaced in a manner that will allow for application of a continuous chemical barrier. Rod holes should not extend beneath the top of the footings.

A trench need not be wider than 6 inches. Rod from the base of a shallow trench to the top of the footings. Low pressure spray may be used to treat soil which will be replaced in the trench. Mix the emulsion with the soil as it is being replaced in the trench. Cover the treated soil with a layer of untreated soil.

### Hollow Masonry Units of the Foundation

Treat so as to make a continuous chemical barrier in the voids. Apply the emulsion at the rate of 2 gallons per 10 linear feet. Apply the emulsion so it will reach the footing.

### RETREATMENT RESTRICTIONS

Retreatment for subteranean termites shall only be made when there is evidence of active termite infestation subsequent to the initial treatment, or there has been a mechanical break in the chemical barrier applied to the soil.

## STORAGE AND DISPOSAL

**Prohibitions**

Do not contaminate water, food or feed by storage, disposal or cleaning of equipment. Open dumping is prohibited.

**Pesticide Disposal**

Pesticide, spray mixture or rinsate that cannot be used or chemically reprocessed should be disposed of in a landfill approved for pesticides or buried in a safe place away from water supplies.

**Container Disposal**

For less than 30 gallons, triple rinse, and offer for recycling, reconditioning, or disposal in approved landfill, or bury in a safe place. For 30 gallons or larger, reseal container and offer for reconditioning OR triple rinse and offer for recycling, reconditioning or disposal in an approved landfill, or bury in a safe place.

**General**

Consult federal, state or local disposal authorities for approved alternatives.

### LIMITED WARRANTY AND LIABILITY

**NOTICE:** Read this Limited Warranty and Liability before buying or using this product. If the terms are not acceptable, return it at once unopened.

It is critical that this product be used and mixed only as specified on the label. The laws of a State may make some or all of this paragraph inapplicable or may give you rights in addition to your rights hereunder. Except to the extent prohibited by applicable law, the exclusive remedy of the user or buyer and the limit of liability of this Company or any other Seller for any and all losses, personal injuries or damages resulting from the use of this product, shall be the purchase price paid by the user or buyer for the quantity of product involved. Except to the extent prohibited by State law, there is no warranty, and this Company and other Sellers disclaim all liability for losses, personal injury or damages: (i) arising from any use of this product in a manner or for a purpose not recommended in its label directions, or from mixing this product before use with any substance except as recommended by the product's label, (ii) arising from handling or storage in violation of label instructions, (iii) for all indirect, special or consequential damages, (iv) when not reported to this Company within one year of discovery, and (v) arising from product not used within the label-designated shelf life or four years from the date of purchase, whichever first occurs. THERE ARE NO IMPLIED WARRANTIES AND NO WARRANTIES OF MERCHANTABILITY OR FITNESS

COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON, D.C. 20548

B-199618

AUGUST 5, 1980

The Honorable Douglas M. Costle
Administrator, Environmental
Protection Agency

Dear Mr. Costle:

SUBJECT: Need For a Formal Risk/Benefit Review of the Pesticide Chlordane (CED-80-116)

We have been reviewing the adequacy of the Environmental Protection Agency's (EPA's) regulation of pesticides used in and around the home. During our review we found that chlordane, a pesticide used for subsurface ground injection for termite control, may pose unreasonable risks to man and the environment. We believe EPA should initiate a formal risk/benefit review of chlordane's use for termite control to determine whether the pesticide's registered uses should be limited or canceled. Additionally, we believe EPA should determine whether the health of people living in certain types of homes treated with chlordane is adversely affected and work with other Federal agencies to take appropriate actions to reduce risk to public health.

PESTICIDE REGULATION

EPA is the primary regulator of pesticides. Its authority is contained in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. 136 et seq.), as amended and the Federal Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. 301 et seq.), as amended. Under FIFRA, a pesticide can generally not be sold, shipped, or delivered unless EPA has registered it. FIFRA further provides that EPA can only unconditionally register a pesticide if it determines, among other things, that the pesticide will perform its intended function without, causing

> "* * *any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."

The 1972 amendments to FIFRA require EPA to insure strict human health and environmental protection from

(089000)

pesticides. In 1975 EPA began a rebuttable presumption against registration (RPAR) process to weigh the risks and benefits of pesticides suspected of causing serious health or environmental problems.

A pesticide must meet certain "risk criteria," before it enters the RPAR process. These criteria (40 CFR 162.11) include short-term and long-term risk levels (whether a pesticide causes cancer or mutation in humans or laboratory animals) and whether an antidote or emergency treatment exists for those exposed to the pesticide. If EPA determines that a pesticide meets at least one of these criteria, it publishes a RPAR notice in the Federal Register announcing a risk/benefit review. Registrants who wish to maintain registration of an existing pesticide or applicants who wish to register the pesticide can then submit evidence rebutting the presumption. Rebuttals can be based on proof that actual exposure to the pesticide does not cause the effects described or that the study(s) supporting the presumption is not valid.

If the risk presumption is rebutted, EPA terminates the process and does not take regulatory action against the pesticide. If the presumption is not rebutted, EPA develops and gathers risk and benefit evidence for the RPAR pesticide. EPA uses this information for risk and benefit analyses. From these analyses, EPA determines risks associated with specific uses. If necessary, EPA develops regulatory options, such as cancellation or restricted uses, reduction of troublesome ingredients or problem contaminants, or new or revised methods of application, to reduce risk associated with the pesticide use. EPA also analyzes the costs of the various options. One, or several, of the options becomes the RPAR decision when approved by EPA's Administrator. Affected parties may appeal the decision through EPA's administrative hearing process, and then, if not satisfied, through the Federal court system.

## CHLORDANE'S HISTORY

Chlordane was introduced in 1945 and became one of the most widely used household and garden pesticides. It kills a wide variety of pests. In 1974 about 21 million pounds of chlordane were produced, about half of which was used to control termites and the remainder used for agriculture and home uses, such as controlling insects and crabgrass.

Studies by the National Cancer Institute, Department of Health, Education, and Welfare (now the Department of Health and Human Services), 1/ and other researchers showed that chlordane caused cancer in mice. Therefore, on November 18, 1974, EPA issued a notice of intent to cancel all registered uses of chlordane, except for subsurface ground insertion for termite control, its major use, and the dipping of nonfood plants (such as ornamental shrubs), a minor use. The notice stated that the excepted uses "achieve the desired control of insects without apparent unreasonable environmental contamination." According to EPA's Office of General Counsel, the decision to continue using chlordane for subsurface termite control was not based on a risk benefit review but was an administrative decision based on available information.

On December 23, 1974, the Velsicol Chemical Corporation, chlordane's manufacturer, filed objections to the notice and requested a public hearing. After lengthy cancellation proceedings, representatives for Velsicol and other parties involved in the proceedings, signed a "settlement agreement" in early March 1978, which canceled, either immediately or over 5 years, all chlordane uses except for subsurface ground insertion for termite control and the dipping of nonfood plants.

Although 21 million pounds of chlordane were produced in 1974, current information on chlordane's uses is not available because of confidentiality restrictions on production data. However, as a result of the 1978 settlement agreement, chlordane's major use according to EPA's technical product manager is for termite control by professional exterminators. Chlordane is also available to the public. The 1978 agreement allowed the public to continue using 1.5 million pounds annually for termite control, provided that chlordane products are distributed in minimum one-half

---

1/"Memorandum of Alert-The National Cancer Institute, Oct. 21, 1974." (Preliminary results showing carcinogenic activity in the livers of mice.) Final Report: "Bioassay of Chlordane For Possible Carcinogenicity," (DHEW Publication No. (NIH) 77-808, 1977).

gallon containers and labeled for termite use only. 1/ At the lowest formulation rate of 2 pounds of chlordane per half gallon, 750,000 half gallon containers could be sold to the public annually.

Although chlordane is presently the most widely used pesticide for termite control, other pesticides are also registered for this use. Additionally the Forest Service, Department of Agriculture, has developed alternative methods and pesticides for termite control which are being used on an experimental basis. We have not evaluated the relative risks of other registered or experimental pesticides. We noted, however, that three presently registered alternatives --aldrin, dieldrin, and heptachlor--are chemically related to chlordane and all three have also caused cancer in laboratory animals.

CONCERN ABOUT CHLORDANE CONTAMINATED HOMES

Since the early 1970s, the Air Force has had problems with chlordane contamination in military housing where chlordane has been used for termite prevention or control. The housing involved homes built on concrete slabs with heating ducts in or below the slab. According to EPA's General Counsel, EPA has been aware of some of the Air Force's chlordane problems but did not consider them in reaching the 1978 settlement agreement. EPA and others have also noted similar chlordane problems with plenum housing construction.

Chlordane contamination of housing is a serious matter because chlordane has been determined to cause cancer in laboratory animals and is a suspected human carcinogen. Also, neither EPA nor the National Academy of Sciences have been able to determine a safe chlordane exposure level in houses.

---

1/Chlordane in smaller containers is allowed for sale until stocks packaged before various cut-off dates are sold. After these products are sold, no new products will be allowed to be sold to the public in less than one-half gallon containers.

Air Force studies on
chlordane contaminated homes

The Air Force's first major chlordane problem surfaced in 1972. In response to an occupant's complaint of an unusual odor, the Air Force sampled four homes at the Wright-Patterson Air Force Base, Dayton, Ohio. The samples showed that chlordane was present on floors in each of the homes. Following further complaints of odors, in 1974 and 1975 the Air Force monitored chlordane levels in the indoor air of 566 homes (mostly new) at Wright-Patterson and 187 homes at six other Air Force bases. Included in the 187 were a control group of 22 homes which had not been treated with chlordane for termite control.

The Air Force took 774 air samples in the 753 houses--all homes were sampled at least once--and found more than trace amounts of chlordane in 62 percent of the air samples. Chlordane was not detected in the 22 control homes. Subsequently, the Air Force sampled the air in 800 new homes and found they all contained chlordane.

Complaints and monitoring data revealed widespread chlordane contamination at Wright-Patterson. Therefore, in October 1974, the Air Force sought comments from EPA on the toxicological significance of the chlordane levels in Wright-Patterson housing and assistance in setting standards for acceptable chlordane levels in family housing. According to an Air Force internal document describing initial contacts between Air Force and EPA personnel, EPA officials were primarily concerned with the suspected carcinogenic property of chlordane. Also, EPA officials indicated that no level of exposure could be considered safe for family housing.

At a November 1974 meeting between EPA and Air Force officials, including the EPA Assistant Administrator responsible for pesticide programs and the Surgeon General of the Air Force, EPA officials indicated they were primarily concerned with regulating future use of chlordane and not conditions resulting from past use. EPA was also concerned with the risk to the unborn baby and the nursing infant. EPA suggested mothers occupying these quarters should not breastfeed. Further, both groups agreed that the Air Force should eliminate additional and reduce existing levels of chlordane contamination. In 1979 the Air Force finished sealing air conditioning and heating ducts and installing new ducts above ground for the 800 new homes at Wright-Patterson at a cost of about $800,000.

The Air Force encountered a second chlordane problem in the fall of 1978. Residents of a housing unit at the Scott Air Force Base, Belleville, Illinois, detected objectionable odors during the start of the heating season. Subsequently, base personnel noticed a similar odor in an unoccupied unit. Both units had been chlordane treated for termites earlier that year.

Base personnel sampled the air in both units and found chlordane. They also sampled nine other houses which had been treated with chlordane during the previous summer and found widespread contamination.

In January 1979 Air Force Surgeon General officials expanded the air sampling at the base. The officials sampled the 11 original houses and 43 randomly selected houses which had been treated for termites in previous years, some about 14 years prior to the monitoring. The study showed that only one unit did not have detectable levels of chlordane.

In April 1979 the Air Force Deputy Surgeon General for Operations asked the National Academy of Sciences to evaluate the significance of chlordane exposure to persons living in Air Force quarters. In August 1979, the Academy said that it

> "* * *could not determine a level of exposure to chlordane below which there would be no biological effect under conditions of prolonged exposure of families in military housing."

The Academy recommended that the Air Force should, among other things, reduce chlordane exposure in contaminated housing by cleaning or sealing floors, walls, and other surfaces and modifying heating systems. The Academy also recommended that the Air Force perform an epidemiological study of the inhabitants of Air Force housing units involved in the 1974 and 1978 episodes and a smaller one in 1970. The purpose of the study would be to determine whether occupants suffered any acute or chronic health effects from their exposure to the chlordane. As of May 1980, the Air Force had begun cleaning and modifying contaminated homes and was considering the recommendation for a study.

In a May 19, 1980, memorandum to Department of Defense housing officials, the Deputy Assistant Secretary of Defense (Installations and Housing) prohibited the use of chlordane

for buildings with subslab or intraslab ducts. The prohibition applies both to pre-construction soil treatment and post-construction soil treatment.

The memorandum stated that chronic human exposure to chlordane may present a health hazard and that no sure way is available to use chlordane under buildings with subslab and intraslab ducting and prevent the entry of chlordane vapor into the interior of such buildings. In geographic locations where subterranean termite infestations are known to exist, the Deputy Assistant Secretary specifically prohibited the use of subslab or intraslab ducts in any new buildings for which construction contracts had not been let. Furthermore, he ordered that any such buildings now under design or construction be modified to remove subslab or intraslab ducts.

The Deputy Assistant Secretary also directed that where the risk and extent of possible termite damage in existing structures is considered unacceptable, because of the prohibition on the use of chlordane, studies should be undertaken to determine the feasibility of sealing subslab or intraslab ducts and renovating heating and cooling systems to use aboveground/above slab ducts.

## Plenum housing construction may also allow chlordane contamination

In addition to housing constructed on slabs with air ducts encased or under the slab, another type of construction may also allow chlordane applied to the subsoil to enter the house. Commonly referred to as plenum housing or plen-wood construction, this type of construction uses the area under the subfloor (the crawl space) as a heat-cooling duct. The National Pest Control Association estimates that 12,000 plen-wood houses were built in 1978.

EPA has conducted limited monitoring (12 homes, 1 experimental house, and 1 office building) of plenum structures where the subsoil was treated for termite control. Chlordane and related chemicals were found in the indoor air. During a 1975-1976 review of the Department of Housing and Urban Development's (HUD's) Minimum Property Standards including plenum type home construction, the Forest Service also found that preconstruction soil treatment for termite control, as well as remedial treatment, could create problems. The subsequent February 1977 report noted that, where used under slab foundations with unencased ducts below the slab,

termite control chemicals "are introduced into the living quarters, sometimes in such quantities that the occupants become ill." Therefore, the Forest Service recommended to HUD that in high and moderate termite hazard zones, the heating ducts be encased in concrete. This action would restrict the use of plenum construction.

The National Pest Control Association has also recognized the problem of potential contamination of plenum constructed housing. On December 20, 1979, the association advised its members not to treat plenum housing for termite control with presently registered pesticides, including chlordane, because of evident problems with vapors entering housing areas.

POTENTIAL NATIONWIDE HOUSING CONTAMINATION PROBLEM

In July 1975 the Air Force notified HUD that measurable airborne chlordane levels were found in housing treated for termite control. As noted previously, the Air Force traced the contamination to chlordane used under the floor slab. Because Air Force housing is constructed in accordance with HUD minimum property standards, the Air Force recommended that HUD reevaluate its minimum property standards for termite treatment.

We contacted HUD officials to determine (1) the number of civilian homes which may be susceptible to chlordane contamination because of the type of construction used and (2) the action taken in response to the Air Force's recommendation for a reevaluation of HUD's minimum property standards for termite control. A HUD official responsible for architecture and engineering standards told us that HUD had not initiated any studies or actions on the Air Force recommendation other than a general study with the Forest Service about wood protection from termites and other pests. This official and a HUD research official stated that they did not determine the number of homes nationwide which may be susceptible to chlordane contamination because of the type of construction used.

To determine the magnitude of this potential problem nationwide, we tried to obtain estimates on the number of homes built on slabs with heating ducts in or under the slab, as well as the number of plenum constructed homes. We also tried to determine the number of homes which would have been treated for termites. While we were not totally successful,