# TOXICOLOGY

## HUMAN EXPERIENCE

Chlordane is a very persistent, non-systemic stomach and contact insecticide. It is non-phytocidal at insecticidal concentrations. It is readily absorbed from the gastrointestinal tract, the respiratory tract and percutaneously. It is stored in the fat, the maximum levels being attained about five days after the beginning of daily doses. There is also some accumulation in glandular tissue. Chlordane is removed fairly rapidly from the fat with very little being detectable 20 days after cessation of exposure. (Clark, 1969) It is a central nervous system stimulant whose exact mode of action is unknown but it may involve microsomal enzyme stimulation. Animals poisoned by chlordane and related indan compounds - aldrin, dieldrin, endrin, and heptachlor - show an extremely marked loss of appetite and neurological findings(Sax, 1969); (Dreisbach, 1971).

The fatal dose for man is unknown though the fatal oral dose has been estimated to be between 6 and 60 grams. One person receiving an accidental skin application of a 25% solution - about 30 grams of technical chlordane - developed symptoms within 40 minutes and died before medical attention could be obtained. (Sax, 1969); (Hayes, 1963).

Aldrich, F.D., et. al.(1969) and Curley, et. al. (1969) reported on acute intoxication from the ingestion of single doses. The actual dose ingested was unknown. Summarized these cases showed that vomiting may or may not occur. Convulsions commonly occur and may occur within 30 or 45 minutes. Convulsions may be clonic in type, recurrent, intermittent; they may occur at 4 - 5 minute intervals and may last 1 to 5 minutes. There was coordination loss, hyporeflexia and increased excitability. Electroencephalograms 24 hours after exposure, 48 hours post-exposure and 26 days later were reported as normal. This is unlike post-exposure electroencephalograms from patients suffering from dieldrin and endrin intoxication where electrical activity may be

abnormal for months after exposure. All usual clinical laboratory tests were not revealing. In one patient the rate of serum chlordane decline was non-linear. During the first three post-ingestion days, the chlordane fell from 3.4 to 0.138 ppm. At 130 days, the serum concentration was 0.03 ppm. In one case, urine concentrations of chlordane were high but fell rapidly to 0.05 ppm on the third day but a sample on the 40th day revealed a rise to 0.13 ppm. Serum half-life in this patient was found be to approximately 88 days in contrast to an earlier report of 21 days. (Dadey, 1953); (Spiotta, 1951); (Hoogendam, I., et. al. 1965).

In the Medical Journal of Australia, Barnes (1967) described the only case in man, to the knowledge of this reviewer, which might be considered "chronic" chlordane poisoning with intermittent acute episodes. The subject was a married male 47 years of age who managed his own nursery growing a wide variety of trees, shrubs and seedling flowers for sale. His only previous significant illness was an attack of pleurisy in December 1961. His family history was essentially negative.

He regularly used the following insecticides in his work: (1) DDT, (2) chlordane, (3) hormone sprays and (4) arsenicals. Realizing the potentially hazardous nature of chlordane, he was particularly cautious when mixing the concentrate to make up the 1% or 2% solution. He refused to use a knapsack sprayer because he considered it to be too hazardous. Instead the diluted chlordane was applied to the seed beds by means of a watering can. Chlordane was used mainly to control the mole cricket. A surface area of more than half an acre was treated on two or three occasions.

In June 1962 he developed a tingling sensation of the right hand which spread slowly up the arm leaving a feeling of weakness. After a week or two

the tingling feeling was followed by twitching of the hand and which then extended up the right arm. These attacks lasted for several minutes. He had several such episodes and then the "shaking of the arm spread to include the right foot." There was also numbness of the face. In all, he suffered approximately two similar attacks weekly over a two month period. He did not seek medical assistance.

One night in August 1963 soon after going to bed, he had a convulsive seizure, described by his wife as starting with a loud cry, followed by "catching of his breath" and strong spasms of the body that shook the bed for several minutes. After the spasms he was unconscious for about ten minutes. A physician was called. The patient was given an injection but became very nauseated and vomited shortly afterwards. A tentative diagnosis of "toad stool" poisoning was made because a meal of mushrooms had been consumed that evening.

The patient was admitted to a hospital but appeared completely well the following morning and was allowed to go home. However, four days later he suffered a second similar convulsive episode lasting for several minutes which was also observed by his wife. The patient was again admitted to the hospital for investigation of the possibility of epilepsy or a cerebral neoplasm. A lumbar puncture, complete blood examination, x-ray studies of the chest, bones and skull and an arteriogram through the left common carotid artery all gave negative results. After being hospitalized for one month and having suffered no more seizures he was discharged with the tentative diagnosis of ideopathic epilepsy.

An electroencephalogram a month later showed a generalized dysrhythmia with no localizing features. There were no asymmetries or focal abnormalities

and the electroencephalogram was not suggestive of a neurotoxic substance. (As is stated elsewhere in this review, this finding is typical of chlordane intoxication. In fact the electroencephalogram, after a convulsion resulting from chlordane intoxication, may be entirely within normal limits.)

In August 1963, a third major seizure occurred, with tonic and clonic spasms and loss of consciousness. The patient was again admitted to the hospital and previous laboratory and x-ray studies were repeated. At this time a ventriculogram was performed and an electroencephalogram was repeated. All tests were within normal limits.

Finally a house physician re-examined the patient's occupational history. In addition to the information presented above, it was determined that the man spent much time replanting seedlings which had been uprooted by the mole cricket, transplanting seedlings from one bed to another and generally handling the soil in the seed beds almost daily. This had occurred for a period of two years before his third admission to the hospital.

He ceased using chlordane after his discharge from the hospital. One year later his electroencephalogram was within normal limits. A year later another electroencephalogram was again within normal limits.

This case demonstrates how a workman can realize the hazardous nature of a chemical he is using, take extreme care in mixing and applying the material but fail to appreciate that the soil and plants he has sprayed and is handling almost daily has high concentrations of the chemical. It also demonstrates the extreme hazard of percutaneous absorption.

The fact that the patient was a fairly heavy pipe smoker, and always rubbed the tobacco well between his palms before filling the pipe, could have led to some inhalation of chlordane, as well as to dermal absorption via the hands.

In another case also reported in the Medical Journal of Australia, a patient had used chlordane virtually every day for a period of ten weeks or more in an attempt to control ants at his home. He had sprayed around the house three or four times in that period and had sprayed inside some of the rooms. The affected person was an engineer by profession and was 35 years old.

He used chlordane, one teaspoon to a pint of water -- which is approximately 0.5% final concentration -- in a continuous hand spray apparatus. Insecticide was used for a period of ten weeks, as described above, at an average rate of one pint per day usually in the evenings. The spray gun used produced a relatively fine mist. All around the outside of the house was sprayed three or four times during the period under discussion. Fences were also sprayed, sometimes at head level, but mainly downwards. Inside the house three rooms, one of them being the bedroom, were similarly treated at floor level to a distance of about six inches out from the walls. In addition to this, the patient sprayed around the sink in the kitchen as well as in the lower cupboards. In the latter instance he took care to keep his head outside the confined space. The smell of insecticide was noticeable throughout all this work. (As noted elsewhere in this review, chlordane is ordorless. The odor reported here was that of the petroleum distillate vehicle.) The patient admitted that skin contamination occurred at various times but was uncertain of the extent. It is not known just how much chlordane was inhaled or absorbed through the skin during the application. No analyses were made on subcutaneous fat.

On the day when the patient became ill he had worked very hard in his garden. He had last sprayed two days before. After a hot dinner he became

laboratory tests were essentially within normal limits. A lumbar puncture was performed and the spinal fluid was not remarkable.

Subsequent to his discharge from the hospital after approximately three weeks, mild tingling persisted in the hands and feet. By the eighth week he considered that he was back to normal health.

The symptoms and findings were attributed to exposure to the chlorinated hydrocarbon, chlordane. (Selby and Jones, 1960).

Bell and Jones (1958) describe an "epidemic" following fumigation with dichlorethyl ether and chlordane in a country clothing factory in New South Wales, Australia. In order to counteract the effects of a borer infestation, an experienced pest exterminator was engaged to spray the wooden foundation beams of the building. A mixture of 12% dichlorethyl ether- 2% chlordane dissolved in kerosene was used. The first ingredient vaporizes quickly and exerts an immediate toxic effect; chlordane, due to its residual properties, minimizes the likelihood of reinfestation.

The factory was a single story building and had a floor area of approximately 18,000 square feet. Individual manufacturing sections were separated by partitions eight feet high. The building was adequately ventilated by numerous windows but because of prevailing blizzard conditions, windows were closed while spraying was in progress.

Between 21 June and 25 June 1956, 60 gallons of the insecticide were handsprayed. Pressures varied between 30 and 35 pounds per square inch. As a result of difficulty in reaching some of the affected timbers, it was not possible on successive nights to spray areas of equal size. The highest quantity used per single session was 20 gallons. During the final spraying eight factory employees were working overtime until 10:00 p.m. One was

affected several days later. At no time was the pest control operator ill. About mid-day of 25 June 1956 a young girl, age 19 years, working in the marking room, complained of a mild skin irritation of the chest and face. Later she fainted and, on recovery, was sent home by taxi. Within a few hours two other workers were also affected. The next day, about noon, another girl fainted. The ambulance was summoned and after the driver had been inside the factory for a short time he complained of an odor and then collapsed.

Within a short space of time twelve more employees were affected. Others developed a slight rash on the exposed skin. Within a period of eleven working days, 55 employees out of a total of 166 were affected to a greater or lesser degree. Those affected were away from work for a total of 218 days.

An investigation was launched by a doctor and a scientific officer of the Division of Industrial Hygiene. During the five hours of their investigation neither were adversely affected.

In order to exclude the possibility of carbon monoxide poisoning from 40 suspended "gas-radiators" used to heat the factory, several tests were made while the heaters were operating and windows and doors had been purposely kept closed. Carbon monoxide concentrations in the workroom did not exceed acceptable limits.

The factory atmosphere was also sampled at multipoints for the presence of organic chemical compounds. "Both series of tests gave negative results and it was clear that there was no toxic agent persisting in the factory atmosphere. It was, however, possible to detect a slight odour of kerosene." Apart from using slightly larger quantities of the insecticide, the methods used at the factory did not differ from the common practices of most other

operators when fumigating private dwellings. The signs and symptoms of those affected were primarily initial local irritation. The eyes and skin were chiefly affected and there was transient flushing or mottling of the skin. Other employees were developing, or had just had, a respiratory infection which was then prevalent in the community. It was not clear why the state of mass anxiety developed. Many employees complained of "palpitations", "pins and needles", "hot and cold shivers", "weeping dizziness", "shakes", or "a weak feeling all over." One stated "I saw all the others faint and I just fainted too."

Five physicians who attended the affected employees were interviewed; four agreed that many of the symptoms could be explained on the basis of mass anxiety or group hysteria.

Kadis, et. al. (1970) reported on the insecticide levels in human tissue of Alberta residents. The levels of chlordane insecticide residues (from diet and environment) found in adipose tissue, liver, kidney, brain, and gonad tissue were obtained from the general population of Alberta. The results calculated on extractable lipid basis indicate that insecticide storage in tissues occurred generally in the following order from highest to lowest concentrations: adipose tissue, liver, kidney, gonad and brain. The mean storage level, calculated on a weight basis, of total DDT and related compounds found in adipose tissue of the Alberta population was 4.34 ppm. No correlation was evident between the insecticide residue levels and the age of the individual. No significant differences were observed in the mean storage level on males and females. No residue of compounds such as endrin, chlordane, toxaphene, or chlorinated biphenyls were detected in the specimens analyzed during this investigation.

Deichmann (1972) made similar studies in Dade County, FL.

Rachmilewitz (1970) states that chlordane has been associated with the development of aplastic anemia in man.

In the Bulgarian literature, Dikova and Kruster (1972) state that it has been suggested that the increased incidence of hepatitis in humans at present is due to excessive agricultural application of organochlorine insecticides such as DDT, lindane, aldrin, dieldrin, chlordane, and BHC.

EXPERIENCE IN

INDUSTRY AND HUMAN HABITATIONS

Since its introduction into commerce in 1946, the industrial experience with chlordane, both manufacturing and agricultural application, must be described as good. Princi and Spurbeck (1951) studied 34 workers employed in various areas of a plant producing chlordane. Of the 34 only 22 were directly engaged in production processes. The average age was 32.6 years and the average duration of employment was 28 months. Complete physical and laboratory examinations were conducted. Air samples were collected in the work areas and analyzed. The analyses were reported as mg/m$^3$ for all chlorinated hydrocarbons calculated as aldrin. Thus these concentrations can not be applied to a situation where only chlordane is of concern. Princi and Spurbeck state, "We do feel it reasonable to assume that under present conditions of formulation and use, chlordane, aldrin and dieldrin will not produce measurable harmful effects among persons who are continuously exposed to concentrations which are encountered under ordinary conditions of use." They caution, however, that "All ordinary precautions should be continued, however, to prevent excessive accidental exposure and skin absorption." (emphasis added)

Fishbein, et. al. (1964) also studied a group of workers who had been employed in the manufacture of chlordane for periods varying from one to fifteen years; there were a total of 15 employees. Ten were engaged in the actual manufacturing process. Those employees engaged in the packaging process probably had the greatest exposure in the opinion of the authors. Examinations included complete physical examinations; laboratory tests included liver function studies. Chest x-rays and electrocardiograms were included. Repeated air sampling was conducted and chlordane concentrations were determined by electron capture gas chromotography. The results were

as follows:

| Sample Location | Chlordane Concentration |
|---|---|
| 2 feet above floor in chlordane building | 1.3 µg/m$^3$ |
| same as above | 1.2 µg/m$^3$ |
| 8 feet above floor 6 feet N.W. of draw-off | 1.7 µg/m$^3$ |
| small table at draw-off | 1.4 µg/m$^3$ |

The authors point out that it is important to note that the liver function tests were normal in all instances, that there were no manifestations of any nervous system disturbances or gastrointestinal or kidney disorders. They conclude that "Since the exposure of these workers is greater than may be expected in the use of chlordane in the quantity and manner recommended and since they showed no signs or symptoms of toxicity, it may be stated that there is little, if any, hazard from the use of chlordane when properly employed." (emphasis added)

However, with respect to the contamination with chlordane of family housing units at Wright-Patterson AFB OH, it is important to point out that air concentrations of chlordane in these housing units are of the same order as those reported above for an industrial plant. Some of these chlordane air concentrations are as follows:

| Date | Address | Sample Location | Concentration µg/m$^3$ |
|---|---|---|---|
| 13 Apr 73 | 309 Mosby Lane | Living room at davenport | 1.2 |
| 13 Apr 73 | 309 Mosby Lane | Living room at TV | 1.1 |
| 13 Apr 73 | 309 Mosby Lane | Kitchen | 0.3 |
| 11 Sep 74 | 118 Welcome Way | Unreported | 5.5 |
| 11 Sep 74 | 118 Welcome Way | Unreported | 8.5 |
| 11 Sep 74 | 118 Welcome Way | Unreported | 4.6 |
| 10 Sep 74 | 120 Welcome Way | Unreported | 2.9 |
| 10 Sep 74 | 120 Welcome Way | Unreported | 4.7 |
| 22 Jul 74 | Unreported | Unreported | 6.4 |

| Date | Address | Sample Location | Concentration $\mu g/m^3$ |
|---|---|---|---|
| 22 Jul 74 | Unreported | Unreported | 4.4 |
| 22 Jul 74 | Unreported | Unreported | 9.5 |
| 22 Jul 74 | Unreported | Unreported | 8.5 |
| 4 Apr 74 | 309 Mosby Lane | Upstairs bathroom | 5.3 |
| 28 Sep 74 | 120 Welcome Way | Downstairs furnace room | 4.1 |
| 28 Sep 74 | 120 Welcome Way | Upstairs bathroom | 6.8 |
| 28 Sep 74 | 120 Welcome Way | Downstairs bathroom | Trace |

(NOTE: Detection Limit = 0.2 $\mu g/m^3$)

Malina, et. al. (1959) studied the concentrations of chlordane in the air of human habitations previously treated for insect control. When chemicals are used for the control of household pests, the question always arises as to whether vapors or dust may be present in the air of the treated home at some time subsequent to the application. Malina, et. al. developed a method of analysis sensitive in the microgram (gamma) range to answer this question. The air from five homes commercially treated for residual control of termites was analyzed. Sampling was conducted one to six months after application. The method of sample collection and final analysis are fully discussed in this paper. The gas chromatographic method of final estimation was very similar to that used for the analysis of samples collected at Wright-Patterson AFB OH housing areas though more sophisticated and sensitive chromatographs employing electron capture detectors were used. Five homes commercially treated with chlordane for termite control were studied. These homes were located in Georgia, South Carolina and Arkansas. The homes were of two basic types of construction: (1) built directly on the top of a concrete slab, and (2) built on a foundation and piers with a crawl space between the ground and flooring. The chlordane was applied by commercial pest control operators following the methods of the US Department of Agriculture Forest Service. Water emulsions at a concentration of 1% chlordane were used. The

results presented in the following table and quoted from the paper of Malina, et. al. are as follows:

AIR FROM HOMES TREATED WITH CHLORDANE FOR TERMITE CONTROL

| Type Home | Location | Date Chlordane Applied | Days After Application | Chlordane γ/Liter |
|---|---|---|---|---|
| Slab | Savannah GA | 9-22-55 | 106 | 0.000 |
| Slab | Aiken SC | 5-24-56 | 12 | 0.000 |
| | | | 47 | 0.000 |
| | | | 83 | 0.000 |
| | | | 131 | 0.000 |
| Crawl space | Savannah GA | 9-15-55 | 112 | 0.000 |
| Crawl space | Aiken SC | 4-19-56 | 48 | 0.006 |
| | | | 82 | 0.000 |
| | | | 117 | 0.000 |
| | | | 166 | 0.000 |
| Crawl space | Hot Springs AR | 12-1-55 | 126 | 0.000 |
| | | | 126 | 0.040 |

(NOTE: γ/l = μg/l)

Based on this study it would appear that when properly applied and in the absence of unusual factors such as a high ground water table or very poor subsurface drainage, chlordane concentrations in the room air of human habitations would normally present no inhalation hazard to occupants. Work done by Davidow (1950), Ingle (1952), Princi (1951), on the toxicity of chlordane vapors to man and other warm blooded animals (DeLong 1954; Nickerson, et. al. 1951a; and Nickerson, et. al. 1951b) indicates that at concentrations of 1γ (μg) to 2γ (μg) in air show no toxic effects.

The Threshold Limit Value, American Conference of Governmental Industrial Hygienists, 1974, is 0.3 $mg/m^3$. The following quotations are provided relative to TLVs:

"Threshold limit values refer to airborne concentrations of substances and represent conditions under which it is believed that nearly all workers may be repeatedly exposed day after day without adverse effect. Because of

wide variation in individual susceptibility, however, a small percentage of workers may experience discomfort from some substances at concentrations at or below the threshold limit, a smaller percentage may be affected more seriously by aggravation of a pre-existing condition or by development of an occupational illness."

"Simple tests are now available (J. Occup. Med. 9:537, 1967; Ann. N.Y. Acad. Sci., 151, Art 2:968, 1968) that may be used to detect those individuals hypersusceptible to a variety of industrial chemicals (respiratory irritants, hemolytic chemicals, organic isocyanates, carbon disulfide). These tests may be used to screen out by appropriate job place the hyper-reactive worker and thus in effect improve the 'coverage' of the TLVs."

"Threshold limit values refer to time-weighted concentrations for a 7 or 8-hour workday and 40-hour workweek. They should be used as guides in the control of health hazards and should not be used as fine lines between safe and dangerous concentrations. (Exceptions are the substances listed in Appendices E and F and those substances designated with a 'C' or Ceiling Value, Appendix D.)"

"Time-weighted averages permit excursions above the limit provided they are compensated by equivalent excursions below the limit during the workday. In some instances it may be permissible to calculate the average concentration for a workweek rather than a workday."

"In spite of the fact that serious injury is not believed likely as a result of exposure to the threshold limit concentrations, the best practice is to maintain concentrations of all atmospheric contaminants as low as is practical."

"These limits are intended for use in the practice of industrial hygiene and should be interpreted and applied only by a person trained in this discipline. They are not intended for use, or for modification for use, (1) as a relative index of hazard or toxicity, (2) in the evaluation of air pollution nuisances, (3) <u>in estimating the toxic potential of continuous, uninterrupted exposures</u>, (4) as proof or disproof of an existing disease or physical condition, or (5) for adoption by countries whose working conditions differ from those in the United States of America and where substances and processes differ." (emphasis added)

There is also a "Skin Notation" for chlordane indicating that there is ".... a potential contribution to the overall exposure by the cutaneous route including mucous membranes and eye, either by airborne, or more particularly, by direct contact with the substance."

Thus while TLVs can be and should be applied to the concentration of chlordane in the workroom air, they can not and must not be applied to concentrations of family housing units where for women and young children the exposure is essentially continuous - 24 hours per day seven days per week.

The reviewer is well aware that lengthy presentations of a paper or papers are not normally included in a review of the literature. However, in the case of the contamination of human habitations by chlordane emulsions used to control termites, the reviewer knows of no other paper which presents in detail the methods used to initially evaluate the problem, the steps taken to assess its magnitude and the procedures employed to decontaminate the quarters. For this reason the contamination with chlordane [redacted] and the decisions made will be clear and easily understood.

The use of the allowable daily intake (ADI) of the World Health Organization and the Food and Agriculture Organization of the United Nations as the basic value upon which many calculations were made is explained. Based upon these calculations, far reaching and sometimes unique decisions and recommendations were made.

In the construction of housing units on prepoured concrete slabs, it is common practice to treat one of the sub-slab layers, either pea gravel or compacted soil, with a persistent organochlorine pesticide such as chlordane prior to the construction of the house. However, if pre-construction "soil sterilization" is not practiced, then termite damage may occur at a later date.

In the latter case, a standard procedure for termite control is to remove all physical evidence of termite damage and repair or replace wood or other cellulosic structural components as necessary. This is followed by sub-slab injection of chlordane to sterilize the soil in which the subterranean termites live. In certain instances the poured concrete slab may contain a number of three inch diameter fiber-board ducts for the dispersal of warm air from an inverted plenum at the furnace.

The sub-slab injection of chlordane is accomplished by drilling a number of 3/8 inch holes through the slab in the region of termite damage. The positioning of the holes is determined by using engineering drawings and allowing a minimum clearance of three inches from the depicted duct location. Through each of these holes, approximately 15 gallons of a 2% water emulsion of chlordane is injected under 200 psi pressure.

In the cases of two houses treated as described above, it became apparent some hours later that the chlordane emulsion had been injected into one or more ducts. About four - five hours after treatment the thermostat-controlled furnaces "came-on" and the odor of the vehicle -- usually a "kerosene-like" hydrocarbon -- became very intense. Subsequently, the quarters were evacuated and an extensive study of the events and required actions began.

CHLORDANE RESIDUES IN GOVERNMENT QUARTERS
(Callahan, 1970)

A. Measurement of Chlordane Contamination

1. Personnel from the USAF Environmental Health Laboratory, Kelly AFB TX visited Webb AFB TX 25-27 Apr 1970. The following data were collected during that period, or where indicated, by the Military Public Health personnel, Webb AFB, subsequent to these dates. The following techniques were used to collect and analyze these data.

2. A Varian Aerograph Gas Liquid Chromatograph (GLC), Model 660, equipped with a tritium foil electron capture (EC) detector was used in all on-site analyses. A 5 ft 1/8" stainless steel column packed with 10% DC-200 on 100-110 mesh Chromosorb/W was used on the initial analyses. Temperature parameters were injector 220, column 200, and the detector 210°C.

3. Over 200 residue samples were taken from various surfaces by wiping within a 15 square inch (5X3) template. Samples from painted surfaces (walls and ceilings) were taken by thorough wiping within the template using a cotton ball dampened with hexane or petroleum ether. On furniture surfaces, samples were taken using dry cotton swabs. Care was taken to wipe each surface at least four times with each of two swabs. The swabs were composited.

4. Air samples were taken by drawing ambient air through two serially aligned impingers containing hexane at one liter per minute. Air flow varied between ducts and also across individual ducts. Estimates of the air flow per duct were made by dividing each duct into thirds, measuring the flow in each third and averaging the measurements. Flow measurements were made with an Anemotherm, Model 60, flow meter prior to removing the cardboard liners of the ducts.

5. Chlordane was extracted from the collecting cotton by saturating the cotton with hexane and squeezing dry. On samples run 25-27 April, the volume of hexane was measured and the chlordane was roughly quantitated (±10%) because the DC - 200 column did not completely separate the various chlordane constituents. This column had the advantage of taking only ten minutes versus twenty minutes or more for each chromatogram. On this survey, numbers of samples were considered more important than fine accuracy.

6. More detailed analysis were made of wall, air, and clothing samples using a 6 ft ¼" column packed with 5% QF-1 in a Micro-Tek Model 220 GLC instrument equipped with a 63Ni EC detector on subsequent dates. Instrument conditions were identical to those cited by Thompson et. al. (1969) whereby concentrations were quantitated by comparing the height of peak #3 to that of a technical chlordane standard.

B. Chlordane Residues in Ambient Air

1. Flows from the ducts varied between registers and also varied greatly across each register. The chlordane delivered to each room was equal to the product of the concentration of chlordane/$m^3$ X $m^3$ air/unit time delivered by the ducts in that room + vapors entering the room through doors. Table I is a compilation of air flow measurements and concentrations of chlordane measured from the various ducts before and after cleaning.

2. Flow variances across individual registers caused the amount of chlordane, the velocity of the air, and air temperature to vary on all planes at a given distance above each heating register. Table I indicates that the stripping of cardboard duct liners immediately lowered the chlordane delivery by the ducts from 48 - 82%. Figure 1 indicates that the three ducts showing the largest initial reductions, 5, 1, and 4 respectively,

TABLE I

Airborne Concentration of Chlordane in Forced Air Ducts

| Duct No.†† | Cu Ft/Min($M^3$/min) Qtrs 57B | Cu Ft/Min($M^3$/min) Qtrs 53A | Initial* Conc mg/$M^3$ 57B | Initial* Conc mg/$M^3$ 53A | Initial* µg/min Before Cleaning 57B | Initial* µg/min Before Cleaning 53A | mg/$M^3$** 1 day† Post Cleaning 53A | µg/min** 1 day† Post Cleaning 53A | mg/$M^3$** 18 days† Post Cleaning 53A | µg/min** 18 days† Post Cleaning 53A | % Reduct 1 day Post Cleaning | % Reduct 18 days Post Cleaning |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 24(0.68) | 12(.34) | 1.14 | 1.06 | 770.0 | 360.4 | 0.37 | 125.8 | 0.034 | 11.5 | 65.1 | 96.8 |
| 2 | 10(.28) | 24(.68) | 0.80 | 0.84 | 224.0 | 571.2 | 0.44 | 299.2 | 0.058 | 39.4 | 47.6 | 93.1 |
| 3 | 17(.48) | 30(.84) | 0.92 | 0.84 | 441.0 | 705.6 | 0.37 | 310.8 | 0.066 | 55.4 | 55.9 | 92.1 |
| 4 | 9(.25) | 17(.48) | 1.10 | 0.80 | 275.0 | 384.0 | 0.31 | 148.8 | 0.059 | 28.3 | 61.2 | 92.6 |
| 5 | 7(.20) | 9(.26) | 0.96 | 1.58 | 192.0 | 410.8 | 0.292 | 75.9 | 0.180 | 46.8 | 81.5 | 88.6 |
| 6 | 12(.34) | 15(.43) | 1.02 | 1.00 | 346.8 | 430.0 | 0.41 | 176.3 | 0.056 | 24.1 | 59.0 | 94.4 |
| 7 | 21(.60) | 11(.31) | 0.80 | 1.20 | 480.0 | 372.0 | 0.68 | 210.8 | 0.058 | 17.9 | 43.3 | 95.2 |

*In both houses ducts had been drained and rinsed with $H_2O$, some liner was removed in Qtrs 57B prior to these measurements.

**Cardboard liners removed, concrete surface swabbed with trichloroethylene soaked rags and blown out with hot air.

†Qtrs 57-B cleaning not accomplished.

††Refer to floor plans.

FIG. 1

Qtrs 53 A




GENERAL ROOM AIR SAMPLE TAKEN IN LIVING ROOM, HEATER ON, DOORS AND WINDOWS OPENED 0.25 Mg/M³

GENERAL ROOM AIR SAMPLE TAKEN IN LIVING ROOM, HEATER OFF, DOORS AND WINDOWS CLOSED 0.85 Mg/M³

| DUCTS | MEAS. CONC. (Mg/M³) BEFORE ATTEMPTED CLEANING | MEAS. CONC. (Mg/M³) AFTER ATTEMPTED CLEANING |
|---|---|---|
| 1 | 1.06 | 0.37 |
| 2 | 0.84 | 0.44 |
| 3 | 0.84 | 0.37 |
| 4 | 0.80 | 0.31 |
| 5 | 1.58 | 0.29 |
| 6 | 1.00 | 0.41 |
| 7 | 1.20 | 0.68 |

were either comparatively straight or were short. Percent reduction was apparently independent of residue concentration and is probably an indication of the success in removing the cardboard.

3. This variability coupled with the number of samples analyzed make quantitative analyses of the chlordane content of each room, wall, or house impossible. Such an estimate would require many hundreds of analyses and were considered beyond the needs of the USAF.

4. Note that before these samples were taken the heating units were removed, the ducts were rinsed with water and in Qtrs 57-B the cardboard liners were partially removed. These "initial" values were therefore substantially lower than the values actually delivered immediately after contamination.

5. Eighteen days after the cardboard liners were removed the ducts of Qtrs 57-B, although reduced 89 - 97%, were still emitting about 60 $\mu g/m^3$ of air (Table I). Obviously, additional action was needed. On 14 Apr 70 a protocol for further cleaning the ducts was provided. Two alternative courses of action were: (a) replace the heating ducts, or (b) clean heating ducts with trichloroethylene (TCE).

6. It was possible to isolate one or two ducts from the rest of the heating system of Qtrs 53-A, allowing a test of the cleaning technique to be accomplished on two ducts alone. This test established that at least one duct (Fig 1 #1) is not completely enclosed with cement but is open at the bottom. The TCE therefore ran into the fill under the slab and could not be retrieved. This cleaning technique was abandoned since other ducts were likely to share the same faulty construction and complete removal of TCE under such conditions was not assured. It is interesting to note that

TCE cleaning was successful in removing chlordane from the ducts. Cardboard lined ducts in contact with sub-slab fill are extremely vulnerable to termite infestation.

C. Patterns of Chlordane Disposition on Surfaces

1. A sufficient number of samples were not taken to quantitate the chlordane residues within the house. Sufficient analyses were made to indicate residue patterns. Figure 2 is a three dimensional view of the living room of Qtrs 57-B. The air intake is approximately 15 ft up the hallway to the left of the room. The view is looking at the north wall, (west wall to the left, east wall to the right, see Figures 3 and 9). Table II lists the distribution of chlordane on walls and ceilings for Qtrs 57-B. Table III lists similar data for Qtrs 53-A.

2. Several things are readily apparent from these figures:

a. Chlordane levels decline rapidly as one proceeds horizontally from the ducts.

b. The greater the contact with contaminated air the higher the residue.

c. Windows have many times the residues as similarly exposed walls. This increase is due to the cool temperature of the window panes; glass exposed to chlordane at ambient temperatures (such as mirrors, Table II, #44) corresponded well with surrounding areas.

d. Away from the heating registers residues become lower and more constant (west, (left) wall).

e. Areas of air eddies (NE rt, corner) had high residues.

These data indicate that chlordane rapidly sublimates from the gaseous phase on to any surface. The sublimation rate is strongly influenced by temperature. This is similar to experiences we have had in this Laboratory working




Qtrs 57B
LIVING ROOM
Fig. 2