# In the United States Court of Federal Claims

Case No. 05-280C (Consolidated)
(**Filed**: February 22, 2007)
**TO BE PUBLISHED**

| | |
|---|---|
| **RICHMOND AMERICAN HOMES OF COLORADO, INC., METROPOLITAN DEVELOPMENT IV, LLC, METROPOLITAN BUILDERS, INC., STANDARD PACIFIC OF COLORADO, INC., and TOUCHSTONE HOMES LLC,** *Plaintiffs,* v. **THE UNITED STATES OF AMERICA,** *Defendant,* | Defense Base Closure and Realignment Act of 1990; National Defense Authorization Act for FY 1993, § 330(a)(1)-(3); Duty to "hold harmless, defend, and indemnify;" Claim for personal injury or property damage; State Compliance Advisory; Asbestos remediation and response costs; Contributory responsibility; Comprehensive Environmental Response Compensation and Liability Act (CERCLA), § 120 (h), concerning property transferred by Federal agencies; Breach of deed covenant; Findings of Suitability for Transfer (FOST). |

***Hubert A. Farbes, Jr.***, Denver, CO, for Plaintiffs. With him on the briefs were ***Mark J. Mathews*** and ***Michelle C. Kales***.

***Kyle Chadwick***, Commercial Litigation Branch, Department of Justice, Washington, D.C., for Defendant. With him on the briefs were ***Peter D. Keisler***, Assistant Attorney General; and ***David M. Cohen***, Director. ***David R. Vecera***, U.S. Air Force, Arlington, VA, Of Counsel.

***John Bergen***, Law Clerk.

***Elizabeth Bradshaw***, Intern.

## OPINION

**BASKIR**, Judge.

This is a case of first impression pertaining to the Government's liability for environmental remediation costs associated with the transfer of military property under base closure laws. *See* Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, as amended, §§ 2901-11, 104 Stat. 1808, 10 U.S.C. § 2687 note ("Base

Closure Act"). Plaintiffs, grantees of former military property, seek cost-recovery under the statutory indemnification scheme provided by section 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub.L. 102-484, 106 Stat. 2315, 2371, 10 U.S.C. § 2687 note ("Section 330"), (Count I), or, in the alternative, a claim for breach of various deed covenants (Count II).

With respect to the first claim, Defendant has filed a motion to dismiss and a motion for summary judgment, pursuant to Rule 12(b)(6) and Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The Government's motions are directed solely at Count I, Plaintiffs' statutory claim. Plaintiffs, on the other hand, have filed a motion for summary judgment with respect to both counts alleged in the Complaint and for damages. Defendant argues that the breach of covenant claim in Count II, as well as damages under either of the two counts, are subject to genuine issues of material facts in dispute. **For the reasons stated herein, Plaintiffs' motion is GRANTED in part, and DENIED in part. Defendant's motions are DENIED.**

## BACKGROUND

### I. The BRAC Transfer Process

In 1988, Congress established the Defense Base Closure and Realignment Commission, commonly known as the "BRAC Commission," with the responsibility to review military bases within the United States and recommend installations that should be closed or realigned and turned over to private development. Base Closure Act, §§ 2901, 2902. Having operated as an active military installation since 1937, the Lowry Air Force Base in Colorado was among those selected for closure in the second round of BRAC in 1991 (there have been five BRAC rounds, the latest of which began in 2005). The five plaintiffs in this consolidated action are residential home builders, all of which gained title to property which had formerly been part of the base. The parcels at issue in this case are located in what was known as the Northwest Neighborhood. The Northwest Neighborhood included not just land, but also buildings and infrastructure, much of which would have to be demolished and removed before the land could be sold to developers.

Accordingly, the property was sold to the Lowry Redevelopment Authority (LRA), a legal entity established under intergovernmental agreement between the city and county of Denver and the city of Aurora, Colorado, and recognized under Colorado state law. *See* Economic Development Conveyance Agreement Between the Department of the Air Force and the Lowry Economic Redevelopment Authority (June 30, 1995) (EDC); Def. App. at 889. The LRA purchased the property from the Air Force in order to improve the lots, and subsequently convey the finished lots to various home builders, including the plaintiffs in this action. Some of these lots were apparently resold to homeowners. However, in the process of selling the improved lots and developing the unimproved lots, both the LRA and the Plaintiffs incurred substantial

cleanup costs as a result of contamination within the soil by asbestos containing material (ACM). According to the Plaintiffs, the Department of Defense may be held liable for these costs and associated damages, over $9 million in the aggregate. Liability in this case is largely a matter of statutory interpretation, at least for Count I. Those facts addressed in this part, and in the Discussion that follows, are undisputed, except where otherwise indicated.

## II. Initial Environmental Steps - Asbestos Containing Material (ACM)

In preparation for the closure of Lowry, and the eventual transfer of the property to private developers, the Air Force had to satisfy a myriad of mandatory environmental requirements. One such requirement, the Basewide Environmental Baseline Survey (EBS), summarized hazardous materials and other regulated areas on the installation, and categorized the property accordingly. The Air Force submitted this document in 1993. The EBS characterizes the Northwest Neighborhood as a Category 1 area (suitable for residential use), indicating an absence of hazardous substances or petroleum products. *See* 1993 Basewide Environmental Baseline Survey; Compl. ¶ 22. According to Defendant, the Category I description only applied to a portion of the Northwest Neighborhood. *Id.* This qualification has no immediate significance for the motions. Various hazardous materials, and corresponding remediation efforts, are noted throughout the records in the appendices. Neither party has suggested that the EBS warned of asbestos detected in the soil. As it went about transferring specific parcels of Northwest Neighborhood property, the Air Force issued Supplemental EBS documents. As with the 1993 survey, none of these documents identified the presence of ACM in the soil.

It is not disputed that the parties were well aware of the presence of asbestos in the Northwest Neighborhood. The EBS is referenced in the contract entered into between the Air Force and the LRA, the EDC Agreement. In June 1995, the Air Force and the LRA agreed to a $32.5 million conveyance, covering 711 acres of the former Lowry Air Force Base, including the Northwest Neighborhood parcels. The EDC agreement included the following representation by the Air Force:

> The EDC Premises are improved with buildings and facilities and equipment that may contain asbestos-containing materials. The Environmental Baseline Survey, a copy of which the Redevelopment Authority acknowledges having received, discloses the condition and the known locations of any asbestos-containing materials.
>
> WARNING!

EDC at ¶ 9 (“Presence of Asbestos”), Def. App. at 894. Like the baseline survey, the EDC makes no reference to ACM *in the soil*. The asbestos clause is limited to “buildings and facilities and equipment.” *Id.* Read in context with the paragraphs that follow, this provision is obviously intended to warn the purchaser of the dangers

associated with ACM – health hazards, primarily due to inhalation of asbestos, arise when the substance is released by demolition of ACM or similar activity – and to shift the responsibilities of asbestos abatement to the LRA and its successors, in any demolition or removal of existing structures performed by them. We return to a more detailed discussion of these provisions in the Discussion section that follows.

Notwithstanding our reading of the limited focus of the contract language, by any measure, the disclaimers are rather broad:

> No warranties, either express or implied, are given with regard to the condition of the EDC Premises including, without limitation, whether the EDC Premises do or do not contain asbestos or are or are not safe for a particular purpose. The failure of the Redevelopment Authority to inspect or to be fully informed as to the condition of all or any portion of the EDC Premises will not constitute grounds for any claim or demand for adjustment or withdrawal by the Redevelopment Authority from this Agreement or rejection of the Air Force's tender of any deed pursuant hereto.

EDC at ¶ 9.3*; see also,* EDC at ¶ 9.2 ("The Redevelopment Authority shall be deemed to have relied solely on its own judgment in assessing the overall conditions of all or any portion of the EDC Premises, including, without limitation, any asbestos hazards or concerns.").

There is no privity of contract between the Plaintiff builders and the Air Force. The EDC Agreement is a contract between the Air Force and the LRA. The LRA has filed its own Complaint in this Court based on these same events. *See Lowry Economic Development Authority v. United States*, No. 06-75 (Wheeler, J.).

## III. <u>The Finding of Suitability for Transfer</u>

The disposition of BRAC property required the Air Force to issue Findings of Suitability for Transfer ("FOST") concerning each of the transferred parcels. The FOST rely heavily on the EBS documentation and, like the EBS, cover every aspect of land management: endangered species protection, wetlands restrictions, historic preservation, and, of course, hazardous substances regulation. The Air Force issued FOST documents each time it transferred to the LRA specific parcels of Northwest Neighborhood property. *See* Compl. at Tab B (FOST, dated Feb 9, 1999; FOST, dated Aug 2, 2000; FOST, dated Feb 25, 2002). The documents described the Northwest Neighborhood parcels as suitable for transfer to the Redevelopment Authority without restrictions on the use of the property. FOST (Feb. 25, 2002) at ¶ 1 ("The anticipated use of the Property is community services and residential"). *See also*, FOST (Feb. 9, 1999) at ¶ 1.1 ("[A]nticipated uses include residences, recreation, industrial/storage, medical activities, and a museum"); FOST (Aug. 2, 2000) at ¶ 1.1 ("[A]nticipated uses include rights of way and residential development").

Under paragraph 4.0 ("Environmental Condition of the Property") of each FOST, there is a table of all facilities on the property, with a record of any hazardous materials stored or released at each, and a corresponding EBS category (*e.g.*, Category 1 indicating no evidence of contamination.) The tables do not list asbestos. Elsewhere in the FOST, however, the Air Force indicates that asbestos was among the "environmental factors considered." *See* FOST (Feb. 9, 1999) at Attachment 2. As with the rest of the transfer documents, asbestos is not treated as a disposed or stored hazardous substance, but rather as a future abatement issue. The document included the warning:

> ACM is located on the property. The Transferee will be responsible for managing the ACM in compliance with all applicable laws and regulations. Notice will be provided in the deeds that the Transferee will be responsible for complying with all applicable Federal, State, and local laws relating to asbestos. During the VSI, asbestos was generally observed to be in "good" condition.

FOST (Feb. 9, 1999) at ¶ 5.5. In contrast to the 1999 FOST, subsequent FOSTs indicate no deed restriction is required for asbestos. *See* FOST (Aug. 2, 2000); FOST (Feb. 25, 2002).

It should be noted that the FOST documents were prepared with close coordination among personnel from the Air Force, the U.S. Environmental Protection Agency, and the Colorado Department of Public Health and the Environment (CDPHE). *See generally*, FOST at ¶ 6.0 ("Regulator Coordination") and Attachment 3 (regulators' comments). The CDPHE – the very same agency that subsequently issued a compliance advisory regarding ACM – was invited to comment, and did comment, on the FOSTs and the draft supplemental environmental baseline surveys. In fact, the CDPHE took great pains to ensure remedial action concerning other hazardous materials in the soil – particularly, with respect to Lead-Based Paint contamination – prior to signing off on the FOST. *Id.* Although soil tests are referenced in the correspondence and comments attached to the 1999 FOST, there is no mention of possible ACM contamination in the soil.

## IV. <u>CERCLA Covenants</u>

Finally, the Air Force was required to comply with Section 120 (h) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9620 (h), which governs property transferred by Federal agencies. To a large extent, CERCLA compliance is rolled into the FOST process. In accordance with Section 120 (h), the Air Force must provide notice prior to sale or transfer of the type, quantity, and time periods in which "any hazardous substance was stored for one year

or more, known to have been released, or disposed of" as well as notice of any remedial action taken. 42 U.S.C. § 9620 (h))(1) and (3). This notice is accomplished in the deed, along with a covenant warranting that:

> (I) all remedial action necessary to protect human health and the environment with respect to any such substance remaining on the property has been taken before the date of such transfer, and
>
> (II) any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States.

42 U.S.C. § 9620 (h)(3)(A)(ii).

The papers reveal several deeds containing the above covenants. The first deed was recorded immediately after the initial FOST. *See* Quitclaim Deed (Feb. 9, 1999); Compl. at Tab C. Several corrected versions of this deed were recorded, but are identical in all material respects. *See* Quitclaim Deed Correction (Oct. 18, 1999); Quitclaim Deed Correction (Nov. 15, 2000); Compl. at Tab D. And finally, the Air Force deeded an additional tract within the Northwest Neighborhood area later in the development project. *See* Colorado Quitclaim Deed (Mar. 29, 2002); Compl. at Tab E. Although the deeds identify the LRA as the grantee, it is universally accepted that the covenants run with the land. They apply with equal force as between the Air Force and the Plaintiffs, the LRA's successors in interest. *Id.* at § VIII (A) ("[E]ach covenant shall be binding upon the Grantee, and shall be deemed to 'touch and concern the land' and shall 'run with the land.'").

The CERCLA covenants in paragraph 2 of each version of the deed reference hazardous substances used or stored on the property, as specifically reflected in a table appearing as an exhibit attached to each deed. Asbestos is not included on these tables, which are dominated by products such as pesticides and fuel. However, asbestos is covered independently in a *grantee* covenant elsewhere in the deeds. As in the baseline surveys and FOSTs, the deeds provide a notice regarding ACM. *See* Quitclaim Deed at ¶ 6 (a) ("The Grantee is warned the Property contains ACM.") Risk-shifting language appears in the notice, as well: "No warranties, either express or implied, are given with regard to the condition of the Property including without limitation, whether the Property does or does not contain asbestos or is or is not safe for a particular purpose." *Id.*; *see also*, Colorado Quitclaim Deed (29 Mar. 2002) ("Grantee acknowledges that it has inspected, is aware of, and accepts the condition and state of ... the Property ... 'as is.'") In contrast to the CERCLA covenants invoked by the Plaintiffs in Count II, which describe the agency's obligations, the asbestos covenants in paragraph 5 of the deed bind the transferee and its assigns, including the Plaintiffs. *See* Quitclaim Deed at ¶ 5 (Grantee agrees to take precautions and assume responsibility for ACM on the property.) Similar covenants inuring to the benefit of the Government, as Grantor, are included for lead-based paint which, like ACM, was not

included in the paragraph 2 CERCLA notice and the covenants respecting hazardous materials. *Id.* at ¶¶ 7-8.

Despite the sweeping nature of the disclaimers, we read these deed clauses as applying to asbestos abatement for equipment and facilities conveyed by the Air Force, and not as a general waiver of any existing but unknown asbestos release or threatened release in the property's soil. This approach is consistent with the manner in which asbestos is treated in the remainder of Air Force's environmental documentation concerning the Lowry conveyance.

## V. Reduction of LRA Purchase Price

In December 1999, more than five years after the EDC was first executed, the Air Force agreed to reduce the sales price for the entire LRA conveyance from approximately $32.6 million to less than $8 million (the amount the LRA had already paid to date), and to cancel the promissory note for the remaining debt. This modification resulted from the concerted efforts of the LRA in November 1999, after the development project encountered a string of difficulties. The modification request, which included a 20-page report, replete with comparative business plans, projected costs and supporting data, was based on "changed assumptions and economic circumstances." Lowry EDC Modification Request at 2 (Nov. 1, 1999); Def. App., 936. The LRA faced a wide range of impediments, not the least of which was extreme financial pressure due to the increased cost of capital. *Id.* The other major factor was the LRA's underestimated expenses. Apparently, the task of updating the Lowry infrastructure, complying with environmental issues (other than asbestos contamination), and remediating ACM found in buildings and steam lines, far exceeded the LRA's expectations. Letter from Thomas O. Markham, Executive Director, Lowry Redevelopment Authority, to Jimmy Dishner, Deputy Assistant Secretary for Installations, Department of the Air Force (Nov. 1, 1999); Lowry EDC Modification Request at 8 and A-5 (Nov. 1, 1999); D. App. 933, 942, 950, 599.

In light of these difficulties, the Air Force agreed to accept partial payment from the LRA, but not before issuing a litany of additional disclaimers. When the subject of ACM remediation surfaced, and the Air Force faced public pressure to assume responsibility for clean-up, the agency pointed to this settlement with the LRA. *See, e.g.*, Letter from Nelson F. Gibbs, Assistant Secretary of the Air Force, to Mayor John W. Hickenlooper, City of Denver (Aug. 28, 2003) ("The Air Force and the LRA have signed numerous legal documents ... that have allocated financial liability between them for both known and unknown conditions on the property."). As we suggested earlier, however, the builders were not a party to the original contract or the subsequent agreement to modify it.

## VI. Discovery of Asbestos Contaminated Soil

The one constant in all the environmental studies performed, and in all the transfer documents executed by the Air Force and the LRA, is that asbestos *in the soil* – which is what this case is all about – was never even considered by the parties. Despite conforming to what we assume are industry standards of due diligence, including other types of "geotechnical testing to determine soil type and stability," the Plaintiffs never tested the soil for asbestos prior to the conveyance. Pls.' Resp. to Def.'s Interrogs. (Feb. 13, 2006); Def. App. 803-806; Compl. ¶ 39. Nor apparently was asbestos-contaminated soil seen as a potential environmental threat by the Air Force, the Redevelopment Authority, or the regulators – both State and Federal – who participated during the preliminary stages in preparing this land for transfer.

At some point in early 2003, however, the State of Colorado evidently stepped up its involvement from its previous consultation role during the creation of the EBS and FOST. Inspections and soil tests conducted during the March-April time frame yielded unsatisfactory results for the presence of asbestos.

From what we have gleaned from the papers, the presence of ACM in the soil is not particularly surprising given the historical records of the base. The Northwest Neighborhood sector of Lowry Air Force Base once included barracks and a large medical facility constructed in 1942. Like the existing buildings on the base ACM was likely used in their construction. Furthermore, these structures were demolished sometime between 1959 and 1979, well before the dangers of asbestos were known and the substance regulated. Consequently, there would have been no reason to suspect that any special care had been taken in disposing of the remnants of those buildings. A number of Government sources, including a study commissioned by the Air Force have surmised that debris contaminated with asbestos remained buried in the footprint of the demolished facilities. *See e.g.,* RCRA Facility Assessment Report, Air Force Real Property Agency (Jan. 2005); Pls. App., 0107.

There seems general agreement that the Air Force was more than likely the original source of the ACM in the Northwest Neighborhood. As we explain more fully below, there is a dearth of reliable information supporting speculation that either the LRA or the Plaintiffs introduced ACM to its construction sites either by importing soil or in the removal of pipes with ACM. However, it is uncontroverted that the redevelopment efforts of the Plaintiffs and the LRA may have brought other pre-existing ACM, present as a result of the Air Force's activities, closer to the surface. Recipients' Revised "Response to Colorado Department of Public Health and Environmental Compliance Advisory" (May 8, 2003) at ¶ 4; Def. App. 770; Consolidated Statement of Uncontroverted Facts (CSUF) D12.

The Northwest Neighborhood property was transformed by the LRA into individual finished lots for sale to the homebuilding companies. As anticipated, this task of converting the military installation into residential communities was quite a substantial

undertaking. The LRA graded the lots for drainage and aesthetic landscaping purposes. Pls.' Resp. to Def.'s Interrogs. (Feb. 13, 2006); Def. App. 813-15; Lackey Decl. at ¶ 7. It also constructed roads and installed utilities. Finally, the Redevelopment Authority demolished buildings and removed obsolete steam lines. Both projects required asbestos abatement activities, by deed covenant, the LRA's responsibility. There is no indication in the papers that the LRA or any other party failed to comply with proper abatement procedures after title passed to them, nor has the Defendant argued that faulty abatement procedures account for the ACM found in the soil.

In addition to the LRA's preparation of the future home sites, the construction activities of the Plaintiffs necessarily disrupted the soil in the Northwest Neighborhood. Between June 2001 and Dec 2002, each of the five plaintiffs purchased finished lots from the LRA and immediately set about developing the property. As was contemplated at the time the land was transferred for private development, the builders excavated soil to construct residential homes with basements. The soil unearthed to construct basements was used by the developers for grading the property and for landscaping. As we later address, the Government provides speculative evidence concerning the builders' use of outside soil for these purposes, as well.

## VII. <u>CDPHE Compliance Advisory</u>

On April 24, 2003, the CDPHE issued a "Compliance Advisory" to the Air Force, the LRA and the Plaintiffs, requiring further investigation and remediation of ACM in the soil of their respective properties in the Northwest Neighborhood. Although much of the land had already been conveyed to the builders, as of the April 24 Compliance Advisory, both the LRA and the Air Force had maintained ownership of certain parcels.

The Compliance Advisory cited 23 discoveries of asbestos contamination in the Northwest Neighborhood. The recipients of this correspondence were informed by CDPHE:

> We advise you that the Department believes that present conditions in the Northwest Neighborhood present a threat to public health and the environment. Department personnel will review the facts established during the inspections and associated communications and documents, and this notice may be revised to include additions or clarifications as a result of that review.
>
> Please be aware that you are responsible for complying with the State hazardous waste and air regulations and that there are substantial administrative and civil penalties for failing to do so. Section 25-15-309, C.R.S., of the Colorado Hazardous Waste Act ("Waste Act"), Sections 25-15-101 to 316, C.R.S., and the Colorado Hazardous Waste regulations, 6 CCR 10007-3; and Section 25-7-115(3)(b), C.R.S., of the Air Quality

> Control Act ("Air Act"), sections 25-7-101 to 1309, C.R.S., and the Colorado Air Quality Control Commission Regulations, 5 C.C.R. 1001, authorize the Department to assess administrative penalties of up to $15,000.00 per day for violations of the Waste and Air Acts and final orders. The issuance of this Compliance Advisory does not ... constitute a bar to enforcement action for conditions that the inspector(s) did not observe or evaluate, or conditions found during future inspections of Lowry.
>
> To avoid additional enforcement action or reduce the penalties described above you must either correct the deficiencies as outlined below, or you must demonstrate to the Department that the deficiencies are not violations of Colorado hazardous waste and/or air laws.

Compliance Advisory (Apr. 24, 2003). The Advisory then provides a list of required actions, including an immediate halt to excavation and grading activities, sampling, and preparation of response plans, to name only a few. *See id.* at ¶¶ III (A)-(J).

One week later, on April 30, 2003, the State issued a second Compliance Advisory, repeating the same language quoted above, and requiring the Plaintiffs to develop and implement an approved plan for indoor air sampling in homes that they had already constructed on the affected property. Compliance Advisory (April 30, 2003). Both the April 24 and the April 30 Advisories provided a "compliance officer," for the Plaintiffs to contact in order "[t]o close out [the] Compliance Advisory." *See* Compliance Advisories, Pls. App. at Tab 16. The correspondence concluded with the following admonition in bold typeface: "Failure to respond in a timely fashion to this Compliance Advisory will be considered in any subsequent enforcement action and the assessment of administrative and/or civil penalties." *Id.*

## VIII. <u>The Response Plan</u>

Faced with the prospect of more formal enforcement action and penalties, both the LRA and the Plaintiffs immediately began negotiations with CDPHE. From April through August 2003, the representatives of the builders and the LRA sought to persuade CDPHE to accept a less onerous cleanup standard to be applied to their properties. They supported their position in a June 17, 2003, report to the CDPHE. The State had demanded that the soil be cleaned to a "non-detect" level. Plaintiffs also objected to what it characterized as "overly restrictive, unreasonably expensive" sampling requirements, but to no avail. Pls.' Affids. at ¶ 10; CSUF D1.

Meanwhile, the Plaintiffs and the LRA beseeched the Air Force to respond to the Compliance Advisories on their behalf. There is no evidence that the Air Force provided any support. Although the Lowry AFB site manager attended the meetings in which the response plan was addressed by the CDPHE and the other recipients of the Compliance Advisory, by all accounts his participation was minimal. Pls. App. at

Tab 26. The builders each sent similar demands to the Air Force and the Department of Defense to hold harmless, defend or indemnify them from the expenses incurred in responding to the CDPHE advisories. Compl. at Tab M. Alternatively, the Plaintiffs invoked the covenants in the deed as authority for the Air Force's responsibility to respond to the State's compliance notices. *Id.*

On August 15, 2003, the final response plan was issued; it called for thorough sampling of each lot in the Northwest Neighborhood, and for two feet of soil to be removed in any area where ACM was found. Response Plan (Aug. 15, 2003), Pls. App. at Tab 17; Pls.' Affids. at ¶ 11. The response plan was "proposed" by the LRA and the developers, although it was scripted by the CDPHE based on its predetermined view of the acceptable remedial actions. *Id.* The characterization and legal import of these notices and the Plaintiffs' responses are addressed at length in our discussion of liability.

For its part, the Air Force chose not to accept the State's findings or determinations, however they may be characterized. Because it objected to the excessive sampling and overly stringent remediation proposed by the CDPHE, the Air Force answered the Compliance Advisory by announcing its intention to rely on a more exacting risk-based methodology. The Defendant was granted an extension in which it could provide more information on this approach. The Air Force only addressed its 22 acres of Northwest Neighborhood property, however. Plaintiffs were left to fend for themselves. A large number of email recipients, some of which appear to be associated with the homebuilders, were copied on the following message from Mr. Sam Rupe, identified as the Deputy Chief Counsel, Air Force Real Property Agency:

> Deanna,
>
> I think this has been mentioned by Bob and the Air Force in the past, but the *LRA and the developers are proceeding at their own financial risk by proceeding with detect levels as a trigger for cleanup level*. The Air Force will reject that notion unless our risk experts indicate that it is necessary from a health risk perspective. Thus far, everything we have heard (sic), such is not the case. We do not view a "detect level" trigger or cleanup standard as consistent with CERCLA or a risk-based approach.

E-mail from Sam Rupe, Deputy Chief Counsel, Air Force Real Property Agency, to Deanna Kaskie, Lowry Redevelopment Authority (July 23, 2003, 1:01PM) (emphasis added); Def. App., 793.

## IX. <u>Plaintiffs' Indemnification Efforts</u>

Despite Mr. Rupe's warning, the LRA and the Plaintiffs accepted the State's response plan. At various points between April 2003 and May 2004, each of the

builders received approval letters from the CDPHE. *See* Pls. App. at Tab 26. Collectively, the Plaintiffs claim to have suffered damages in excess of $9 million, including costs associated with investigation and remediation, as well as attorneys' fees, homeowner expenses and unabsorbed overhead. *Id.*

Plaintiffs pursued formal demands for indemnification of these costs under Section 330 (a)(1) of the National Defense Authorization Act for Fiscal Year 1993. Contemporaneously, Plaintiffs pursued response costs under the appropriate provisions of CERCLA. There is an extensive record of correspondence between Plaintiffs and Air Force officials, DoD officials, and various elected representatives. The Air Force legal office processed the claims, and sought supporting documentation, never hinting that the Plaintiffs' claims would be rejected. Finally, on November 18, 2004, Mr. David Vecera of the Department of the Air Force Legal Services Agency, answered the claims of each Plaintiff with the same letter:

> The Air Force appreciates your patience while we thoroughly reviewed your claims regarding remediation costs at the former Lowry Air Force base. After reviewing all the information you provided, along with the information obtained from the Air Force personnel associated with the Lowry redevelopment, and conferring with our client, we have reached the conclusion that we will not settle your claims pursuant to 42 U.S.C.§ 9613 (f)(1) and 42 U.S.C. § 9620 (h).
>
> This letter does not address your claims relating to Section 330 of the National defense Authorization Act for Fiscal Year 1993 (§ 330). As previously explained, those claims will be addressed by the Office of the Secretary of Defense. The documentation you provided relating to your § 330 claims has been forwarded to the Office of the General Counsel, Department of Defense, for appropriate action.

*See* Letter from David R. Vecera, Attorney, Environmental Litigation Division, Department of the Air Force, to Ronald S. Loser, Attorney for Standard Pacific Homes (Nov. 18, 2004). The denied CERCLA claims are not before us. Those matters fall under the jurisdiction of the United States district courts; Plaintiffs have elected not to pursue the CERCLA claims at this point in time. As to the question of indemnification, the central legal theory upon which the complaint rests, there has never been a formal response by the Department of Defense to the Plaintiffs' statutory claims.

After a couple months without a determination of their claim, the Plaintiffs filed their Complaint with this Court. Concerned with the ripeness doctrine, we pressed the parties for more information on the DoD position. At oral argument, we learned that in the related case of *Lowry Redevelopment Authority v. United States*, No. 06-75 (Wheeler, J.), which is presently at a less advanced stage of litigation, there was a "final decision" on the LRA's request for indemnification, not just on the CERCLA claims. *See* Letter from James G. Van Ness, Acting Dep. Gen. Counsel, Department of

Defense, to Thomas O. Markham, Executive Director, Lowry Redevelopment Authority (Dec. 1, 2005); Pls. Suppl. Ex. (filed by leave of Court, Dec. 11, 2006). Although the rejection letter was addressed to the LRA, and not to the Plaintiffs, we can assume that the same result would have been obtained had the Plaintiffs pressed the issue.

The reasons for the denial are identical to those reasons argued by the Government in its papers. According to the Defendant, the Plaintiffs do not qualify for indemnification because the costs for which it seeks reimbursement did not stem from "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage," under Section 330 (a)(1). We scrutinize those reasons in the discussion that follows.

## DISCUSSION

### I. <u>Procedural Context</u>

Jurisdiction in this matter is based on the Tucker Act, 28 U.S.C. § 1491, and is not contested. Plaintiffs claim damages arising under an "Act of Congress" (Count I) and an "express ... contract with the United States" (Count II). 28 U.S.C. § 1491; *see* Compl. at ¶¶ 4-7.

In their first count, Plaintiffs claim costs and damages incurred as a result of releases of ACM on their lots, specifically those costs and fees associated with sampling and remediation required by the CDPHE's Compliance Advisories. They rely on Section 330 (a), which provides for the Secretary of Defense to "hold harmless, defend and indemnify in full" for certain claims resulting from hazardous substances on BRAC properties. 10 U.S.C. § 2687 note.

Alternatively, in the second count, Plaintiffs claim these same damages under a breach of covenant theory. The covenants, described in greater detail in the Background, were contained in the deed as prescribed by the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9620 (h) (CERCLA § 120 (h)). The Plaintiffs argue that they are entitled to judgment as a matter of law, and damages, under either one of its two theories.

The Defendant's motions are less expansive. The Government moves in the alternative for dismissal or summary judgment, on Count I, alone. In order to prevail upon its Rule 12(b)(6) motion, the Defendant must show that the Plaintiffs can offer no evidence which would entitle them to the relief they request – indemnification for the costs of remediation and other expenses under Section 330 (a)(1). *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (motion to dismiss should be denied unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002). In considering such motions we "must assume all well-pled factual

allegations are true and indulge all reasonable inferences in favor of the nonmovant." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *see Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Owen v. United States*, 851 F2d 1404, 1407 (Fed. Cir. 1988). Under Rule 12 (b)(6), we decide "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. at 236). Under the circumstances, we believe the question of entitlement under Section 330 is better addressed under the summary judgment rubric.

## II. Standards for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 (c); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 670 (1997). In its consideration of motions for summary judgment, the Court resolves all reasonable inferences in the light most favorable to the non-moving party. RCFC 56 (c). Where, as here, both parties have moved for summary judgment, the Court evaluates each motion on its own merits. *See Kanehl v. United States*, 38 Fed. Cl. 89, 98 (1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

A material fact is one that would, under applicable law, affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to meet its initial burden on summary judgment, a party must demonstrate "an absence of evidence to support [its opponent's] case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. at 325).

The party opposing summary judgment may not simply rest upon mere allegations or denials of the adverse party's pleading. Instead, "[t]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." RCFC 56 (e); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985). The supporting affidavit itself need not be in an admissible form. *Celotex Corp.*, 477 U.S. at 324. However, the opposing party must "point to an evidentiary conflict created on the record at least by a counter statement of fact or facts set forth in detail ... by a knowledgeable affiant." *Barmag Barmer v. Murata*, 731 F.2d 831, 836 (Fed. Cir. 1984); *see generally, Williams v. Borough of West Chester, Pennsylvania*, 891 F.2d 458 (3d Cir. 1989) (for a discussion of Supreme Court's "summary judgment trilogy").

In the present matter, the Defendant attempts to establish a genuine issue for trial on causation. However, both parties contend that summary judgment is appropriate on purely legal grounds based upon their reading of Section 330 (a)(1). Cases of statutory construction, such as that identified in the cross-motions of Plaintiffs and the Government, are particularly well-suited for adjudication by summary judgment.

## III. The Statutory Scheme

The task of breaking ground at the former Lowry Air Force Base fell to the LRA. This quasi-governmental organization had to transform 50-year-old infrastructure and build finished lots that would entice homebuilders to invest in a new residential community where a military installation once operated. Those who receive former military property under the BRAC process expect certain assurances from the Department of Defense as respects the environmental health of the property. Those assurances are what this entire case is about.

The Defendant argues that "[s]tatutory construction begins with the text, which should be read as a whole and given its plain and ordinary meaning, provided the result is not absurd, *in light of evident legislative purposes*." Def. Br. at 8 (citing *Lamie v. United States*, 540 U.S. 526, 530 (2004) and *Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000)) (emphasis added). In the pages that follow, we consider the plain text of Section 330. We do so not in a vacuum, but rather in the context of the BRAC process, which Section 330 supports.

In 1988, by providing for the BRAC Commission, Congress inserted itself into the base closure process. Base Closure Act, § 2902. Although the military value of a given base is the most important criterion in determining which bases to close, the impact on the installation's neighboring civilian community has always been an important consideration in the BRAC process. *See* Memorandum of Secretary of Defense Frank Carlucci (May 3, 1988) (establishing first commission); Defense Base Closure and Realignment Commission, Report to the President (1991), Secretary of Defense Transmittal Memorandum, App. C (BRAC policy considerations included "supporting reinvestment necessary to restore economic growth"); DoD Selection Criteria for Closing and Realigning Military Installations Inside the United States, Fed. Reg. 6948 (Feb. 12, 2004) (economic impact on existing communities in the vicinity of military installations listed among "other considerations"). This was certainly the case in Denver, Colorado, where Lowry Air Force Base once operated. The impact on the local economy was estimated at several hundred million dollars annually and over 6,500 jobs. Lowry EDC Modification Request; Def. App., 937. The recitals appearing at the beginning of the Air Force's conveyance agreement acknowledge that base closure "without other economic redevelopment, will cause economic hardship for the communities in the vicinity of Lowry AFB." Economic Development Conveyance Agreement Between the Department of the Air Force and the Lowry Economic Redevelopment Authority (EDC) at ¶ B; Def. App., 889.

If ever there was a doubt that the BRAC process, in general, and the transition at Lowry, in particular, is geared toward providing incentives for private development, the following "recital" from the Air Force- LRA conveyance agreement should put that doubt to rest:

> It is in the interest of the United States that the Department of Defense facilitate the economic recovery of communities that experience adverse economic circumstances as a result of the closure and realignment of military installations under the [Base Closure Act]. To encourage such redevelopment, Congress enacted the "Pryor Amendments" (Title XXIX of the National Defense Authorization Act for Fiscal Year 1994) Pub. L. No. 103-160, which provides for Economic Development Conveyances ("EDCs") of property on military installations closed under the [Base Closure Act].

EDC at ¶ C; Def. App., 889.

The Defendant argued with respect to Section 330 and CERCLA, that we should apply a presumption that these closely related statutes were intended to work harmoniously together and not frustrate the other's purposes. Def. Br. at 8. The same could be said of Section 330 and the Base Closure Act. Section 330 serves the BRAC purpose of encouraging economic development of former military facilities and their surrounding populations. These goals can only be achieved by addressing the potential disincentives and environmental risks inherent in assuming ownership of property that was once used by military services.

Senator John McCain from Arizona, who sponsored the indemnity legislation, explains in no uncertain terms its intended purpose. The Senator's remarks were made in opposition to language in an earlier version of the bill which would have insulated the Government rather than protect the recipient of former military property with regard to environmental claims. Senator McCain's amendment struck language linking the indemnification obligation to Federal Tort Claims Act liability, a limiting qualification. We quote his remarks at length:

> Under current law, receivers of closed base property can be successfully sued for pollution caused by Defense Department activities. Such suits might include environmental cleanup orders or civil damage claims.
>
> This situation is unjust and it must be remedied. We simply cannot ask States or businesses to assume potentially devastating liability for conditions they did not create. Moreover, the Federal Government has a duty to accept full and unconditional responsibility for its actions.
>
> Last year, I introduced legislation to ensure that the Federal Government remains fully responsible for hazardous waste problems at military installations after base closure. The bill requires the Department of Defense to defend, hold harmless, and indemnify innocent receivers of the property against claims arising from pollution caused by military activities.

> This protection is absolutely critical if we are to promote the timely and efficient transmission of base property to new and productive uses. How many States or employers are anxious to acquire base property without such protection?
>
> * * *
>
> In many cases, hazardous dumping by the military occurred prior to the enactment of our environmental laws. Such dumping probably would not be defined as negligent. Under the committee bill [proposed amendment] that would mean receivers of closed base property could not receive indemnification. The unfortunate result is that the innocent property owner pays for Uncle Sam's mistakes.
>
> * * *
>
> Mr. President, base closure is a difficult and traumatic period for local economies which have grown dependent on the employment and economic activity provided by defense installations.
>
> We have a Federal obligation to help facilitate a safe and timely transfer of base property to other productive uses. We cannot possibly achieve that goal if those who would put that property to use must risk everything in the process.
>
> We must do what is right – ensure, without condition, that the Federal Government will defend and indemnify states and employers who are sued over pollution caused by Federal activities. My amendment will accomplish that goal.

138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992), 1992 WL 229896; Pls. App. at Tab 18.

The Defendant argues that Section 330 indemnification provisions were not intended to be so sweeping. This is a litigation position. We give much more credence to the Defense Department's contemporaneous reaction to the law, as expressed in a letter to the Senator, which was made part of the congressional record:

> This is in reply to your letter of November 5, 1992, to Secretary Cheney, requesting confirmation that the Department will apply those provisions of the 1993 Authorization Act ... which require the Department to indemnify certain transferees of DoD real property.
>
> * * *

> Quite frankly, the Department did not support either [the FY 93 Authorization Act or the FY 93 Appropriations Act], largely because of the dramatic impact both may have on the Department's liability. The Department does not hesitate to shoulder its responsibility for cleaning up contamination. However, both Acts appear to go much father, perhaps effectively eliminating such legitimate limitations on the Department's liability as defense under the Tort Claims Act and other defenses. *The wholesale shift of all risks to the Department* may, unfortunately, delay the transfer of base closure properties until the Department can adequately assess its risks with regard to those properties.

Letter from David Berteau, Principal Dep. Asst. Secretary of Defense, to Sen. McCain (Feb. 3, 1993) (emphasis added); 139 Cong. Rec. S8433-01 (daily ed. July 1, 1993), 1993 WL 239656; *see* Pls. App. at Tab 19.

The Air Force was careful to segregate Plaintiffs' claims when they were initially submitted. But the Government argues that the Plaintiffs' Count I claim should be read in connection with other remedies available under CERCLA. The standards and triggers for liability under CERCLA bear no relationship to those applicable to Section 330. CERCLA may hold valid causes of action for the Plaintiffs in another forum. The claims before us today in Count I are about a Government promise, an insurance provision, which as the Department of Defense itself has acknowledged, operates as a "wholesale shift of all risks." *Id.* The question is whether this risk-shifting statutory provision was triggered in this case. Upon close scrutiny of the language of the statute, we find that it was.

## IV. The Text of Section 330 (a)

Section 330 of the National Defense Authorization Act for FY 93 provides the protections to which Senator McCain referred in his statements on the floor of the Senate. After the Government refused to defend the Plaintiffs, upon receipt of the Compliance Advisories, the builders invoked the indemnification provisions of the statute. There are three sections governing entitlement under this law:

First and foremost, Section 330 (a)(1) provides:

> [T]he Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee *arising out of any claim for personal injury or property damage* (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or

> contaminant as a result of [DoD] activities at any installation (or portion thereof) that is closed pursuant to a base closure law.

10 U.S.C. § 2687 note (emphasis added).

Paragraph (2) specifies the persons and entities covered under the law:

> (A) Any State (including any officer, agent, or employee of the State) that acquires ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1).
> (B) Any political subdivision of a State (including any officer, agent, or employee of the State) that acquires such ownership or control.
> (C) Any other person or entity that acquires such ownership and control.
> (D) Any successor, assignee, transferee, lender, or lessee of a person or entity described in subparagraphs (A) through (C).

10 U.S.C. § 2687 note. The Plaintiffs' status as potentially eligible beneficiaries under this paragraph has not been questioned.

And, finally, paragraph (3) provides the sole exception to the indemnification provisions: "To the extent the persons and entities described in paragraph (2) contributed to any such release or threatened release, paragraph (1) shall not apply." 10 U.S.C. § 2687 note. We will address this subparagraph, and the Defendant's assertion that factual disputes exist on this issue of contributory responsibility, after first interpreting the statute's entitlement provisions.

The controversy centers on the language of Section 330 (a)(1). The Secretary of Defense denied coverage to the LRA for two reasons, and those same reasons are repeated here as against the homebuilders. *See* Letter from Mr. Van Ness to LRA (Dec. 1, 2005). Defendant contends: first, that there was no "claim" against the Plaintiffs; and second, that even if the CDPHE regulatory actions against the Plaintiffs constitutes a claim, it was not a claim for personal injury or property damage, as required by the statute. We consider each of these arguments in turn.

## V. <u>The Requirement of a "Claim"</u>

The critical language triggering entitlement is: "any suit, claim, demand or action, liability, judgment, cost or other fee *arising out of any claim* for personal injury or property damage ...." The statute does not define the term "claim," nor has either party pointed to authoritative guidance to aid us in arriving at our own definition. Despite the absence of a formal definition in the statute, the Government urges us to adopt a strict and limited meaning. Such a limited understanding, of course, serves to limit the scope of the Government's exposure.

***Third Party Claimant***

The Defendant's position is that a third party must make a judicially enforceable demand or its equivalent against the party seeking the protection of Section 330 (a)(1). Transcript of Oral Argument ("Tr.") at 53-64; *see also*, Def. Br. at 9 ("The act does not apply here, as plaintiffs do not allege that the CDPHE, or another third party, pursued a claim against them for damage suffered by the third party.") As an initial matter, we note that the Government has cited no authority for this requirement. The Defendant thus reintroduces the concept of tort liability into Section 330 and thereby excludes recovery of remediation costs from its coverage.

The protections of Section 330 (a)(1) are sweeping. They include not only a duty to indemnify, but also a duty to defend and an undefined duty to "hold harmless." 10 U.S.C. § 2687 note. By its own terms the statute is applied broadly, providing for indemnification from and against "any suit, claim, demand or action, liability, judgment, cost or other fee." *Id.* The Defendant asks us to narrow the scope of its Section 330 obligations and contends that Section 330 (a)(1) would come into play only if a "third party," sued for personal injury or property damage. For instance, the Plaintiffs here could only recover to the extent that they refused to clean up asbestos in the soil and faced legal claims by a homeowner based on diminished property values or, worse yet, by an individual who claims to have suffered health effects as a result of the contamination. Tr. at 54-55; *see e.g.*, Letter from James G. Van Ness, Acting Dep. Gen. Counsel, Department of Defense, to Thomas O. Markham, Executive Director, Lowry Redevelopment Authority (Dec. 1, 2005) (DoD denied requests for indemnification based on Compliance Advisory requirements, but settled $540,000 indemnification request arising out of LRA's reimbursement of costs incurred by builders.)

We cannot reconcile that view with the broad exposure urged by Senator McCain and feared by Mr. Berteau. In the only published case applying Section 330, *In re New London Dev. Corp*., 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005), a recipient of base property successfully argued for indemnification costs incurred in responding to a regulatory enforcement action like the one here. The Armed Services Board of Contract Appeals denied the Government's motion to dismiss for failure to state a claim. We will explore the Board's reasoning further in our discussion of property damage, in Section VI, *infra*. It is interesting to note, however, that in that case the Navy defined the claim requirement of Section 330 in much different terms than does the Government in this case. *See id.* ("includes, but is not limited to, any judicial, administrative or private cost recovery proceeding ... (1) for response costs arising under CERCLA, (2) for costs incurred to enjoin or abate presence or migration of contamination ... under RCRA, or (3) for costs incurred to comply with the requirements of similar federal or state laws and regulations ... which arise from environmental conditions at the Leased Premises.")

The Government's theory is also at odds with the general theme of environmental remediation statutes. In general, CERCLA's liability and cost-recovery provisions mandate prompt clean-up of hazardous wastes, while providing mechanisms to ensure that a single party is not left holding the bag for other responsible parties. By reading into Section 330 (a)(1) a third party claimant requirement the Defendant creates a disincentive to the policy of remediation first. It also reintroduces the concept of equating indemnity with tort liability that the Senate rejected. And, finally, it discourages private economic development of former military property.

Rather, our understanding of Section 330 recognizes the Government's "obligation to help facilitate a safe and timely transfer of base property to other productive uses." 138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992); Pls. App. at Tab 18. As Senator McCain stated to his fellow lawmakers, "[w]e cannot possibly achieve that goal if those who would put that property to use must risk everything in the process." *Id.* Defendant does not address the incompatibility of its cramped reading with the clear policy goals of its author. It merely offers up the technical argument that the debated bill contained language that differed from the language of the legislation that ultimately became law. *See* Tr. at 53 (The "arising out of a claim for personal injury or property damage" limitation was added to bill during conference).

At oral argument, counsel for the Government indulged the Court in hypothetical supposition concerning the validity of certain "claims" under its reading of the statute. Defendant reluctantly acknowledged that the Plaintiffs would be covered in the event individual homeowners sued the builders for damages. Tr. at 54 ("[B]ecause this is a case of first impression I'm loathe to say anything with certainty ... but it does appear.") But the Plaintiff builders would not be indemnified for losing potential home buyers, because in that case there is no third party claimant. Tr. at 55-56. We also demanded to know what this third party claim must look like. Does the third party claimant have to file a legal instrument of some sort, or would a demand letter suffice? Counsel for the Defendant could not provide a definitive answer. *See* Tr. at 56.

We reject the notion that a "third party claim" is required for application of Section 330 (a)(1). But even assuming such a requirement, we have no trouble reading the CDPHE's involvement as a third party claim. We understand the State to be acting on behalf of its citizenry. The Government has never argued that the State of Colorado has no interest in conserving natural resources or protecting the health and welfare of Colorado residents. But its third party tort claim theory led counsel at oral argument to reject a State effort to compel remedial action by the builders to protect its citizens. We repeat a portion of the exchange here:

> THE COURT: Now, you agreed I think a moment ago that a third-party assertion of economic loss or personal injury if let's say expressed in a suit would suffice.
>
> MR. CHADWICK: On its face it would appear to.

> THE COURT: What about the state on behalf of its citizens, homeowners, future homeowners and otherwise making this same sort of claim?
>
> MR. CHADWICK: It would depend on the gravamen, if you will, of the claim. If it were a claim seeking some sort of relief and if it [was] a claim based upon allegations of property damage, not simply allegations of threats to public health as we have here, allegations of damage to the property for which –
>
> THE COURT: Why not public health? Wouldn't that encompass personal injury?
>
> MR. CHADWICK: Well, first of all if it ripened into a personal injury obviously.
>
> THE COURT: Wait, wait, wait. You're not saying the state has to wait until one of those homeowners develops asbestosis?

Tr. at 59-60.

Counsel's position is dictated by the necessary consequence of the theory advanced by the DoD General Counsel in the Van Ness letter respecting the LRA's claim. We believe the statutory language easily accommodates a claim by a state alleging an environmental hazard.

***Definition of a "Claim"***

We next must determine what constitutes a "claim" for purposes of invoking Section 330. As we have noted, the Government argues the need for a formal assertion equivalent to a demand in a civil complaint. There is no independent authority for the Defendant's theory. By contrast, according to the Plaintiffs, "any document such as the Compliance Advisories that the government issues to a party may serve as a 'claim' if it imposes a clear legal obligation to address environmental contamination." Pls. Br. at 20. When a state brings a "claim" on behalf of its citizens, the question then becomes whether something less than a formal legal demand, in this case, a Compliance Advisory, as opposed to a Compliance Order, suffices. According to the Government, the Compliance Advisory does not rise to the level of demand necessary to invoke the Secretary's duty to defend against the State's enforcement actions, or to indemnify the Plaintiffs, thereafter. The Defendant contends that the State's Compliance Advisories were "preliminary" and indicated only that the state "believed" remediation was necessary. Def. Br. at 6. We disagree with that characterization of the CDPHE's Advisories.

Compliance Advisories are provided for in Section 1007-2 of the Colorado regulations, the paragraph 1.9, governing "Inspections – Enforcement – Civil Penalty." The regulation reads in pertinent part:

> 1.9.2 Enforcement. Whenever the Department determines that any site or facility as well as any property, premises or place where the Department reasonably believes , based on information provided to the Department, discovered by the Department during an inspection, or otherwise in the possession of the Department that solid waste may be located is not or has not been in compliance with the Act , any subsequent rule or regulation , the terms of a certificate of designation issued under Section 30-20-104, C.R.S. or will previously issued Compliance Orders, the Department may issue a Compliance Order to such site or facility (the respondent). Further, the Department may request that the Attorney General bring for injunctive relief or penalties.
>
> (A) A Compliance Advisory may be issued when the Department deems it appropriate to notify the respondent that a violation has occurred or is occurring. It shall include the factual basis for the violations. It does not constitute an agency action subject to appeal, but it does constitute notice to the respondent of the violation(s).
>
> (1) Compliance Advisories may be resolved by:
>
> (a) An informal conference that shall be available to the respondent ... The respondent shall be given the opportunity to submit additional materials addressing the basis for the Department's belief that a violation has occurred or is occurring.
>
> (b) A No Violations Letter shall be issued by the Department, if after receipt of the facility's response, the Department determines that some or all of the violations did not occur ...
>
> (c) A No Further Actions Letter shall be issued ... if, after the Informal Conference or submittal of additional information, the Department finds ... that compliance with some or all of the violations in the Compliance Advisory has been achieved ...
>
> (d) If, in the case of a Compliance Advisory, no Informal Conference is held or if after the Informal Conference the Department determines that some or all the violations cited in the Compliance Advisory are correct, it may issue a Compliance Order.

6 Colo. Code Regs. § 1007-2-1.9.2 (A) (2006).

The Advisory is not considered final agency action for purposes of filing an administrative appeal. But it may not safely by ignored. Unless the recipient submits proof to the contrary, the noted violations are deemed to persist. The Government points out that the CDPHE could seek legally enforceable relief by issuing a Compliance Order, as opposed to a Compliance Advisory. *See* Def. Br. at 16. At oral argument, the Government refused to take a position on whether a mandatory Compliance Order would suffice for purposes of section 330. Tr. at 63.

In this case, we can imagine no substantive difference between the two. Had the Plaintiffs chosen to ignore or resist the required actions in the Compliance Advisories, those requirements would have merely been repeated on a document with a new label, while any penalties or fees for ongoing violations continued to be assessed. It is noteworthy that the Air Force also did not ignore the Compliance Advisory. The Air Force took the State seriously enough to contest the State's demands by asserting its own resolution of the alleged environmental threats.

The text of the two Compliance Advisories, dated April 24, 2003 and April 30, 2003, shows that the State of Colorado was not making an idle inquiry. The Plaintiffs were informed that "[t]he issuance of this Compliance Advisory does not limit or preclude the Department from pursuing its enforcement options ... including issuance of a Compliance Order and assessment of penalties." In other words, the Plaintiffs will have to pay eventually. In another section of the Compliance Advisory, the Plaintiffs were warned that they would face administrative and civil penalties of up to $15,000 per day for violations of the State's hazardous wastes and air regulations.

Furthermore, the Compliance Advisory places the burden squarely on the Redevelopment Authority and the builders to either take remedial steps or demonstrate that no violations have occurred. Specifically, each advisory stated:

> To avoid *additional enforcement action or reduce the penalties described above*, you must either correct the deficiencies as outlined below, or you must demonstrate to the Department that the deficiencies are not violations of Colorado hazardous waste and/or air laws.

Compliance Advisories, Pls. App. at Tab 16 (emphasis added). The advisory then details a lengthy list of mandatory actions, and concluded with the following warning:

> To close out the Compliance Advisory, we encourage you to contact the Compliance Officer listed below ... Failure to respond in a timely fashion to this Compliance Advisory will be considered in any subsequent enforcement action and the assessment of administrative and/or civil penalties.

*See* Compliance Advisories, Pls. App. at Tab 16.

In making its case for a less imperative meaning to “claim,” the Plaintiffs’ papers rely heavily on analogous insurance carrier cases. In each of the cases cited by Plaintiffs, a State-level environmental enforcement action triggered the insurance carrier’s duty to defend or indemnify the insured.

The critical inquiry in these cases is whether the particular State environmental agency’s demand was sufficiently concrete to create a legal obligation. *See Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1564 (9th Cir. 1991) (damages under policy included costs of complying with consent decree); *Avondale Indus. Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206 (2d Cir. 1989) (demand letter commencing administrative proceeding considered a “suit” under insurance policy); *New Castle Co. v. Hartford Acc. & Indem. Co.*, 673 F. Supp. 1359, 1366 (D. Del. 1987) (although department did not threaten to file suit, demand letter required remedial actions that were ultimately enforceable in a legal proceeding).

These cases apply state insurance law, which has no direct application to the present dispute over the meaning of a Federal statute. *See Avondale Indus.*, 887 F.2d at 1204 (state insurance law carries presumption in favor of insured; presumption is broader in the case of a duty to defend than it is in the case of a duty to indemnify). Moreover, the decisions invariably interpret private contractual matters such as the scope of the pertinent insurance policy, and whether various exclusions apply. Accordingly, despite some startling similarities in the environmental regulatory context in which they arise, these cases are far too distinguishable to be of conclusive aid to us.

However, we also see no merit in the Government’s argument, based on these same insurance cases, that the CDPHE advisories lack the requisite elements of mandatory enforcement. The Defendant analyzes the case law, as follows:

> The *Avondale* court itself distinguished a decision construing similar policy language, *Technicion Electronics Corp. v. American Home Assurance Co.*, 141 A.D. 2d 124 (NY 2d Dept. 1988), *aff'd*, 542 N.E.2d 1048 (N.Y. 1989), upon the grounds that [in that case] a letter from the [EPA] "merely informed Technicion of its potential liability under CERCLA and that the EPA was interested in discussing Technicion's voluntary participation in remedial measures. The letter was an invitation to voluntary action ...' (citation omitted). As noted, the same is true of a Compliance Advisory under Colorado law. *See* 6 Colo. Code Regs. § 1007-2-1.92 (A).

Def. Br. at 19-20. To the contrary, under Colorado’s regulatory scheme the Plaintiffs’ response to the CDPHE Compliance Advisory was required. Under the circumstances of this case, the CDPHE’s exertion of regulatory authority cannot be construed as a mere “invitation to voluntary action.” *Id.* at 19. The Compliance Advisory directs its recipients to comply now or pay the price in fines later.

## VI. Claim for Property Damage

The Government contends that the Compliance Advisory, even if it is considered a claim for purposes of Section 330, is not a claim for personal injury or property damage because it seeks reimbursement for cleanup costs, and does not allege property damage.

The statute defines "property damage" in descriptive terms, once again giving a broad range of examples of the type of claim for which DoD will provide indemnification, including:

> any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage *(including death, illness, or loss of or damage to property or economic loss*) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant.

10 U.S.C. § 2687 note (emphasis added). There is no indication that Congress intended to limit the type of property damage. Quite the contrary, the language "loss of or damage to property or economic loss" encompasses a variety of possible damage theories. Furthermore, the claim may be predicated on either the release of a hazardous substance or the threatened release of such substance. Therefore, necessary preventative measures such as the response actions directed by the CDPHE in this case, are contemplated by this legislation.

The sole Section 330 indemnification case, mentioned earlier, confirms the result we reach here. In the *New London* case, the Armed Services Board of Contract Appeals (ASBCA) heard a contract dispute involving the very same issue raised by the Defendant. *New London Dev. Corp*., 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005). The appellant there claimed costs incurred in removing undisclosed ACM on BRAC property. Its claim was predicated not on the statute, itself, but on an indemnification provision in a lease which had been extended by the Navy pending the formal transfer of the base property. The clause in question, however, referenced the statutory requirements and incorporated the precise indemnification language of Section 330 (a)(1). *Id.*

The Board denied the Navy's motion to dismiss, holding that costs similar to those incurred by Plaintiffs here – monitoring, removal and disposal of ACM – could constitute a claim for property damage within the language of Section 330. *Id.* The Board reasoned that because under tort principles the term "economic loss" includes costs of repair and replacement of a defective product or defective property, Section 330's expansive definition of property damage should also include the costs of remediating environmental contamination. *Id.; cf. Ford Motor Co. v. United States*, 378 F.3d 1314, 1319 (Fed. Cir. 2004) (contract providing for indemnity for loss,

destruction or damage to property construed to include environmental response costs.) The Board also noted "[t]he inclusion of 'economic loss' in ... the parenthetical definition of property damage indicates an intention that indemnification would not be limited to tort liability claims." *New London Dev. Corp.*, 2005 WL 1634772 at n.6 (ASBCA). We agree with the reasoning of the ASBCA.

The Government essentially ignores this case. It focuses on the entirely different statutory scheme established under CERCLA. CERCLA treats natural resource damages differently than it treats equitable actions for clean-up costs. Defendant argues, we should presume that Congress would not merge the two remedies under this Section 330. *Compare*, 42 U.S.C. § 9607(a)(4) (makes parties liable to the Government for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release") *and* 42 U.S.C. §§ 9607 (a)(1)-(3) and 9613 (provides for cost recovery and contribution claims directed to potentially responsible parties).

CERCLA provides for a wide range of potential liability, including liability for costs of removal or remediation, response costs, costs of health assessments, and "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." *See* 42 U.S.C. § 9607 (a)(4) (A)-(C) (quoting subsection (C)). The Government selects the natural resources damages provision from among the various CERCLA causes of actions in its effort to persuade us that the indemnification provisions of Section 330 should be limited to this type of remedy, and not extended to response costs or remedial actions. Because CERCLA treated natural resources damages separately from these other forms of liability, Defendant argues, Congress, in enacting Section 330, could not have intended a more expansive definition for "personal injury or property damage" in an indemnification claim under Section 330 (a). We note that the natural resources damages provision might not impose liability in the present case, to the extent that the ACM contamination occurred when the hospital and barracks debris was buried over fifty years ago. 42 U.S.C. § 9607 (f)(1) ("There shall be no recovery ... where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980."). In any event we are not persuaded by the Government's argument.

The entirely different statutory purposes served by CERCLA and Section 330 undermine the Government's construction of the latter's "property damage" language. Congress enacted CERCLA to facilitate the prompt clean-up of hazardous wastes, and to shift the costs of cleanup from the taxpayer to the responsible parties. 42 U.S.C. §§ 9601, *et seq*.; 57 AM. JUR. Trials 1 (Nov. 2006). The statute, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 100 Stat. 1613, gives rise to a variety of causes of actions, with varying procedural mechanisms and potential claimants. *See* Alfred L. Light, CERCLA Law and Procedure ch. 3-4 (1991);

42 U.S.C. § 9607 (a)(1)-(4) (identifying four categories of "covered persons" – including current and past owners of contaminated property – who are considered actual or potential joint tortfeasors and held strictly liable for cleanup).

By holding property owners responsible while at the same time providing for contribution actions under CERCLA, Congress eliminated the resolution of disputes over responsibility as a predicate to actions to protect public health: clean-up first, liability afterwards. *See* William H. Rogers, Jr., Environmental Law 681 (2d ed. 1994) (describing the statute's focus on providing "shovels first, lawyers later"). *Compare* 42 U.S.C. § 9607(a) (cost recovery action) *and* 42 U.S.C. § 9613 (f) (contribution action for equitable share of cleanup costs). Thus one of the primary goals of this legislation is to ensure prompt cleanup of hazardous wastes. *See* William Bradford Reynolds and Lisa K. Hsiao, *The Right of Contribution Under CERCLA After Cooper Industries v. Aviall Services*, 18 Tul. Envtl. L.J. 339, 349-50 (2005) (describing incentives for early settlement of cleanup claims under SARA scheme); *see also,* S. Rep. No. 96-848, 96th Cong., 2d Sess. 12 (1980) (stating CERCLA's goal to establish "a revolving fund that would allow [the EPA] to go in and clean up hazardous waste sites first, then try to recover the costs of cleanup later"); *but see, Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 165-66 (2004) (Party who conducts purely voluntary cleanup – prior to being sued under CERCLA, or entering into an administrative or judicially approved settlement that resolves liability to the State – may not obtain contribution from other responsible parties under CERCLA, § 113(f)).

By contrast, Section 330 is not an environmental cleanup statute. Instead it is aimed at removing disincentives such as protracted litigation to private development of former military bases. 138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992), 1992 WL 229896; Pls. App. at Tab 18. CERCLA supplies its own remedies. Congress had an independent purpose in enacting Section 330. Risk-shifting legislation such as Section 330 spares the transferee of former DoD base property the burdens and risks associated with defending environmental suits or enforcement actions.

In limiting its own liability, in the 1995 EDC Agreement with the LRA, the Air Force chose language similar to that of Section 330 (a). The Air Force was prepared to invoke the provision in response to mere regulatory actions, without the precondition of a third-party suit. In a letter to Denver's mayor, Air Force Assistant Secretary Nelson Gibbs noted the release clause in its contract with the LRA:

> From and after the date of this Agreement, the Redevelopment Authority agrees to assume responsibility for compliance with all laws and regulations related to the presence, containment, release, abatement removal, handling, transportation, and disposal of asbestos-containing material ("ACM") and lead-based paint ("LBP"), now or hereinafter existing, on and from the EDC Premises ... the [LRA] hereby releases the Air Force of all liability associated with ACM and LBP on the EDC

> Premises, and *agrees to indemnify and defend the Air Force against, and hold the Air Force harmless from, all claims, suits, demands, actions, liability, judgments, and costs accruing after the date of this Agreement for death, personal injury, and property damage arising from, or in connection with,* the presence, containment, release, abatement, removal, handling, transportation, and disposal of ACM and LBP from and after the date of this Agreement.

Letter from Nelson F. Gibbs, Assistant Secretary of the Air Force, to Mayor John W. Hickenlooper, City of Denver (Aug. 28, 2003) at n.3 (emphasis added).

## VII. Contributory Responsibility Under § 330 (a)(3)

We turn now to the issue of causation. Despite our conclusion that the Compliance Advisory issued by Colorado meets the requirement for a claim for property damage, we must also consider the final clause of Section 330 (a)(1) and Section 330 (a)(3). Those sections make it clear that the statute does not provide for blanket indemnification. Rather, it promises to indemnify those held responsible for property damage "that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant ... as a result of Department of Defense activities" on the land transferred pursuant to BRAC. 10 U.S.C. § 2687 note. Similarly, Section 330 (a)(3) expressly limits liability, by the measure of the transferee's own responsibility for the contamination. *See id.* ("To the extent the persons and entities described in paragraph (2) contributed to any such release or threatened release, paragraph (1) shall not apply ...."). Under this provision, the Government is not responsible for asbestos contamination caused by either the LRA or the Plaintiffs.

The Government contends that factual disputes concerning responsibility for the asbestos contamination prevent summary judgment in favor of the Plaintiffs. It concedes that it was the original source of the ACM at Lowry, but it will not accept responsibility for the ACM "contamination":

> One crucial point is that, whereas we do not dispute that materials containing asbestos (*e.g.*, utility pipes) were in all likelihood *buried* underground at the Lowry site when the land was conveyed to the LRA, the remediation performed by plaintiffs involved, *not* subsurface debris, but *asbestos fibers found in the upper two feet of the soil.*

Def. Br. at 4. In other words, the need for the specific remediation and response activities demanded by CDPHE – which is of course, the basis for Plaintiffs' indemnification requests and their measure of damages – was not caused solely by the Air Force. Therefore, the DoD should not be held accountable for the costs of responding to the immediate threats that triggered the State's intervention. *See*

10 U.S.C. § 2687 note ("To the extent the [LRA and the developers] contributed to any such release or threatened release [indemnification pursuant to § 330(a)(1)] shall not apply ....").

Despite ample opportunity to explore the question of contributory responsibility during discovery, the Defendant has come up with virtually no support for its contentions that the LRA or the Plaintiffs bear responsibility for ACM in the surface and subsurface layers of the soil.

***Removal of Steam Lines***

First, the Government has suggested that the early redevelopment activities of the LRA *may have* contributed to asbestos in the soil. Defendant suggests that summary judgment is not appropriate on this issue. It contends that a fact-finder must weigh the evidence to determine responsibility. This allegation, which is premised upon the fact that the LRA removed buried steam lines and other utility pipes which had been insulated with asbestos-containing material, has never been substantiated.

This theory of soil contamination, along with the purported risk-shifting arrangements between the Air Force and the LRA, was laid out in the Assistant Secretary's August 2003 letters to Denver Mayor Hickenlooper and to State Senator Ken Gordon. Pls. App. at Tab 9. It was also suggested in testimony by Major General Fox in testimony before the Senate Armed Services Committee as early as April 1, 2004. Pls. App. at Tab 8. Yet we have not been shown any evidence supporting the view that the LRA's removal of the pipes caused a release of asbestos that resulted in the Compliance Advisories. Indeed, contemporaneous evidence, such as the RCRA Facility Assessment Report (RFA), which was prompted by the CDPHE's Compliance Order for the Air Force, suggests otherwise. *See* RCRA Facility Assessment Report, Air Force Real Property Agency (Jan. 2005) at ¶ 4.5.5 (LRA demolished facilities, "presumably as required by state and federal regulations;" for purposes of RFA, "it is assumed that there are no potential environmental concerns associated with the demolition/ relocation and disposal of these approximately 318 buildings and facilities demolished and/or relocated by LRA."); Pls. App. at Tab 6; *see also*, Deposition of Amy Lange, CH2M Hill, Pls. App. at Tab 11.

Based on this state of the evidence, no reasonable fact-finder could conclude that the removal of buried utility pipes by the LRA resulted in ACM contamination. Consequently, these allegations, which appear to have been abandoned in any case, do not preclude summary judgment. *See Williams*, 891 F.2d at 459 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

***Removal and Transfer of Soil***

Other allegations of contributory responsibility are found in the declaration of Mr. Robert E. Lackey. As the Lowry Site Manager, Mr. Lackey was "responsible for overall management of environmental remediation and compliance activities" at the former Air Force base, as well as "on-scene interface with the [LRA]". Lackey Decl. (July 26, 2006) at ¶¶ 2-3; Def. App. at 760. He indicated that "to the best of [his] knowledge" prior to the issuance of the Compliance Advisories, the LRA or contractors did advance work, including "the movement of dirt, and in some cases the introduction of fill dirt." Lackey Decl. at ¶ 6; Def. App. at 761. The Government's entire case on outside sources of ACM relies on the following observations by Mr. Lackey:

> In the very early days of construction by the developers they would dig a basement and dump the excavated dirt on an adjacent piece of property. To my knowledge, all of the homes built in the [Northwest neighborhood] have basements. However, the pace of construction soon made this impractical and the developers came up with other options to deal with excavated dirt. Thomas Markham, from the LRA, told me that the developers were contributing to a "community stockpile" located ... on a lot owned by the LRA. I personally saw this stockpile and saw many trucks take dirt to and from the pile. I am uncertain which trucks belonged to which developer, or subcontractor. However, since all of the developers were digging basements and regrading after construction to fill in around foundations and for landscaping purposes, it appeared to me that all of the developers were using the community stockpile. It is improbable to me that a developer could excavate a basement and then backfill around the foundation and not have excess soil. That soil had to go somewhere other than the hole it came from. It was most likely taken to the community stockpile, spread over the lot it came from for landscaping purposes, or used elsewhere on other lots owned by the developers.

Lackey Decl. at ¶ 7; Def. App., 761-62.

Mr. Lackey could provide only sketchy accounts of the construction taking place in the Northwest Neighborhood. Defendant attempts to establish circumstantial evidence, that might be weighed at trial. In light of the "reasonable jury" standard, summary judgment is disfavored in circumstantial evidence cases. *See Williams*, 891 F.2d at 460. However, courts are permitted to draw the line where an opposing party's evidence is not strong enough to survive a motion for summary judgment. *Id.* at 466. We do so here.

The evidence consists of a mix of first and second-hand information, which offers little more than pure speculation. We will disregard, for our present purposes, the fact that the Plaintiffs refuted Mr. Lackey's conjecture. *See* Pls.' Affids. at ¶ 6 (Plaintiffs universally deny importing soil, and all but one of the developers refrained from using

stockpiled soil); Pls. App. at Tab 26. Even if we accept Mr. Lackey's statements at face value, there are no reasonable inferences that this soil was contaminated with ACM.

***The Significance of Anticipated Construction Activities***

The CDPHE's Compliance Advisory, issued two years after the Plaintiffs began their construction, adds to the speculation that the asbestos threat may have been due in part to the actions of the LRA and the builders:

> Upon information and belief, recent construction activities (including excavation, soil grading, and landscaping) by the Recipients have resulted in some of the previously buried asbestos contamination being dug up, moved or otherwise handled, made airborne and deposited on the surface and subsurface soils in the Northwest Neighborhood.

Compliance Advisory (Apr. 24, 2003) at ¶ II. *See also*, Colorado Dept. of Public Health and Environment Fact Sheet (May 2003) ("[ACM] has been found in locations where construction is taking place, in areas where homes have been completed and residents reside, and in open blocks where little or no construction has taken place. These materials have been found both on the surface of the ground and in the subsurface."); Compl. at Tab H.

Clearly, the State assumed that redevelopment of Lowry – including the initial preparation of the sites by the LRA and the excavation activities of the builders – would necessarily have contributed to the need for remediation. Asbestos becomes an immediate health threat only when it is disturbed and released into the air where it can be inhaled. *See* CDPHE Fact Sheet. Consequently, there may not have been a need for regulation at all until the ACM was brought to the surface during redevelopment activities. The parties do not dispute this proposition. *See* Recipients' Revised "Response to Colorado Department of Public Health and Environmental Compliance Advisory" (May 8, 2003) at ¶ 4.0 ("Asbestos in the shallow surface soils is believed to be the result of the movement of asbestos during excavation or dirt-moving activities. Asbestos in the deeper subsurface soils is believed to be the result of [Air Force] activities related to building demolition and the burial of associated asbestos."); Def. App., 770.

However, all parties to these conveyances anticipated the construction activities – the grading, excavation, and removal of old steam pipes – that the Government now blames for the release. Therefore, evidence suggesting that DoD-introduced asbestos may have been inadvertently brought to the surface by the redevelopment project does not diminish the Government's liability. The FOST authorized transfer of the Northwest Neighborhood property without any restriction as to its use. The Lowry conveyances were premised on the BRAC goal of putting former military property to productive uses – the transformation of the base to residential communities. The Government applauded the attempt by the Plaintiffs to demonstrate to CDPHE that its enforcement

was excessive, but now it attacks the negotiated cleanup standard requiring the removal of the top two feet of soil where asbestos is detectable as excessive. *See* Def. Br. at 30 (Court could make the inference that "plaintiffs caused much or all of the surface soil conditions they remediated.").

The development activities in the Northwest Neighborhood were entirely proper and within the scope of the FOST and the deeds of transfer. These activities do not absolve the DoD of its responsibilities under Section 330(a). The Plaintiffs' actions in carving out basements in the land, and in transferring dirt among lots and onto the surface layer, may have caused the "release" of the buried asbestos but no fault can be attributed to their unknowing conduct. There is no question that the Air Force, as the original source of ACM buried in the soil, was to blame for the "threatened release." And the threatened release is sufficient to trigger the need for remediation, according to the CDPHE's enforcement action against the Air Force:

> Undisturbed, intact asbestos generally does not pose a health risk. Asbestos generally becomes hazardous and a health risk when disturbed in some manner that releases asbestos fibers into the air. Simple activities such as disturbing bare soils can cause the release of asbestos fibers, particularly if such fibers are located on or near the ground surface. Construction activities within the Northwest Neighborhood, including the excavation, movement and deposition of soils, and heavy vehicular traffic associated with such construction, pose a risk of airborne asbestos.

Compliance Order 04-03-24-01, Findings of Fact and Conclusions of Law (Mar. 24, 2004) at ¶ 13. Under the statute, the Government is liable for claims "predicated upon, the release *or threatened release*" of this asbestos. 10 U.S.C. § 2687 note (emphasis added). We therefore, find no distinction between the Government's responsibility for creating the threat and the Government's obligations once the threat was discovered through residential development of the former base.

## VIII. <u>Breach of Deed Covenants</u>

We have found under Section 330 that the costs of complying with the CDPHE regulatory enforcement measures should be bourne by the Government. Accordingly, we need not decide whether the Air Force also agreed by way of the covenants to conduct the required remediation when it executed the legal instrument conveying the property to the LRA. Count II is an alternative basis for liability. See Tr. at 46-47.

## CONCLUSION

Based on the foregoing reasons, we conclude that Plaintiffs have established entitlement to indemnification pursuant to Section 330 of National Defense Authorization Act of 1993, 10 U.S.C. § 2687. **Accordingly, the Defendant's motion to**

**dismiss Count I, and its motion for summary judgment on Count I, are hereby DENIED.**

Plaintiff has moved for summary judgment as to liability, as well as damages. Counsel for Plaintiff also conceded that summary disposition of damages is unusual in a case such as this one. Tr. at 45. **Accordingly, pursuant to RCFC 56(c), we enter summary judgment on the issue of liability alone**. **Plaintiff's motion for summary judgment is GRANTED, in part, and DENIED, in part.**

**The parties are to propose further proceedings in this matter in a Joint Status Report filed no later than March 23, 2007.**

**IT IS SO ORDERED.**

FRANCIS M. ALLEGRA, Judge
for Judge Lawrence M. Baskir