No. 05-1020C
Judge Sweeney

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S RENEWED MOTION TO DISMISS**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202)305-7562
Facsimile: (202)305-7644

Attorneys for Defendant

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Navy Litigation Office
Washington, D.C.

June 5, 2007

TABLE OF CONTENTS

STATEMENT OF THE ISSUES ........................................................................................1

BACKGROUND AND SUMMARY OF AISLIC'S ALLEGATIONS .......................................2

SUMMARY OF THE ARGUMENT.............................................................................................6

ARGUMENT ...............................................................................................................................8

I. Legal Standards ..................................................................................................................8

II. The United States Did Not Breach The East Housing Deed (Counts One Through Four) ................................................................................................. .......9

A. The Government Did Not Breach Either Of The Two CERCLA Covenants ........9

1. The Government Did Not Breach The First CERCLA Covenant By Its Conduct "Before" The Transfer Date ..... ....................................10

2. The Government Did Not Breach The Second CERCLA Covenant By Its Conduct "After" The Transfer Date ........... ................................. 12

B. The United States Did Not Misrepresent The Presence Of OCPs ...................... 13

1. The Quitclaim Deed Did Not Misrepresent The FOST ........................... 13

2. The Deed's Hazardous Substance Notification Was Not Misleading ....... 14

III. The United States Did Not Breach The MOA (Counts Seven And Eight) ..................... 16

A. The MOA's Disclosures Were Correct And Complete ...................................... 16

B. MOA Article 21 Creates No Obligations ......................................................... 16

IV. AISLIC Cannot Recover Under Section 330, Which Does Not Provide For Indemnification Of A Transferee's Cleanup Costs (Counts Five And Six) ..................... 17

A. Section 330's Requirements .................................................................... 17

B. Errors In Richmond American Homes v. United States .................................... 19

1. Sen. McCain's Statement Is Not "Legislative History" Of Any Of The Relevant Language Of Section 330(a)(1) Or (a)(2) ................................... 20

2. DoD's 1993 Letter To Sen. McCain Is Neither "Legislative History" Nor Relevant ........ 23

C. The City Did Not Acquire A Section 330 "Facility" ........ 23

D. There Was No "Claim" Against The City ........ 24

E. There Was No Claim "For Property Damage" ........ 26

F. There Was No Claimed "Release Or Threatened Release" Of Termiticide ........ 31

G. Assuming There Was A Threatened Release, The United States Was Not Responsible ........ 32

CONCLUSION ........ 32

INDEX TO APPENDIX

PAGES 1-10 NOT USED

Vol. 1, Final Environmental Impact Statement, Oct. 1999 (excerpts) ........11

Parcel Evaluation Data Summary (Environmental Baseline Survey, East Housing Area), April 2000 ........15

# TABLE OF AUTHORITIES

## CASES


AMI, Inc. v. International Forging Equip. Co.,
982 F.2d 989 (6th Cir. 1993) .......... 11

A&W Smelter and Refs., Inc. v. Clinton,
146 F.3d 1107 (9th Cir. 1998) .......... 11

Ambassador Div. of Florsheim Shoe Co. v. United States,
748 F.2d 1560 (Fed. Cir. 1984) .......... 9, 30

American Intl. Spec. Lines Ins. Co. v. United States,,
No. C 04-01591 CRB 2005 WL 680159 (N.D. Cal. March 24, 2005) .......... 4-5

Application of Norris,
179 F.2d 970 (CCPA 1950) .......... 3

Barnes v. Independent Auto. Dealers Assoc. of Cal. Health & Welfare Ben. Plan,
64 F.3d 1389 (9th Cir. 1995) .......... 4-5

Bell Atlantic v. Twombly,
127 S. Ct. 1955 (2007) .......... passim

Briscoe v. LaHue,
663 F.2d 713 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983) .......... 11

Bryan v. United States,
524 U.S. 184 (1988) .......... 23, 24

C.B.C. Enterps., Inc. v. United States,
24 Cl. Ct. 1 (1991) .......... 14

Casitas Mun. Water Dist. v. United States,
72 Fed. Cl. 746 (2006) .......... 18

Clary v. United States,
333 F.3d 1345 (Fed. Cir. 2003) .......... 21, 22, 24

Conley v. Gibson,
355 U.S. 41 (1957), abrogated by Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007) .......... 7

Continental Ins. Co. v. Northeastern Pharm. & Chem. Co.,
842 F.2d 977 (8th Cir. 1988) .......... 30

Cortec Indus., Inc. v. Sum Holding, L.P.,
949 F.2d 42 (2d Cir. 1991) .......... 8, 13

D.V. Gonzalez Elec. & Gen. Contrs. v. United States,
55 Fed. Cl. 447 (2003) .......... 14

Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.,
906 F.2d 1059 (5th Cir.1990) .......... 25

Dulien v. United States,
143 Ct. Cl. 484 (1958) .......... 16

First United Methodist Church of Hyattsville v. U.S. Gypsum Co.,
882 F.2d 862 (4th Cir. 1989) .......... 26

Gussack Realty Co. v. Xerox Corp.,
224 F.3d 85 (2d Cir. 2000) .......... 28

Haskell v. Time, Inc.,
857 F. Supp. 1392 (E.D. Cal. 1994) .......... 8

Hawkins v. United States,
469 F.3d 993 (Fed. Cir. 2006) ..........25, 28

Hegeman-Harris & Co. v United States,
194 Ct. Cl. 574, 440 F.2d 1009 (1971) ..........24

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 351 F.2d 972 (1965) .......... 9

Lamie v. United States Trustee,
540 U.S. 520 (2004) .......... 9

Mattes v. ABC Plastics, Inc.,
323 F.3d 695 (8th Cir. 2003) .......... 8

Munsey Trust Co. v. United States,
330 U.S. 234 (1947)..........12

New London Dev. Corp.,
ASBCA No. 54535, 05-2 BCA ¶ 33018 ..........31-32

PBGC v. LTV Corp.,
496 U.S. 633 (1990) ..........24

Papasan v. Allain,
478 U.S. 265 (1986) ....................11, 28

Redwing Carriers, Inc. v. Saraland Apts.,
94 F.3d 1489 (11th Cir. 1996) .................... 12

Richmond American Homes v. United States,
75 Fed. Cl. 376 (2007)....................7, 10, 20-25

Schwegmann Bros. v. Calvert Distillers Corp.,
341 U.S. 384 (1951) ....................23

Southern Cal. Edison Inc. v. United States,
58 Fed. Cl. 313 (2003) .................... 8

Splane v. West,
216 F.3d 1058 (Fed. Cir. 2000) .................... 9, 31

Swift & Co. v. Hocking Valley Ry. Co.,
243 U.S. 281 (1917) ....................24

Teagardener v. Republic-Franklin Inc. Pension Plan,
909 F.2d 947 (6th Cir. 1990)....................9, 17

United States Fidelity & Guar. Co. v. United States,
201 Ct. Cl. 475 F.2d 1377 (1973)....................6, 12

STATUTES

Department of Defense Appropriations Act for 1991,
Pub. L. No. 101-511, 104 Stat. 1856, 1887 (1990) .................... 25

7 U.S.C. §§ 136-136y .................... 12

10 U.S.C. § 2687 note .................... passim

28 U.S.C. § 1631 .................... 5

42 U.S.C. § 9601 .................... 28

42 U.S.C. § 9601(6) .................... 26

42 U.S.C. § 9601(9) .................... 23, 29, 30

42 U.S.C. § 9601(14) .................... 11, 29, 30

42 U.S.C. § 9607(a) .......... 29

42 U.S.C. § 9607(i) .......... 12

42 U.S.C. § 9620(h)(3)(A) .......... 9, 29

MISCELLANEOUS

S. 3114, 102d Cong. (1992) .......... 21

H.R. Conf. Rep. No. 102-966 (1992), reprinted in 1992 U.S.C.C.A.N. 1769 .......... 21

138 Cong. Rec. S13982-01 (Sept. 18, 1992) (statement of Sen. McCain) .......... 20-21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | No. 05-1020C (Judge Sweeney) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RENEWED MOTION TO DISMISS**

Pursuant to Rules 12(a)(2) and 12(b)(6) of the Court's Rules ("RCFC"), defendant, the United States, in lieu of an answer, respectfully renews its request that the Court dismiss all eight counts of the first amended complaint, filed by American International Specialty Lines Insurance Company ("AISLIC") in January 2006, for failure to state claims upon which the Court may grant relief. In support of our motion, we rely upon the pleadings and the following brief. The documents appended to this brief are cited in AISLIC's pleadings.

STATEMENT OF THE ISSUES

1. Whether the Court should dismiss counts one through four, seven, and eight of the first amended complaint for failure to state claims upon which the Court may grant relief, given that the Department of the Navy's lawful application of a chlordane-based termiticide at the East Housing Area of the former Naval Air Station Alameda (i) was not a release or threatened release of a hazardous substance, pollutant, contaminant, or petroleum product; and (ii) was fully disclosed to AISLIC's alleged insured before, or in connection with, the execution of the memorandum of agreement ("MOA") and quitclaim deed that are contained in the pleadings.

2. Whether the Court should dismiss counts five and six for failure to state claims upon which the Court may grant relief, given the pleadings establish that (i) the property acquired by

AISLIC's alleged insured was not a "facility" within the scope of section 330 of the National Defense Authorization Act of 1993, as amended, 10 U.S.C. § 2687 note ("section 330"); (ii) the costs allegedly incurred by the City to remove pesticide-treated soil when demolishing buildings at the property did not "aris[e] out of any claim for personal injury or property damage"; (iii) assuming there was a "claim," it was not predicated upon a "release or threatened release of any hazardous substance"; and (iv) assuming there was a claim premised upon a "release or threatened release," the latter was caused by the insured, not by the United States.

## BACKGROUND AND SUMMARY OF AISLIC'S ALLEGATIONS

The following narrative is derived from the pleadings and documents cited therein.

1. The Federal Government conveyed the East Housing property to an agency of the City of Alameda, California, pursuant to the Defense Base Realignment Act of 1990, 10 U.S.C. § 2687 note, by quitclaim deed dated July 17, 2000. 1st Am. Compl. Exh. 2. The attachments to the first amended complaint establish that the City was advised several times before the transfer that organochlorine pesticides ("OCPs") and related compounds were present at the property.

For example, the memorandum of agreement ("MOA") anticipating the transfer of the property, signed on June 6, 2000, states that an environmental baseline study ("EBS") for the property, dated April 2000, "ha[s] been provided to [the City]." Id. Exh. 1, at 6. A precursor of that April 2000 EBS was referenced in the finding of suitability for transfer ("FOST") executed by the Navy on April 7, 2000. 1st Am. Compl. Exh. 3, at 8.[1] The MOA and the quitclaim deed – both of which are part of AISLIC's pleadings because they are attached the first amended

---

[1] The FOST, which is Exhibit C to the MOA, cites "IT 2000" when referring to the EBS, as the EBS was prepared by IT Corporation. The EBS is also cited in the FOST as "Parcel Evaluation Data Summary Phase 2A Sampling Zone 16." See Def. App. 15 The "Introduction" to the latter document makes very clear that it is, indeed, the EBS. Id. at 20-21.

complaint – refer to the 2000 EBS. Id. Exh. 1, at 6; Exh. 2, at 6. The EBS states that soil samples taken from within the East Housing area tested positive for alpha-chlordane and gamma-chlordane; the chlordane-related compounds heptachlor and heptachlor epoxide; and methoxychlor, which is also an orgranochlorine pesticide. Def. App. 26, 28, 38.[2] The EBS contains a map showing the locations where these samples were taken. Def. App. 36A. The MOA also cites the environmental impact statement ("EIS") prepared by the Navy, dated October 1999. 1st Am. Compl. Exh. 2, at 6. The EIS states that the Navy used pesticides, including chlordane and DDT, "which are now banned." Def. App. 12.

2. At the time of the conveyance in 2000, military housing structures, around which an organochlorine termiticide had been applied, remained on the property. In May 2002, the California DTSC approved a "workplan" for the City's demolition of the buildings. See 1st Am. Compl. ¶ 45. AISLIC attached the DTSC's approval letter to its earlier pleadings in this case. 9/30/05 Transf. Compl. Exh. 2, Tab 7. AISLIC chose not to attach the letter to its Januuary 2006 first amended complaint, however, perhaps under the mistaken impression that not attaching the letter would bar the Court from considering it in connection with a motion to dismiss. In the letter, which remains part of the pleadings in this case, the State agency advised the City:

> The building foundations at EHA [East Housing area] appear to have been properly treated with organochloride pesticides (OCP) for termite control, and as such, are currently being used in the manner intended. Upon removal [by the City] of the buildings and foundations that are treated with OCP, any OCP remaining in soils and exceeding the [State-prescribed]

---

[2] The Court should take judicial notice of the nature and properties of these chemical compounds. E.g., Application of Norris, 179 F.2d 970, 973-74 (CCPA 1950). The fact sheets developed by the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (www.atsdr.cdc.gov/toxfaq.html), are an authoritative source.

> concentrations . . . would be a hazardous substance released to the environment, and would require remedial action . . . .
>
> . . . [E]nsuring that soils and structures impacted with OCP [are] removed concurrent with structure demolition . . . would lead to DTSC concurrence that no release of OCP to the environment remains that requires action.

Id. (emphasis added). The City allegedly remediated the treated soil in accordance with the State-approved workplan. 1st Am. Compl. ¶ 46.

3. In October 2002, the City filed a claim with the Navy for indemnification of the soil remediation costs under "section 330," cited above. Id. Exh. 4. The City supplemented its section 330 claim in December 2003. Id. Exh. 5.

The Department of Defense had not acted upon the claim when, in April 2004, AISLIC filed an equitable subrogation lawsuit against the United States in the District Court for the Northern District of California, seeking cost recovery and declarative relief pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), (ii) section 330, and (iii) the July 2002 quitclaim deed. AISLIC alleged in that complaint that it had incurred some cleanup costs upon behalf of the insureds. AISLIC acknowledges, however, that it did not "complete[] payment in full of all claims and demands relating to the remedial action that is the subject of this suit [until] November 20, 2005," after its claims had been transferred to this Court. 1st Am. Compl. ¶ 52.

In March 2005, the district court dismissed AISLIC's CERCLA claims for lack of jurisdiction, as unripe. American Intl. Spec. Lines Ins. Co. v. United States, No. C 04-01591 CRB, 2005 WL 680159 (N.D. Cal. March 24, 2005). The court relied upon "the general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for

her injuries, that is, has been made whole." Barnes v. Indep. Auto. Dealers Assoc. of Cal. Health & Welfare Ben. Plan, 64 F.3d 1389, 1394 (9th Cir. 1995), quoted in 2005 WL 680159, at *4; cf. United States Fidelity & Guar. Co. v. United States, 201 Ct. Cl. 1, 475 F.2d 1377, 1385 (1973) ("[W]e would be powerless . . . to require that the Government make a payment . . . to the surety when it is clear that the surety has not paid these subcontractors in full.").

4. The district court transferred AISLIC's other equitable subrogation claims to this Court, pursuant to 28 U.S.C. § 1631. 2005 WL 680159, at *5. This Court's May 5, 2006 order summarized the procedural history from the time the matter was transferred here, until that date. In July 2006, we filed a motion to dismiss or, in the alternative, for summary judgment. On January 5, 2007, AISLIC filed a motion to continue our summary judgment motion, pursuant to RCFC 56(f). On February 6, the Court (i) granted AISLIC's RCFC 56(f) motion; (ii) denied, "without prejudice," our summary judgment motion and our motion to dismiss; and (iii) canceled the oral argument.

In a teleconference on May 1, 2007, the Court denied our motion to reconsider its denial without prejudice of our motion to dismiss, but directed us to refile that motion. This is that refiling. Our arguments for dismissal are substantially the same as those we made in our prior dispositive motion. However, in accordance with the Court's instructions during the May 1 teleconference, we have deleted our arguments in favor of summary judgment and added a discussion of Richmond American Homes v. United States, 75 Fed. Cl. 376 (2007).

5. Counts one through four of the first amended complaint allege that the United States breached the quitclaim deed by falsely representing that OCPs were not present in the soil, or failing to disclose them, and by failing to remove OCPs from the soil, before or after the transfer. 1st Am. Compl. ¶¶ 53-105. In the fifth count, AISLIC alleges that it (as the City's alleged

subrogee) is entitled to indemnification under section 330 for remediation costs. Id. ¶¶ 106-19. Count six sounds in contract, and alleges that the quitclaim deed required the United States to indemnify the City under the same terms as section 330. Id. ¶ 120-35. Finally, counts seven and eight allege that the Government breached the June 2000 MOA by failing to disclose the presence of OCPs and failing to conduct remedial action. Id. ¶¶ 136-62.

## SUMMARY OF THE ARGUMENT

The first amended complaint – actually the fourth complaint AISLIC has filed in this case, including the district court litigation – is deficient upon multiple grounds. AISLIC's pleadings – which include the exhibits to the complaint and documents cited therein – establish that the City of Alameda was repeatedly placed on notice before assuming ownership of the East Housing site in 2000, that the Navy had applied a chlordane-based termiticide near buildings on the property, and that OCPs remained in the soil. In 2002, California regulators determined that the Navy had properly applied the termiticide for its intended purpose and that the termiticide would be deemed a released hazardous substance requiring remediation only if actionable amounts remained in the soil after the structures were removed. This plainly meant that no remediation would have been required, had the City not proceeded with the demolition. The City allegedly safely removed the treated soil.

Accordingly, the pleadings raise no "plausible" claims for recovery, sufficient to satisfy the pleading standard announced by the United States Supreme Court this Term in Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007). Inspection of the pleadings as a whole establishes that the United States did not breach the June 2000 MOA or the July 2000 quitclaim deed, either by failing to perform necessary remediation before or after transferring title to the City, as is alleged in counts one and two, or by inaction or affirmative misrepresentation, as is alleged in counts

three, four, seven, and eight. By and large, the quitclaim deed and the MOA do not even say what AISLIC alleges they say. To the extent the United States made contractual representations, there is no plausible basis to allege those representations were inaccurate or material.

With respect to counts five and six, the pleadings similarly establish that the City, AISLIC's alleged insured, is not entitled to indemnification pursuant to section 330. That legislation obligates the Secretary of Defense to indemnify transferees of certain military property, under limited circumstances, against particular types of costs arising from damages claims brought by third parties. The following required elements of a section 330 claim are absent here: (i) a claim (ii) against a transferee of a covered facility, as defined by CERCLA, (iii) for property damage (iv) in connection with a release or threatened release of CERCLA-regulated material (v) which resulted from military activities, rather than those of the transferee.

Instead, approximately two years after accepting title to the property, at which there had been no release of a hazardous substance, the City merely received advice from State regulators as to how to avoid environmental liability when (and if) the City demolished structures at the site. Congress plainly did not provide for indemnification under these circumstances. The far more generous interpretation of section 330 that was adopted in Richmond American Homes lacks support in the statute and flowed from the Richmond Court's mistaken reliance upon statements in the Congressional Record that are not relevant legislative history.

ARGUMENT

I. Legal Standards[3]

In Bell Atlantic, the Supreme Court abrogated Conley v. Gibson, 355 U.S. 41 (1957), and clarified that, in order to survive a motion to dismiss for failure to state a claim, it is not enough for a complaint simply to allege in conclusory fashion, as Conley had suggested, that relief could be granted under some conceivable set of facts. 127 S. Ct. at 1965-66. Instead, a complaint must allege "enough factual matter (taken as true) . . . to raise a right to relief above the speculative level," by making allegations "plausibly suggesting (not merely consistent with)" a valid claim. Id. Bell Atlantic arguably has more significance for the resolution of this case than does the February 2007 decision concerning section 330 liability in Richmond American Homes, which does not bind this Court.

Pursuant to RCFC 10(c), the exhibits to a complaint become part of the pleadings and may be consulted in resolving a motion to dismiss. Moreover, the Court may consult any documents that are contained or cited in the pleadings, without treating this motion as a summary judgment motion. E.g., Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 & n.4 (8th Cir. 2003); Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42 (2d Cir. 1991); see also Southern Cal. Edison Inc. v. United States, 58 Fed. Cl. 313, 321 (2003) (construing contract on motion to dismiss).

AISLIC cannot avoid dismissal by resting upon bare allegations as to the contents of documents cited in its pleadings. "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of

[3] We responded in July 2006 to the questions the Court posed in its May 2006 order regarding its jurisdiction. We respectfully incorporate that discussion here by reference.

translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." Cortec, 949 F.2d at 48 (emphasis added); accord Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947, 949-50 (6th Cir. 1990) ("[T]he language of the Plan, and the arguable meanings of its terms, were central to the plaintiffs' complaint, and were part of the pleadings before the district court."); Haskell v. Time, Inc., 857 F. Supp. 1392, 1397-98 (E.D. Cal. 1994).

Statutory construction begins, and typically ends, with the text. The text should be read as a whole and given its plain and ordinary meaning, when the result is not absurd, in light of the evident legislative purposes. Lamie v. United States Trustee, 540 U.S. 520, 530 (2004); Splane v. West, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000). The Court should presume that Congress intends for closely related statutes – such as Section 330 and CERCLA – to "work harmoniously together, and for neither to frustrate the other, or partially repeal it . . . ." Ambassador Div. of Florsheim Shoe Co. v. United States, 748 F.2d 1560, 1565 (Fed. Cir. 1984).

Similarly, contract terms are interpreted as far as possible in accordance with their plain and ordinary meaning, without rendering any part superfluous or producing an absurd result. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F.2d 972, 975 (1965).

## II. The United States Did Not Breach The East Housing Deed (Counts One Through Four)

### A. The Government Did Not Breach Either Of The Two CERCLA Covenants

AISLIC could recover only if, and to the extent, the United States would be liable in a lawsuit brought directly by the City, AISLIC's alleged subrogor. Cf. Munsey Trust Co. v. United States, 330 U.S. 234, 242 (1947) (noting "[o]ne who rests on subrogation stands in the place of one whose claim he has paid" and "cannot acquire by subrogation" any rights that the alleged subrogor "did not have"); U.S. Fidelity, 475 F.2d at 1382. There is no legal liability.

The first four counts of the first amended complaint allege breaches of the July 2000 East Housing Area quitclaim deed. 1st Am. Compl. ¶¶ 53-105. Counts one and two rely upon two covenants which were included in the deed pursuant to CERCLA (the "CERCLA covenants"). See 42 U.S.C. § 9620(h)(3)(A)(ii)(I), (II). They appear in section F of the deed and provide:

> 2. Grant of Covenant [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(ii)(I)]. The GRANTOR [United States] covenants that all remedial action necessary to protect human health and the environment with respect to any hazardous substance remaining on the Property has been taken before the date of transfer.
>
> 3. Additional Remediation Obligation [CERCLA 42 U.S.C. Section 9620 (h)(3)(A)(ii)(II)]. The GRANTOR covenants and warrants that the GRANTOR shall conduct any additional remedial action necessary after the date of transfer of any hazardous substance existing on the Property prior to the date of this Deed. This covenant shall not apply to the extent that the GRANTEE caused or contributed to any release or threatened release of any hazardous substance, pollutant, contaminant, petroleum, or petroleum derivative.

1st Am. Compl. Exh 2, at 6 (emphasis added; bracketed statutory citations in original).[4] The Richmond American Homes Court did not construe the CERCLA covenants upon which the plaintiffs in that case relied. 75 Fed. Cl. at 399.

### 1. The United States Did Not Breach The First CERCLA Covenant By Its Conduct "Before" The Transfer Date

AISLIC alleges the Government breached the first covenant above "by failing to take all remedial action necessary to protect human health and the environment with respect to the hazardous substances chlordane and/or OCPs remaining on the Property before the [transfer]

[4] The East Housing deed covenants do not precisely track 42 U.S.C. § 9620(h)(3). For example, pursuant to the statute, the final sentence of the second covenant should refer only to "any hazardous substance," and not to "any . . . . pollutant, contaminant, petroleum, or petroleum derivative." The inconsistencies appear to be immaterial to this case.

date . . . ." Id. ¶ 60 (emphasis added). However, the May 2002 letter to the City from the California DTSC, which is part of the pleadings, RCFC 10, indicates that (i) the pesticide was "properly applied" by the Navy and was functioning "in the manner intended," and, consequently, (ii) there existed no threat to "human health [or] the environment" requiring remediation "before" the transfer of ownership. (Indeed, as discussed below, the DTSC stated that no such threat existed after the transfer, either.) These are the only "plausible" inferences that can be drawn from AISLIC's pleadings. See Bell Atlantic, 127 S. Ct. at 1966.

AISLIC's conclusory allegation that the termiticide used by the Navy constituted a "hazardous substance" requiring remediation before the transfer is "a legal conclusion couched as a factual allegation," and is not presumed true under RCFC 12(b)(6). Papasan v. Allain, 478 U.S. 265, 286 (1986) (citing Briscoe v. LaHue, 663 F.2d 713 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983)). The pleadings demonstrate that the allegation is legally erroneous. The CERCLA liability scheme regarding "hazardous substances," 42 U.S.C. § 9601(14), does not apply to useful products used for their intended purpose, including lawfully applied pesticide that serves a legitimate purpose in its existing state. See A&W Smelter and Refs., Inc. v. Clinton, 146 F.3d 1107, 1112 (9th Cir. 1998); AMI, Inc. v. International Forging Equip. Co., 982 F.2d 989, 998 (6th Cir. 1993). That is, of course, exactly how the California DTSC characterized the termiticide in the soil at the East Housing area in May 2002: The DTSC declared that the pesticide had been "properly applied" and was functioning "in the manner intended," even after the property was transferred to the City. 9/30/05 Transf. Compl. Exh. 2, Tab 7.

Because it is apparent, based upon the pleadings, that the termiticide constituted a "useful product" being used for its intended purpose, the United States bore no responsibility to

remediate the termiticide before the conveyance, and the first CERCLA covenant above provides no grounds upon which to grant relief .

2. The United States Did Not Breach The Second CERCLA Covenant By Its Conduct "After" The Transfer Date

Similarly, there was no breach of the second CERCLA covenant above. That covenant pertains to "additional remedial action necessary after the date of transfer . . . ." 1st Am. Compl. Exh 2, at 6. The pleadings establish that no "remedial action [was] necessary," in the words of the covenant, until the City created new circumstances, by demolishing the existing buildings. 1st Am. Compl. ¶¶ 44-46. As a result, by its terms, the second CERCLA covenant does "not apply." Id. Exh 2, at 6.

Application of a pesticide that is registered in accordance with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y – which includes the chlordane-based termiticide at issue here, at the time the Navy allegedly used it at the East Housing area – does not cause a release giving rise to CERCLA liability. Redwing Carriers, Inc. v. Saraland Apts., 94 F.3d 1489, 1511 n.31 (11th Cir. 1996) (holding the 42 U.S.C. § 9607(i) exclusion covers chlordane and dieldrin compounds, although both chemicals later lost FIFRA registration). Consistent with this, the California DTSC never identified a "release or threatened release of any hazardous substance, pollutant, contaminant, petroleum, or petroleum derivative" caused by the Navy at the East Housing area, within the meaning of the second covenant above.

To the contrary, the pleadings establish that the State agency advised the City, almost two years after the City assumed ownership of the property, that remedial action of hazardous substances would be required only if the buildings were demolished and treated soils exceeding an action level were left in place. 9/30/05 Transf. Compl. Exh. 2, Tab 7. Even assuming, for

purposes of argument, that the City's demolition plan presented a "threat" of a "release" of termiticide into the soil within the meaning of the second CERCLA covenant above, that "threatened release" would have resulted from the City's decisions concerning redevelopment of the property. Since, even if we assume that the condition cited by the DTSC constituted a "threatened release," the only plausible inference from the pleadings is that the City alone "caused or contributed to" that condition, count two fails to state a claim. The second covenant above does "not apply" and did not obligate the United States to remediate soil in connection with the City's demolition activities. 1st Am. Compl. Exh 2, at 6.

B. The United States Did Not Misrepresent The Presence Of OCPs

AISLIC's third and fourth counts allege that the United States breached the East Housing quitclaim deed by misrepresenting or failing to disclose the Navy's use, storage, release, or threatened release of OCPs at the site. 1st Am. Compl. ¶¶ 74-105. These two counts also fail as a matter of law, as the pleadings and documents cited therein demonstrate the invalidity of AISLIC's misrepresentation claims. See RCFC 10(c); Cortec, 949 F.2d at 48.

1. The Quitclaim Deed Did Not Misrepresent The FOST

AISLIC "must [plausibly] allege a connection between the government's [supposed] misrepresentation and an express contract term." D.V. Gonzalez Elec. & Gen. Contrs. v. United States, 55 Fed. Cl. 447, 459 (2003) (emphasis added); accord C.B.C. Enterps., Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). Count three alleges that "[p]ursuant to the terms and conditions of the East Housing Deed, the Government represented that the FOST listed the pesticides that may have been used on the Property. See East Housing Deed, II.F.1.a and FOST, Section 6.8." 1st Am. Comp. ¶ 75. It further alleges that a failure to disclose the presence of OCPs in the FOST "was a negligently untrue representation of fact," resulting in a breach. Id. ¶ 81.

An examination of the portions of the quitclaim deed and the FOST cited by AISLIC demonstrates that the Government made no such representation of fact. Section II.F.1.a of the deed simply states in general terms that a FOST was prepared. Section II.F.1.a says nothing about "pesticides." 1st Am. Compl. Exh. 2, at 6. Equally fatal to count three, that same section of the deed states that the City "is hereby made aware of the notifications contained in the FOST and EBS [environmental baseline survey]." Id. As noted above, the EBS is part of the pleadings and discloses multiple detections of OCPs in soil samples taken from the property. Def. App. 26, 28. Given the disclosures in the EBS, and the reference to the EBS in the deed, there could have been no misrepresentation in the deed regarding OCPs.

Because the deed – the contractual document executed by the United States and the City – contains no specific representations concerning the FOST at all, there is no textual basis for count three. D.V. Gonzalez, 55 Fed. Cl. at 459. The FOST itself, by contrast, is not a contract, and thus cannot form the basis for a contractual misrepresentation claim. Id. There was, in any event, no misrepresentation in the FOST, either. Section 6.8 of the FOST, which AISLIC cites, does not, by its terms, purport to provide a complete list of pesticides used in the East Housing area. Instead, it lists substances that "typically" or "may" have been used, throughout the former Naval Air Station. 1st Am. Compl. Exh. 3, at 12. Nowhere in the FOST was it suggested that FOST section 6.8 listed all pesticides that were ever used at the East Housing area. Count three thus fails to state a claim for relief.

2. The Deed's Hazardous Substance Notification Was Not Misleading

Count four, by contrast, alleges that the United States breached the deed by omitting OCPs from the "Hazardous Substance Notification" in exhibit B of the deed, "misle[ading] the Alameda Reuse and Redevelopment Authority to believe that Chlordane and/or OCPs were not

stored for one year or more, known to have been released, or disposed of on the Property." 1st Am. Compl. ¶ 101. This count also fails as a matter of law, essentially for reasons already noted. Chlordane did not need to be listed as a hazardous substance in the deed notification, because it was not a hazardous substance that was stored, released, or disposed of at the site, as those terms are used in CERCLA. The pleadings establish that, as far as the California regulators and the City ever determined, the chlordane-based termiticide was applied in a lawful manner and served its intended purpose until the City demolished the nearby buildings. AISLIC has alleged no facts "plausibly suggesting (not merely consistent with)" storage, release, or disposal of OCPs. Bell Atlantic, 127 S. Ct. at 1966.

Just as important, as a matter of law, AISLIC cannot establish "reasonable reliance" by the City upon any alleged misrepresentation by the Navy regarding OCPs. See, e.g., Dulien v. United States, 143 Ct. Cl. 484, 493-94 & n.9 (1958). This is because the pleadings establish that, well before it accepted the quitclaim deed in 2000, the City was repeatedly put on notice that OCPs had been used at the East Housing Area.

The environmental impact statement, which is cited in the MOA, discloses the Navy's use of chlordane pesticide. Def. App. 12. The environmental baseline survey, which is also cited in the MOA, and which the City acknowledged in the MOA having received, notes the presence of several OCPs. Id. at 26, 28, 38. The pleadings themselves (among other documents which we could adduce) thus establish the absence of any grounds to allege that the Navy concealed from the City the use or presence of OCPs at the East Housing Area.

Therefore, like counts one and two, counts three and four should be dismissed for failure to state a claim, because the pleadings, and documents cited therein, demonstrate the invalidity of AISLIC's misrepresentation claims. See, e.g., Teagardener, 909 F.2d at 949.

III. The United States Did Not Breach The MOA (Counts Seven And Eight)

A. The MOA's Disclosures Were Correct And Complete

AISLIC alleges in its seventh and eighth counts that the Government breached the memorandum of agreement, which was signed approximately six weeks before the quitclaim deed. 1st Am. Compl. ¶¶ 136-62. Count seven alleges that the Government materially misrepresented and failed to identify, in the MOA or its exhibits, OCPs among the hazardous substances that were stored for one year or more, or known to have been released or disposed of on the property. Id. ¶¶ 136-53. Count seven fails for reasons similar to those discussed above.

Even assuming AISLIC could present probative evidence to support its allegations of storage, release, or disposal of OCPs (which it could not), we have just demonstrated that the MOA and its exhibits did, in fact, disclose the use of chlordane, and the presence of OCPs in soil samples. Because the pleadings thus establish that the City could not have reasonably relied upon a belief that it would not find OCPs at the property, count seven fails to state a claim.

B. MOA Article 21 Creates No Obligations

In count eight, AISLIC alleges that the Government breached article 21 of the MOA, which provides that the City had "no obligation under this Agreement to undertake the defense of any claim or action, whether in existence now or brought in the future, or to conduct any cleanup or remediation action solely arising out of the use or release of any toxic or hazardous wastes, substances or materials . . . on or from any part of the Property due to activity on the Property by the Government." 1st Am. Compl. ¶ 157 (emphasis added); see id. Exh. 1, at 16. Count eight also fails as a matter of law.

Most important, article 21 is plainly not an indemnification provision: It simply clarifies that the City did not assume any cleanup responsibilities or obligations as a consequence of

signing the MOA. By its terms, article 21 does not contain any affirmative promises by the United States. It is a provision that "merely recites a condition of the parties' exchange and as such [creates] no affirmative obligation[.]" Casitas Mun. Water Dist. v. United States, 72 Fed. Cl. 746, 753 (2006) . Consequently, article 21 cannot support a breach claim. Cf. id.

Alternatively, assuming article 21 can be read to impose affirmative duties, AISLIC fails to allege, as explained above, any costs which were incurred by the City and were due "solely" to the use or release of a "hazardous substance" by the Navy. The only plausible inferences from the pleadings and documents cited therein are that the Navy used a lawfully registered termiticide, which served its purpose. Application of the pesticide did not constitute the release of a hazardous substance by the Navy. By the same token, the pleadings establish that any costs incurred by the City to remediate soil after the City assumed ownership are not attributable "solely" to the Navy's activities at the site “before” the transfer of title. Accordingly, the pleadings show that count eight fails to state a claim for breach damages under the MOA.

IV. AISLIC Cannot Recover Under Section 330, Which Does Not Provide For Indemnification Of A Transferee's Cleanup Costs (Counts Five And Six)

Finally, count five of the first amended complaint alleges that the City and its subrogee, AISLIC, are entitled to recover the remediation-related costs under section 330, 1st Am. Compl. ¶¶ 106-19; and count six alleges the Government "expressly recognized" section 330 obligations in the East Housing deed. Id. ¶ 122. Because the contract claim depends entirely upon, and adds nothing to, AISLIC's claim of entitlement under the statute, we focus upon the statute.

A. Section 330's Requirements

Section 330 directs the Secretary of Defense to indemnify a transferee of closed military property solely against "claims" by third parties for "personal injury or property damage"

suffered by those third parties. The statute does not apply here, since AISLIC does not allege that the DTSC, or another third party, pursued a claim against the City for damage suffered by the third party.

Section 330 provides in relevant part:

> a) IN GENERAL.– (1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.
>
> (2) The persons and entities described in this paragraph are the following:
>
> (A) Any State (including any officer, agent, or employee of the State) that acquires ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1).
>
> (B) Any political subdivision of a State (including any officer, agent, or employee of the State) that acquires such ownership or control.
>
> (C) Any other person or entity that acquires such ownership or control.
>
> (D) Any successor, assignee, transferee, lender, or lessee of a person or entity described in subparagraphs (A) through (C).
>
> (3) To the extent the persons and entities described in paragraph (2) contributed to any such release or threatened release, paragraph (1) shall not apply. . . .

10 U.S.C. § 2687 note.

Section 330 thus establishes several prerequisites to indemnification. Although the requirements arguably could be analyzed in various orders and combinations, to survive a motion to dismiss, a section 330 claimant must plausibly allege, at a minimum, that:

(i) It is a "person or entity" described in subsection (a)(2);

(ii) It has acquired "ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1)";

(iii) It has encountered a "suit, claim, demand or action, liability, judgment, cost or other fee";

(iv) The latter circumstance or expense "aris[es] out of [a] claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss)";

(v) The latter claim "results from, or is in any manner predicated upon, the release or threatened release of any the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative" at a covered property;

(vi) The release or threatened release occurred "as a result of Department of Defense activities"; and

(vii) The party that is allegedly entitled to indemnification (here, the City) did not "contribut[e] to any such release or threatened release" (subsection (a)(3)).

B. Errors In Richmond American Homes v. United States

The Court in Richmond American Homes, 75 Fed. Cl. 376, in granting partial summary judgment for the plaintiffs in that case with regard to section 330 liability, erroneously read section 330 as imposing more lenient requirements than those listed above. Relying heavily, and

repeatedly, upon a September 1992 floor statement by Senator John McCain – who, as we will explain, supported different legislation – the Court held, among things, that:

(i) "[No] 'third party claim' is required for application of Section 330(a)(1)," id. at 391;

(ii) An "exertion of regulatory authority" by a State agency, without either an enforceable order or a demand for money, can (perhaps depending upon the facts of a given case) constitute a "claim for personal injury or property damage," id. at 391-93;

(iii) "[T]he language 'loss of or damage to property or economic loss'" in the legislative definition of "property damage" "encompasses . . . necessary preventative measures such as . . . response actions directed by [State agencies]," id. at 394; and

(iv) As a consequence of the above, "Section 330 spares the transferee of former DoD base property [all] burdens and risks associated with defending environmental suits or enforcement actions." Id. at 395.

We explain below that the Richmond American Homes Court's erroneous method of statutory interpretation underlies these mistaken holdings

1. Senator McCain's Statement Is Not "Legislative History" Of Any Of The Relevant Language Of Section 330(a)(1) Or (a)(2)

The Richmond American Homes Court was led astray by, first, mistakenly considering what it believed to be the "legislative history" of section 330 before construing the plain words of the statute. Compare 75 Fed. Cl. at 387-88 ("Senator John McCain . . . explain[ed] in no uncertain terms [section 330's] intended purpose.") with Clary v. United States, 333 F.3d 1345, 1348 (Fed. Cir. 2003) ("To interpret a statute we first look to the statutory language and then to the legislative history if the statutory language is unclear.").

Additionally, the Richmond American Homes Court repeatedly employed one statement from what it believed to be the "legislative history" of section 330 to broaden its meaning, without ever asking whether section 330 is ambiguous, much less holding that it is. Compare 75 Fed. Cl. at 387, 389 ("Section 330 . . . provides the protections to which Senator McCain referred in his statements on the floor of the Senate."), 390 ("We cannot reconcile [the Government's] view with the broad exposure urged by Senator McCain . . . . Rather, our understanding of Section 330 recognizes [sic] the Government's 'obligation to help facilitate a safe and timely transfer of base property to other uses.'" (quoting 138 Cong. Rec. S13982-01 (Sept. 18, 1992) (statement of Senator McCain)), 395 ("Section 330 . . . is aimed at removing disincentives such as protracted litigation to private development of former military bases." (citing Senator McCain again)) with Clary, 333 F.3d at 1345, 1349 (examining no legislative history, noting "[n]either party asserts this [statutory] section is ambiguous").

The Richmond American Homes Court made still another mistake. For, as we explained in that case, Senator McCain was not discussing the version of section 330 that was passed by Congress, and that currently exists, in his September 1992 floor statement. Thus, the views he expressed are not "legislative history" of section 330(a)(1) or (a)(2). At the time Senator McCain spoke in September 1992, the bill before the Senate prescribed a far broader indemnification of transferees of base property than Congress ultimately enacted, and the President signed, into law. Most important here, the Senate Bill contained neither the words "claim for personal injury or property damage," which are construed in Richmond American Homes and are at the center of this case, nor the related term "plaintiff," which now appears in section 330(d). See S. 3114, 102d Cong., § 317 (1992). Senator McCain was speaking in

opposition to a limiting amendment to the Senate Bill. 138 Cong. Rec. S13982-01 (Sept. 18, 1992) (statement of Senator McCain).

Given the clarity of section 330, there should be no need to examine legislative history. Clary, 333 F.3d at 1348. But assuming the act is ambiguous, views expressed (i) by a legislatve opponent (ii) before the text at issue was under consideration do not aid in construing the words "arising out of a claim for personal injury or property damage." E.g., Bryan v. United States, 524 U.S. 184, 196 (1988) (statements by opponents of legislation carry no weight); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394 (1951). Indeed, all of the legislative language that is most important here – the words "claim for personal injury or property damage" in section 330(a)(1); the related requirement in section 330(c) that the transferee tender the "claim" to the Government; and section 330(d), which governs the accrual of an indemnification claim and uses the term "plaintiff" to describe a third party – was added after the bill left the Senate, in the House-Senate Conference convened later in September 2002 to reconcile the House and Senate Bills. See H.R. Conf. Rep. No. 102-966, pt. 3, at 685 (1992) ("The House recedes with an amendment . . . .") (emphasis added), reprinted in 1992 U.S.C.C.A.N. 1769, 1776. We have found no pertinent legislative history from the House of Representatives concerning the operative language of section 330.

By relying upon a floor statement that is not legislative history, the Richmond American Homes Court treated the Senate Bill supported by Senator McCain "as if it had become law, when in fact it did not." Former Emp'ees of Marathon Ashland Pipe Line Co. v. Secretary of Labor, 370 F.3d 1375, 1384-85 (Fed. Cir. 2004). Senator McCain's floor statement is of no assistance in construing section 330, because it reflects rejected legislative intent.

2. DoD's 1993 Letter To Senator McCain Is Neither "Legislative History" Nor Relevant

With all due respect, the Court in Richmond American Homes also erred by relying, in part, upon a letter concerning section 330 from David Berteau, then the Principal Deputy Assistant Secretary of Defense, to Senator McCain, dated February 3, 1993. 75 Fed. Cl. at 388-89. Mr. Berteau stated in that letter that section 330 and similar legislation "perhaps effectively eliminat[e] . . . legitimate limitations on the Department's liability," and that "[t]he wholesale shift of all risks to the Department may" delay the disposition of base closure properties. Id. (emphasis added). The February 1993 DoD letter is not "legislative history," as it was written after section 330 was passed, not before. It is, at best, one item of "subsequent legislative history," a species which is "worthy of little weight." Colt Indus., Inc. v. United States, 880 F.2d 1311, 1313 n.** (Fed. Cir. 1989); accord PBGC v. LTV Corp., 496 U.S. 633, 650 (1990). In any event, the letter contains no statements of legislative intent, nor does it constitute, with its qualifications ("perhaps effectively," "may"), a formal or definite interpretation by DoD of any language of section 330 that is at issue here. Nor is the letter relevant as a supposed "admission of law" by DoD. Admissions of that kind do not, as a rule, bind either the Court or the parties. Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1917); Hegeman-Harris & Co. v. United States, 194 Ct. Cl. 574, 581, 440 F.2d 1009, 1012 (1971).

C. The City Did Not Acquire A Section 330 "Facility"

The starting point for construing section 330 is not legislative history, as in Richmond American Homes, but the "literal text," which is given "its plain meaning." Hawkins v. United States, 469 F.3d 993, 1000 (Fed. Cir. 2006). The pleadings establish that the express requirements in section 330(a) of a CERCLA "facility"; a "claim for personal injury or property

damage"; an alleged "release or threatened release"; and an absence of contributory causation by the party invoking section 330 (here, the City) are all missing here.

The first issue was not addressed in Richmond American Homes. Pursuant to section 330(a)(2), a person or entity eligible for indemnification must have acquired ownership or control of "any facility at a military installation (or any portion thereof)." Section 330(f) incorporates CERCLA's definition of the term "facility," which includes "any site or area where a hazardous substance has . . . come to be located; but does not include any consumer product in consumer use . . . " 42 U.S.C. § 9601(9) (emphasis added). As previously stated, the pleadings demonstrate that, until the City demolished the buildings, the termiticide at the East Housing Area was a useful product applied for its intended use – protecting the buildings.

The "consumer use" exception is broad enough to encompass the East Housing property in general. See, e.g., Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059, 1065-66 (5th Cir.1990) (holding Congress did not intend to provide for recovery for releases from useful consumer products contained in building structures); see also Kane v. United States, 15 F.3d 87, 89 (8th Cir. 1994) (holding sale of a building containing asbestos insulation exempt from CERCLA under consumer use exception, under facts of the case). Accordingly, the East Housing property was not a CERCLA "facility," and the City could not, if it were the plaintiff, meet a threshold requirement for recovery under section 330. Cf. First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 867 (4th Cir. 1989) (holding CERCLA as a whole "cannot reasonably be interpreted to encompass the asbestos-removal problem").

D. There Was No "Claim" Against The City

Assuming the City took title to a statutory "facility," AISLIC does not plausibly allege the City faced a "claim for personal injury or property damage," as required by section 330(a)(1).

That section encompasses only liabilities "arising out of any claim for personal injury or property damage" relating to military activities at a covered base (emphasis added). The significance of the quoted language is confirmed by comparing section 330 to a prior law, indemnifying the State of New Hampshire for costs arising at Pease Air Force Base. Section 8056 of the Department of Defense Appropriations Act for 1991, Pub. L. No. 101-511, 104 Stat. 1856, 1887 (1990), was substantially similar to section 330, except that the earlier legislation held New Hampshire harmless "from and against all suits, claims, demands or actions, liabilities, judgments, costs and attorney's fees arising out of, or in any manner predicated upon releases or threatened releases of hazardous substances, or pollutants or contaminants resulting from Department of Defense activities at Pease[.]" Id. (emphasis added).

Section 330 – rather than providing for indemnification of suits, claims, etc., arising out of, or predicated upon, "releases or threatened releases" – refers to suits, claims, etc., "arising out of any claim for personal injury or property damage . . . that results from, or is in any manner predicated upon, [a] release or threatened release," etc. The "arising out of any claim" language inserted by Congress into section 330 limits the general categories of recoverable costs set forth in the statute. This limitation obligates AISLIC to point to a "claim for personal injury or property damage" from which the damages it seeks "aris[e]." Suits, claims, demands, liabilities, costs, etc. that do not "aris[e]" from a "claim for personal injury or property damage" are excluded from the scope of the indemnity. Indeed, even these categories of "suit, claim, demand or action, liability, judgment, cost or other fee" all denote, in context, circumstances and expenditures related to litigation or similar disputes – and not to an entity's general environmental expenses.

It is clear from the plain language of section 330(a) alone, therefore, that a legal "claim" for personal injury or property damage would need to have been brought against the City, in order for section 330 to apply here. Other language in the statute supports the same reading. Section 330(c)(1) provides that, if the Secretary of Defense determines that indemnification may be available, the Secretary may "settle or defend, on behalf of [the indemnitee], the claim for personal injury or property damage." This provision makes no sense if the term "claim" is not understood to mean a legal or administrative proceeding against the alleged indemnitee. The reference to a "claim" cannot mean merely the incurrence of cleanup costs by a transferee, since such costs are not ordinarily said to be "settle[d]" or "defend[ed]" against.

Similarly, section 330(d) provides that a claim for indemnification accrues when the "plaintiff knew (or reasonably should have known) that the personal injury or property damage referred to in Section (a) was caused or contributed to by" a covered release or threatened release (emphasis added). The term "plaintiff" must refer to someone other than the transferee – as the transferee is identified elsewhere in the act as "the person or entity making a claim for indemnification" (in Section 330(b)) and "that person" (in Section (c)(1)). Reference to a "plaintiff" in subsection (d) confirms that Congress intended that an indemnified party would be facing a damages claim brought by a third party.

The Richmond American Homes Court disagreed, primarily because it believed "the Government cited no authority" for our position, and the Court could not "reconcile [our] view with the broad exposure urged by Senator McCain and feared by Mr. Berteau [of DoD]." 75 Fed. Cl. at 390. However, the "authority" for our reading of section 330 is the text of section 330, which we parsed above. Hawkins, 469 F.3d at 1000. And the Court's reliance upon Senator McCain's 1992 floor statement and the 1993 DoD letter is misplaced, as explained above.

The Richmond American Homes Court expressed concern that our position "reject[s]," as a qualifying "claim," "a State effort to compel remedial action . . . to protect its citizens." Id. at 391. That is, indeed, the plain meaning of what Congress has said in section 330, however. Had Congress intended, as the Richmond Court believed, to protect transferees from any and all environmental costs, section 330 would say so. It would not be confined to costs "arising out of any claim." By contrast, the text of section 330 plainly indicates a legislative intent to require a third-party legal claim against a transferee.

That condition is not satisfied here. AISLIC alleges that "the DTSC asserted a claim, demand, and/or action against the [City and AISLIC], requiring [them] to conduct remedial action." 1st Am. Compl. ¶¶ 111, 127. This is a legal conclusion which is not presumed true under RCFC 12(b)(6), and which the Court can, and should, reject. Papasan, 478 U.S. at 286. As a threshold matter, the terms "demand" and "action" are irrelevant. As noted, section 330(a) includes demands or actions only if they "aris[e] from any claim." The threshold question is, therefore, only whether the costs AISLIC seeks to recover arose from a "claim." A "demand" or "action" against a transferee which is not a "claim" does not trigger section 330. The statement in Richmond American Homes that the act "provid[es] for indemnification from and against 'any suit, claim, demand or action, liability, judgment, cost or other fee," 75 Fed. Cl. at 390, is wrong as a simple matter of syntax, as it reads the "arising out of" clause entirely out of the act.

The only supposed "claim" that can be plausibly found in AISLIC's pleadings is the May 2002 letter from the DTSC approving the City's soil remediation workplan. See 1st Am. Compl. ¶ 45. The DTSC said the chlordane compounds found in the soil at the East Housing area were "currently being used in the manner intended," and "would be a hazardous substance released to the environment, and would require remedial action," only if the City removed the buildings

from the site and did not remediate the allegedly pesticide-treated soil. 9/30/05 Transf. Compl. Exh. 2, Tab 7. The State regulators did not claim the City had caused any damage; demand money from the City; or even impose any firm requirement that the City remediate the soil, should the City opt not to proceed with the demolition. Because the May 2002 advisory letter from the DTSC was only that, an advisory, and not a legal "claim" within the plain, intended meaning of section 330(a), the City possesses no right to indemnification under the statute, and the Court should dismiss counts five and six.

E. There Was No Claim "For Property Damage"

Assuming the May 2002 advisory from the DTSC could be deemed a "claim" brought by the DTSC, it certainly was not a claim "for personal injury or property damage," as required by section 330(a)(1). The DTSC obviously did not bring a personal injury claim. Assuming there was a "claim," the question is whether it could be called a claim for "property damage," within the meaning of section 330(a)(1). A fair comparison of the text of section 330 and the allegations in the pleadings establishes that the answer is no.

In section 330(f), Congress expressly incorporated the definitions set forth in CERCLA, 42 U.S.C. § 9601, of "[t]he terms 'facility,' 'hazardous substance,' 'release,' and 'pollutant or contaminant' . . . ." Although neither statute contains a definition of "property damage," section 330 and CERCLA should be construed consistently, as they are in pari materia. Cf. Ambassador Div. of Florsheim, 748 F.2d at 1565. CERCLA contains only one provision authorizing an action based upon damage: Pursuant to CERCLA section 107, parties associated with a site (or "facility") at which a CERCLA-regulated substance has been released may be held "liable [to the Government] for . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a

release[.]" 42 U.S.C. § 9607(a)(4) (emphasis added). Consistent with this, CERCLA defines the related term "damages" to mean only "damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title." Id. § 9601(6).

Other CERCLA provisions, by contrast, rather than creating monetary liability for damage, authorize suits in equity against potentially responsible parties for incurred cleanup costs, id. §§ 9607(a)(1)-(3), 9613(f) (contribution claims by potentially responsible parties), and empower courts and the Executive Branch to order the removal or remediation of environmental contamination. Id. §§ 9604, 9606. "Under CERCLA," therefore, "cleanup costs are not substantially equivalent to compensatory damages for injury to or destruction of the environment." Continental Ins. Co. v. Northeastern Pharm. & Chem. Co., 842 F.2d 977, 986 (8th Cir. 1988) (en banc) (emphasis added); accord Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 91 (2d Cir. 2000).

It should be presumed, given these features of CERCLA, a statute that section 330 partially incorporates, that, had Congress intended to indemnify transferees for environmental cleanup costs, such as the costs allegedly incurred by the City of Alameda, Congress would have said so, rather than specifying "property damage." Had Congress included remediation costs in the section 330 indemnity, it would have essentially duplicated the cost-recovery provisions that already existed under CERCLA, 42 U.S.C. §§ 9607, 9613, while, at the same time, rendering superfluous the post-transfer obligations imposed upon the Government by the "CERCLA covenants" which must appear in deeds transferring Federal lands. Id. § 9620(h)(3)(A)(ii). Congress instead chose to omit cleanup costs from section 330 and to limit the statutory indemnity to transferees facing "claim[s] for personal injury or property damage."

The Richmond American Homes Court rejected this reading, primarily because it saw "no indication that Congress intended to limit the type of property damage." 75 Fed. Cl. at 394. But that simply begs the question of whether cleanup costs are "property damage" in the first place. Again, had Congress intended to cover remediation costs in section 330, it would have been simple to say so: There would have been no need for the limiting term "property damage." Given that the term is in the statute, however, it cannot be ignored. Splane, 216 F.3d at 1068.

The Richmond American Homes Court said we "essentially ignor[ed]" New London Development Corp., ASBCA No. 54535, 05-2 BCA ¶ 33018. 75 Fed. Cl. at 394. We explained to the Court however, that New London – although not nearly as definitive a ruling as the Richmond decision seems to suggest – was wrongly decided. The board in New London construed, in an interlocutory decision, contract language that tracked section 330. But the board erroneously skipped directly to asking whether there was "property damage," without considering whether there had been a "claim" against the contractor. Indeed, New London nowhere construes the term "claim." Furthermore, the suggestion in New London that a "claim for property damage" may exist whenever a contractor alleges it has itself incurred an "economic loss" must be rejected, because it would render section 330 nonsensical: Under that reading of section 330(a), a transferee of base property would be indemnified against a "claim for" its own costs ("economic loss"). That is not a grammatical construction.

Properly read, against the backdrop of CERCLA and ordinary legal usage, section 330(a) requires that a third party pursue a "claim" against the indemnitee, for "property damage" suffered by that third party, which may include "economic loss." Add to this Congress' complete omission from section 330 of any reference whatsoever to "cleanup" or "remediation" costs, and it is evident that Congress intended to exclude a transferee's own remediation costs from the

kinds of "claims" from which costs reimbursable under section 330 may "arise." Accordingly, even assuming the May 2002 advisory letter from the California DTSC regarding the East Housing Area constituted a "claim" (which it did not), the "claim" did not, as a matter of law, involve "property damage," so there can be no relief under section 330.

F. There Was No Claimed "Release Or Threatened Release" Of Termiticide

Alternatively, if the Court discerns a "claim" for "property damage" against the City, there are further deficiencies in AISLIC's statutory claim. Section 330(a)(1) provides that a claim against a transferee of covered military property must be "predicated upon[] the release or threatened release of any hazardous substance or pollutant or contaminant . . . . " Section 330(f)(1) incorporates the CERCLA definitions of "release," "hazardous substance," and "pollutant or contaminant," 42 U.S.C. § 9601(14), (22), and (33). "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." Id. § 9601(22).

Here, as demonstrated above, there was no release or threatened release of the chlordane termiticide, which was properly applied by the Navy; served its intended purpose as a consumer product while in the soil; and was allegedly safely removed by the City. 1st Am. Compl. ¶ 46. Thus, an additional reason the City does not meet the criteria for relief under section 330 is that the City faced no claim for relief based on any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposal of termiticide into the soil at the East Housing Area.

The facts of Richmond American Homes make that case uninstructive for construing the words "release or threatened release" in this case. The Richmond American Homes plaintiffs discovered asbestos while building homes at the former Lowry Air Force Base, and were found

to have colorably alleged that asbestos fibers were present, and constituted a health hazard, at the time the Government transferred the property. 75 Fed. Cl. at 396-97. Here, by contrast, there is no plausible allegation that the City's costs were caused by a similar soil condition, and AISLIC's conclusory allegation that hazardous levels of OCPs were present at the East Housing Area when the City took title in 2002 is directly contradicted, within the pleadings, by the same DTSC correspondence that supposedly contains the indemnified "claim."

### G. Assuming There Was A Threatened Release, The Government Was Not Responsible

As a final alternative, inspection of the pleadings establishes that AISLIC's recovery is barred by the requirement in section 330(a)(1) that the "release or threatened release" arise from activities of DoD, and also by section 330(a)(3), which withdraws indemnity when an eligible transferee of military property "contributed to any such release or threatened release." We demonstrated above that, assuming there was a release or threatened release, the only plausible inference from the pleadings is that it occurred after the transfer of ownership, and only because the City chose to demolish the buildings. AISLIC thus fails to state a claim for relief under the plain language of section 330, because the costs allegedly incurred by the City were the proximate result of its own actions in redeveloping the East Housing Area. Indeed, the pleadings show the City was warned in advance by the DTSC not to proceed with demolition, absent an approved soil remediation plan. For this final reason, in addition to those above, the Court should dismiss counts five and six, which seek relief pursuant to section 330.

## CONCLUSION

Accordingly, we respectfully renew our request that the Court dismiss AISLIC's first amended complaint for failure to state a claim.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Navy Litigation Office
Washington, D.C.

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

June 5, 2007

CERTIFICATE OF FILING

I certify that on June 5, 2007, this document was filed electronically. I understand that service is complete upon filing and parties and others may access this filing through the Court's system.

s/Kyle Chadwick

APPENDIX

# INDEX TO APPENDIX

PAGES 1-10 NOT USED

Vol. 1, Final Environmental Impact Statement, Oct. 1999 (excerpts) ........................................11

Parcel Evaluation Data Summary (Environmental Baseline Survey) for Naval Air Station Alameda, et al., April 2000 ........................................................................................15