No. 05-1020C
Judge Margaret M. Sweeney

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS

---

T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison (pending admission *pro hac vice*)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Plaintiff American International Specialty Lines Insurance Company*

July 6, 2007

## TABLE OF CONTENTS

I. Introduction ..... 1

II. Argument ..... 3

A. Defendant Misstates the Standard of Review on Its Motion to Dismiss ..... 3

B. AISLIC Has Alleged a Claim for Indemnification under Section 330 of the National Defense Authorization Act of 1993 ..... 5

1. Defendant Improperly Asks the Court to Make a Factual Finding that the Chlordane was a "Useful Product Applied for its Intended Use" ..... 6

2. Section 330 Does Not Require a Third Party Claim to Trigger Indemnification Obligations ..... 8

a. The Statute's Broad Language Does Not Restrict Claims to Only Those Submitted by Third Parties ..... 8

b. This Court Previously Rejected Defendant's Theory that a Third Party Claim is a Prerequisite to Indemnification ..... 10

c. Even if Section 330 Had Required a Third Party Claim, DTSC Asserted a Claim Against the City ..... 13

3. AISLIC Has Alleged a Claim for "Property Damage" ..... 14

4. AISLIC's Claim is Predicated on Defendant's Release or Threatened Release of Chlordane ..... 17

5. Defendant Improperly Asks the Court to Make a Factual Finding that the City Contributed to the Release or Threatened Release of Chlordane ..... 18

C. Plaintiff Has Sufficiently Alleged Breach of Contract Claims ..... 19

1. Defendant Breached the CERCLA Covenants of the East Housing Deed (Counts One and Two) ..... 20

2. Defendant's Misrepresented the Environmental Conditions at the East Housing Area (Counts Three and Four) ..... 23

3. Defendant Breached the Memorandum of Agreement (Counts Seven and Eight) ..... 26

III. Conclusion ..... 27

## TABLE OF AUTHORITIES

**Cases**

A&W Smelter & Refs., Inc. v. Clinton, 146 F.3d 1107 (9th Cir. 1998) ....................20

Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004) ....................3

Am. Airlines v. United States, 68 Fed. Cl. 723 (2005) ....................3

AMI, Inc. v. Int'l Forging Equip. Co., 982 F.2d 989 (6th Cir. 1993) ....................20

Balboa Ins. Co. v. United States, 3 Ct. Cl. 543 (1983) ....................3

Beers v. Williams Pipe Line Co., No. 93-C-2189, 1994 WL 477187 (D. Kan. 1994) ....................21

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) .................... 3-5

Bernard v. United States, 59 Fed. Cl. 497 (2004) ....................4

Cameron v. Navarre Farmers Union Coop. Ass'n, 76 F. Supp. 2d 1178 (D. Kan. 1999) ....................21

Conley v. Gibson, 255 U.S. 41 (1957) ....................4

Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059 (5th Cir. 1990) ....................7

Demarco Durzo Dev. Co. v. United States, 60 Fed. Cl. 632 (2004) ....................19

Erickson v. Pardus, 127 S. Ct. 2197 (2007) ....................4

First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862 (4th Cir. 1989) .......7

Godwin v. United States, 338 F.3d 1374 (Fed. Cir. 2003) ....................3

Henke v. United States, 60 F.3d 795 (Fed. Cir. 1995) ....................3

Hill v. McDonough, 126 S. Ct. 2096 (2006) ....................4

In re Hemingway Transp., 993 F.2d 915 (1st Cir. 1993) ....................7

In re New London Dev. Corp., 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005) .................... 5-6, 9-10, 15-16

Jones v. Bock, 127 S. Ct. 910 (2007) ....................4

Jordan v. Southern Wood Piedmont Co., 805 F. Supp. 1575 (S.D. Ga. 1992) ....................21

Kane v. United States, 15 F.3d 87 (8th Cir. 1994) ....................7

Lamie v. United States, 540 U.S. 526 (2004)........................................................................9, 11, 15

Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633 (1990)............................................................12

Peterson v. United States, 68 Fed. Cl. 773, 775 (2005) ..............................................................................25

R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818 (8th Cir. 1983) ........................................16

Redwing Carriers, Inc. v. Saraland Apts., 94 F.3d 1489 (11th Cir. 1996) ..........................................7, 23

Richmond Am. Homes of Colo., Inc. v. United States, 75 Fed. Cl. 376 (2007)..............................*passim*

S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402 (11th Cir. 1996) ......................................................7

Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951).......................................................11

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ......................... 3-4

Trans States Airlines v. Pratt & Whitney Canada, 130 F.3d 290 (7th Cir. 1997)...................................16

United States v. Hardage, No. CIV-86-1401-P, 1989 U.S. Dist. LEXIS 17877, at *1 (W.D. Okla. Nov. 9, 1989) ...............................................................................................................................7

United States v. Tropical Fruit, S.E., 96 F. Supp.2d 71 (D. P.R. 2000) ................................. 7, 20-21, 26

**Statutes, Rules and Regulations**

10 U.S.C. § 2687 note............................................................................................................*passim*

42 U.S.C. § 9601(9) ............................................................................................................... 6-7

42 U.S.C. § 9601(14)..................................................................................................................20

42 U.S.C. § 9601(22)..................................................................................................................17

42 U.S.C. § 9607(a)(3)................................................................................................................20

42 U.S.C. § 9607(i) ....................................................................................................................21

42 U.S.C. § 9620...........................................................................................................................1

40 C.F.R. § 302.4..................................................................................................................17, 20

RCFC 8(a) ................................................................................................................................4, 25

RCFC 9..........................................................................................................................................4

RCFC 12(b)(6) .......... 5

**Legislative History**

138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992), 1992 WL 229896 .......... 11, 13

**Other Authorities**

Letter from David Berteau, Principal Dep. Asst. Secretary of Defense, to Sen. McCain (Feb. 3, 1993); 139 Cong. Rec. S8433-01 (daily ed. July 1, 1993), 1993 WL 239656 .......... 12

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | No. 05-1020C<br>Judge Margaret M. Sweeney |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS**

Plaintiff American International Specialty Lines Insurance Company ("Plaintiff" or "AISLIC"), by and through its undersigned attorneys, respectfully submits Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss ("Mot.").

## I. INTRODUCTION

Defendant closed the Naval Air Station Alameda and transferred the East Housing Area and other property at the former military base to the City of Alameda and the Alameda Reuse and Redevelopment Authority (collectively, the "City") on July 17, 2000, to develop a mixed-use, residential community. Before this conveyance, Congress acted to ensure that whenever the Government transferred a former military base, including the Naval Air Station Alameda, it would take responsibility for all remedial action necessary to protect human health and the environment with respect to hazardous substances on the base. Congress enacted the National Defense Authorization Act (the "Act") of 1993, Pub. L. No. 102-484, 106 Stat. 2371, 10 U.S.C. § 2687 note, and Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9620, to facilitate the transfer of closed military bases to persons and entities, such as the City, while at the same time ensuring that the Government is, and continues to be, responsible for all environmental contamination that occurred prior to the date of transfer.

Accordingly, the indemnification provisions of the Act, and the requirements of Section 120(h) of CERCLA, governing property transferred by federal agencies, provide assurances that the Government is responsible for remediating environmental contamination at former military bases and will not thrust the cost of such remediation upon municipalities that agree to develop the sites for other beneficial purposes.

Notwithstanding Congress' mandate, in this case, Defendant has breached both its statutory and contractual responsibilities to remediate environmental contamination caused by its own activities and to indemnify the City for accomplishing the remediation. In 2000, the Department of the Navy formally announced its decision to close the Naval Air Station Alameda, which included the East Housing Area—the contaminated property at issue in this case. Later that year, Defendant, through the Navy, transferred the East Housing Area, as well as other land, to the City for development in accordance with a Community Reuse Plan approved by the Navy. Shortly after the transfer, the City discovered that hazardous organochlorine pesticides ("OCPs"), namely chlordane, were present on the property—in dangerously high concentrations—as a result of Defendant's activities prior to the transfer. Once the presence of the highly concentrated OCPs became known to the City, the Department of Toxic Substance Control ("DTSC"), the State of California's cognizant agency, ordered the City to remediate that contamination prior to implementation of the Community Reuse Plan. Despite the fact that Defendant was required to remediate these hazardous substances, Defendant failed to do so, and continues to deny responsibility for any cleanup whatsoever.

By contract, Defendant covenanted and warranted that it (1) had remediated all hazardous substances at the East Housing Area; and (2) would remediate any such substances found to be present after the date of transfer. Also by contract, Defendant represented what hazardous substances had been released or remained on the East Housing Area, but failed to disclose the

release or presence of chlordane in dangerously high concentrations on the property. In contravention of its contractual and statutory obligations, Defendant failed to remediate the chlordane or to indemnify the City for incurred remediation costs. Consequently, AISLIC, as subrogee for the City, is now seeking to recover costs incurred to remediate the organochlorine pesticides, and to rightly hold Defendant accountable for its contractual and statutory obligations. In setting forth its case, AISLIC has sufficiently alleged facts supporting numerous causes of action for breach of contract and violation of express statutory indemnification obligations.

## II. ARGUMENT

### A. Defendant Misstates the Standard of Review on Its Motion to Dismiss.

"Dismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff can 'prove no set of facts in support of his claim which would entitle him to relief.'" Am. Airlines, Inc. v. United States, 68 Fed. Cl. 723, 728 (2005) (quoting Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004)). In ruling on a motion to dismiss, the court "[i]s obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995); see also Godwin v. United States, 338 F.3d 1374, 1377 (Fed. Cir. 2003); Am. Airlines, 68 Fed. Cl. at 728. "As a general rule, a motion to dismiss for failure to state a claim is viewed with disfavor and should rarely be granted." Balboa Ins. Co. v. United States, 3 Ct. Cl. 543, 545 (1983).

Defendant misreads the Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), to require a plaintiff to extensively allege the facts upon which its claim is based. The Supreme Court rejected such a notion: "we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can only be accomplished 'by the process of amending the Federal Rules, and not by judicial interpretation.'" 127 S. Ct. at 1973 n.14 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515, 122 S. Ct. 992, 152

L. Ed. 2d 1 (2002)).[1] Indeed, since Bell Atlantic, the Supreme Court has confirmed that the pleading standards have not changed: "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the…claim is and the grounds upon which it rests.'" Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007), slip op. 5 (citing Bell Atl.) (emphasis added). Therefore, AISLIC's complaint merely must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" under RCFC 8(a). See Bernard v. United States, 59 Fed. Cl. 497, 500 (2004). AISLIC's claims, unlike those in Bell Atlantic, are not subject to the heightened pleading requirements of RCFC 9.

Defendant also errantly opines that Bell Atlantic abrogated the oft-cited standards of Conley v. Gibson, 255 U.S. 41 (1957), in every conceivable type of litigation, despite the fact that the Supreme Court granted *certiorari* solely "to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct." Bell Atl., 126 S. Ct. at 1963; Mot. at 8. Bell Atlantic simply requires a plaintiff in an antitrust action under Section 1 of the Sherman Act to allege "plausible grounds" that there was an illegal agreement. 127 S. Ct. at 1965; id. at 1971 (explaining that the plausibility of a complaint's allegations must be assessed in light of the market and regulatory contexts in which they arise, "viewed in light of common economic experience"). The Supreme Court's area-specific decision does not speak to the pleading issues raised here. This is not an antitrust conspiracy case.

Defendant not only misinterprets Bell Atlantic, it goes even further, boldly stating that, "Bell Atlantic arguably has more significance for the resolution of this case than does the February 2007

[1] The Supreme Court's decision in Bell Atlantic also did not overrule its other recent decisions affirming that pleading requirements are regulated by a court's procedural rules, rather than case-by-case determinations of the federal courts. See, e.g., Jones v. Bock, 127 S. Ct. 910 (2007) (unanimously re-affirming the simple notice pleading standards of Swierkiewicz and rejecting heightened pleading standards in civil cases); Hill v. McDonough, 126 S. Ct. 2096, 2098 (2006) ("Specific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-case determinations of the federal courts.").

decision concerning Section 330 liability in Richmond American Homes." Mot. at 8 (referring to Richmond Am. Homes of Colo., Inc. v. United States, 75 Fed. Cl. 376, 399 (2007)). This assertion is perplexing, given that this Court's ruling in Richmond American Homes is directly on point concerning AISLIC's Section 330 claim, whereas Bell Atlantic is limited to cases alleging an antitrust conspiracy in violation of the Sherman Act.

Even if this Court were to adopt Defendant's contention that Bell Atlantic abrogates fifty years of federal civil procedure practice, AISLIC's Complaint provides more than conclusory allegations, and Defendant repeatedly and improperly disputes AISLIC's factual allegations, which must be accepted as true. Bell Atlantic did *not* alter the fundamental standard on a RCFC 12(b)(6) motion that the Court accepts all of AISLIC's factual allegations as true and draws all reasonable inferences in AISLIC's favor. 127 S. Ct. at 1965 (factual allegations are "taken as true"). AISLIC's well-pleaded facts in the First Amended Complaint ("Compl.") are more than sufficient to support its claims, and therefore, Defendant's motion should be denied.

### B. AISLIC Has Alleged a Claim for Indemnification under Section 330 of the National Defense Authorization Act of 1993.

AISLIC has sufficiently alleged a claim that Section 330 of the National Defense Authorization Act of 1993 requires Defendant to indemnify AISLIC for costs incurred to remediate the East Housing Area. Compl., ¶¶ 106-35 (Counts Five and Six); 10 U.S.C. § 2687 note. As set forth below, Defendant repeatedly and improperly asks the Court to make factual findings contradicting AISLIC's allegations, which the Court cannot do on a motion to dismiss. Defendant also wrongly attempts to add new requirements to the express provisions of Section 330. In addition, there are two landmark cases interpreting and applying the provisions of Section 330, both of which buttress AISLIC's claim: Richmond American Homes of Colorado, Inc. v. United States, 75 Fed. Cl. 376, 399 (2007), and In re New London Dev. Corp., 2005 WL 1634772 (ASBCA), 05-2 BCA ¶ 33018, ASBCA No. 54535 (July 5, 2005). Defendant attempts to minimize the import of

Richmond American Homes by wrongly claiming that this Court unduly relied on what it believed to be legislative history to interpret Section 330. Although the Court repeatedly cited New London in its Richmond American Homes decision, Defendant essentially fails to address why the Court should not rely on New London here. The Court should not limit Defendant's indemnification obligations by reading new restrictions into Section 330, and it should follow the precedent set by this Court and the ASBCA in the only two cases to date applying Section 330.

**1. Defendant Improperly Asks the Court to Make a Factual Finding that the Chlordane was a "Useful Product Applied for its Intended Use."**

Section 330 provides for indemnification of a State, political subdivision of a State, or any other person that acquires ownership or control of any facility at a military installation (or any portion thereof). See Section 330(a)(2). Section 330(f) incorporates the definition of "facility" provided in Section 101(9) of CERCLA:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphasis added). Defendant argues that the East Housing Area is not a "facility" because "the termiticide … was a useful product applied for its intended use." Mot. at 24. As such, Defendant asks this Court to make a factual finding against AISLIC, which would be improper on a Rule 12(b)(6) motion.

Defendant cannot contest AISLIC's allegations, which must be accepted as true. As set forth in the Complaint, Defendant did not disclose the presence of chlordane in its Final Finding of Suitability to Transfer ("FOST"), in which it identified the pesticides that may have been used on the property. Compl. ¶ 24-27. It is difficult to fathom how Defendant can now state with such certainty that the chlordane was a useful product applied for its intended use when, if it is to be

believed in its FOST, it did not know about the chlordane. Further, AISLIC's allegations establish that chlordane is not a consumer product in consumer use because the Environmental Protection Agency cancelled use of chlordane in 1988. Compl. ¶ 44. AISLIC would not have had to remediate the chlordane if it was "in consumer use" today, a requirement under 42 U.S.C. § 9601(9).

Confirming that the Court cannot, at this stage, make a factual finding that Defendant properly applied chlordane for its intended use, courts have determined the existence of a "facility" under CERCLA and found "liability for the transport, storage, spilling, and disposal of pesticides." United States v. Tropical Fruit, S.E., 96 F. Supp. 2d 71, 84 (D.P.R. 2000) (emphasis added) (citing In re Hemingway Transp., 993 F.2d 915 (1st Cir. 1993); S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402 (11th Cir. 1996); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir. 1996); United States v. Hardage, No. CIV-86-1401-P, 1989 U.S. Dist. LEXIS 17877, at *1 (W.D. Okla. Nov. 9, 1989)); see Compl. ¶ 70 (alleging storage, release, and disposal of chlordane).[2] Therefore, the Court cannot find that, as a matter of fact, Defendant properly applied a useful product for its intended consumer use before 1988, and that it did not store, release, spill or dispose of the chlordane, without departing from the standards on a Rule 12(b)(6) motion.

Even if the Court could make such a factual finding, which it cannot on this motion, the term "facility" is much broader than Defendant sets forth in its motion. See Mot. at 24. The limitation concerning consumer products in consumer use applies to only one definition of "facility" based on the presence of a hazardous substance. See 42 U.S.C. § 9601(9)(B). "Facility" is independently defined (by use of the term "or") as "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond,

[2] The cases Defendant cites are inapposite because, among other reasons, they deal with actions brought under CERCLA against manufacturers and suppliers of asbestos. See Mot. at 24 (citing Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059 (5th Cir. 1990); Kane v. United States, 15 F.3d 87 (8th Cir. 1994); and First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 867 (4th Cir. 1989)).

lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft," without any limitation based on any presence of a consumer product in current use. See 42 U.S.C. § 9601(9)(A). Defendant has not contested the fact that the City acquired ownership and control of a facility, as separately defined in subsection (A). Therefore, Defendant's claim that the East Housing Area and the buildings and other structures in existence at the East Housing Area at the time of transfer do not constitute a "facility" or "facilities" has no substance.

### 2. Section 330 Does Not Require a Third Party Claim to Trigger Indemnification Obligations.

#### a. The Statute's Broad Language Does Not Restrict Claims to Only Those Submitted by Third Parties.

Defendant argues that a "legal 'claim'" for personal injury or property damage must be brought against the City before it can obtain indemnification under Section 330. Mot. at 26. Citing no precedent for its position, Defendant's lead argument is that a different statute indemnifying the State of New Hampshire contained similar, but not identical wording. Mot. at 25. Based on the variance, Defendant presumes, without citing anything to support its presumption, that the "legislative intent [of Section 330] require[s] a third-party legal claim against a transferee." Mot. at 27. Rather than comparing various statutes to divine an unstated Congressional intent to include a third-party claim requirement, the Court should simply apply the provisions of Section 330 as written.

Despite the fact that the statute does not define the term "claim," Defendant assumes that any indemnification must result from litigation or some sort of "similar disputes" brought by a third party. Mot. at 25. In doing so, Defendant misconstrues the phrase "arising out of any claim," which is in fact sweeping in its coverage. As alleged in the Complaint, the City of Alameda, the Alameda Reuse and Redevelopment Authority, and AISLIC jointly submitted a claim for reimbursement pursuant to Section 330 for costs incurred in monitoring, removal and disposal of previously

undisclosed organochlorine pesticides ("OCPs"), including chlordane. Compl. ¶ 47. Defendant has not explained why this joint claim does not constitute "any claim" under Section 330, particularly where Section 330(b) explicitly addresses the person or entity's "claim for indemnification," requirements for the indemnitee to provide notice within two years after "such claim" accrues, and when the indemnitee can bring action after "final denial of the claim" by the Defense Department.

Defendant also makes the superficial assertion that the words "plaintiff" and "settle or defend" in Section 330 support its view that there must be a third party claimant. Mot. at 26. Section 330(c)(1) simply grants the Secretary of Defense the authority to settle and defend claims. The term "plaintiff" refers to the City and AISLIC because Section 330(d) defines the date on which an indemnitee's claim for indemnification accrues "for purposes of subsection (b)(1)." Subsection (b)(1) sets forth conditions under which an indemnitee may sue Defendant for indemnification, including the requirement that the entity making a claim for indemnification notify the Defense Department within two years of claim accrual or begin action against (*i.e.*, sue) the Defense Department within six months of its denial of the claim. If the indemnitee were not the "plaintiff" under Section 330(d), the indemnitee's claim for indemnification could expire long before a third party plaintiff pursued any claim against the indemnitee. Such a reading of the statute would be inconsistent with Section 330's purpose and other provisions affording indemnification. See Lamie v. United States, 540 U.S. 526, 530 (2004) (statutes are to be read as a whole).

Judicial precedent directly supports AISLIC's application of Section 330. In New London, which Defendant wholly ignores, the ASBCA denied a motion to dismiss for failure to state a Section 330 claim for indemnification. New London Dev. Corp., 2005 WL 1634772 (ASBCA). In that case, the appellant had submitted a claim for reimbursement pursuant to Section 330 for its costs incurred in monitoring, removal and disposal of previously undisclosed asbestos contaminated material ("ACM") and Polychlorinated Biphenyl ("PCBs"). Id. No claim, by lawsuit or otherwise,

had been asserted against the appellant, but rather the appellant filed *its own claim* (as AISLIC does here) to recover incurred costs. Id. Therefore, the New London decision confirms that a third party claim is not required for a transferee to obtain indemnification.

**b. This Court Previously Rejected Defendant's Theory that a Third Party Claim is a Prerequisite to Indemnification.**

This Court soundly "reject[ed] the notion that a 'third party claim' is required for application of Section 330(a)(1)." Richmond Am. Homes, 75 Fed. Cl. at 391. As in Richmond American Homes, Defendant has cited no authority for a third-party claimant requirement. See id. at 390. Without any such authority, the Court concluded that in Defendant's attempt to define the term "claim" to exclude liability, Defendant:

- fails to appreciate the "sweeping" protections of Section 330;
- asserts a theory "at odds with the general theme of environmental remediation statutes," creating a disincentive to the policy of remediation first and discouraging private economic development of former military property;
- "does not address the incompatibility of its cramped reading [of Section 330] with the clear policy goals of its author"; and
- Could not answer whether the third party claimant would "have to file a legal instrument of some sort, or [whether] a demand letter [would] suffice?"

Id. at 390-91. Absurdly, Defendant would have the City and other transferees intentionally refrain from remediating hazardous material and wait for someone to suffer personal injury or property damage in order to be sued, and thus, indemnified by Defendant. Id. at 390.

Defendant does not explain why the Court's construction of Section 330 was supposedly wrong. Instead, Defendant denigrates the Court's analysis of Section 330's policy goals by asserting that the Court mistakenly relied on Senator McCain's 1992 floor statement and a 1993 Defense Department letter. Mot. at 26. The Court properly considered Senator McCain's floor statement to ascertain Section 330's legislative purposes. Richmond Am. Homes, 75 Fed. Cl. at 387 ("Senator

John McCain from Arizona, who sponsored the indemnity legislation, explains in no uncertain terms its intended purpose.") (emphasis added). "Statutory construction begins with the text, which should be read as a whole and given its plain and ordinary meaning, provided the result is not absurd, in light of evident legislative purposes." Lamie, 540 U.S. at 530 (emphasis added). Therefore, the Court properly considered the legislative purpose of Section 330 to interpret the text of the statute. In doing so, the Court appropriately considered Senator McCain's explanation that the purpose of the statute is to protect receivers of closed base property from assuming "potentially devastating liability for conditions they did not create" because the "Federal Government has a duty to accept full and unconditional responsibility for its actions." 138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992), 1992 WL 229896.

In a strained effort to rewrite legislative history, Defendant makes the preposterous assertion that Senator McCain was an opponent of the legislation because there were amendments to the original bill. Mot. at 22. Senator McCain was in fact the sponsor of the legislation. If Defendant's view here were to prevail, practically every sponsor of legislation would ultimately be classified as an "opponent" whose views on the purpose of the legislation should be disregarded simply because the legislation was somehow modified, however slightly or however unrelated the aspect of the legislation being considered, before it was passed. Furthermore, Senator McCain was speaking in opposition to an earlier version of the bill "linking the indemnification obligation to Federal Tort Claims Act liability, a limiting qualification." Richmond Am. Homes, 75 Fed. Cl. at 385-86. It is inconceivable that Senator McCain can be labeled an "opponent" when the language to which he objected was not included in the legislation he sponsored and which was passed by Congress. In fact, the Supreme Court stated, in a decision cited by Defendant, that "[i]t is the sponsors we look to when the meaning of the statutory words is in doubt." Schwegmann Bros. v. Calvert Distillers

Corp., 341 U.S. 384, 394-95 (1951). Therefore, it was proper for the Court to consider Senator McCain's statement.

In another attempt to undermine the Richmond decision, Defendant states that the Court erred by considering the Defense Department's contemporaneous reaction to the law in a letter from David Berteau, Principal Deputy Assistant Secretary of Defense, to Senator McCain. Mot. at 23. Contrary to Defendant's spin, the Court did not label the Defense Department's correspondence as "legislative history,"[3] and the Court did not rely on Mr. Berteau's letter to determine Congressional intent. The Court considered the letter to reflect the Executive Branch's "contemporaneous reaction to the law," rather than its current litigation position. Richmond Am. Homes, 75 Fed. Cl. at 388. The Defense Department's contemporaneous view, describing the "wholesale shift of all risks to the Department" under Section 330, is consistent with the statute's plain language. Id. (quoting Letter from David Berteau, Principal Dep. Asst. Secretary of Defense, to Sen. McCain (Feb. 3, 1993); 139 Cong. Rec. S8433-01 (daily ed. July 1, 1993), 1993 WL 239656). The Defense Department's contemporaneous interpretation of the law in correspondence to the sponsor of Section 330, even with the caveats Defendant takes great pain to point out, is certainly relevant to the Court's understanding of the purpose and construction of Section 330.

Defendant's attacks on the Court's consideration of Senator McCain's floor statement and the Defense Department's contemporaneous reaction to the indemnification legislation fail to address, much less undermine, any of the substantive analysis contained in the Richmond American Homes decision. Defendant's attempt to discount the Court's decision also does nothing to further its erroneous claim that indemnification is required only where there is a third party claimant.

---

[3] Defendant also tries to characterize the Defense Department's correspondence to Senator McCain as "subsequent legislative history." Mot. at 23. This is not a case where a court unduly relied on legislative history of subsequent amendments to determine Congress' intent in enacting the original statute. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 649-50 (1990) (court of appeals wrongly relied on amendments to ERISA to determine the intent of an earlier Congress).

**c. Even if Section 330 Had Required a Third Party Claim, DTSC Asserted a Claim Against the City.**

Even if, *assuming arguendo*, Section 330 did require that a claim be made against the indemnitee, AISLIC has sufficiently alleged such facts, which must be accepted as true. The Department of Toxic Substance Control ("DTSC") required the City to assess and remediate the contamination at the East Housing Area in order to implement the Community Reuse Plan approved by Defendant. Compl. ¶ 45. The DTSC formalized this requirement in a letter directing the City to monitor, remove, and dispose of chlordane before commencing the reuse plan, a key element of which involved demolishing existing building structures. Id. If the City did not comply, the DTSC would be compelled to exert its regulatory authority, pursuant to the California Health and Safety Code, Chapter 6.8, requiring investigation and remediation of any threatened release of hazardous substances, and imposing stiff statutory penalties for noncompliance. Under California's regulatory scheme, the DTSC letter imposed a clear legal obligation, not a mere invitation to voluntary action.

The DTSC directive constitutes a claim under Section 330. In Richmond American Homes, this Court held that a state environmental agency's demand pursuant to a compliance advisory was "sufficiently concrete to create a legal obligation" constituting a claim, as it directed its recipients to "comply now or pay the price in fines later." 75 Fed. Cl. at 393. The only legislative history before the Court also reflects that Congress intended for Section 330 to cover both regulatory and civil actions, such as "environmental cleanup orders" and civil damage claims. 138 Cong. Rec. S13982, at *S14009 (1992) (statement of Senator McCain).

Although Defendant contests the Court's conclusion in Richmond American Homes and whether the sponsor of Section 330 can speak to Congress' intent, Defendant cannot point to any contrary authority. Section 330 does not define the word "claim," and Defendant has not yet been able to explain exactly where to draw the line. For example, Defendant still cannot answer whether

a claimant must file a legal instrument of some sort to constitute a claim, or whether a demand letter would suffice. See id. at 391. Defendant has only said that a "claim" must mean litigation or some sort of "similar [undefined] disputes." Mot. at 25. Given the absence of a statutory definition and the fact that both case law and legislative history support AISLIC's position, Defendant's inability to articulate exactly what constitutes a "claim" precludes it from reasonably opining that DTSC's letter is not one.

Looking beyond Defendant's unyielding efforts to create that which does not exist (*i.e.,* a definition of the word "claim"), Defendant's argument entirely depends on the Court making factual findings about exactly what the DTSC investigated, concluded, and ordered. Defendant again attempts to contradict the AISLIC's factual allegations by reinterpreting the DTSC's statements and requirements, and by creating a factual dispute over whether the DTSC ever found that a hazardous substance was present at the East Housing Area. See Mot. at 27-28. Defendant mischaracterizes the DTSC's findings and fails to accept the fact that the DTSC required the City to remediate the chlordane to use the property in the manner Defendant approved in the Community Reuse Plan. Drawing all reasonable inferences in favor of AISLIC, Plaintiff has sufficiently plead facts which, if true, would entitle it to relief under Section 330. Defendant's motion to dismiss must therefore be denied.

**3. AISLIC Has Alleged a Claim for "Property Damage."**

Rather than looking to the language of Section 330, Defendant attempts to define the term "property damage" by relying on the legislative history of a separate statute, CERCLA, which does not define the term "property damage," and by arguing that "cleanup costs" do not constitute a claim for damage. Mot. at 28-29. Instead of attempting to draw analogies based on the legislative history of another statute that does not define the term "property damage," the Court should look

to the language of the applicable statute, Section 330.[4] In that regard, it is common sense that the East Housing Area was damaged; otherwise, the City would not have had to remediate the property.

Contrary to Defendant's assertion that the statute does not define the term, Section 330 expressly provides that the term "property damage" includes "loss of or damage to property or economic loss." 10 U.S.C. § 2687 note. The plain language of the statute is clear:

> …the Secretary of Defense shall hold harmless, defend, and indemnify… for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon the release or threatened release of any hazardous substance, pollutant or contaminant.

10 U.S.C. § 2687 note (emphasis added). Moreover, the statute's provision concerning any "threatened release" only makes sense if Section 330 indemnifies economic losses incurred to abate such threat. If Defendant's position were correct, it would never have to indemnify anyone for a threatened release of a hazardous substance, pollutant or contaminant, which would nullify those provisions of Section 330. See Lamie, 540 U.S. at 530 (statutes are to be read as a whole).

The Court properly concluded in Richmond American Homes that "there is no indication that Congress meant to limit the type of property damage" covered by Section 330 and that "the language 'loss of or damage to property or economic loss' encompasses a variety of possible damage theories." 75 Fed. Cl. at 394. On this point, the Court looked to New London for guidance. There, the ASBCA held that the term "'economic loss' is defined in tort law as including among other things 'costs of repair and replacement' of the defective product or defective property." New

[4] Not only is CERCLA a separate statute, it serves a different purpose. CERCLA allows the EPA to clean up a hazardous waste site first and to establish the liability of responsible third parties thereafter. By contrast, Section 330 is a risk-shifting statute designed to remove any disincentives to the private development of former military bases. Richmond Am. Homes, 75 Fed. Cl. at 395. It spares the transferee from any liability for environmental damage caused by the Defense Department's activities on the property. Id. at 387 ("Section 330 serves the BRAC purpose of encouraging economic development at former military facilities and their surrounding populations."); Defense Base Closure and Realignment Act of 1990, P.L. No. 101-510, as amended, §§ 2901-11, 104 Stat. 1808, 10 U.S.C. § 2687.

London Dev. Corp., 2005 WL 1634772 (ASBCA) at n.6 ("[t]he inclusion of 'economic loss' in … the parenthetical definition of property damage indicates an intention that indemnification would not be limited to tort liability claims") (citing Trans States Airlines v. Pratt & Whitney Canada, 130 F.3d 290, 291 (7th Cir. 1997); R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 829 n.11 (8th Cir. 1983)). The ASBCA denied the government's motion to dismiss because the appellant's costs incurred in monitoring, removal and disposal of previously undisclosed ACM and PCBs could constitute property damage claims that were indemnifiable under the deed provision citing to Section 330.

Defendant claims that the Court erred in Richmond American Homes because it would have been easy for Congress to define property damage to include cleanup costs if it intended to do so. Mot. at 30. This is a double-edged sword for Defendant, as it also would have been easy for Congress to define property damage to include CERCLA section 107 if, as Defendant suggests, Congress intended to do so. Mot. at 28. The fact that Congress incorporated certain definitions under CERCLA into Section 330, but not the definition upon which Defendant relies, reflects that Congress did not intend to limit what constitutes property damage.

Defendant also does not contest the ASBCA's analysis in New London, but rather claims the Court should not consider the analysis because the ASBCA did not first address whether there was a "claim." Mot. at 30. It would be remarkable if the Court were to refrain from considering all precedent where a court did not determine the meaning of every single term of a statute. Defendant is simply running away from authority directly against it.

As in Richmond American Homes and New London, the City here incurred costs to monitor, remove and dispose of a hazardous substance, pollutant or contaminant. Thus, the City has alleged a claim for property damage, and the Court should deny the motion to dismiss.

### 4. AISLIC's Claim is Predicated on Defendant's Release or Threatened Release of Chlordane.

Plaintiff has sufficiently alleged "the release or threatened release of any hazardous substance, pollutant or contaminant," namely Organochlorine Pesticides, including chlordane, at the East Housing Area. Compl. ¶¶ 40-44. Section 330(f)(1) defines the term "release" as having the meaning given to it under CERCLA, 42 U.S.C. § 9601(22). Under that section, the term "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)…." 42 U.S.C. § 9601(22). The chlordane was released at the East Housing Area when the Navy put it there, a fact Defendant concedes. Mot. at 31. At a minimum, there was a "threatened" release requiring remediation.

Although it attacks this element of Section 330, Defendant does not directly address whether there was a release or threatened release, but instead argues that, as a matter of fact, the Navy "properly applied" the chlordane, the chlordane "served its intended purpose as a consumer product while in the soil," and was "safely removed by the City."[5] Mot. at 31. Even if Defendant were not improperly contesting Plaintiff's factual allegations on a 12(b)(6) motion, the definitions of "release" in both Section 330 and CERCLA Section 9601(22) make *no distinction* between the proper and improper application of a pesticide. Whether or not the Navy's application of chlordane was proper or the chlordane served its intended purpose, it constituted a release or threatened release requiring remediation.

---

[5] Contrary to Defendant's factual assertions, chlordane constitutes a "hazardous substance" under CERCLA, and the EPA cancelled use of chlordane in 1988. <u>See</u> 40 C.F.R. § 302.4; Compl. ¶¶ 44-45. At a minimum, it is a pollutant or contaminant requiring remediation. <u>See</u> Compl. ¶¶ 41-45.

Defendant again takes issue with the Richmond American Homes decision as "uninstructive" based on far-fetched factual assertions that the City's costs were not caused by a similar soil condition and that hazardous levels of OCPs were not present at the East Housing Area when the City took title in 2002. Mot. at 31. As in Richmond American Homes, AISLIC suffered costs because there were hazardous substances in the soil. Defendant has not explained how, much less submitted any evidence that, the soil conditions are not similar, and again, Defendant improperly asks the Court to make factual findings on a Rule 12(b)(6) motion. Likewise, Defendant asks the Court to find, without an evidentiary record, that the City put the hazardous levels of OCPs at the East Housing Area, which is contradicted by Defendant's admission that the OCPs were "applied by the Navy." Mot. at 31. Regardless, with or without an evidentiary record, Defendant again improperly injects factual disputes in its motion to dismiss. The Court is required to accept all well-pleaded facts as true and draw all reasonable inferences in AISLIC's favor, and therefore, the Court should deny Defendant's motion.

**5. Defendant Improperly Asks the Court to Make a Factual Finding that the City Contributed to the Release or Threatened Release of Chlordane.**

On a motion to dismiss, the Court cannot look past the allegations of the Complaint, as Defendant presses, to conclude that the City was responsible, as a matter of fact, for any release or threatened release of the chlordane. Even if it could, AISLIC's claim would only be limited "to the extent" the City contributed to any such release or threatened release. Section 330(3). It is impossible for the Court to conclude, based solely on the allegations of the Complaint, that the City was entirely responsible for any release or threatened release, particularly where the Court is required to draw all reasonable inferences in favor of AISLIC.

Defendant also fails to note that the City's demolition of existing housing stock is closely analogous to the underlying facts in Richmond Homes. As in Richmond Homes, Defendant "concedes that it was the original source of [OCPs] at [the East Housing Area], but it will not accept

responsibility for the … 'contamination.'" 75 Fed. Cl. at 396. To implement the development plan approved by Defendant, the City had to demolish any existing structures. In fact, the FOST authorized transfer of the East Housing Area, without any restriction as to its use. See FOST Sec. 6.8. Therefore, even if the City's redevelopment activities caused the OCPs to be "dug up, moved or otherwise handled, made airborne and deposited on the surface and subsurface soils," that "does not diminish the Government's liability." Richmond Am. Homes, 75 Fed. Cl. at 398 (quoting a state agency compliance advisory); see also id. ("Consequently, there may not have been a need for regulation at all until the ACM was brought to the surface during redevelopment activities."). It is improper to draw any kind of distinction between Defendant's responsibility for creating an environmental hazard and Defendant's responsibility once that hazard was discovered. Id. at 399. Doing so invites mischief; it allows Defendant to escape liability by failing to disclose existing and potential contaminants. Therefore, even if the Court could make factual findings against AISLIC on a motion to dismiss, which it cannot, Defendant's motion fails as a matter of law.

**C. Plaintiff Has Sufficiently Alleged Breach of Contract Claims.**

The Complaint properly alleges numerous breaches of contract by Defendant, including multiple breaches of both the East Housing Deed and a separate Memorandum of Agreement to convey portions of the Naval Air Station Alameda to the City. Accepting the well-pleaded allegations as true and drawing all reasonable inferences in Plaintiff's favor, AISLIC properly asserted that: (1) a valid contract existed between Defendant and the City, (2) Defendant was obligated to take remedial action and indemnify the City under the provisions of the contract; (3) Defendant breached its contractual duties by failing to remediate and indemnify the City; and (4) the City (and Plaintiff, as subrogee) suffered damages resulting from Defendant's breach. See Demarco Durzo Dev. Co. v. United States, 60 Fed. Cl. 632, 636 (2004) (providing the elements required to allege and establish a breach of contract claim and finding that plaintiff set forth sufficient

allegations for breach of contract claim to withstand a motion to dismiss). Defendant's motion disputes AISLIC's factual allegations and injects additional factual claims upon which its arguments depend, which is improper on a motion to dismiss. Therefore, Defendant's motion to dismiss should be denied with respect to Counts One through Four, Seven and Eight.

**1. Defendant Breached the CERCLA Covenants of the East Housing Deed (Counts One and Two).**

Defendant argues that AISLIC's claims involving CERCLA covenants are precluded because the "CERCLA liability scheme regarding 'hazardous substances,' 42 U.S.C. § 9601(14), does not apply to useful products used for their intended purpose, including lawfully applied pesticide that serves a legitimate purpose in its existing state." Mot. at 11. Contrary to Defendant's assertion, chlordane does constitute a "hazardous substance." See 40 C.F.R. § 302.4 (EPA list of "hazardous substances," which includes chlordane); see also United States v. Tropical Fruit, S.E., 96 F. Supp. 2d 71, 85 (D.P.R. 2000) (finding that pesticides listed as "hazardous substances" under EPA regulations at 40 C.F.R. § 302.4 are "hazardous substances" under CERCLA and that no minimum level is required to trigger CERCLA coverage).

Further, Section 9601(14) sets forth no exception to the definition of 'hazardous substances' for "useful products used for their intended purpose." See Mot. at 11. Defendant cites as support cases that discuss a separate provision of CERCLA, 42 U.S.C. § 9607(a)(3), which lists as a covered person under the CERCLA liability provision a person who arranges for *disposal or treatment* of hazardous substances. One case, A&W Smelter & Refs., Inc. v. Clinton, 146 F.3d 1107, 1112 (9th Cir. 1998), looks to the definitions of disposal and treatment under the Solid Waste Disposal Act and states "A&W disposed of or treated the ore only if it was waste . . . If the ore was a useful product, then it was not waste and not subject to CERCLA. This has been called the useful product defense." Similarly, the court in AMI, Inc. v. Int'l Forging Equip. Co., 982 F.2d 989, 999 (6th Cir. 1993), considers the interpretation of 42 U.S.C. § 9607(a)(3) and states "it has been held that no

arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a 'useful, albeit dangerous product, to serve a particular intended purpose.'" Given that Defendant relies on inapplicable precedent for its proposition, Defendant's motion fails to establish that it is somehow a defense if Defendant used the chlordane at the East Housing Area for a useful, intended purpose.

Moreover, even if chlordane was not necessarily always a hazardous substance for all purposes, merely because Defendant claims that a chlordane-based termiticide was used for its intended purpose and that it was properly applied does not make it so. See Jordan v. S. Wood Piedmont Co., 805 F. Supp. 1575, 1581 (S.D. Ga. 1992) (stating that an interpretation that pesticides are excluded from CERCLA coverage under all circumstances such that it is a complete defense to a CERCLA claim exaggerates the scope of § 9607(i)). Importantly, not every application of pesticide is exempted from CERCLA liability. Tropical Fruit, 96 F. Supp. 2d at 90; see also Cameron v. Navarre Farmers Union Coop. Ass'n, 76 F. Supp. 2d 1178, 1182 (D. Kan. 1999) (denying government's motion to dismiss where its liability depended on whether a proper application occurred). Rather, the pesticide exemption of CERCLA is a narrow one that does not include a "release" of a pesticide, such as pesticide disposal, storage, spills, or transport. Tropical Fruit, 96 F. Supp. 2d at 90; Cameron, 76 F. Supp. 2d at 1182. Additionally, as a party seeking to take advantage of a statutory exemption from liability under 42 U.S.C. § 9607(i), Defendant bears the burden of proving that the pesticides it used were registered under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and that it applied the pesticides in the customary manner. Tropical Fruit, 96 F. Supp. 2d at 90; Cameron, 76 F. Supp. 2d at 1182-83; Beers v. Williams Pipe Line Co., No. 93-C-2189, 1994 WL 477187, *5 (D. Kan. 1994) ("FIFRA registration is not a complete defense to a CERCLA claim … Rather, even if a registered pesticide was used, defendant is not exempted from liability unless it applied [the registered pesticide] in the customary manner.").

Defendant has offered no proof, nor could it on a Rule 12(b)(6) motion to dismiss, as to the *manner* in which pesticides were applied or released at the East Housing Area, including whether the pesticides were *lawfully* applied or released, *when* chlordane was applied[6] or released at the East Housing Area and in *what concentrations*, and whether the chlordane was *useful* and used for its *intended purpose*. Again, Defendant improperly disputes the truth of AISLIC's allegations by characterizing the DTSC letter as "evidence" that the pesticides were properly applied and were functioning in the manner intended. See Mot. at 11. This litigation is not yet at a stage for the Court to make the factual findings proposed by Defendant, but even if the Court could decide the factual merits on a motion to dismiss, the DTSC letter merely states that the "building foundations at EHA appear to have been properly treated with organochlorine pesticides (OCP) for termite control, and as such, are currently being used in the manner intended." Compl. Ex. 4, Tab 7 (emphasis added). This letter does not explain the *factual basis* for the conclusions of the state agency, and the conclusions are based upon a proposed workplan that is not before the Court and unspecified provisions of the California Health and Safety Code (not CERCLA). The letter does not contain any real information about how the OCPs came to exist at the site or even their concentration. Further, the letter reflects that the manner and extent of Defendant's release of the chlordane was unknown because the DTSC addresses only the presence of pesticides at building foundations and acknowledges that it did not know whether there would be "any OCP remaining in soils and exceeding [unspecified] concentrations." Therefore, Defendant's conclusory allegation that it must have lawfully applied the pesticides based on a single document that is subject to multiple interpretations and built on unknown information cannot justify dismissal, particularly where the Court must draw all reasonable inferences in AISLIC's favor.

---

[6] Defendant improperly contradicts AISLIC's factual allegations by claiming that the pesticide was registered in accordance with FIFRA at the time it was used at the East Housing Area. Mot. at 14.

In a desperate attempt to avoid liability on count two, Defendant also cites the same DTSC letter for the proposition that the state agency never identified a "release or threatened release" of any hazardous substances by the Navy, arguing that the City alone must have caused the release of OCPs by demolishing the buildings. Mot. at 12-13. First, Defendant's argument amounts to no more than speculation that the City must have released OCPs. The letter is irrelevant because the state agency did not make any determination, much less set forth any facts establishing, whether the Navy or the City had or would release any hazardous substance pursuant to the terms of the East Housing Deed. See East Housing Deed, II.F.3. Second, the Navy did not have to release the OCPs to be liable; all that is necessary is that the hazardous substance existed on the property prior to the date of the Deed, a fact Defendant does not deny. Id. Finally, even if the City caused or contributed to a release, that would only reduce Defendant's liability, not extinguish it. Defendant makes no attempt to establish the relative degrees to which Defendant and the City are responsible for any release. In fact, the City would *not* be responsible for any release because it was merely executing the Community Reuse Plan approved by the Navy.[7]

In sum, Defendant's arguments are rife with conclusory factual arguments disputing the truth of AISLIC's allegations, which is improper at this stage of the pleadings. Accordingly, Defendant's motion as to the first and second counts for breach of the East Housing Deed should be denied.

#### 2. Defendant's Misrepresented the Environmental Conditions at the East Housing Area (Counts Three and Four).

Defendant makes the reaching claim that it did not breach the East Housing Deed because Section II.F.1.a of the deed "says nothing about 'pesticides.'" Mot. at 14. The plain language of the

[7] Unlike Defendant in this case, in Redwing Carriers, Inc. v. Saraland Apts., 94 F.3d 1489, 1511 n.31 (11th Cir. 1996), the defendant provided proof that the pesticides were properly applied to treat the property for termites and the plaintiff failed to produce evidence refuting that proof.

deed establishes that Defendant represented that the East Housing Area was suitable for transfer based on the environmental conditions on the property, as set forth in the FOST. East Housing Deed, II.F.1.a. The FOST, which is incorporated into Defendant's representation, described the East Housing Area as suitable for mixed use, including residential use, as intended in the Alameda Point Community Reuse Plan, and noted that the buildings on the East Housing Area were to be demolished so that the area could be redeveloped as a residential area. FOST, Sections 1.0, 2.0, 7.0. Importantly, the FOST identifies pesticides that may have been present on the property, but does *not* identify the presence of chlordane and does not impose any deed restrictions. FOST, Section 6.8. Similarly, the FOST in Richmond American Homes described the property at issue as suitable for transfer without any restrictions as to its use, and did not list asbestos as a hazardous material. 75 Fed. Cl. at 379-80. Therefore, Defendant both misrepresented in the deed that the East Housing Area was suitable for transfer and misled the City to believe that chlordane was not among the hazardous substances that were present at the site.

While Defendant claims that an environmental baseline study ("EBS") notified the City of the presence of chlordane (Mot. at 14), the East Housing Deed specifies that its representation that property is suitable for transfer is based on the FOST, and the FOST misled the City to believe the property was suitable for transfer because there were no OCPs on the property. Moreover, Defendant has not established, and cannot do so on a Rule 12(b)(6) motion, whether the pesticides identified in Defendant's document are the same OCPs the City was forced to remediate, and whether the pesticides were in the same concentrations identified in Defendant's document.[8]

---

[8] Contrary to Defendant's assertion, AISLIC's Complaint does not refer to the EBS. Even if it did, that a plaintiff may reference a document in a complaint for one purpose does not require the Court to adopt as true all information reflected in the document. For example, Defendant represented in the East Housing deed that chlordane was not present on the property, but its representation was not true. It is the Government's misrepresentation in the deed that forms the very basis for one of AISLIC's breach claims.

Similarly, in Richmond American Homes, the EBS referenced the presence of asbestos in the neighborhood, but this did not translate to a blanket disclosure for anything related to asbestos. 75 Fed. Cl. at 378-79. The Court should apply the same reasoning here.

In another attempt to reinterpret its representations to the City, Defendant also claims that the FOST does not suggest that it "lists all pesticides that were ever used at the East Housing area." Mot. at 14. The language is clear: the FOST represents that the pest management plans reflect the pesticides that "may have been used" at the East Housing Area. FOST, Section 6.8. Accordingly, Defendant misled the City to believe that chlordane was not a pesticide that "may have been used" at the site. Defendant's misrepresentation led the City to reasonably believe it would not have to remediate the presence of chlordane on the property to accomplish the Navy's approved residential development. See Compl. ¶¶ 10-11. Therefore, Defendant's motion as to count three should be denied.

Regarding count four, Defendant disputes AISLIC's factual allegations and makes the unfounded conclusory assertion that the chlordane and/or OCPs at the EHA were not hazardous substances stored for one year or more, known to have been released, or disposed of on the property as those terms are used in CERCLA. Mot. at 15. Defendant adds nothing more than to declare chlordane was not a hazardous substance "essentially for reasons already noted." Id. Again, the DTSC letter upon which Defendant solely relies draws no conclusions regarding proper application in a lawful manner. Mot. at 15. At this stage of the pleadings, a plaintiff is only required to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," and these allegations must be accepted as true. RCFC 8(a); Peterson v. United States, 68 Fed. Cl. 773, 775 (2005). AISLIC has sufficiently alleged that Defendant failed to identify chlordane in its Hazardous Substance Notification. Compl. ¶¶ 91-92. Accordingly, Defendant's motion as to the fourth count should be denied.

### 3. Defendant Breached the Memorandum of Agreement (Counts Seven and Eight).

AISLIC has sufficiently alleged that Defendant breached the Memorandum of Agreement by misrepresenting and failing to identify the extent of the application, storage, release, and/or disposal of chlordane at the East Housing Area. Importantly, the burden rests with Defendant to demonstrate that it applied chlordane in a lawful manner. Tropical Fruit, 96 F. Supp. 2d at 90; Cameron, 76 F. Supp. 2d at 1182-83. Moreover, the City reasonably relied on the assertions in the Memorandum of Agreement based on the intended residential use of the East Housing Area. For the reasons set forth above, Defendant's motion to dismiss count seven should be denied.

Defendant also argues that any costs incurred by the City in connection with remediation of the chlordane-contaminated soil cannot be attributed "solely" to the Navy. Mot. at 17. The City certainly did not deposit the chlordane at the site before proceeding to remediate it.[9] As alleged in the Complaint, Defendant is solely responsible for the release of OCPs, namely chlordane, because *it* applied the hazardous substances at the East Housing Area prior to the date of transfer. Compl. ¶ 44; see Richmond Am. Homes, 75 Fed. Cl. at 382 (finding government liable even though plaintiff's redevelopment efforts "may have brought other pre-existing ACM, present as a result of the Air Force's activities, closer to the surface"). Ultimately, whether Defendant is solely or partially responsible for the contamination is a question of fact that cannot be determined on a motion to dismiss. Therefore, the Court should deny Defendant's motion.

[9] Defendant makes another peculiar claim by asserting that although the City did not assume liability to cleanup the chlordane by entering into the Memorandum of Agreement ("MOA") with Defendant, Defendant still had no obligation to cleanup the site. Mot. at 16. As set forth herein, Defendant had the obligation to cleanup the site *before* it transferred the property, and it failed to do so. By shifting the cleanup responsibility to the City in contravention of its contractual affirmation that the City would not be liable or responsible for the cleanup, Defendant breached Article 21 of the MOA.

## III. CONCLUSION

Based on the foregoing, Defendant's Renewed Motion to Dismiss should be denied.

Respectfully submitted,

s/T. Michael Guiffré
T. Michael Guiffré
J. Gordon Arbuckle
Daniel R. Addison
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Attorneys for Plaintiff American International
Specialty Lines Insurance Company

July 6, 2007

**CERTIFICATE OF FILING**

I certify that on July 6, 2007 the foregoing Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/T. Michael Guiffré
T. Michael Guiffré