No. 05-1020C
(Judge Sweeney)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF RENEWED MOTION TO DISMISS**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0476
Facsimile: (202)305-7644

Attorneys for Defendant

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Naval Litigation Office
Washington, D.C.

July 23, 2007

TABLE OF CONTENTS

I. The Standard For Dismissal ....................................................................................1

II. AISLIC Cannot Recover Under Section 330 ....................................................................3

A. The City Of Alameda Did Not Acquire A CERCLA "Facility"................................4

B. There Was No "Claim" Against The City.................................................................8

C. The Supposed DTSC Claim Was Not "For Property Damage".............................15

D. There Was No Claim Predicated Upon A "Release Or Threatened Release" .....16

E. No Release Or Threatened Release Resulted From Military Activities..................17

III. AISLIC Has Not Plausibly Alleged A Breach Of Contract.............................................17

CONCLUSION...........................................................................................................................20

ATTACHMENTS

1. Westlaw tracking summary of S. 3114 (1992)

2. Text of S. 3114 § 317, as passed by Senate (from http://thomas.loc.gov)

# TABLE OF AUTHORITIES

## CASES

AMI, Inc. v. International Forging Equip. Co.,
982 F.2d 989 (6th Cir. 1993) ....18

A&W Smelter and Refs., Inc. v. Clinton,
146 F.3d 1107 (9th Cir. 1998) ....18

ATSI Communic., Inc. v. Shaar Fund, Ltd.,
___ F.3d ___, 2007 WL 1989336 (2d Cir. July 11, 2007) ....3

Bell Atlantic Co. v. Twombly,
127 S. Ct. 1955 (2007) ....passim

Bryan v. United States,
524 U.S. 184 (1988) ....13

Casitas Mun. Water Dist. v. United States,
72 Fed. Cl. 746 (2006) ....20

Clary v. United States,
333 F.3d 1345 (Fed. Cir. 2003) ....11

Combined Counties Police Ass'n v. 55 S. Partnership,
1996 WL 521285 (N.D. Ill. Sept. 11, 1996). ....4, 5

Conley v. Gibson,
355 U.S. 41 (1957) ....1-2

Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.,
906 F.2d 1059 (5th Cir.1990)....5

Detroit Housing Corp. v. United States,
55 Fed. Cl. 410 (2003)....19

Duncan v. Walker,
533 U.S. 167 (2001)....8

Erickson v. Pardus,
127 S. Ct. 2197 (2007) ....2

Executive Jet Aviation, Inc. v. United States,
125 F.3d 1463 (Fed. Cir. 1997). ....16

Fisher v. Caruso,
2007 WL 1827395 (E.D. Mich. June 22, 2007)........................................................3

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) ........................................................................9,15

New London Devel. Corp.,
ASBCA No. 54535, 05-2 BCA ¶ 33,018 ........................................................ passim

Richmond American Homes v. United States,
75 Fed. Cl. 376 (2007) ..........................................................................................passim

Town of New Windsor v. Tesa Tuck, Inc.,
935 F. Supp. 305 (S.D.N.Y. 1996) ..........................................................................5

United States v. Tropical Fruit, S.E.,
96 F. Supp. 2d 71 (D.P.R. 2000) ......................................................................6-7, 16-17

STATUTES AND REGULATIONS

10 U.S.C. § 2687 note ...............................................................................................passim

42 U.S.C. § 9601(9)........................................................................................................4-5, 8

42 U.S.C. § 9601(22).........................................................................................................16

42 U.S.C. § 9603(e)............................................................................................................7

42 U.S.C. § 9607(i) ......................................................................................................7, 16

MISCELLANEOUS

H.R. Conf. Rep. No. 102-966 (1992) .....................................................................................9

Merriam-Webster Online Dictionary (claim, n., def. 1) ...................................................14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | No. 05-1020C (Judge Sweeney) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF RENEWED MOTION TO DISMISS**

Pursuant to the Court's Rules ("RCFC"), defendant, the United States, respectfully replies to the opposition filed on July 6, 2007 by plaintiff, American International Specialty Lines Insurance Company ("AISLIC"), to our June 6, 2007 renewed motion to dismiss the first amended complaint. AISLIC's brief often seems to respond to some brief other than ours. Among other things, AISLIC accuses us of overlooking counterarguments we refuted and misstating legal principles we quoted and correctly applied. AISLIC is entitled to no relief.

I. The Standard For Dismissal

AISLIC argues that we "misread[]" the standard of review for a motion to dismiss set forth in Bell Atlantic Co. v. Twombly, 127 S. Ct. 1955 (2007), which abrogated Conley v. Gibson, 355 U.S. 41 (1957). Pl. Br. 3. That assertion is curious, as our recitation of the standard consisted entirely of direct quotations from Bell Atlantic. Def. Br. 8 (quoting Bell Atlantic, 127 S. Ct. at 1965-66). AISLIC urges this Court to continue to apply Conley's "no set of facts" test, Pl. Br. 3 (citing American Airlines, Inc. v. United States, 68 Fed. Cl. 723 (2005)) – even though Bell Atlantic (which was decided by a 7-2 majority) holds unambiguously that

> Conley's "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the Conley Court,

> the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement.

127 S. Ct. at 1969; see also id. at 1978 (Stevens, J., dissenting) ("If Conley's 'no set of facts' language is to be interred, let it not be without a eulogy.").

Pursuant to Bell Atlantic, this Court should "look for plausibility in [AISLIC's first amended] complaint," id. at 1970, and grant our motion to dismiss unless AISLIC has alleged "enough factual matter (taken as true) . . . to raise a right to relief above the speculative level," i.e., allegations "plausibly suggesting (not merely consistent with)" a valid claim. Id. at 1965-66 (citing, inter alia, Fed. R. Civ. P. 8(a)). AISLIC cites the more recent statement in Erickson v. Pardus, 127 S. Ct. 2197 (2007) (per curiam), a pro se prisoner lawsuit, that "[s]pecific facts are not necessary." Id. at 2200 (citing Bell Atlantic), cited in Pl. Br. 4. That phrase in Erickson cannot be read, however, to imply that an implausible, "formulaic," or "wholly conclusory statement of a claim [sh]ould survive a motion to dismiss," since those results are what Bell Atlantic, in so many words, rules out. 127 S. Ct. at 1964-65, 1968.

AISLIC also argues that Bell Atlantic "is limited to cases alleging an antitrust conspiracy in violation of the Sherman Act." Pl. Br. 4-5. That argument (in addition to being contradicted by Erickson's citation of Bell Atlantic) is incompatible with the opinion. The Bell Atlantic Court explained that "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) [an unlawful] agreement reflects the threshold requirement of Rule 8(a)(2)." 127 S. Ct. at 1966. The Court went on to state that the "main argument" of the Bell Atlantic plaintiff-

respondents "against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing Rule 8," in Conley v. Gibson. Id. at 1968.

Accordingly, Bell Atlantic's abrogation of Conley is clearly not confined to antitrust law and affects Federal civil procedure, in general. See, e.g., ATSI Communic., Inc. v. Shaar Fund, Ltd., ___ F.3d ___, 2007 WL 1989336, at *5 & n.2 (2d Cir. July 11, 2007); Fisher v. Caruso, 2007 WL 1827395, at *3 & n.3 (E.D. Mich. June 22, 2007). The dissent in Bell Atlantic, which states that "there is no dispute about the substantive [antitrust] law" and argues that the majority's holding marks a "departure from settled procedural law," reflects this same reading of the decision. Id. at 1974-75 (Stevens, J., dissenting) (emphasis added). Similarly, AISLIC's argument that Bell Atlantic, in effect, cannot mean what it says, because the applicable Federal Rules have not changed, Pl. Br. 4 n.1, is refuted in the opinion. 127 S. Ct. at 1964-64 & n.3.

## II. AISLIC Cannot Recover Under Section 330

Addressing the counts of its first amended complaint out of order, AISLIC argues, first, that counts five and six state claims for relief under "section 330," 10 U.S.C. § 2687 note. Pl. Br. 5-19. As noted below, AISLIC relies heavily upon what it hyperbolically terms (id. at 5) "two landmark cases," Richmond American Homes v. United States, 75 Fed. Cl. 376 (2007), and New London Development Corp., ASBCA No. 54535, 05-2 BCA ¶ 33018 Both Richmond and New London remain interlocutory, however. Neither decision has received appellate review. Nor, of course, does either decision bind this Court. In any event, we explained the errors in Richmond and New London in our moving brief and revisit some of those flaws below.

A. The City Of Alameda Did Not Acquire A CERCLA "Facility"

We established in our motion that the pleadings lack allegations plausibly supporting the express requirements in section 330(a) of a "facility," as defined by the Comprehensive Environmental Response, Control and Liability Act ("CERCLA"); a "claim for personal injury or property damage"; an alleged "release or threatened release"; and an absence of contributory causation by the party invoking section 330 (here, the City of Alameda, whose claim AISLIC is pursuing as an alleged subrogee). Def. Br. 17-32.

AISLIC's section 330 claim fails, at the threshold, because the City did not acquire a "facility," as defined in 42 U.S.C. § 9601(9), which is incorporated by section 330(a)(2) and (f). Def. Br. 23-24. Whether the allegations of the first amended complaint plausibly suggest the City acquired a CERCLA "facility" is a question of law amenable to resolution on a motion to dismiss. Combined Counties Police Ass'n v. 55 S. Partnership, 1996 WL 521285 (N.D. Ill. Sept. 11, 1996). We demonstrated that, accepting the purely factual allegations of the first amended complaint (including the attachments) as true, the East Housing Area of the former Naval Air Station Alameda was not a CERCLA facility, in light of the exclusion from the statutory definition relating to a "consumer product in consumer use." See 42 U.S.C. § 9601(9).

AISLIC argues it has properly alleged a facility under the CERCLA definition, because the Government allegedly "has not contested," in our brief, that the City acquired a "'building, structure, installation, equipment, pipe or pipeline . . ., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft.'" Pl. Br. 7-8 (quoting 42 U.S.C. § 9601(9)(A)). The reason we did not "contest" those elements is that the first amended complaint does not specifically allege them. Rather, the first amended complaint plausibly

suggests only that the City acquired land at which pesticides were used consistent with CERCLA's "consumer product in consumer use" exclusion. See 42 U.S.C. § 9601(9)(B)

The first amended complaint nowhere suggests the City acquired any "installation, equipment, pipe or pipeline . . ., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft" at the East Housing Area. Id. § 9601(9)(A). Thus, those terms in part (A) of CERCLA's definition of "facility" are irrelevant. While the first amended complaint arguably refers to "buildings" or "structures" at the East Housing Area, AISLIC seems to read part (A) of the CERCLA definition of facility to mean that "any building" or "structure" can be a facility, regardless of whether it allegedly has any connection to a hazardous substance. The courts, however, have understandably not adopted that overbroad interpretation of part (A). See Town of New Windsor v. Tesa Tuck, Inc., 935 F. Supp. 305, 309 (S.D.N.Y. 1996); Combined Counties, 1996 WL 521285, at *4 ("To be a facility under CERCLA, a particular site must contain a hazardous substance, which does not include petroleum or petroleum products.").

That is why we focused upon part (B) of the definition of facility, which excludes from the definition any site or area where there has come to be located only "any consumer product in consumer use." 42 U.S.C. § 9601(9)(B); see Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059, 1065-66 (5th Cir. 1990). The pleadings demonstrate that the East Housing Area was not a CERCLA facility when the City acquired it in 2000, because, at that time, the chlordane-based termiticide allegedly used there was a useful consumer product applied for its intended use, protecting the existing buildings. AISLIC argues that we are asking the Court "to

make a factual finding" regarding the issue of a consumer product in consumer use, "which would be improper on a Rule 12(b)(6) motion." Pl. Br. 6. AISLIC is mistaken.

Instead, AISLIC's first amended complaint is deficient because it alleges no facts or circumstances lending "plausibility" to AISLIC's "formulaic" and "conclusory" allegations, cf. Bell Atlantic, 127 S. Ct. at 1965-66, that the soil at the East Housing Area contained a hazardous substance, i.e., chlordane, that was "transport[ed], stor[ed], spill[ed], or dispos[ed] of" at that property by the Navy. See Pl. Br. 7 (quoting United States v. Tropical Fruit, S.E., 96 F. Supp. 2d 71, 90 (D.P.R. 2000)). The pleadings identify no regulatory body or other entity that has ever allegedly identified improper use of chlordane at the East Housing Area, or any requirement for the Navy to remediate chlordane. To the contrary, the only aspect of the pleadings, beyond AISLIC's conclusory allegations, relating to the condition of the soil at the property is the May 2002 letter to the City from the California Department of Toxic Substances Control ("DTSC") approving the City's demolition workplan. 9/30/05 Transf. Compl. Exh. 2, Tab 7. The DTSC said the organochlorine pesticides ("OCPs") were "currently being used in the manner intended," and were not actionable, although pesticide-treated soil would need to be removed from the property if the City removed the buildings. Id.

AISLIC also argues, in essence, that the Navy's finding of suitability for transfer ("FOST") can be read as asserting that the Navy "did not know about the chlordane" and that, therefore, the Navy cannot know whether chlordane was a useful product applied for its intended use, within the meaning of the CERCLA exclusion. Pl. Br. 6- 7. Even if this characterization of the FOST were accurate, which it is not, it is irrelevant, because we bear no burden to plead a claim, nor do we rely upon the FOST in connection with the facility issue. The crucial point is

that AISLIC, the plaintiff, alleges no facts plausibly suggesting that the pesticide was anything other than a consumer product in consumer use. AISLIC argues that chlordane was not a consumer product in consumer use because it was de-registered as a pesticide in 1988. Id. Again, however, there is nothing in the pleadings, or in the law, to support an argument that the termiticide at the East Housing Area was not still subject to that exclusion in 2002, when the California DTSC told the City there was no immediate need for remediation.

Finally, AISLIC appears to conflate the "consumer product in consumer use" exclusion in the CERCLA definition of "facility," on the one hand, with the exemption from liability under 42 U.S.C. § 9607(i) for the application of registered pesticides, on the other. AISLIC cites Tropical Fruit for the proposition that "courts have determined the existence of a 'facility' under CERCLA and found 'liability for the transport, storage, spilling and disposal of pesticides.'" Pl. Br. 7 (quoting 96 F. Supp. 2d at 84) (emphasis added by AISLIC). Tropical Fruit does not address the "consumer product in consumer use" exclusion, however. Defendant in that case argued that its farm was not a "facility," based upon 42 U.S.C. § 9603(e), which exempts registered pesticides from the notification requirements for releases. The district court rejected that argument, upon the grounds that section 9603(e) "deals exclusively with notification requirements with respect to releases of CERCLA hazardous substances, and is irrelevant to the determination of whether the Tropical Fruit farm constitutes a facility." 96 F. Supp. 2d at 84.

We do not rely upon section 9603(e). Moreover, the Tropical Fruit court went on to find that there had, in fact, been a release of a hazardous substance at the farm – not only a proper application of pesticide – because "pesticide droplets, particles, and vapor ha[d] drifted or migrated onto adjacent properties." Id. at 85. There is no similar plausible allegation here.

AISLIC argues without foundation that, in contrast to Tropical Fruit, certain decisions cited in our moving brief are inapposite because they concern CERCLA lawsuits involving asbestos. Pl. Br. 7. To the contrary, although the "consumer product in consumer use" in those cases differs from the product here, the decisions construe the relevant exclusion in 42 U.S.C. § 9601(9)(B). In sum, AISLIC has alleged no facts plausibly supporting its "formulaic recitation of the elements," Bell Atlantic, 127 S. Ct. at 1965, of a CERCLA "facility." AISLIC has instead apparently made these conclusory allegations in the hope of uncovering a cause of action. Counts five and six fail, because there is not "enough factual matter (taken as true)" in the first amended complaint to suggest that the East Housing Area was a CERCLA facility. Cf. id.

B. There Was No "Claim" Against The City

Assuming the City acquired a covered "facility," we established that the costs alleged in the pleadings do not "aris[e] out of any claim," as section 330(a) requires. We demonstrated that the natural and straightforward reading of section 330 requires, among other things, that the transferee have incurred costs "arising out of" a third-party legal "claim," which does not exist here. Def. Br. 19, 24-28. AISLIC argues that the phrase "arising out of any claim for . . . property damage" does not mean that a "claim" must have been filed against the City. Pl. Br. 8-10. AISLIC argues that "any claim" in section 330 means a transferee's own claim. Id. at 8 (noting the City and AISLIC "jointly submitted a claim for reimbursement under Section 330").

AISLIC's reading of "any claim" is untenable, because it would impermissibly render the entire phrase "arising out of any claim for personal injury or property damage" surplusage, nonsensical, or both. E.g., Duncan v. Walker, 533 U.S. 167, 174 (2001). The "arising out of" clause would be mere surplusage if a transferee of closed base property could satisfy the

requirement simply by having asserted a "claim" to the Government for indemnification. That would be no limitation at all; the clause could be omitted entirely. At the same time, given that a claim for indemnification under section 330 must "aris[e] out of a claim for personal injury or property damage," a transferee's own section 330 claim cannot be the "claim for personal injury or property damage" that the section 330 claim "aris[es] out of." For one thing, a claim does not arise out of itself. For another, a claim to the Government for indemnification under section 330 is not, in itself, a "claim for personal injury or property damage."

AISLIC's arguments concerning the term "claim" also ignore the fact that section 330 differs from similar legislation enacted in 1990, indemnifying the State of New Hampshire for costs arising at Pease Air Force Base, Pub. L. No. 101-511, § 8056, 104 Stat. 1856, 1887 (1990), precisely in that Congress subsequently referred in section 330(a) to a "claim for personal injury or property damage." Def. Br. 25. Under AISLIC's argument, the 1990 legislation and section 330 would provide the same indemnity, although only section 330 limits the scope of the indemnity to circumstances "arising out of any claim for . . . property damage." That cannot be correct. Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F.2d 972, 975 (1965).

By contrast, we noted that our straightforward reading of the term "claim" is supported by this comparison with the 1990 Pease legislation and by, among other things, section 330(c), which authorizes the Secretary of Defense to "settle or defend, on behalf of [the transferee], the claim for personal injury or property damage" (which confirms that the "claim" in question is not the transferee's own claim), and section 330(d), which provides that a claim for indemnification accrues when the "plaintiff knew (or reasonably should have known) that the personal injury or

property damage referred to in Section (a) was caused or contributed to by" a covered release or threatened release. (Emphasis added.)

AISLIC fails to respond to our textual argument concerning section 330(c). See Pl. Br. 9. With regard to section 330(d), AISLIC argues that, unless the word "plaintiff" is construed to refer to a transferee, such as the City, rather than to a third party, "the indemnitee's claim for indemnification could expire long before a third party pursued any claim against [it]." Id. AISLIC asserts baldly that this result "would be inconsistent with Section 330's purpose" but cites no evidence to that effect, much less evidence sufficient to outweigh the plain language of section 330. Id. To the contrary, the apparent and unremarkable "purpose" served by section 330(d) is to ensure that the duration of the Federal Government's potential liability for indemnification under section 330, after a transfer of closed base property, is not tied to the myriad State statutes of limitation that might apply to potential "claim[s] for personal injury or property damage" against a transferee. It is AISLIC's reading of section 330(d), not ours, that is inconsistent with the legislative purpose.

AISLIC devotes considerable space to defending New London (a board case that AISLIC misleadingly labels "[j]udicial precedent," Pl. Br. 9) and Richmond American Homes. Mysteriously, AISLIC asserts (echoing a similar mistake in Richmond, 75 Fed. Cl. at 394) that we "wholly ignore[d]" New London. Pl. Br. 9. We quote our moving brief:

> The board in New London construed, in an interlocutory decision, contract language that tracked section 330. But the board erroneously skipped directly to asking whether there was "property damage," without considering whether there had been a "claim" against the contractor. Indeed, New London nowhere construes the term "claim." Furthermore, the suggestion in New London that a "claim for property damage" may exist whenever a contractor

> alleges it has itself incurred an "economic loss" must be rejected, because it would render section 330 nonsensical: Under that reading of section 330(a), a transferee of base property would be indemnified against a "claim for" its own costs ("economic loss"). That is not a grammatical construction.

Def. Br. 30. Rather than responding to the above, AISLIC "wholly ignores" it and asserts baldly that New London "confirms that a third party claim is not required." Pl. Br. 10. That is not true – because the board in New London did not address the issue – and would not bind this Court if it were true. AISLIC's argument that, because a single, non-binding board decision skipped an analytical step, this Court should do likewise, plainly lacks merit. Id. at 16.

AISLIC's arguments concerning Richmond begin from the odd premise that we "d[id] not explain why the Court's construction of Section 330 was supposedly wrong." Id. at 10. We doubt any other reader of our brief, particularly pages 19-23, where we set forth the statute's plain meaning and contrasted it with the Richmond Court's too-generous construction, would share AISLIC's premise. AISLIC, for its part, errs by urging this Court to adopt the Richmond Court's erroneous "substantive analysis" of section 330's supposed legislative history. Pl. Br. 12.

As a preliminary matter, given the clarity of section 330, there is no reason to consult legislative history. Clary v. United States, 333 F.3d 1345, 1348 (Fed. Cir. 2003). Nonetheless, we demonstrated that the floor statement by Senator McCain, upon which the Richmond Court so heavily relied, does not constitute legislative history of the phrase "arising out of any claim for personal injury or property damage" in section 330(a); or the term "plaintiff" in section 330(c); or the accrual provision in section 330(d), none of which were in the Senate Bill at the time Senator McCain was speaking, and the inclusion of which he evidently opposed. Def. Br. 22.

AISLIC caricatures our argument as "the preposterous assertion that Senator McCain was an opponent of" section 330 in general. Pl. Br. 11. That is not what we said, of course. We demonstrated, instead, that Senator McCain opposed the inclusion of the language that is relevant to this case. S. 3114, the bill that Senator McCain sponsored, did not contain the relevant language. In the floor statement upon which the Richmond Court relied, Senator McCain was arguing against an amendment – not "in opposition to an earlier version of the bill," as AISLIC claims, Pl. Br. 11 – that would have limited the Government's liability. Although that amendment did not pass the Senate, nothing Senator McCain said on the floor of the Senate in September 1992 relates in any way to the limiting phrase "arising out of any claim for personal injury or property damage" in section 330(a); the term "plaintiff" in section 330(c); or the accrual provision in section 330(d), none of which appeared in S. 3114. As we established, each and every one of those words was added in the House-Senate Conference later in September 1992.

The legislative history that is relevant here, therefore, consists only of the following passage in the House-Senate Conference Report, cited in our moving brief:

> The Senate amendment contained a provision (sec. 317) that would require the Secretary of Defense to hold harmless, defend, and indemnify transferees of closing military facilities, from all suits, claims, demands, judgments, costs, or other fees arising out of the release or threatened release of any hazardous substance, pollutant, or contaminant as a result of DOD activities at the closing military installation. This indemnification provision would not apply where the transferee caused or contributed to the release or threatened release. The provision would require that the Secretary of Defense be notified of the claim for indemnification within two years after such claim accrues. This would establish a statute of limitations for handling any such claim. The provision would also require that the person seeking indemnification cooperate fully with the Department of Defense in handling the claim.

> The House bill contained no similar provision.
>
> The House recedes with an amendment that would ensure that the indemnification provided pursuant to this section does not conflict with or modify section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601-9657). In addition, the amendment would clarify when a claim accrues.

H.R. Conf. Rep. No. 102-966, pt. 3, at 685 (1992) (emphasis added), reprinted in 1992 U.S.C.C.A.N. 1769, 1776, cited in Def. Br. 22. (We attach section 317 of the Senate Bill.)

Although the Conference Report does not specifically explain the insertion of the phrase "arising out of any claim for personal injury or property damage" (which is clear enough upon its face), the Report makes clear the intent of the House Conferees to impose limitations upon the indemnity provision that was supported by Senator McCain and passed by the Senate. There is no evidence that Senator McCain reversed his position to support the House Conferees' limiting amendment and every reason to believe he did not. Consequently, we correctly pointed out that Senator McCain was an opponent of the relevant statutory language and that his statements to the Senate concerning different language carry no weight as legislative history in this case. Bryan v. United States, 524 U.S. 184, 196 (1988).

AISLIC also attempts to defend the Richmond Court's mistaken reliance upon a letter sent to Senator McCain by the Principal Deputy Assistant Secretary of Defense in February 1993, more than four months after section 330 became law. See 75 Fed. Cl. at 388. While not denying that the Richmond Court relied upon the letter to interpret section 330, AISLIC argues that the Richmond Court only "considered the letter to reflect the Executive Branch's 'contemporaneous reaction to the law.'" Pl. Br. 12 (quoting 75 Fed. Cl. at 388).

There is simply no canon of statutory interpretation, however, that could justify a court's reliance upon post-enactment correspondence between an agency official and a legislator. Even if there were such a canon, moreover, AISLIC and the Richmond Court overlook the fact that the February 1993 letter was not "contemporaneous" with the October 1992 passage of the act. (Nor, as we noted, was the letter a definitive or formal Executive Branch interpretation of section 330.) All of AISLIC's efforts to evade the plain language of section 330, which requires a third-party legal "claim for personal injury or property damage" against the transferee, and to support the unusual and expansive definition of "claim" adopted in Richmond, thus fall flat.

AISLIC argues that, assuming our reading of the term "claim" is correct, it has properly alleged that the DTSC brought a "claim" against the City. Pl. Br. 13-14. Contrary to AISLIC's assertion, id. at 14, whether the allegations of the first amended complaint plausibly suggest the existence of a "claim" within the meaning of section 330 is an issue of law, not of fact. AISLIC's arguments depend upon the Richmond Court's overbroad reading of the term "claim" and do not suggest the presence of a "claim" within the plain and ordinary meaning, i.e., "a demand for something [typically money] due or believed to be due." Merriam-Webster Online Dictionary (claim, n., def. 1). The DTSC did not demand that the City pay, transfer, or convey anything to the DTSC, or allege that anything was "due" to the DTSC. In a different case, the Court might need to decide "whether a claimant must file a legal instrument of some sort . . ., or whether a demand letter would suffice." Pl. Br. 13-14. But here, such secondary issues are irrelevant, because the pleadings do not allege anything that could plausibly be called a "claim."

C. The Supposed DTSC Claim Was Not "For Property Damage"

We further demonstrated that, assuming the May 2002 letter from the DTSC to the City can be construed as a claim, it is not a claim "for property damage (including death, illness, or loss of or damage to property or economic loss)." Def. Br. 28-31. AISLIC's response again relies almost entirely upon New London and Richmond American Homes and disregards what we said in our moving brief about those decisions. In particular, AISLIC ignores our demonstration, Def. Br. 30, that the term "property damage" in section 330(a) cannot logically include "economic losses incurred" by a transferee "to abate [an environmental] threat." Pl. Br. 15. That reading is precluded, we demonstrated, because it would mean section 330 would indemnify a transferee "from and against" a "claim for" its own costs ("economic loss"), which is neither semantically correct nor reasonable. Def. Br. 30; see Hol-Gar, 351 F.2d at 975.

At best, the pleadings suggest the May 2002 letter from the DTSC to the City caused economic loss – not that the letter was a "claim for" economic loss or other property damage, as section 330 requires. AISLIC's only response to our observation that, had Congress intended to reimburse environmental cleanup costs, Congress could, and would, have said so, rather than enacting legislation referring to "any claim for personal injury or property damage," Def. Br. 30, is to assert that our argument "is a double-edged sword," because Congress could also have defined "property damage" to exclude cleanup costs. Pl. Br. 16. The flaw in AISLIC's logic is that the plain and ordinary meaning of "claim for personal injury or property damage" does not include regulatory actions requiring remediation. True, Congress could have enacted a special definition of "claim" or "property damage" for section 330. But it did not. Thus, the

plain meaning of the act prevails and cleanup costs are excluded from the indemnity. See Executive Jet Aviation, Inc. v. United States, 125 F.3d 1463, 1468 (Fed. Cir. 1997).

D. There Was No Claim Predicated Upon A "Release Or Threatened Release"

With regard to the further requirement in section 330(a) that a claim for personal injury or property damage must be "predicated upon" a "release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of Department of Defense activities . . .," AISLIC again relies upon Richmond American Homes and argues that "chlordane was released at the East Housing Area when the Navy put it there . . . . At a minimum, there was a 'threatened' release requiring remediation." Pl. Br. 17. (AISLIC asserts we "concede[d]" there was a release. Id. (citing Def. Br. 31). We did not, of course.)

AISLIC's argument that chlordane is currently listed as a hazardous substance, which we acknowledge, misses the point. The point is, there are no allegations in the pleadings plausibly suggesting that the past application of pesticide constituted a release or threatened release of a hazardous substance. Although the definition of "release" in 42 U.S.C. § 9601(22) arguably does not distinguish between proper and improper application of pesticides, courts interpreting CERCLA have done so. Indeed, the court in Tropical Fruit, upon which AISLIC relies, distinguished between improper application of pesticide falling within the definition of "release" and proper application protected by the exemption from liability under 42 U.S.C. § 9607(i) concerning registered pesticides. 96 F. Supp. 2d at 84. Because section 330 incorporates the CERCLA definition of "release," the same logic applies here. There is nothing in the pleadings to suggest OCPs were improperly used. The May 2002 DTSC letter states just the opposite.

Nothing in Richmond American Homes affects this analysis because unlike pesticides, asbestos, which is at issue in Richmond, cannot be "properly" applied to soil consistent with CERCLA.

E. No Release Or Threatened Release Resulted From Military Activities

Finally, we demonstrated that section 330 is inapplicable because the need to remediate the soil at the East Housing area arose "as a result of" the City's actions, rather than "as a result of Department of Defense activities" at the former Naval Air Station. Def. Br. 32. AISLIC argues that "it is impossible for the Court to conclude" from the pleadings "that the City was entirely responsible for any release or threatened release . . . ." Pl. Br. 18. That is not the question.

The question is whether AISLIC's pleadings allege facts plausibly suggesting that military activities were the cause. AISLIC's conclusory, formulaic assertion of Government responsibility is not enough. Bell Atlantic, 127 S. Ct. at 1965. The only plausible inference from the pleadings is that the need for remediation arose from the intervening cause of the City's decision to demolish the buildings. No facts are alleged that suggest otherwise. AISLIC's assertion that we seek to distinguish between the Government's "responsibility for creating an environmental hazard and [its] responsibility once that hazard was discovered" rests upon the mistaken premise that an "environmental hazard" traceable to the Government has been plausibly alleged. Pl. Br. 19. For all of the above reasons, and each of them, AISLIC has pleaded no plausible right to indemnification under section 330.

III. AISLIC Has Not Plausibly Alleged A Breach Of Contract

We demonstrated that counts one through four, seven, and eight of the first amended complaint fail to state claims for relief because AISLIC has misread the contractual documents and alleges no facts plausibly suggesting, rather than merely consistent with, breaches by the

Government. Def. Br. 9-16. With respect to counts one and two, which involve the two "CERCLA covenants" in the quitclaim deed, we noted that, because there is no plausible allegation that the termiticide was improperly applied or thereby released, the "useful product" doctrine establishes there was no "remedial action necessary" at the site, in the words of the CERCLA covenants, until the City demolished the buildings. See 1st Am. Compl. Exh. 2, at 6. AISLIC criticizes our reliance upon A&W Smelter & Refineries, Inc. v. Clinton, 146 F.3d 1107 (9th Cir. 1998), and AMI, Inc. v. International Forging Equipment Co., 982 F.2d 989 (6th Cir. 1993), because those cases address "arranger" liability under CERCLA. Pl. Br. 20-21. But those decisions are relevant because they discuss the useful product exception and establish there was no "remedial action [by the Navy] necessary" in this case. In AMI, for example, plaintiff sold real property that included intact buildings containing chemical solutions, and the court determined that the threat of a release of the products requiring remediation "arose only after defendants . . . allowed the buildings and [the] sprinkler system to deteriorate." 982 F.2d at 991-92. Similarly, here, the only plausible inference from the pleadings is that there was no requirement for remediation until the City removed the buildings the termiticide was protecting.

Counts three and four allege that the Navy made misrepresentations in the June 2000 quitclaim deed, upon which the City detrimentally relied, concerning the use, release, storage, and/or disposal of OCPs at the East Housing Area. We demonstrated that the quitclaim deed does not say what AISLIC argues it says, and that no facts or circumstances are alleged in the pleadings that plausibly suggest the disclosures in the deed were incorrect or incomplete. Def. Br. 13-15. AISLIC responds with general assertions about the transaction and the FOST, which is not a contract, but fails to point to specific language in the deed that is supposedly false or

misleading. Pl. Br. 23-25. Absent an alleged misrepresentation in a contract term, count three fails to allege a breach. Detroit Housing Corp. v. United States, 55 Fed. Cl. 410, 414-16 (2003).

AISLIC's argument regarding count four is equally insubstantial. Remarkably, AISLIC accuses us of "mak[ing] the unfounded[,] conclusory assertion that the chlordane and/or OCPs at the [property] were not hazardous substances stored for one year or more, known to have been released, or disposed of on the property as those terms are used in CERCLA." Pl. Br. 25 (citing Def. Br. 15). What we demonstrated, however, is that the first amended complaint – in which AISLIC must satisfy its burden under RCFC 8, as construed in Bell Atlantic – contains only AISLIC's unfounded assertions of the opposite conclusions and no allegations raising more than a speculative prospect of a right to relief. Because AISLIC's implausible, "formulaic," and "wholly conclusory statement of a [breach] claim [sh]ould [not] survive a motion to dismiss," the Court should dismiss count four. Bell Atlantic, 127 S. Ct. at 1964-65, 1968.

Finally, counts seven and eight allege that the Government breached the memorandum of agreement ("MOA") that was executed in anticipation of the deed of transfer in 2000. We established that the allegation underlying count seven, that the Government misrepresented or failed to identify OCPs as having been were stored for a year or more, released, or disposed of at the property, is, like so much else in the first amended complaint, conclusory and lacking plausible substance. Def. Br. 16. AISLIC argues that by making these conclusory allegations of breach, it can shift "the burden" to the Government to disprove them. Pl. Br. 26. That is plainly not the law after Bell Atlantic and arguably never was. 127 S. Ct. at 1964-65.

We demonstrated that MOA article 21, upon which count eight is based, merely states what is not a subject of the MOA (viz., the City's responsibility for environmental costs "solely

arising out of" the Navy's pre-transfer activities) and imposes no duty upon the Government that could support a claim for breach. Def. Br. 16-17 (citing Casitas Mun. Water Dist. v. United States, 72 Fed. Cl. 746, 753 (2006)). Ignoring Casitas, AISLIC argues in a footnote that the Government breached article 21 "[b]y shifting the cleanup responsibility to the City." Pl. Br. 26 n.9. However, that could not be a "breach" of the purely negative statement in article 21 that the City accepts "no obligation under this Agreement [MOA]" for preexisting environmental conditions. 1st Am. Comp. Exh. 1, at 16 (emphasis added). The Government has never asserted that the City took on such obligations "under" the MOA.

AISLIC also repeats its allegation, refuted above, that the Navy is "solely" responsible, within the meaning of article 21, for the need to remediate the soil at the East Housing Area after the City removed the buildings. Pl. Br. 26. But because AISLIC fails to respond substantively to our demonstration that MOA article 21 creates no obligations subject to being breached, we need not belabor the plain meaning of the term "solely" in article 21. In sum, the Court should dismiss every count of the first amended complaint.

## CONCLUSION

We respectfully renew our request that the Court grant our June 6, 2007 renewed motion to dismiss the first amended complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

MARY RAIVEL
Senior Trial Attorney
Navy Litigation Office
Washington, D.C.

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-0476
Fax: (202) 305-7644

Attorneys for Defendant

July 23, 2007

CERTIFICATE OF FILING'

I certify that the attached brief was filed electronically on July 23, 2007. I understand that service is complete upon filing and that parties and others may access the filing through the Court's CM/ECF system.

s/Kyle Chadwick