# In the United States Court of Federal Claims

No. 05-1020 C
(Filed: January 31, 2008)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMERICAN INTERNATIONAL      \*
SPECIALTY LINES INSURANCE      \*
COMPANY,      \*
     \*
         Plaintiff,      \*
     \*
v.      \*
     \*
THE UNITED STATES,      \*
     \*
         Defendant.      \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

In this action, plaintiff, a general liability insurer, seeks to recover the costs incurred in removing certain hazardous substances–chlordane and other organochlorine pesticides ("OCPs")–from a portion of a former naval installation. Plaintiff alleges that the United States Department of the Navy ("Navy") failed to notify the property's purchaser that chlordane and other OCPs were present on the property and that the Navy failed to remediate the chlordane and other OCPs in breach of two contracts between the parties. Plaintiff further alleges that defendant failed to indemnify plaintiff for its remediation costs pursuant to section 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, 106 Stat. 2315, 2371-73 (1992) (codified as amended at 10 U.S.C. § 2687 note (2000)). Before the court is Defendant's Renewed Motion to Dismiss ("Renewed Motion"), which seeks dismissal of the First Amended Complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim upon which relief can be granted. For the reasons stated below, the court grants in part and denies in part defendant's Renewed Motion.

## I. BACKGROUND

Pursuant to the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, §§ 2901-2911, 104 Stat. 1485, 1808-19 (codified as amended at 10 U.S.C. § 2687 note (2000)), the 1993 Defense Base Closure and Realignment Commission recommended the closure of Naval Air Station Alameda, located in Alameda, California.[1] Compl. ¶ 9. Subsequently, the

---

[1] It is the general rule that "a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." PSI

Navy issued an Environmental Baseline Survey ("EBS") for Naval Air Station Alameda, which divided the property into 208 individual parcels. Pl.'s Ex. 3 at 8. Parcels 170 and 171 constituted the East Housing Area–the property that is the subject of this action. Id.; Compl. ¶¶ 9, 25. Naval Air Station Alameda closed on April 30, 1997. Compl. ¶ 9.

On April 5, 1994, after the closure recommendation, the City of Alameda and the County of Alameda joined together to establish a local redevelopment authority, which they named the Alameda Reuse and Redevelopment Authority ("Authority"). Id. ¶¶ 3, 10. The Authority developed a Community Reuse Plan for Naval Air Station Alameda and adopted the final plan on September 3, 1997. Id. ¶ 10; Pl.'s Ex. 1 at 145. The Authority's Community Reuse Plan proposed that Naval Air Station Alameda and an adjacent property be used for residential, educational, industrial, and commercial activities.[2] Compl. ¶ 11. In particular, the Authority planned to demolish the buildings in the East Housing Area and redevelop it as a residential area. Pl.'s Ex. 3 at 9.

As required by the National Environmental Policy Act of 1969, Pub. L. No. 91-190, § 102, 83 Stat. 852, 853-84 (1970) (codified as amended at 42 U.S.C. § 4332 (2000)), in February 1996, the Navy began the process of developing an Environmental Impact Statement ("EIS") to describe the impacts of disposing and reusing Naval Air Station Alameda. Pl.'s Ex. 1 at 145-46. The final EIS, which the Navy issued on October 29, 1999, analyzed four reuse alternatives for the property and identified the Authority's Community Reuse Plan as the preferred alternative. Id.; Compl. ¶ 11. The final EIS also noted that pesticides used in the past at Naval Air Station Alameda "included chlordane, lindane, and dichlorodiphenyltrichloroethane (DDT), which are now banned." App. 12. However, the one substantive page from the final EIS provided to the court does not specify the locations at Naval Air Station Alameda where the pesticides were used. Id.

---

Energy, Inc. v. United States, 59 Fed. Cl. 590, 597 n.8 (2004), rev'd on other grounds, 411 F.3d 1347 (Fed. Cir. 2005); see also RCFC 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.34[2] (3d ed. 2006) ("In deciding whether to dismiss, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice."). Thus, for the purposes of ruling on the Renewed Motion, the court derives the facts from the First Amended Complaint ("Compl.") and the attachments to the First Amendment Complaint ("Pl.'s Ex."). The court also derives facts from the Appendix to the Renewed Motion ("App."), as the court finds that the documents included in the Appendix are incorporated by reference into the First Amended Complaint and the attachments to the First Amended Complaint.

[2] The adjacent property–to which this case does not pertain–is Fleet and Industrial Supply Center Oakland, which includes the Alameda Annex and Facility. Compl. ¶ 11; Pl.'s Ex. 1 at 145.

In April 2000, the Navy issued a site-specific EBS for Parcel 170.[3]  Id. at 15; Pl.'s Ex. 3 at 8, 24.  Additional sampling was performed on Parcel 170 in the landscaped or formerly unpaved areas of that parcel that potentially could have been affected by pesticide use.  App. 26, 28.  Specifically, two surface soil samples were analyzed for the presence of pesticides, which yielded "detectable" concentrations of chlordane.[4]  Id. at 26, 28.  This site-specific EBS declared that "[n]one of these concentrations exceed 1996 [Preliminary Remediation Goals ("PRGs")] . . . ."  Id. at 26.  However, the site-specific EBS did not identify the 1996 PRGs.  See id. at 35 (listing "NA" in the column identifying the PRGs).  The site-specific EBS concluded: "The concentrations of the detected pesticides do not suggest improper use or application practices.  Based on the low concentrations detected, further investigation is not recommended for [this area]."  Id. at 28.

Meanwhile, on April 7, 2000, the Navy issued a Finding of Suitability to Transfer ("FOST") for the East Housing Area.  Compl. ¶ 25.  The purpose of the FOST was "to document environmental findings regarding the real property made available through the Base Realignment and Closure process" and to "address[] the suitability for transfer of property for the intended residential reuse . . . ."  Pl.'s Ex. 3 at 8.  The FOST, in presenting the hazardous substances notification required by federal law,[5] provided that "[h]azardous materials were stored on various

---

[3]  A site-specific EBS was also prepared for Parcel 171.  Pl.'s Ex. 3 at 8, 24.  Presently, the record does not contain this site-specific EBS.

[4]  The site-specific EBS indicated the following:

> Analytical results for surface soil samples 170-0001 and 170-0002 are summarized below.  Results qualified with a "J" are estimated concentrations.
>
> •  4,4'-DDD (5.4J and 95 micrograms per kilogram ($\mu$g/kg)), alpha-chlordane (4.4J and 12J $\mu$g/kg), and gamma-chlordane (4.2J and 9.8 $\mu$g/kg) were detected in both samples.  4,4'-DDE (2.6J $\mu$g/kg) and 4,4'-DDT (40 $\mu$g/kg) were detected in sample 170-0001.

App. 26; see also id. at 28 (summarizing the same results).

[5]  Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub. L. No. 96-510, 94 Stat. 2767 (codified as amended at 42 U.S.C. §§ 9601-9675 (2000)), when contracting to transfer real property to another party, the United States is required to include, in the contract, notice of the type and quantity of hazardous substances that had been stored for at least one year, released, or disposed of on the property.  42 U.S.C. § 9620(h)(1).  CERCLA also requires that each deed reflecting the transfer of the property include the same notice, as well as a description of any remedial action taken, a covenant warranting that the United States has taken any required remedial action or will take any required

parcels throughout former NAS Alameda as part of routine activities" and "were limited to small quantities of pesticides and herbicides used in routine maintenance activities." Id. at 13-14.  The FOST discussed the various chemicals used at Naval Air Station Alameda for pest management purposes:

> A review of pest management plans from [the Navy Public Works Center] indicates that the following were typical of herbicides and pesticides that were used at former NAS Alameda.  The following herbicides, insecticides, termiticides, and rodenticides may have been used at the former NAS Alameda:
>
> - PT-515 (Wasp Freeze)
> - Dursban 2E
> - Drione
> - Ficam W
> - Talon G
>
> Pesticides, herbicides, insecticides, termiticides, and rodenticides were applied intermittently on an as-needed basis at former NAS Alameda, either by personnel from the PWC Pest Control Department or by contractor personnel.  All personnel who routinely applied pest control substances were trained and licensed in the proper and legal application of pesticides, including the insecticides, termiticides, and rodenticides listed previously.  Pesticides were applied in accordance with the manufacturer's directions, state and federal EPA registered pesticide label directions, and the installation's annually approved pest management plan. Because the pesticides and herbicides were routinely applied in a manner consistent with the standards for licensed application, they likely do not pose a threat to human health or the environment.  In addition, records do not indicate that parcels covered by this FOST have been used to store pesticides in any great quantity.

Id. at 19-20.  Table 3 of the FOST was a Notice of Hazardous Substance Stored, Released, or Disposed of at Parcels 170 and 171.  Id. at 31.  The notice identified the following hazardous substances that were "stored for more than 1 year or known to have been released or disposed" of on the two parcels: Dursban 2E,[6] Ficam W, Drione, Talon G, and PT 515.  Id.  Neither the FOST nor any exhibits to the FOST mentioned chlordane or other OCPs.

On June 6, 2000, defendant, acting through the Navy, and the Authority entered into a Memorandum of Agreement that provided for the conveyance of portions of Naval Air Station

_____

remedial action in the future, and a clause permitting the United States to access the property to take remedial action.  Id. § 9620(h)(3).

   [6] "Dursban" was misspelled on the notice.

Alameda, including the East Housing Area.  Compl. ¶¶ 12-13.  Article 21 of the Memorandum of Agreement described the Authority's liability for environmental contamination:

> Notwithstanding any other provision of this Agreement, and except as set forth in the Deed described herein, the Authority and its assigns do not hereby assume any liability or responsibility for environmental impacts and damage caused by the Government's use of toxic or hazardous wastes, substances or materials, or petroleum derivatives, on any portion of the Property.  The Authority and its assigns have no obligation under this agreement to undertake the defense of any claim or action, whether in existence now or brought in the future, or to conduct any cleanup or remediation action solely arising out of the use or release of any toxic or hazardous wastes, substances or materials, or petroleum or petroleum derivatives, on or from any part of the Property due to activity on the Property by the Government.

Pl.'s Ex. 1 at 16.  Article 7 of the Memorandum of Agreement contained defendant's representations to the Authority, and included the following subsection:

> (b) <u>Complete Information</u>.  To the best of the Government's knowledge, information and belief, the information included in this Agreement, and the Exhibits hereto and the documents to be delivered to the Authority pursuant to this Agreement or previously delivered to the Authority are true, correct and complete in all material respects, and the same do not omit any material information required to make the submission thereof fair and complete.

<u>Id.</u> at 11.  The exhibits attached to the Memorandum of Agreement included a form deed and the FOST for the East Housing Area.  <u>Id.</u> at 4.  The exhibits also included a copy of the Notice of Hazardous Substance Stored, Released, or Disposed of at Parcels 170 and 171.  <u>Id.</u> at 40.

At some point prior to July 17, 2000, the Authority and the City of Alameda purchased a pollution legal liability insurance policy from plaintiff that covered the East Housing Area for the period of July 17, 2000, through July 17, 2010.[7]  Compl. ¶ 48.  Defendant was not an insured party under the policy.  <u>Id.</u> ¶ 49.  According to plaintiff, the policy provided: "In the event of any payment under the Policy, [AISLIC] shall be subrogated to all the Insured's rights of recovery therefore against any person or organization . . . ."  <u>Id.</u> ¶ 50.

On July 17, 2000, defendant, acting through the Navy, conveyed the East Housing Area to the Authority via Quitclaim Deed and Environmental Restrictions Pursuant to Civil Code Section 1471 for East Housing Portion of NAS Alameda ("deed").  <u>Id.</u> ¶¶ 20-21; Pl.'s Ex. 2.  Section II.B of the deed contained a general disclaimer about the condition of the property:

---

[7] The insurance policy is not part of the record before the court.

Except as otherwise provided herein, or as otherwise provided by law, the GRANTEE acknowledges that it has inspected, is aware of, and accepts the condition and state of repair of the Property, and that the Property is conveyed "as is" and "where is" without any representation, promise, agreement, or warranty on the party of the GRANTOR regarding such condition and state of repair, or regarding the making of any alterations, improvements, repairs or additions. Except for the environmental remediation required to be undertaken by GRANTOR, the GRANTEE further acknowledges that the GRANTOR shall not be liable for any latent or patent defects in the Property except to the extent required by applicable law.

Pl.'s Ex. 2 at 3.  The deed also included the following notices and covenants in section II.F:

**1. Notices:**

    **a. Finding of Suitability of Transfer**.  A Finding of Suitability of Transfer (FOST) has been completed and an Environmental Baseline Survey ("EBS") report is referenced in the FOST.  The FOST and EBS reference environmental conditions on the Property and on other property not subject to this Deed.  The FOST sets forth the basis for the GRANTOR's determination that the Property is suitable for transfer[.]  The GRANTEE is hereby made aware of the notifications contained in the FOST and EBS[.]

    **b. Hazardous Substance Notification**.  Pursuant to CERCLA 42 U.S.C. Section 9620(h), notice is hereby provided that the information set out in Exhibit "B", attached hereto and made a part hereof, identifies hazardous substances that were stored for one year or more, known to have been released, or disposed of on this Property.  The GRANTOR has made a complete search of its files and records concerning the Property and found that the FOST provides (1) a notice of the type and quantity of such hazardous substances, (2) notice of the time the storage, release, or disposal took place, and (3) a description of the remedial action taken, if any[.]

**2. Grant of Covenant [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(ii)(I)]**.  The GRANTOR covenants that all remedial action necessary to protect human health and the environment with respect to any hazardous substance remaining on the Property has been taken before the date of transfer[.]

**3. Additional Remediation Obligation [CERCLA 42 U.S.C. Section 9620(h)(3)(A)(ii)(II)]**.  The GRANTOR covenants and warrants that GRANTOR shall conduct any additional remedial action necessary after the date of transfer for

> any hazardous substance existing on the Property prior to the date of this Deed.
> The covenant shall not apply to the extent that the GRANTEE caused or
> contributed to any release or threatened release of any hazardous substance,
> pollutant, contaminant, petroleum or petroleum derivative[.]

Id. at 6.  Additionally, section II.G of the deed contained the following language under the
heading "Indemnification Regarding Transferees": "The GRANTOR hereby recognizes its
obligations under Section 330 of the National Defense Authorization Act of 1993 (Pub L 102-
484), as amended, regarding indemnification of transferees of closing Department of Defense
property[.]"  Id. at 8.  Further, section III of the deed provided:

> THE CONDITIONS, RESTRICTIONS, RESERVATIONS, AND COVENANTS
> set forth in this deed, unless subsequently released, are a binding servitude on the
> Property, shall inure to the benefit of the GRANTOR and GRANTEE, their
> successors and assigns, and will be deemed to run with the land in perpetuity[.]

Id.  Appended to the deed were three exhibits.  Id.  Of special relevance was Exhibit B to the
deed, as referred to in section II.F.1.a, which was a copy of the Notice of Hazardous Substance
Stored, Released, or Disposed of at Parcels 170 and 171.  Id. at 14.  According to plaintiff, the
Authority relied upon defendant's representations within the deed in agreeing to accept
conveyance of the East Housing Area.  Compl. ¶¶ 31-32.

On August 1, 2001, the Authority transferred the East Housing Area to the Community
Improvement Commission of the City of Alameda ("Commission").  Id. ¶ 39.  The Commission
was a successor to the Authority pursuant to the deed.  Id.

Prior to the demolition of the buildings in the East Housing Area, during the early spring
and summer of 2001, Winzler and Kelly Consulting Engineers performed soil sampling to test
for the presence of OCPs.  Id. ¶ 40; Pl.'s Ex. 4 at 3, 6-7.  In their October 20, 2001 report, the
engineers documented their discovery of OCPs–namely chlordane–in the East Housing Area at
levels that "exceeded potentially applicable regulatory standards."  Compl. ¶ 43; Pl.'s Ex. 4 at 6.
Plaintiff avers that the presence of chlordane in the East Housing Area was due to the storage,
release, or disposal of OCPs by defendant prior to defendant's conveyance of the property to the
Authority.  Compl. ¶ 44.  In support of its assertion that the chlordane and other OCPs were
present in the East Housing Area prior to the property's conveyance, plaintiff alleges that the
Environmental Protection Agency ("EPA") prohibited the use of chlordane in 1988.  Id.

Upon discovery of the OCPs in the East Housing Area, the Department of Toxic
Substance Control ("DTSC") of the California Environmental Protection Agency required the
Authority and the Commission to assess and remediate the OCP contamination in order for the
property to be put to unrestricted residential use pursuant to the Authority's Community Reuse

Plan. Id. ¶¶ 43, 45. The DTSC memorialized this requirement in a May 3, 2002 letter,[8] id. ¶ 45;
Pl.'s Ex. 4 at 224, which provided:

> The building foundations at [the East Housing Area] appear to have been
> properly treated with organochlorine pesticides (OCP) for termite control, and as
> such, are currently being used in the manner intended. Upon removal of the
> buildings and foundations that are treated with OCP, any OCP remaining in soils
> and exceeding the concentrations specified in the [Demolition and Organochlorine
> Pesticide Removal Workplan], would be a hazardous substance released to the
> environment, and would require remedial action pursuant to the California Health
> and Safety Code, Chapter 6.8.

Pl.'s Ex. 4 at 224; see also id. at 6 (noting, in an attachment to plaintiff's October 31, 2002 claim
for indemnification, that the DTSC permitted remediation to proceed without issuing a formal
"Cleanup and Abatement Order" to hasten remediation efforts and to eliminate the costs
associated with formal administrative proceedings).

The Authority and the Commission removed 29,270 tons of impacted soil pursuant to the
April 23, 2002 Demolition and Organochlorine Pesticide Removal Workplan approved by the
DTSC. Compl. ¶ 46. The soil removal occurred between April 2002 and August 2002. Id. The
total cost of the remediation that was covered by the insurance policy issued by plaintiff was
$3,763,328. Id. ¶ 52. Plaintiff reimbursed the Authority and the Commission for the remediation
costs, completing payment on November 20, 2005. Id.

On October 31, 2002, and December 18, 2003, the Authority, the Commission, and
plaintiff submitted written claims for indemnification to defendant pursuant to the provisions of
the deed and section 330(b) of the National Defense Authorization Act for Fiscal Year 1993. Id.
¶ 47. Defendant did not respond to the claims. Id.

Plaintiff initially filed an action in the United States District Court for the Northern
District of California ("district court"). Am. Int'l Specialty Lines Ins. Co. v. United States, No.
04-1591 (N.D. Cal. filed Apr. 23, 2004). During the proceedings before the district court,
plaintiff filed an amended complaint. Id. Subsequently, in a March 24, 2005 Memorandum and
Order, the district court dismissed plaintiff's CERCLA claims as unripe and transferred
plaintiff's express indemnification and breach of contract claims to this court. Am. Int'l
Specialty Lines Ins. Co. v. United States, No. 04-1591, 2005 WL 680159, at *5 (N.D. Cal. Mar.
24, 2005).

---

[8] Defendant erroneously contends that plaintiff "chose not to attach the letter to its
[January] 2006 first amended complaint." Def.'s Renewed Mot. Dismiss ("Renewed Mot.") 3.
Defendant must have overlooked pages 224-226 of Exhibit 4 to the First Amended Complaint.

Plaintiff filed a First Amended Complaint in this court on January 27, 2006.  The First Amended Complaint contains eight claims for relief: seven claims for breach of contract and one claim for express indemnification.  Compl. ¶¶ 53-162.  Plaintiff seeks damages of at least $3,763,328.  Compl. Prayer ¶ 1.  Defendant filed its Renewed Motion on June 5, 2007, plaintiff filed Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss ("Renewed Opposition") on July 23, 2007, and defendant filed Defendant's Reply in Support of Renewed Motion to Dismiss on July 23, 2007.  The court deems oral argument unnecessary.

## II.  JURISDICTION AND JUSTICIABILITY

### A.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  Although the parties, at the court's request, addressed the issue of jurisdiction in their briefing on an earlier motion, defendant did not raise a jurisdictional challenge to the First Amended Complaint in its Renewed Motion.  However, the court finds that a discussion of its jurisdiction remains appropriate.

The ability of this court to hear and decide suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of the United States Court of Federal Claims ("Court of Federal Claims"), waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2000).

### B.  The United States Waives Sovereign Immunity for the Subrogation Claims of Liability Insurers

When construing the Tucker Act's waiver of sovereign immunity for claims based upon an express or implied contract, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") requires that privity must exist between the plaintiff and the government in order to find a such a waiver.  Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998).  The Federal Circuit has enumerated several exceptions to this general rule, however.  First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999).  These exceptions include suits by intended third-party beneficiaries, suits by subcontractors "by means of a pass-through suit when the prime contractor is liable to the

subcontractor for the subcontractor's damages," and suits by government contract sureties "for funds improperly disbursed to a prime contractor."[9]  Id.; see also Ins. Co. of the W., 243 F.3d at 1373-74 (holding, in a breach of contract action brought by a government contract surety under the Tucker Act, that the Tucker Act "contains an unequivocal expression waiving sovereign immunity as to claims, not particular claimants").  The Federal Circuit noted that "the common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity."  First Hartford Corp. Pension Plan & Trust, 194 F.3d at 1289.

The Federal Circuit expounded upon the surety exception to the privity requirement in Insurance Co. of the West.  Read narrowly, the Federal Circuit's decision holds that a surety, as an equitable subrogee, "may rely on the wavier of sovereign immunity in the Tucker Act and bring suits against the United States."  243 F.3d at 1370, 1375.  On the other hand, read broadly, the Federal Circuit's decision holds that the Tucker Act waives sovereign immunity for equitable subrogation claims by all subrogees.  Id. at 1372-75; see also Centers v. United States, 71 Fed. Cl. 529, 533-34 (2006) (finding that the holding of Insurance Co. of the West was limited to subrogation claims and did not apply to all assignments).

In this case, seven of plaintiff's eight claims for relief are based upon representations made by defendant to the Authority in the Memorandum of Agreement and the deed.  However, plaintiff was not a party to those contracts.  Instead, plaintiff is pursuing its breach of contract

---

   [9] A surety is "[a] person who is primarily liable for the payment of another's debt or the performance of another's obligation."  Black's Law Dictionary 1482 (8th ed. 2004).  According to the United States Supreme Court ("Supreme Court"), it is "the usual view, grounded in commercial practice, that suretyship is not insurance."  Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140 n.19 (1962).

   In the case of a government contract, a "surety guarantees that a contract will be completed in the event of the principal's default and that the government will not have to pay more than the contract price."  Ins. Co. of the W. v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001).  The performance bond issued by the surety "creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)."  Id.; see also First Hartford Corp. Pension Plan & Trust v. United States, 42 Fed. Cl. 599, 611 (1998) ("[A] suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the obligor's (Government contractor) debt or duty to the third-party obligee (Government) . . . ."), aff'd in part, rev'd in part, 194 F.3d 1279.  There is no contract or privity of contract between the surety and the government.  Ins. Co. of the W., 243 F.3d at 1370.  Instead, "sureties traditionally have asserted claims against the government under the equitable doctrine of subrogation."  Id.; see also Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1548 (Fed. Cir. 1997) (noting that, in a case regarding a surety's right to a retainage, "[t]he Federal Circuit and its predecessor Court of Claims have recognized that subrogation is governed by equitable principles rather than by strict rules of law.").

claims as a subrogee of the Authority and the City of Alameda.[10]  See Compl. ¶ 50 (quoting the insurance policy's subrogation clause); id. ¶ 52 (noting that plaintiff reimbursed the Authority and the Commission pursuant to the insurance policy); Pl.'s Ex. 1 at 19 (containing Article 27 of the Memorandum of Agreement, which provides that "[a]ll representations, warranties, agreements, obligations and indemnities of the parties shall . . . inure to the benefit of and be binding upon the respective successors and assigns of the parties"); Pl.'s Ex. 2 at 8 (containing section III of the deed, which provided that "THE CONDITIONS, RESTRICTIONS, RESERVATIONS, AND COVENANTS set forth in this deed . . . shall inure to the benefit of the GRANTOR and GRANTEE, their successors and assigns").  Subrogation, as used in this case, is "[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy."  Black's Law Dictionary, supra, at 1467.  Subrogation can be legal or conventional.  Legal subrogation, also known as equitable subrogation, arises by operation by law.  Id. at 1468.  Conventional subrogation arises by contract, id., but "if the contractual right of subrogation consists merely of the usual equitable right which would have existed in any event in the absence of the contract, then equitable principles control."  83 C.J.S. Subrogation § 5 (2005).  Accordingly, in this case, plaintiff maintains both contractual and equitable subrogation claims.  Thus, the issue before the court is whether plaintiff may sue the United States as a subrogee of the Authority and the City of Alameda; that is, whether, in a contract and statutory indemnification action under the Tucker Act, the United States has waived sovereign immunity to permit a liability insurer to sue the government in the Court of Federal Claims on its own behalf.  In essence, the court must ascertain whether the Federal Circuit's holding in Insurance Co. of the West would permit such an action to proceed.

The court could not find, and the parties did not supply, any binding authority in which a liability insurer successfully enforced a right to subrogation in the Court of Federal Claims.  In fact, the court could identify only one nonbinding opinion from this court on this issue: Federal Insurance Co. v. United States, 29 Fed. Cl. 302 (1993).[11]  In Federal Insurance Co., a liability insurer of a government contractor sought to recover from the government payments it made to the contractor as a result of the government's alleged breach of the contract with its contractor. 29 Fed. Cl. at 302.  The insurance policy contained a subrogation provision, which provided that if the liability insurer made a payment under the policy, it "shall be subrogated to all [of the government contractor's] rights of recovery against any person or organization."  Id. at 303 (internal quotation marks omitted).  The liability insurer argued that it could maintain the suit in

_____

[10]  Had plaintiff included the Authority or the City of Alameda as a co-plaintiff in this action, there would have been no question surrounding this court's jurisdiction because the Authority and the City of Alameda stand in privity with defendant.

[11]  Neither party cited this case in its briefing on this issue.  See Def.'s Corrected Mot. Dismiss or Alternative Summ. J. ("Combined Mot.") 10-12; Pl.'s Opp'n Def.'s Corrected Mot. Dismiss or Alternative Summ. J. ("Combined Opp'n") 3-5.

its own name under the authority of the subrogation provision in the insurance policy and through the general principle of equitable subrogation.  Id. at 304.

The court found that the liability insurer was not in privity with the government.  Id.  As a result, the court held that the United States had not waived its sovereign immunity to authorize the liability insurer to maintain the suit in its own name.  Id. at 308.  In so holding, the court rejected the applicability of decisions permitting a surety to bring suit against the government.  Id. at 304-07.  The court explained that "[a] general liability insurance contract does not result in a 'three-party agreement' analogous to a surety arrangement" because sureties completely step into the shoes of a contractor and take over all of the contractor's rights and responsibilities.  Id. at 304-05 (citing Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed. Cir. 1985)).  The court then contrasted suretyship with liability insurance, noting that subrogation provisions in liability insurance policies transfer only one right–the right to sue the government if the insurer pays a claim.  Id. at 305.  The court concluded:

> The Balboa court's interpretation that the Tucker Act authorizes suit by a person who is "as much a party to the Government contract as the contractor" would hardly demand the conclusion that Congress also intended to authorize suit by parties who have no direct responsibility for contract performance and no other obligation owed directly to the government.

Id. at 306.  Hence, the court treated the subrogation provision in the insurance policy at issue as "no more than a contingent assignment of a right to sue the government."  Id. at 305-06.

Furthermore, the court rejected the liability insurer's argument that "a series of cases brought under statutes other than the Tucker Act" stood for the proposition that "the doctrine of equitable subrogation applies broadly against the government."[12]  Id. at 306-07.  The court distinguished these cases from the one before it, noting that the three statutes at issue in the cited cases included clear waivers of sovereign immunity.  Id.  The court found "no analogous clear waiver of sovereign immunity in the Tucker Act to authorize suit by plaintiff, a liability insurer for a federal contractor."  Id. at 307.

The holding of Federal Insurance Co. notwithstanding, the parties in this case agree that the law permitting a surety to file suit in its own name in this court extends to liability insurers.  In this regard, defendant relies upon the decision of the Federal Circuit in Insurance Co. of the West to support its view that plaintiff can bring suit in its own name.  Combined Mot. 10-11.  Plaintiff relies solely upon the Supreme Court's decision in Aetna Casualty & Surety Co. in support of its conclusion.  Combined Opp'n 3.

_____

[12]  The cases discussed by the court were United States v. Aetna Casualty & Surety Co., 338 U.S. 366 (1949) (Federal Tort Claims Act); Quarles Petroleum Co. v. United States, 551 F.2d 1201 (Ct. Cl. 1977) (Federal Water Pollution Control Act); and Aetna Insurance Co. v. United States, 142 Ct. Cl. 771 (1958), reh'g denied, 142 Ct. Cl. 790 (1958) (tax refund suit).

As noted above, in Insurance Co. of the West, the issue before the Federal Circuit was "[w]hether the United States has waived sovereign immunity for the equitable subrogation claims of a surety," 243 F.3d at 1370 (emphasis added); but it held more generally that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." Id. at 1375 (emphasis added). In its ruling, the Federal Circuit applied a broader interpretation to the Supreme Court's holding in Aetna Casualty & Surety Co. than did the Court of Federal Claims in Federal Insurance Co.:

> [N]othing in Aetna suggested that its holding regarding sovereign immunity was based on the Federal Tort Claims Act's broad language. Instead, we think that Aetna reflects a broader and more generally applicable legal principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant.

Id. at 1373. But see Centers, 71 Fed. Cl. at 533 (noting that the Federal Circuit's interpretation of Aetna Casualty & Surety Co. is dicta). Thus, the Federal Circuit rejected the notion that the holding of Aetna Casualty & Surety Co. was based upon the broad, clear waiver of sovereign immunity in the Federal Tort Claims Act, as the Court of Federal Claims in Federal Insurance Co. had previously held. However, the Federal Circuit did not refer to Federal Insurance Co. in its decision, nor did it make any reference to liability insurers; thus, the question facing the court is whether the broad, general holding of Insurance Co. of the West includes liability insurers. The court finds that although the Federal Circuit's decision in Insurance Co. of the West applies only to the equitable subrogation claims of sureties and that its broad, general holding is therefore dicta, that dicta is instructive in this case.[13]

While suretyship is distinct from liability insurance, Pearlman, 371 U.S. at 140 n.19, the companies in both arrangements rely upon the concept of equitable subrogation to prosecute their claims. The Federal Circuit noted that the language of the Tucker Act "contains an unequivocal expression waiving sovereign immunity as to claims, not particular claimants." Ins. Co. of the W., 243 F.3d at 1373-74. If sureties can sue the United States for breach of contract under an

---

[13] In a recent decision, the Federal Circuit remarked: "Dicta, as defined by this court, are 'statements made by a court that are 'unnecessary to the decision in the case, and therefore[,] not precedential (although [they] may be considered persuasive).'"" Nat'l Am. Ins. Co. v. United States, 498 F.3d 1301, 1306 (Fed. Cir. 2007) (quoting Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1307 (Fed. Cir. 2004) (quoting Black's Law Dictionary 1100 (7th ed. 1999))). It further explained that merely because certain language is dicta, it does not logically follow that the reasoning contained therein is flawed. Id.

equitable subrogation theory, there is no reason to prevent liability insurers from utilizing the same theory for the same claim.[14]  Thus, the court is persuaded that the Federal Circuit's holding in Insurance Co. of the West stands for the proposition that the Tucker Act waives sovereign immunity for equitable subrogation claims of all subrogees.[15]

## C.  Ripeness

Where applicable, the ripeness doctrine may constrain this court's exercise of jurisdiction. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'"  Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807 (2003) (quoting Abbot Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)).  The ripeness doctrine derives from both "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."[16]

---

[14]  This conclusion assumes that there is no violation of 31 U.S.C. § 3727 (2000), commonly referred to as the Assignment of Claims Act.

[15]  The court has previously addressed the Federal Circuit's holding in Insurance Co. of the West in a case arising under the Contract Disputes Act of 1978 ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended at 41 U.S.C. §§ 601-613 (2000)).  In Nelson Construction Co. v. United States, the prime contractor formally assigned the rights to all payments due under the contract to the payment and performance bond surety.  79 Fed. Cl. 81, 83 (2007).  Plaintiffs, who served both as a subcontractor to the prime contractor and as indemnitors to the performance and payment bond surety, asserted that they were equitably subrogated to the surety's right under the assignment agreement to pursue a claim against the government.  Id. at 86.  After reciting the Federal Circuit's statement in Insurance Co. of the West that "waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments," and noting other courts' construction of that statement, the court held that plaintiff-indemnitors could not invoke the doctrine of equitable subrogation "to proceed in the place of the assignee against the government . . . ."  Id. at 88-89.  The plaintiffs in Nelson Construction Co. were not themselves assignees.  Id.  Thus, Nelson Construction Co. stands in contrast to the instant case, where plaintiff is directly subrogated to the rights of "the original claimant" pursuant to a liability insurance policy.  The instant case is further distinguished from Nelson Construction Co. as it does not arise under the CDA.

[16]  Congress created the Court of Federal Claims under Article I of the United States Constitution.  28 U.S.C. § 171(a).  Courts established under Article I are not bound by the "case or controversy" requirement of Article III.  Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  However, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines in their cases for prudential reasons.  See id.; CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000).  These justiciability doctrines include, among others, ripeness, standing, mootness, and political questions.  Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005).

Id. at 808 (citing Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)).  In making a determination of ripeness, a court must make a fact-specific determination of "whether the issues are fit for judicial decision" and "whether there is sufficient risk of suffering immediate hardship."  Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1580-81 (Fed. Cir. 1993).  "[T]he question of ripeness may be considered on a court's own motion."  Nat'l Park Hospitality Ass'n, 538 U.S. at 808 (citing Reno, 509 U.S. at 57 n.18).

### D.  Plaintiff's Claims Are Ripe Because the Parties Contracted Around the Make-Whole Rule of Insurance Law

Although the court has determined that plaintiff can sue the United States in this court as an equitable subrogee, the court must also address whether plaintiff's claims are ripe.  Within the realm of insurance law, the so-called make-whole rule requires insurance companies to indemnify fully the insured prior to bringing a subrogated claim.  Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan, 64 F.3d 1389, 1394 (9th Cir. 1995).  But, because the make-whole rule is one of interpretation, the insurer and the insured may contract around it. Id. at 1394-95.  In the case sub judice, the insurance policy contained the following relevant language: "In the event of any payment under the Policy, [AISLIC] shall be subrogated to all the Insured's rights of recovery therefore against any person or organization . . . ."  Compl. ¶ 50 (emphasis added).  Plaintiff did not fully compensate the Authority and the City of Alameda prior to bringing its subrogated claims against defendant in the district court.[17]  Am. Int'l Specialty Lines Ins. Co., 2005 WL 680159, at *4.  However, plaintiff completed payment of the Authority and the City of Alameda's claims shortly after it filed the transfer complaint in this court.  See Compl. ¶ 52.  Thus, the court must determine whether plaintiff was required to compensate fully the Authority and the City of Alameda prior to bringing its subrogated claims against defendant and, if so, whether the requirement can be satisfied by the completion of payments after the filing of the complaint.  Defendant challenged the ripeness of plaintiff's claims in its original motion to dismiss because plaintiff had not fully compensated the Authority and the City of Alameda prior to filing suit.  Defendant subsequently abandoned its argument, but the court must satisfy itself that plaintiff's claims are properly before it.

As a preliminary matter, the court will assume that it is required to apply the make-whole rule in this case in order to determine whether the subrogation provision in the insurance policy at issue constitutes the agreement of the parties to override the make-whole rule.  The policy indicates that plaintiff will be subrogated to the rights of the Authority and the City of Alameda "[i]n the event of any payment under the Policy."  Id. ¶ 50 (emphasis added).  The fact that plaintiff's subrogation rights arise upon "any" payment clearly contradicts the make-whole rule.

---

[17]  The district court noted that plaintiff failed to allege that it had an agreement with the Authority and the City of Alameda contrary to the make-whole rule.  Am. Int'l Specialty Lines Ins. Co., 2005 WL 680159, at *4.  However, the district court did not indicate whether plaintiff pled the specific language of the insurance policy's subrogation clause as plaintiff did before this court.  Id. at *1-5.

Thus, plaintiff, the Authority, and the City of Alameda contracted around the make-whole rule by allowing plaintiff to assert a subrogated claim as soon as it made one payment under the policy. Accordingly, plaintiff's claims are ripe: the issues are fit for judicial decision and plaintiff faces sufficient risk of suffering immediate hardship.  Because the court holds that plaintiff, the Authority, and the City of Alameda contracted around the make-whole rule, the court need not reach the more general issue of whether the make-whole rule applies to liability insurers bringing equitable subrogation claims in the Court of Federal Claims.

### III.  DEFENDANT'S RENEWED MOTION TO DISMISS

Because the court is satisfied that it possesses jurisdiction to entertain plaintiff's complaint and that plaintiff's claims are ripe for decision, it turns to defendant's Renewed Motion.

### A.  Legal Standard for an RCFC 12(b)(6) Motion to Dismiss

Defendant filed a motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6).  A motion to dismiss tests the sufficiency of a complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  The Supreme Court recently clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id. at 1964-65 (citation omitted).  The Supreme Court explained that although a complaint need not contain "detailed factual allegations," id. at 1964, the "factual allegations must be enough to raise a right to relief above the speculative level," id. at 1965.  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."[18]  Id. at 1969. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

### B.  Breach of Contract

Plaintiff asserts eight claims for relief in its complaint, three of which are straightforward breach of contract claims: the first, second, and eighth claims for relief.  "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed.

---

[18]  In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley, 355 U.S. at 45, "has earned its retirement," Bell Atl. Corp., 127 S. Ct. at 1969.

Cir. 1989); see also Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001) ("[A] plaintiff must show that but for the breach, the damages alleged would not have been suffered.  Moreover, the damages must have been foreseeable at the time the parties entered the contract, which requires that they be the natural and proximate result of the breach." (citations & internal quotation marks omitted)); Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach. . . . [A] breach of contract is a failure to perform a contractual duty when it is due."); id. at 1626 ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.").

For the purposes of its three straightforward breach of contract claims, plaintiff has, without dispute, alleged the first and fourth elements of a breach of contract.  First, plaintiff has alleged the existence of two valid contracts between the parties–the first and second claims for relief concern the deed and the eighth claim for relief concerns the Memorandum of Agreement. Compl. ¶¶ 12, 20, 54, 63, 155; Pl.'s Exs. 1-2.  In addition, plaintiff has alleged that defendant's breach of its contractual duties has caused it damages of no less than $3,763,328.  Compl. Prayer ¶ 1.  Further, it appears that defendant does not dispute that the deed created the specified obligations alleged by plaintiff.  Where the parties' disputes lie, then, is whether the Memorandum of Agreement created an obligation for defendant and whether defendant breached any of its contractual obligations.

"A party breaches a contract when it is in material non-compliance with the terms of the contract."  Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071 (Fed. Cir. 2003).  A material breach is one that "relates to a matter of vital importance, or goes to the essence of the contract."  Id. (citations omitted).  The determination of materiality "depends on 'the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.'"  Link v. Dep't of the Treasury, 51 F.3d 1577, 1583 (Fed. Cir. 1995) (quoting Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1550-51 (Fed. Cir. 1992)).  Further, the materiality determination "is a mixed question of fact and law."  Gilbert, 334 F.3d at 1071.  "What was required by way of contract performance turns on contract interpretation, which is an issue of law.  At the same time, the conduct of the allegedly breaching party–in other words, what the party did nor did not do–is an issue of fact."  Id. at 1071-72 (citation omitted).

In interpreting a contract, the court begins by examining "the language of the written agreement."  NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions."  TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  However, applicable statutes and regulations in force at the time a contract is executed shall be incorporated into the contract. Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117, 129-30 (1991); Armour

Packing Co. v. United States, 209 U.S. 56, 82 (1908); Helix Elec., Inc. v. United States, 68 Fed. Cl. 571, 584 (2005).

**1. Plaintiff's First Claim for Relief States a Claim Upon Which Relief Can Be Granted**

In its first claim for relief, plaintiff alleges that defendant was obligated to have taken "all remedial action necessary to protect human health and the environment with respect to any hazardous substance remaining on the Property" pursuant to section II.F.2 of the deed. Compl. ¶ 55. However, plaintiff contends that defendant breached section II.F.2 of the deed by "failing to take all remedial action necessary to protect human health and the environment with respect to the hazardous substances chlordane and/or OCPs remaining on the Property before the date of the Government's transfer of the Property to the [Authority]." Id. ¶ 60.

The deed itself does not define the critical terms utilized in section II.F.2. Thus, because the presence of section II.F.2 in the deed was mandated by CERCLA, the court looks to CERCLA to define two of those terms– "hazardous substance" and "remedial action." Pursuant to CERCLA, "hazardous substance" includes "any element, compound, mixture, solution, or substance designated" in regulations promulgated by the EPA. 42 U.S.C. §§ 9601(14), 9602. At the time the parties executed the deed, the appropriate regulation designated chlordane as a hazardous substance. 40 C.F.R. § 302.4 (2000). Next, "remedial action" refers to:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24). The "release" referred to in the definition for "remedial action" includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." Id. § 9601(22).

Given the foregoing definitions and allegations of the complaint, plaintiff argues that prior to defendant's transfer of the East Housing Area to the Authority, the Navy released

chlordane on the property in such a way that caused a "substantial danger to present or future public health or welfare or the environment," and that the Navy failed to take the remedial action required by CERCLA as a result of that release.  Specifically, plaintiff alleges that the Navy stored, released, or disposed of chlordane in the East Housing Area prior to transferring the property to the Authority, and that the chlordane levels discovered after the transfer were higher than the law permitted, thus evidencing a failure to remediate.

At the outset, the court notes that defendant's argument for the dismissal of the first claim for relief assumes that plaintiff's claim can be disposed of pursuant to the liability provision of CERCLA, 42 U.S.C. § 9607.[19]  Renewed Mot. 11.  However, plaintiff's claim is not based on CERCLA's liability provisions.[20]  Instead, plaintiff alleges that defendant did not comply with the provisions of the deed that contained the notices and covenants required by CERCLA.  See 42 U.S.C. § 9620(h).  That allegation is separate and distinct from a CERCLA liability claim. See 42 U.S.C. § 9620(a)(1) (noting that the United States is required to comply with all of CERCLA's provisions, and that the liability provision is but one of the provisions with which the United States must comply).

Notwithstanding the foregoing distinction, defendant argues that CERCLA liability for the release of hazardous substances "does not apply to useful products used for their intended purpose, including lawfully applied pesticide that serves a legitimate purpose in its existing state."  Renewed Mot. 11 (citing A&W Smelter & Refiners v. Clinton, 146 F.3d 1107, 1112 (9th Cir. 1998); AM Int'l, Inc. v. Int'l Forging Equip. Corp., 982 F.2d 989, 999 (6th Cir. 1993)).  The useful product defense is explicitly tied to CERCLA's liability provision.  Under CERCLA's liability provision, four groups of "covered persons" are subject to liability under CERCLA:

> (1) the owner and operator of a vessel or a facility,

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any

---

[19]  In its Renewed Opposition, plaintiff also invokes CERCLA's liability provisions in responding to defendant's argument concerning the useful product defense.  Opp'n Def.'s Renewed Mot. Dismiss ("Renewed Opp'n") 21.

[20]  In fact, the district court dismissed plaintiff's CERCLA claims prior to transferring the case to the Court of Federal Claims.  Am. Int'l Specialty Lines Ins. Co., 2005 WL 680159, at *3-5.

other party or entity, at any facility or incineration vessel owned or operated by
another party or entity and containing such hazardous substances, and

> (4) any person who accepts or accepted any hazardous substances for
> transport to disposal or treatment facilities, incineration vessels or sites selected
> by such person, from which there is a release, or a threatened release which causes
> the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a). The latter three groups' liability depends upon the disposal of hazardous
substances, and it is the definition of "disposal" that creates the useful product defense. See
A&W Smelter & Refiners, 146 F.3d at 1112. CERCLA draws its definition of "disposal" from
the Solid Waste Disposal Act ("SWDA"), Pub. L. No. 89-272, §§ 201-210, 79 Stat. 992, 997-
1001 (1965) (codified as amended at 42 U.S.C. §§ 6901-6992k (2000)). 42 U.S.C. § 9601(29).
The SWDA defines "disposal" as:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any
> solid waste or hazardous waste into or on any land or water so that such solid
> waste or hazardous waste or any constituent thereof may enter the environment or
> be emitted into the air or discharged into any waters, including ground waters.

Id. § 6903(3). Thus, in order to have a "disposal," "solid waste or hazardous waste" must be
involved. "Hazardous waste" is also defined by the SWDA, see id. § 9601(29), and includes:

> a solid waste, or combination of solid wastes, which because of its quantity,
> concentration, or physical, chemical, or infectious characteristics may–

> (A) cause, or significantly contribute to an increase in mortality or an
> increase in serious irreversible, or incapacitating reversible, illness;  or

> (B) pose a substantial present or potential hazard to human health or the
> environment when improperly treated, stored, transported, or disposed of, or
> otherwise managed.

Id. § 6903(5). Thus, in order for liability to attach under CERCLA, a covered person must have
disposed of a hazardous waste. If a hazardous substance is not waste but instead is deemed to be
a useful product under the statute, liability does not attach. This exception is known as the useful
product defense. A&W Smelter & Refiners, 146 F.3d at 1112. However, because the useful
product defense is appropriately raised in response to claims of liability pursuant to 42 U.S.C.
§ 9607, it is not applicable to plaintiff's first cause of action for breach of contract.

However, assuming that the useful product defense did apply to plaintiff's claim, in order
to show that plaintiff cannot state any set of facts that would entitle it to relief, defendant would
be required to present conclusive evidence that the Navy used chlordane for its intended purpose,

because the court must assume the facts alleged by plaintiff to be true. Defendant has not done so. Defendant's sole evidence that the Navy used chlordane in the East Housing Area for its intended purpose is contained within the DTSC's May 3, 2002 letter. Renewed Mot. 11-12. Defendant characterizes this letter as establishing that "the responsible regulators found the pesticide applied to the building foundations was used in the manner intended." Id. Contrary to defendant's assertion, the letter merely indicates that the building foundations "appear to have been properly treated" with chlordane. See Pl.'s Ex. 4 at 224. Furthermore, the DTSC's conclusory statement lacks a factual basis. Clearly, used in this context, the word "appear" is nothing more than the DTSC's qualifier that it was making an assumption without the benefit of performing its own in-depth evaluation, and thus the entire statement is nothing more than the DTSC's supposition. The May 3, 2002 letter unquestionably required remediation of any soils with excessive concentrations of OCPs upon the removal of buildings and foundations treated with OCPs. See id. Thus, the DTSC's statement in its May 3, 2002 letter is not persuasive evidence that the Navy applied OCPs in the appropriate manner. Therefore, at this stage of the proceedings, defendant has not provided evidence conclusively negating plaintiff's allegations that the levels of chlordane and other OCPs it discovered in the East Housing Area were so high as to suggest that the Navy did not use chlordane or other OCPs in the manner intended. See, e.g., id. at 6 (reporting OCPs at levels exceeding "potentially applicable regulatory standards"). Accordingly, plaintiff has set forth facts sufficient to state a claim on its first claim for relief for breach of contract.

### 2. Plaintiff's Second Claim for Relief States a Claim Upon Which Relief Can Be Granted

Plaintiff next alleges that section II.F.3 of the deed obligated defendant to "conduct any additional remedial action necessary after the date of transfer for any hazardous substance existing on the Property prior to the date of this Deed." Compl. ¶ 64. However, plaintiff contends that defendant breached section II.F.3 of the deed by "failing to conduct remedial action necessary after the date of the Government's transfer of the Property to the [Authority] for the hazardous substances chlordane and/or OCPs existing on the Property prior to the date of the [deed]." Id. ¶ 71.

In essence, plaintiff argues that prior to defendant's transfer of the East Housing Area to the Authority, the Navy released chlordane on the property and that defendant failed to take the necessary remedial action required by CERCLA after the date of transfer. Specifically, plaintiff alleges that the Navy stored, released, or disposed of chlordane in the East Housing Area prior to transferring the property to the Authority, that the chlordane levels discovered after the transfer were higher than the law permitted, and that defendant failed to take appropriate remedial action after the discovery of high chlordane levels.

Plaintiff does not address the second sentence of section II.F.3, which modifies the scope of defendant's obligation, and provides: "The covenant shall not apply to the extent that the GRANTEE caused or contributed to any release or threatened release of any hazardous substance . . . ." Pl.'s Ex. 2 at 6. The court finds that this sentence introduces an ambiguity into the

covenant, because the covenant seemingly can be applied to two different "releases."  One interpretation is that the covenant applies to the initial "release" of chlordane by the Navy prior to transferring the East Housing Area to the Authority.  The other interpretation is that the covenant applies to the "release or threatened release" of chlordane caused by the demolition of the buildings in the East Housing Area after the transfer of the property.  Plaintiff appears to favor the former interpretation and defendant appears to favor the latter.  See Compl. ¶ 69; Renewed Mot. 12-13.

Assuming, for the sake of argument, that defendant's interpretation of the covenant is correct, it follows that defendant, in order to show that plaintiff cannot state any set of facts that would entitle it to relief, must show that the actions of the Authority caused a "release or threatened release" of chlordane.  To achieve this end, defendant again relies solely upon the DTSC's May 3, 2002 letter.  Renewed Mot. 12-13.  However, the letter does not address which party is or would be responsible for any "release or threatened release."  Further, the letter fails to explain the scope of a party's potential responsibility.  Indeed, as plaintiff notes, it could argue that defendant is at least partially responsible for a "release or threatened release" because the Authority was "merely executing the Community Reuse Plan approved by the Navy."  Renewed Opp'n 23.  Thus, the May 3, 2002 letter is not sufficient show that the Authority caused or contributed to any "release or threatened release" of chlordane.

Defendant also argues that liability for the release of chlordane, under CERCLA, does not attach to the "application of a pesticide that is registered in accordance with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y."  Renewed Mot. 12; see 42 U.S.C. § 9607(i) (indicating that "[n]o person . . . may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered" pursuant to FIFRA).  Again, this argument is based upon CERCLA's liability provision and not upon defendant's alleged breach of contract.

Even if CERCLA's liability provision applied in this case, defendant's argument fails. Once again, defendant wields the DTSC's May 3, 2002 letter as the sole support for its pesticide exception argument.  But, this letter is insufficient evidence to prove that the Navy properly applied chlordane or that chlordane was registered pursuant to FIFRA when allegedly applied. Not only is the wording of the letter equivocal as to whether the chlordane was applied properly, but the letter fails to address (1) when the Navy allegedly applied the chlordane and (2) whether chlordane was a registered pesticide during the times the chlordane was applied.  See, e.g., United States v. Tropical Fruit, S.E., 96 F. Supp. 2d 71, 90 (D.P.R. 2000) (holding that CERCLA's pesticide exemption is narrow, that every application of pesticide is not exempted from CERCLA liability, and that for the exemption to apply, the pesticide's user must show that the pesticide was registered and was applied properly).  Thus, the May 3, 2002 letter is not sufficient to foreclose plaintiff's ability to state a claim for relief.  Plaintiff has set forth facts sufficient to state a claim for breach of contract.

### 3. Plaintiff's Eighth Claim for Relief Fails to State a Claim Upon Which Relief Can Be Granted

According to plaintiff, the deed was not the only instrument that created obligations for defendant.  Plaintiff alleges that in Article 21 of the Memorandum of Agreement, defendant relieved the Authority from assuming "any liability or responsibility for environmental impacts and damage caused by the Government's use of toxic or hazardous wastes, substances or materials, . . . on any portion of the Property" and from undertaking "the defense of any claim or action . . . , or to conduct any cleanup or remediation action solely arising out of the use or release of any toxic or hazardous wastes, substances or materials . . . on or from any part of the Property due to activity on the Property by the Government."  Compl. ¶¶ 156-57.  Plaintiff contends that defendant breached Article 21 by "failing to conduct cleanup or remedial action arising out of the Government's use or release of chlordane and/or OCPs on the Property" and by "failing to indemnify the [Authority] for costs incurred to conduct such cleanup or remedial action on behalf of the Government."  Id. ¶¶ 160-61.

Defendant disputes that Article 21 of the Memorandum of Agreement created any affirmative obligation for the government.  Renewed Mot. 16-17.  Defendant is correct.  Article 21 acknowledged that the Authority did not assume any pre-existing liability for harms caused by the Navy's use of hazardous substances in the East Housing Area and that the Authority would not be responsible for any current or future remedial action arising from the release of hazardous substances caused by government activity in the East Housing Area.  Pl.'s Ex. 1 at 16.  Article 21 released the Authority from liability, thus limiting the Authority's obligations, but did not create a corresponding obligation for defendant to assume such liability.[21]  Therefore, plaintiff is unable to state a claim for which this court can grant relief.  Accordingly, the court dismisses plaintiff's eighth claim for relief.

### C. Breach of Contract by Misrepresentation

In addition to its straightforward breach of contract claims, plaintiff asserts claims for breach of contract by misrepresentation in its third, fourth, and seventh claims for relief.  Misrepresentation is a claim that sounds in tort.  Fla. Keys Aqueduct Auth. v. United States, 231 Ct. Cl. 911, 912 (1982); Somali Dev. Bank v. United States, 508 F.2d 817, 821 (Ct. Cl. 1974).  The Tucker Act prohibits the Court of Federal Claims from entertaining tort claims.  28 U.S.C. § 1491(a)(1).  However, "[i]f contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction."  Fountain v. United States, 427 F.2d 759, 761 (Ct. Cl. 1970); see also Fla. Keys Aqueduct Auth., 231 Ct. Cl. at 912 (noting that when "there is privity of contract," allegations of false representation and deceit "often ha[ve] a

---

[21]  The fact that Article 21 of the Memorandum of Agreement does not impose an absolute responsibility on defendant to pay for remediation costs does not negate any liability that would arise under statute, such as CERCLA, or under other agreements between defendant and the Authority.

contract as well as a tort aspect," and that as a result, the court possesses subject matter jurisdiction).  Put another way, "[w]here . . . a claim is based on a breach of contract[,] it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract."  Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 745 (1980).

In the present case, plaintiff clearly alleges that defendant breached its contracts with the Authority by including false representations in the deed and the Memorandum of Agreement. The Authority had the right to rely upon defendant's positive representations in the two contracts. Morrison-Knudsen Co. v. United States, 345 F.2d 535, 539 (Ct. Cl. 1965).  "Such positive representations amounted to a warranty . . . and established a predicate for a possible action for breach of contract . . . ."  Id.  In order to prove a claim of breach of contract by misrepresentation, plaintiff must show that defendant made "an erroneous representation of a material fact" and that the Authority "reasonably relied" on that fact to its detriment.  T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 729 (Fed. Cir. 1997); accord Pratt v. United States, 50 Fed. Cl. 469, 481 (2001).

**1.  Plaintiff's Third Claim for Relief States a Claim Upon Which Relief Can Be Granted**

Plaintiff alleges that defendant made two misrepresentations in the deed.  In its third claim for relief, plaintiff alleges that the deed misrepresents that the FOST listed all of the pesticides that might have been used in the East Housing Area because the FOST did not identify chlordane or any other OCPs that were later discovered in the East Housing Area.  Compl. ¶¶ 75-81.  Plaintiff alleges that the misrepresentation was material, that the misrepresentation induced the Authority to enter into the deed, that the Authority was justified in relying on the misrepresentation to infer that chlordane or other OCPs were not present in the East Housing Area, and that the Authority was damaged by its reliance upon defendant's misrepresentation.  Id. ¶¶ 83, 85-88.

Defendant first argues that the provision of the deed cited by plaintiff, section II.F.1.a, does not represent that the FOST listed all of the pesticides that might have been used in the East Housing Area because the provision references no pesticides.  Renewed Mot. 14.  Defendant's argument is inapposite because it misidentifies the misrepresentation in section II.F.1.a alleged by plaintiff.  Although inartfully pled in the First Amended Complaint, plaintiff contends that section II.F.1.a misrepresents that the FOST adequately described the environmental conditions in the East Housing Area and that, accordingly, the East Housing Area was suitable for transfer. See Renewed Opp'n 24.  Specifically, section II.F.1.a provides that the FOST addresses "environmental conditions on the Property."  Pl.'s Ex. 2 at 6.  Among the environmental conditions addressed in the FOST is the usage of pesticides in the East Housing Area.  Pl.'s Ex. 3 at 19-20.  Of significance is the fact that chlordane, a potentially harmful chemical, is not identified as a pesticide used in the East Housing Area in the FOST.  Id.  Further, the FOST represented that the described pesticide usage in the East Housing Area did not detract from the property's suitability for transfer.  Id. at 20, 23.  Section II.F.1.a of the deed reiterates the

contention that "[t]he FOST sets forth the basis for the GRANTOR's determination that the Property is suitable for transfer." Pl.'s Ex. 2 at 6.  In accordance with these facts, plaintiff argues that the FOST did not accurately describe the environmental conditions of the East Housing Area and that, accordingly, the East Housing Area was not suitable for transfer as represented in the deed.  Thus, the fact that section II.F.1.a does not mention pesticides does not defeat plaintiff's claim.

In a related argument, defendant contends that the FOST does not contain any misrepresentations because the pesticide provision of the FOST does not "purport to provide a complete list of pesticides used in the East Housing area."  Renewed Mot. 14.  In countering defendant's argument, plaintiff notes that because the FOST indicates what pesticides may have been used, a list that excludes chlordane, defendant misled the Authority into believing that chlordane was not a pesticide that may have been used.  Renewed Opp'n 24-25.  In essence, defendant views the list as underinclusive, and plaintiff views the list as complete or overinclusive.  Given that the FOST purports to make the hazardous substances notification required by CERCLA, see Pl.'s Ex. 3 at 13-14, 31, the court finds plaintiff's interpretation more reasonable.  Thus, defendant's argument must fail.

In sum, defendant's arguments center upon whether section II.F.1.a contained the alleged representations alleged by plaintiff.  Defendant does not question the correctness or materiality of those representations or whether the Authority reasonably relied upon those representations to its detriment.  Because the court has found that defendant's arguments lack merit and because the remaining elements of plaintiff's claim remain unchallenged, the court finds that plaintiff has stated a claim for relief.  Plaintiff has set forth facts sufficient to state a claim for breach of contract by misrepresentation.

## 2.  Plaintiff's Fourth Claim for Relief States a Claim Upon Which Relief Can Be Granted

Plaintiff next alleges that section II.F.1.b of the deed misrepresents that Exhibit B thereto listed all of the "hazardous substances that were stored for one year or more, known to have been released, or disposed of on the Property," and misrepresents that defendant "had made a complete search of its files and records concerning the Property and found that the FOST provides notice of the type and quantity of such hazardous substances on the property and of the time the storage, release, or disposal took place," because neither Exhibit B to the deed nor the FOST identified "chlordane or other OCPs among the hazardous substances that were stored for one year or more, known to have been released, or disposed of on the Property . . . ."  Compl. ¶¶ 91-98.  Plaintiff alleges that the misrepresentations were material, that the misrepresentations induced the Authority to enter into the deed, that the Authority was justified in relying on the misrepresentations to infer that chlordane or other OCPs were not present in the East Housing Area, and that the Authority was damaged by its reliance upon defendant's misrepresentations. Id. ¶¶ 100, 102-05.

Defendant reiterates some of its previous arguments in support of the dismissal of this claim:

> Chlordane did not need to be listed as a hazardous substance in the deed notification, because it was not a hazardous substance that was stored, released, or disposed of at the site, as those terms are used in CERCLA.  The pleadings establish that, as far as the California regulators and the City ever determined, the chlordane-based termiticide was applied in a lawful manner and served its intended purpose until the City demolished the nearby buildings.

Renewed Mot. 15.  The court remains unpersuaded.  First, pursuant to 42 U.S.C. §§ 9601-9602, any substance identified in 40 C.F.R. § 302.4 is a "hazardous substance," and any "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)" constitutes a "release."  The fact that liability may not attach pursuant to 42 U.S.C. § 9607 does not alter the existence of a "release" of a "hazardous substance" or the effect of a contractual provision representing that the existence of all "hazardous substances" had been disclosed.  Further, as noted above, the only documentary evidence that defendant points to in support of its argument–the DTSC's May 3, 2002 letter–is insufficient to show that the chlordane discovered in the East Housing Area was a registered pesticide or was properly applied.

Defendant also argues that plaintiff cannot establish that the Authority reasonably relied upon the representations in section II.F.1.b of the deed.  Id.  Defendant points to both the nonactionable levels of chlordane described in the site-specific EBS and the notification contained in the final EIS that chlordane was used on Naval Air Station Alameda as evidence that plaintiff's reliance on "any alleged misrepresentation by the Navy regarding OCPs" was unreasonable.  Id.  First, defendant is correct that the site-specific EBS for Parcel 170 of the East Housing Area identifies nonactionable levels of chlordane in two surface soil samples.  App. 26, 28.  However, references to chlordane in the site-specific EBS do not negate plaintiff's misrepresentation argument.  The site-specific EBS for Parcel 170 describes the results from two surface soil samples and indicates that the tests revealed low levels of chlordane that did not require further action.  Id. at 28.  In effect, defendant, through this site-specific EBS, represented that the Authority need not be concerned about the presence of chlordane.  And, according to plaintiff, the Authority relied upon all of the representations in the deed (and, accordingly, its incorporated documents) in agreeing to take title to the East Housing Area.  See Compl. ¶¶ 31-32.  It was not until the Authority conducted its own postconveyance sampling that it discovered that chlordane levels in the East Housing Area exceeded acceptable standards.  Pl.'s Ex. 4 at 6.  Thus, the nonactionable levels of chlordane described in the site-specific EBS may not have been sufficient to raise any red flags with the Authority that it might encounter levels of chlordane high enough to require remediation.  Second, with respect to defendant's reliance on the final EIS, the court is disinclined to give it any weight without additional context for the provided

excerpt.  There is no indication in the provided excerpt that chlordane was used specifically in the East Housing Area.  Accordingly, plaintiff may be able to demonstrate that it was reasonable for the Authority to rely upon the fact that the chlordane levels were nonactionable in executing the deed.

Defendant's arguments opposing the fourth claim for relief center upon whether the representations found in section II.F.1.b of the deed were erroneous and whether the Authority could have reasonably relied upon those representations.  Defendant does not question the materiality of those representations or whether the Authority's reliance on those representations caused it injury.  Because the court has found that defendant's arguments lack merit and because the remaining elements of plaintiff's claim remain unchallenged, the court concludes that plaintiff has stated a claim upon which relief can be granted.  Plaintiff has set forth facts sufficient to state a claim for breach of contract by misrepresentation.

### 3.  Plaintiff's Seventh Claim for Relief States a Claim Upon Which Relief Can Be Granted

In addition to the alleged misrepresentations in the deed, plaintiff contends that the Memorandum of Agreement contains a misrepresentation.  Specifically, plaintiff alleges that Article 7(b) of the Memorandum of Agreement misrepresents that the document was "complete and did not omit any material information" because one of the exhibits to the Memorandum of Agreement–Exhibit B of the deed–did not "identify chlordane or other OCPs among the hazardous substances" that were stored, known to have been released, or disposed of in the East Housing Area.  Compl. ¶¶ 138-45.  Plaintiff alleges that the misrepresentation was material, that the misrepresentation induced the Authority to enter into the Memorandum of Agreement, that the Authority was justified in relying on the misrepresentation to infer that chlordane or other OCPs were not present in the East Housing Area, and that the Authority was damaged by its reliance upon defendant's misrepresentation.  Id. ¶¶ 147, 149-53.

Defendant's arguments mirror those it made regarding the third and fourth causes of action.  Renewed Mot. 16.  As such, the court's conclusion is the same: plaintiff has set forth facts sufficient to state a claim for breach of the Memorandum of Agreement by misrepresentation.

### D.  Express Indemnification Under Section 330

Plaintiff's final two claims for relief relate to defendant's alleged obligation to indemnify transferees pursuant to section 330 the National Defense Authorization Act for Fiscal Year 1993.  In its fifth claim for relief, plaintiff asserts that section 330 requires defendant to indemnify the Authority for its remediation costs.  Compl. ¶¶ 107-19.  In its sixth claim for relief, plaintiff contends that defendant breached sections II.G and III of the deed, which "explicitly" recognize defendant's obligations to indemnify the Authority pursuant to section 330.  Id. ¶ 122.  The determination of whether defendant breached sections II.G and III of the deed is necessarily predicated upon whether section 330 provides plaintiff with a cause of action.  In other words, if

section 330 does not provide plaintiff with a basis for suit, then contract provisions incorporating section 330 also cannot provide a basis for suit.

An extensive quotation from section 330 is necessary to provide context and clarity to the court's subsequent analysis:

(a) IN GENERAL.–(1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

(2) The persons and entities described in this paragraph are the following:

(A) Any State (including any officer, agent, or employee of the State) that acquires ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1).

(B) Any political subdivision of a State (including any officer, agent, or employee of the State) that acquires such ownership or control.

(C) Any other person or entity that acquires such ownership or control.

(D) Any successor, assignee, transferee, lender, or lessee of a person or entity described in subparagraphs (A) through (C).

(3) To the extent the persons and entities described in paragraph (2) contributed to any such release or threatened release, paragraph (1) shall not apply.

(b) CONDITIONS.–No indemnification may be afforded under this section unless the person or entity making a claim for indemnification–

(1) notifies the Department of Defense in writing within two years after such claim accrues or begins action within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the Department of Defense;

-28-

. . . .

(c) AUTHORITY OF SECRETARY OF DEFENSE.–(1) In any case in which the Secretary of Defense determines that the Department of Defense may be required to make indemnification payments to a person under this section for any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage referred to in subsection (a)(1), the Secretary may settle or defend, on behalf of that person, the claim for personal injury or property damage.

. . . .

(d) ACCRUAL OF ACTION.–For purposes of subsection (b)(1), the date on which a claim accrues is the date on which the plaintiff knew (or reasonably could have known) that the personal injury or property damage referred to in subsection (a) was caused or contributed by the release or threatened release of a hazardous substance or pollutant or contaminant as a result of Department of Defense activities at any military installation (or portion thereof) described in subsection (a)(1).

. . . .

(f) DEFINITIONS.–In this section:

(1) The terms "facility", "hazardous substance", "release", and "pollutant or contaminant" have the meanings given such terms under paragraphs (9), (14), (22), and (33) of section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, respectively (42 U.S.C. 9601(9), (14), (22), and (33)).

National Defense Authorization Act for Fiscal Year 1993 § 330.

### 1. Prior Decisions of the Armed Services Board of Contract Appeals and the Court of Federal Claims Have Construed Section 330

The parties have cited two other cases that address section 330, neither of which is binding on this court.  The first such case was before the Armed Services Board of Contract Appeals ("ASBCA"): New London Development Corp., ASBCA No. 54535, 05-2 BCA ¶ 33018 (2005).  In New London Development Corp., plaintiff sought indemnification for the costs it incurred in removing asbestos contaminated material ("ACM") and polychlorinated biphenyls ("PCBs") from property it leased from the federal government.  Id.  More specifically, plaintiff encountered ACM and PCBs, which had not been previously disclosed by the government in any

-29-

of the required environmental documentation, "while performing demolition and excavation work" on the property.  Id.  Plaintiff alleged that it had been "required to monitor, remove and dispose of the hazardous materials in accordance with federal, state and local laws and regulations."  Id.  Plaintiff brought an indemnification action against the government based on the provisions of the lease, which contained the following clause that closely, but not precisely, tracks the language of section 330(a)(1):

> Subject to the terms, conditions and limitations as set forth in Section 330 . . . , the Government shall hold harmless, defend and indemnify, in full, Lessee . . . from and against any suit, claim, demand, administrative or judicial action, liability, judgment, cost or fee, arising out of any claim for personal injury or property damage (including death, illness, loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant, contaminant, petroleum or petroleum derivative from or on the Leased Premises, as a result of Department of Defense activities on the Leased Premises.

Id.

In ruling on the government's motion to dismiss for failure to state a claim, the ASBCA agreed with plaintiff that its claim "rest[ed] not on the Government's liability under CERCLA but on the Government's liability under the environmental indemnification provision[]" quoted above.  Id. (internal quotation marks omitted).  Thus, the ASBCA's analysis centered on whether plaintiff had met the requirements of the lease's indemnification provision, and identified the three following requirements of the provision:

> First, the indemnification claim must be for costs "arising out of any claim for personal injury or property damage (including death, illness, loss or damage to property or economic loss)."  Second, the claim for personal injury or property damage must result from or be predicated upon the release or threatened release of a hazardous substance from or on the leased premises.  Third, the release or threatened release must be "as a result of Department of Defense activities on the Leased Premises."

Id.  In discussing the first requirement, the ASBCA narrowly focused on the definition of "property damage," concluding that it could not say that "under no set of facts could [plaintiff]'s contract cost overrun claims be property damage claims indemnifiable" under the lease provision.  Id.  Given its focus, the ASBCA apparently assumed that plaintiff's indemnification claim arose out of a claim for personal injury or property damage, as it did not discuss the meaning or effect of "arising out of any claim."  The ASBCA then held that it could not "conclude that under no set of facts could the allegations in the complaint meet the second and third conditions for indemnification . . . ."  Id.  Thus, the ASBCA denied the government's motion to dismiss.  Id.

More recently, the Court of Federal Claims construed section 330 in <u>Richmond American Homes of Colorado, Inc. v. United States</u>, 75 Fed. Cl. 376 (2007).  In <u>Richmond American Homes</u>, plaintiffs sought indemnification for the costs they incurred in removing asbestos containing material from property previously owned by the government.  <u>Id.</u> at 384-85.  The property involved in <u>Richmond American Homes</u> was the former Lowry Air Force Base in Colorado, which closed in the early 1990s.  <u>See id.</u> at 377-78.  The United States Air Force ("Air Force") sold the property to the Lowry Redevelopment Authority, "a legal entity established under intergovernmental agreement between the city and county of Denver and the city of Aurora, Colorado," which in turn conveyed the property to plaintiffs, who were residential home builders.  <u>Id.</u> at 378.  After plaintiffs obtained title to the property, they "excavated soil to construct residential homes with basements," and used the excavated soil "for grading the property and for landscaping."  <u>Id.</u> at 382.

According to the court, at some point after the excavation of the soil, state authorities conducted inspections and soil tests that "yielded unsatisfactory results for the presence of asbestos."  <u>Id.</u>  The court found that neither the Air Force, nor the Lowry Redevelopment Authority, nor plaintiffs considered, at any time prior to receiving these results, the possibility that there was asbestos in the soil.  <u>Id.</u> at 381-82.  Based on the results, the Colorado Department of Public Health and the Environment ("CDPHE") issued a "Compliance Advisory," advising the Air Force, the Lowry Redevelopment Authority, and plaintiffs that it believed that the conditions on the property "present[ed] a threat to public health and the environment," that they were "responsible for complying with the State hazardous waste and air regulations," and that failing to comply with the regulations could result in "substantial administrative and civil penalties."  <u>Id.</u> at 383 (internal quotation marks omitted).  The CDPHE subsequently issued a second Compliance Advisory.  <u>Id.</u>  Both Compliance Advisories included the following language: "Failure to respond in a timely fashion to this Compliance Advisory will be considered in any subsequent enforcement action and the assessment of administrative and/or civil penalties."  <u>Id.</u>  Ultimately, the state of Colorado issued a response plan, which was accepted by the Lowry Redevelopment Authority and plaintiffs.  <u>Id.</u> at 384.

Like plaintiff in the instant case, the plaintiffs in <u>Richmond American Homes,</u> after pursuing indemnification directly from the Air Force and the Air Force's rejection of their claims, filed a claim for indemnification in the Court of Federal Claims, based upon both the alleged violation of section 330 and the alleged breach of the covenants contained in the deed.  <u>Id.</u> at 385.  Plaintiffs moved for summary judgment on all of their claims, and the government moved for dismissal or for summary judgment solely on plaintiffs' section 330 claim.  <u>Id.</u>

The court in <u>Richmond American Homes</u> construed section 330 by considering its plain text "in the context of the [base closure] process, which Section 330 supports."  <u>Id.</u> at 387.  The court found that section 330 served the "purpose of encouraging economic development of former military facilities and their surrounding populations," which could "only be achieved by addressing the potential disincentives and environmental risks inherent in assuming ownership of property that was once used by military services."  <u>Id.</u>  The court supported this finding with two

citations to the Congressional Record.  First, the court quoted the remarks of Senator John McCain, who opposed "language in an earlier version of the bill which would have insulated the Government . . . with regard to environmental claims," and who instead supported an amendment that would strike "language linking the indemnification obligation to Federal Tort Claims Act liability . . . ."  Id. (citing 138 Cong. Rec. S13982-01 (daily ed. Sept. 18, 1992)).  Second, the court quoted a letter from the United States Department of Defense ("Defense Department") to Senator McCain–dated February 3, 1993, after the November 23, 1992 enactment of section 330–that indicated the Defense Department's understanding that section 330 "perhaps effectively eliminat[ed] such legitimate limitations on the Department's liability as defense[s] under the Tort Claims Act and other defenses" and noted that "[t]he wholesale shift of all risks to the Department" might "delay transfer of base closure properties."  Id. at 388 (citing 139 Cong. Rec. S8433-01 (daily ed. July 1, 1993)) (internal quotation marks & emphasis omitted).

After making its findings of the underlying legislative purposes of section 330, the court addressed the government's arguments that (1) "there was no 'claim' against the Plaintiffs" and (2) "even if the . . . regulatory actions against the Plaintiffs constitute[d] a claim, it was not a claim for personal injury or property damage as required by the statute."  Id. at 389.  The government first argued that "a third party must make a judicially enforceable demand or its equivalent against the party seeking the protection of Section 330(a)(1)."  Id. at 390.  The court characterized defendant's argument as "reintroduc[ing] the concept of tort liability into Section 330," contrary to the statements of Senator McCain and the Defense Department in the Congressional Record.  Id.  The court also found defendant's argument to be "at odds with the general theme of environmental remediation statutes."  Id.  Accordingly, the court rejected the notion that section 330 required a third-party claim.  Id. at 391.  The court then alternatively held that even if section 330 required a third-party claim, the "CDPHE's involvement" could constitute such a claim, rejecting defendant's argument that a "Compliance Advisory does not rise to the level of demand necessary to invoke the [Air Force]'s duty to defend against the State's enforcement actions, or to indemnify the Plaintiffs, thereafter."  Id.; see also id. at 393 (finding that "under Colorado's regulatory scheme[,] the Plaintiffs' response to the CDPHE Compliance Advisory was required" and that "the CDPHE's exertion of regulatory authority [could not] be construed as a mere 'invitation to voluntary action'" (citation omitted)).

The government next argued that even if the Compliance Advisories constituted claims, plaintiffs sought only reimbursement for cleanup costs, and did not allege property damage.  Id. at 394.  The court found "no indication that Congress intended to limit the type of property damage" in section 330, noting that "the language 'loss of or damage to property or economic loss' encompasse[d] a variety of possible damage theories" and that because recovery under section 330 must be based on the release or threatened release of a hazardous substance, it directly contemplated the costs of environmental remediation.  Id.  The court cited the ASBCA's decision in New London Development Corp. in support of its conclusion concerning the definition of property damage.  Id.

The court in <u>Richmond American Homes</u> then turned to the issue of contributory responsibility, analyzing whether plaintiffs were responsible for any asbestos contamination, so as to reduce their recovery pursuant to sections 330(a)(1) and 330(a)(3).  <u>Id.</u> at 396-99.  The court dismissed the government's assertion that factual disputes existed concerning plaintiffs' responsibility for contamination, and found no genuine issue of material fact that plaintiffs bore no responsibility for the release or threatened release of asbestos containing material from the soil.  <u>Id.</u>  Based on its entire analysis of section 330, the court denied defendant's motions and granted plaintiffs' motion with respect to their section 330 claim.  <u>Id.</u> at 399.

**2.  The Plain Language of Section 330 Does Not Provide Plaintiff With a Cause of Action and, Thus, Plaintiff's Fifth and Sixth Claims for Relief Fail to State a Claim Upon Which Relief Can Be Granted**

The cardinal rule in interpreting a statute is that "courts must presume that a legislature says in a statute what it means and means in a statute what is says there."  <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992).  A court begins its inquiry by examining the text of the statute.  <u>Lamie v. United States Trustee</u>, 540 U.S. 526, 534 (2004).[22]  "Unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute.  <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979).  When the statutory language is clear, a court's inquiry is complete.  <u>Conn. Nat'l Bank</u>, 503 U.S. at 254.  However, if the statutory text is ambiguous, a court "must look to other means of statutory construction."  <u>Garcia v. Dep't of Homeland Sec.</u>, 437 F.3d 1322, 1338 (Fed. Cir. 2006).  In other words, a court must ascertain the legislative intent by examining the context and legislative history of the statute.  <u>Star-Glo Assocs., LP v. United States</u>, 414 F.3d 1349, 1356 (Fed. Cir. 2005).  But, a court must be cautious when considering legislative history, as it is may be an unreliable indicator of legislative intent.  <u>See Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 568 (2005) (explaining the vulnerabilities of legislative history).  Accordingly, based upon the binding case law of the Supreme Court and the Federal Circuit, the court begins its analysis by examining the text of section 330.

Section 330 enumerates several requirements that must be satisfied before a party can obtain indemnification.  A plain reading of the statute indicates that a party must prove, among other things, the following: (1) that it is a person or entity as defined by section 330(a)(2); (2) that it encountered a "suit, claim, demand or action, liability, judgment, cost or other fee"; (3) that the "suit, claim, demand or action, liability, judgment, cost or other fee" arose from a "claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss)"; (4) that the "claim for personal injury or property damage" resulted from or

_____

[22]  In its Renewed Opposition, plaintiff contends that the Supreme Court in <u>Lamie</u> stated: "Statutory construction begins with the text, which should be read as a whole and given its plain and ordinary meaning, proved the result is not absurd, in light of evidence legislative purposes."  Renewed Opp'n 11.  Plaintiff misattributes the quotation, which actually comes from a brief filed by defendant in <u>Richmond American Homes</u>.  75 Fed. Cl. at 387.

was predicated upon "the release or threatened release of any hazardous substance or pollutant or contaminant"; and (5) that "the release or threatened release of any hazardous substance or pollutant or contaminant" was a result of "Department of Defense activities at any military installation (or portion thereof)" that was "closed pursuant to a base closure law."

The court begins its analysis by considering the third required element of a section 330 indemnification claim noted above, which is key in determining whether section 330 provides plaintiff with a cause of action. Defendant argues that plaintiff's remediation costs did not arise from "any claim for personal injury or property damage." Renewed Mot. 24-28. Relying upon the plain language of section 330(a), defendant asserts that the "arising out of any claim for personal injury or property damage" language "limits the general categories of recoverable costs set forth in the statute" by excluding recovery for a "suit, claim, demand or action, liability, judgment, cost or other fee" that does not arise from a "claim for personal injury or property damage." Id. at 25 (emphasis omitted). Defendant also relies on the plain language of section 330(c), contending that the only way that the Secretary of Defense could "settle or defend" a "claim for personal injury or property damage" on behalf of the entity seeking indemnification is with the existence of a third-party claim. Id. at 26. Finally, defendant relies upon the plain language of section 330(d), asserting that the use of the term "plaintiff" demonstrates the need for a claim from a third party. Id. Altogether, defendant concludes that a "claim for personal injury or property damage" must have been brought against the Authority or the City of Alameda for plaintiff to be able to state a claim under section 330, and that the "claim for personal injury or property damage" must have been a "legal or administrative proceeding . . . ." Id.

Plaintiff responds that section 330 does not restrict a "claim" to a legal or administrative action brought against the Authority and can instead include the indemnification claim it made, along with the Authority and the City of Alameda, to the Navy. Renewed Opp'n 8-9. In addition, plaintiff discounts defendant's reliance upon the "settle or defend" and "plaintiff" language, construing the term "plaintiff" to refer to an indemnitee, i.e., it or the City of Alameda. Id. at 9. Plaintiff further contends that even if section 330 required a claim against the Authority, the definition of "claim," which is not provided in section 330, should be construed broadly to include "[t]he DTSC directive" evidenced by the DTSC's May 3, 2002 letter. Id. at 13-14.

The court first examines the meaning of the phrase "arising out of any claim," as used in section 330. The phrase must mean something different from the phrase "suit, claim, demand or action, liability, judgment, cost or other fee," or else it would be mere surplusage, a result that the rules of statutory construction seek to avoid. Duncan v. Walker, 533 U.S. 167, 174 (2001). The plain language of section 330(a)(1), which provides that the government shall indemnify an entity for "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage," clearly demonstrates that the "claim for personal injury or property damage" is separate and distinct from the request for indemnification. A third-party claim is necessary to obtain indemnification under section 330. Because the statute is clear, the court's inquiry on this issue is complete. Conn. Nat'l Bank, 503 U.S. at 254. Thus, the indemnification claim made by plaintiff, the Authority, and the City of Alameda to the Navy

cannot be a "claim for personal injury or property damage" because none of those entities is a third party.  Indeed, to hold otherwise would render the "settle or defend" language of section 330(c) nonsensical, as it would require the Secretary of Defense to "settle or defend" the indemnification claim made by plaintiff, the Authority, and the City of Alameda "on behalf of" plaintiff, the Authority, and the City of Alameda.  The court's conclusions that section 330 requires a third-party "claim for personal injury or property damage" and that the indemnification claim is not a third-party claim do not end its analysis, however.  The court must also determine whether the DTSC's May 3, 2002 letter describes a third-party claim.

To make this determination, the court must construe the term "claim."  Section 330 does not provide a definition, so the court must look to its "ordinary, contemporary, [and] common meaning."  Perrin, 444 U.S. at 42.  The dictionary definition of "claim" is:

> n. 1. A demand for something as rightful or due.  2. A basis for demanding something: a title or right.  3. Something claimed in a formal or legal manner, esp. a tract of public land staked out by a miner or homesteader.  4a. A demand for payment in accordance with an insurance policy or other formal arrangement.  b. The sum of money demanded.  5. A statement of something as a fact; an assertion of truth.

The American Heritage College Dictionary 264 (4th ed. 2004).  Defendant contends that the "plain and ordinary meaning" of "claim" does not apply to the DTSC's May 3, 2002 directive because "[t]he DTSC did not demand that the [Authority] pay, transfer, or convey anything to the DTSC, or allege that anything was 'due' to the DTSC."  Def.'s Reply Support Renewed Mot. Dismiss 14.  Defendant also seeks to limit the common and ordinary definition of "claim" by analyzing "arising out of any claim" within the context of section 330 in its entirety.  As noted above, defendant asserts that section 330(c)(1)'s grant of permission to the Secretary of Defense to "settle or defend . . . the claim for personal injury or property damage" and section 330(d)'s usage of the term "plaintiff" in concert with "personal injury or property damage" would be meaningless if "arising out of any claim" did not refer to a legal or administrative action. Renewed Mot. 26.  Plaintiff does not attempt to apply the plain and ordinary meaning of "claim," and instead contends that "[g]iven the absence of a statutory definition and the fact that both case law and legislative history support [its] position, Defendant's inability to articulate exactly what constitutes a 'claim' precludes it from reasonably opining that DTSC's letter is not one." Renewed Opp'n 13-14 (referring to the Richmond American Homes decision and the statement of Senator McCain quoted in the Richmond American Homes decision).  Plaintiff concludes that the May 3, 2002 letter "constitutes a claim under Section 330" because it "imposed a clear legal obligation, not a mere invitation to voluntary action."  Id. at 13.

The canons of statutory construction require the court to give "claim" its common and ordinary meaning.  Although it is possible to broadly define "claim," see The American Heritage College Dictionary, supra, at 264, section 330 constrains the definition in at lease two respects. First, the "claim" must be for "personal injury or property damage."  Claims for personal injury

and property damage commonly and ordinarily entail legal demands for money damages. Thus, to fit the DTSC's May 3, 2002 letter within the plain text of section 330, the court would be required to construe it as indicating that the DTSC was seeking money damages for "personal injury or property damage" it sustained–an awkward construction at best. The purported damages in this case were not sustained by the DTSC but by the Authority and the City of Alameda.[23]

In addition, section 330(d) provides that the accrual date for the indemnification claim "is the date on which the plaintiff knew (or reasonably should have known) that the personal injury or property damage . . . was caused by the release or threatened release of a hazardous substance . . . ." Reference to the person or entity with the "claim for personal injury or property damage" as a "plaintiff" is a clear indication that section 330 requires a third-party legal action.[24] The court's analysis gives the term "claim" its common and ordinary meaning without rendering "personal injury or property damage" or "plaintiff" as mere surplusage. Thus, there is no need to look beyond the text of section 330, such as to nonbinding precedent or statements from the Congressional Record.[25] Accordingly, the court concludes that section 330 clearly requires a third-party legal action against the Authority or the City of Alameda in order for plaintiff to successfully recover indemnification pursuant to its terms.

---

[23] Plaintiff correctly notes that the court must accept all of plaintiff's factual allegations as true. Renewed Opp'n 13. Plaintiff argues that a holding that the DTSC's May 3, 2002 letter is not a "claim" under section 330 "entirely depends on the Court making factual findings about exactly what the DTSC investigated, concluded, and ordered." Id. at 14. The court disagrees. In reaching its legal conclusion that the May 3, 2002 letter does not constitute a "claim for personal injury or property damage," the court accepted all facts alleged by plaintiff to be true.

[24] "The term "plaintiff" must refer to the person or entity with the "claim for personal injury or property damage," as the indemnitee is referred to as "the person or entity making a claim for indemnification." National Defense Authorization Act for Fiscal Year 1993 § 330(b).

[25] The court notes that the neither the statutory language commented upon by Senator McCain nor the amendment for which he spoke in support contained either the phrase "claim for personal injury or property damage" or the term "plaintiff." See 138 Cong. Rec. at S13982-01, S14009; S.311, 102d Cong. (1992). The court disagrees with the statement by the court in Richmond American Homes that the difference between the bill commented on by Senator McCain and the enacted statute is merely a "technical" distinction. See 75 Fed. Cl. at 391. Furthermore, unlike the court in Richmond American Homes, id. at 388, the court declines to rely upon the letter from the Defense Department purporting to interpret section 330, more than three months after section 330's enactment, as indicative of legislative intent. The letter is nothing more than an after-the-fact expression of the executive branch's interpretation of the statute.

Because plaintiff has not identified a third-party claim on which to base its section 330 indemnification claim, the court must dismiss plaintiff's fifth and sixth claims for relief. However, the court is compelled to address certain other arguments made by defendant.

First, defendant argues that the plaintiff cannot bring a claim under section 330 because the Authority did not "acquire[] ownership or control of any facility at a military installation." Renewed Mot. 23-24. Section 330(a)(2) permits the indemnification of "[a]ny political subdivision of a State" that "acquires ownership or control of any facility at a military installation" that was "closed pursuant to a base closure law." Section 330(f)(1) incorporates CERCLA's definition of "facility," which is:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. §9601(9). Defendant construes the last clause of CERCLA's definition of "facility" to exclude from the definition all locations where consumer products are used for their intended purpose. Renewed Mot. 24 (citing Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059 (5th Cir. 1990)).

Courts have recognized the ambiguity present in the last clause of CERCLA's definition of "facility." See Uniroyal Chem. Co. v. Deltech Corp., 160 F.3d 238, 253 (5th Cir. 1998) (noting that a federal appellate court and a "handful" of federal district courts have addressed the issue). One court, the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit"), described the inherent ambiguity in the following manner: "If it is read literally, the only consumer product exempted by the statute is the consumer product that is a facility. The alternative is to read the exemption as referring to facilities that contain consumer products." Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 750 (7th Cir. 1993). The description of the ambiguity by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") was more detailed:

> If the phrase is read as modifying the overall definition of facility, then the exception is limited to facilities (as defined in subparts (A) and (B)) which are themselves consumer products in consumer use. If, on the other hand, the phrase is read as modifying just the preceding subpart language, then the exception is limited to facilities (as defined in subparts (A) and (B)) which contain consumer products in consumer use. Notice that under this second interpretation the word "include," which is in the phrase "but does not include any consumer product in consumer use or any vessel," directly modifies the objects listed in subparts (A) and (B), and therefore takes on a meaning that denotes storage or containment.

<u>Uniroyal Chem. Co.</u>, 160 F.3d at 253.  Both circuit courts concluded that the first, literal construction was correct.[26]  The Seventh Circuit held that the nonliteral construction:

> does excessive violence to the statutory language.  The exception is for facilities that are consumer products in consumer use, not for consumer products contained in facilities.  Although read as it is written the exception is narrow, it is not meaningless, for the statute defines "facility" so broadly that it could be thought to include a can of lye.  . . .  A literal interpretation that furthers the statute's purpose is hard to beat.

<u>Amcast Indus. Corp.</u>, 2 F.3d at 750.  The Fifth Circuit agreed with the Seventh Circuit's holding, and further noted:

> Syntactically, the phrase "consumer product in consumer use" cannot reasonably be interpreted under the alternative, non-literal approach.  This is so because the phrase does not merely exclude "any consumer product in consumer use."  It excludes "any consumer product in consumer use and any vessel."   Under the alternative interpretation, § 9601(9) would thus have to be read as establishing an exclusion for buildings, equipment, pipelines, aircraft (subpart (A)), or waste disposal sites (subpart (B)), that contain a "vessel."  Given the definition of vessel, that is an impossible construction.

<u>Uniroyal Chem. Co.</u>, 160 F.3d at 254.  The court finds the holdings and shared rationale of the Fifth and Seventh Circuits to be persuasive.  Defendant's construction of 42 U.S.C. § 9601(9) is contrary to the plain text of the statute and must be rejected.  The "facility" in this case is the East Housing Area, regardless of whether chlordane was used for its intended purpose on the property.

Defendant also argues that, reading section 330 in conjunction with CERCLA, the term "property damage" does not encompass the remediation undertaken by the Authority and the City of Alameda.  Renewed Mot. 28-31.  Defendant's reliance on CERCLA is misplaced.  Section 330(f) only incorporates CERCLA's definitions of "facility," "hazardous substance," "release," and "pollutant or contaminant."  Further, as defendant notes, the term "property damage" is not defined in CERCLA.  <u>Id.</u> at 28.  Instead of turning to CERCLA, defendant should have relied

---

[26]  In reaching its conclusion, the Fifth Circuit explicitly limited <u>Dayton Independent School District</u> to the facts of that case.  <u>Uniroyal Chem. Co.</u>, 160 F.3d at 252.  The court noted that in that case, its holding that CERCLA did not afford a remedy for the removal of asbestos was "based squarely on the conclusion that the commercial use of asbestos could not possibly be viewed as a disposal of a hazardous substance" and that its "subsequently expressed concerns about the facility requirement, and the consumer product exception, added confidence" to its holding, but was "by no means necessary to it."  <u>Id.</u> at 251-52.

upon the text of section 330 itself, which defines "property damage" as "including . . . loss of or damage to property or economic loss . . . ."

Finally, defendant challenges the existence of a "release or threatened release of any hazardous substance or pollutant or contaminant," once again arguing that "there was no release or threatened release of the chlordane termiticide, which was properly applied by the Navy; served its intended purpose as a consumer product while in the soil; and was allegedly safely removed by the City." Id. at 31. As the court has already noted in its discussion of plaintiff's breach of contract claims, plaintiff has alleged facts sufficient to allow it to attempt to prove otherwise.

## IV. CONCLUSION

For the above-stated reasons, the court **GRANTS IN PART** defendant's motion to dismiss and **DISMISSES** plaintiff's fifth, sixth, and eighth claims for relief for failure to state a claim upon which relief can be granted. The court **DENIES IN PART** defendant's motion to dismiss with respect to plaintiff's first, second, third, fourth, and seventh claims for relief. Pursuant to the RCFC, defendant is directed to file an answer and the parties shall then, again pursuant to the RCFC, file a Joint Preliminary Status Report.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge